GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
WILLIAM M. NOALL, ESQ.
Nevada Bar No. 3549
E-mail: wnoall@gordonsilver.com
THOMAS H. FELL, ESQ.
Nevada Bar No. 3717
E-mail: tfell@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
[Proposed] Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>AHERN RENTALS, INC.<br><br>      Debtor. | Case No.: 11-53860-BTB<br>Chapter 11<br><br><br>Date:  December 23, 2011<br>Time:  9:30 a.m.<br>Place:  Clifton Young Federal Bldg.<br>       300 S. Booth Street<br>       Reno, NV 89509<br>       Court Room: 2 |

## OMNIBUS DECLARATION OF HOWARD L. BROWN IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS

I, Howard L. Brown, hereby declare as follows:

1. I am over the age of 18 and am mentally competent. I make this declaration (the "Declaration") in support of the motions and applications requesting various types of immediate relief (collectively, the "First Day Motions") filed by Ahern Rentals, Inc. ("Debtor" or "Borrower") in the above-captioned case (the "Chapter 11 Case").

2. I am the Chief Financial Officer ("CFO") of Debtor and have served in that capacity since 1997. In my capacity as CFO, I am familiar with the Debtor's daily business, operational, and financial affairs.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

review of relevant documents, and information supplied to me by other members of the Debtor's management and the Debtor's various business and legal advisors.  If called upon to testify as to the content of this Declaration, I could and would do so.

4.   This Declaration is filed on the same date (the "Petition Date") that the Debtor has filed a voluntary petition for relief under Chapter 11, Title 11 of the U.S. Code (the "Bankruptcy Code").  Debtor has filed its various First Day Motions[1] (as defined herein) to allow them to operate effectively in their respective Chapter 11 Cases.  The relief sought in the First Day Motions is critical to the Debtor's business operations, will allow for a comprehensive and smooth transition into Chapter 11, and will ensure that the Debtor is provided the opportunity to reorganize successfully.

5.   This Declaration provides the Court with background information regarding the Debtor as well as the context for the initial relief sought by the Debtor.  Accordingly, the Declaration is organized into three parts: (a) an overview of Debtor, its business, its organizational structure, its capital structure, and the events leadings up to the Chapter 11 Cases; (b) an explanation of the relief sought in the First Day Motions, which relief I believe is critical to the Debtor's reorganization; and (c) an explanation of the relief sought in certain other motions Debtor intends to file in the ordinary course of the Chapter 11 Case.

**I.
BACKGROUND**

**A.    Debtor's Business**

    **1.     Corporate Structure**

6.   Debtor is a Nevada corporation organized on December 23, 1997 through the merger of Ahern Renters Center, Inc., a Nevada corporation, and Ahern Rentals SW, Inc., a Nevada corporation.

7.   Debtor's shares are held 97% by Don F. Ahern as Trustee of the DFA Separate Property Trust and 3% by John Paul Ahern, Jr.

---

[1] All capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the relevant Motions, all of which are being filed contemporaneously herewith.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

## 2.   Operations and Past Performance

8.   Debtor operates an equipment rental company that additionally sells new and used rental equipment, parts and supplies related to its rental equipment, and merchandise used by the construction industry.  Further, Debtor provides maintenance and repair services.

9.   As of November 30, 2011, Debtor's rental fleet contains 37,320 total rental items, including 20,042 high reach units, including fork lifts, boom lifts, and scissor lifts.  Debtor's rental fleet also contains 17,278 general rental units, including backhoes, skid steers, skiploaders, trenchers, compressors, generators, light towers, welders, lawn and garden equipment, and hand tools.

10. Debtor's business operates through 74 branches located in 22 states.

11. Debtor's level of equipment rental revenue is sensitive to overall macro-economic conditions, particularly the level of activity within the non-residential construction industry, as well as to factors specific to Debtor, such as the size and condition of the Debtor's equipment rental fleet, the utilization level of this rental fleet, the level of rental rates, the length of time the equipment is on rent, and general weather conditions within the Debtor's geographic markets.

12. For financial reporting purposes, Debtor's revenues are divided into three categories: (a) equipment rentals and related, including revenues from renting equipment and related revenues such as fees charged for equipment delivery, damage waivers, repair of rental equipment, and fuel; (b) sales of rental equipment; and (c) sales of new equipment and other.

13. In order to measure the health of its business, the Debtor reports and monitors its level of EBITDA (Earnings Before Interest Expense, Income Taxes, Depreciation and Amortization) generation as an important financial metric.  Adjusted EBITDA represents an adjustment to the company's EBITDA for items considered extraordinary and non-recurring. EBITDA is a commonly used financial metric utilized by companies within the equipment rental industry.  In the 2005 through 2008 timeframe, Debtor's Adjusted EBITDA increased from $80.2 million to $150.1 million as the Debtor benefited from strong growth of non-residential construction activity, particularly in the Las Vegas market.  Subsequent to 2008, the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

Debtor's financial performance was adversely impacted by the severe economic recession, and resulting significant reduction in non-residential construction spending, as more fully described later in this document in "Events Leading to the Chapter 11 Case." Debtor's Adjusted EBITDA declined from $150.1 million in 2008 to $67.7 million in 2009 and to $53.0 million in 2010. The trough of the Debtor's financial performance was realized midway through 2010 when the Debtor's LTM ("Last Twelve Months") Adjusted EBITDA through the quarter ended June 30, 2010 bottomed at $46.7 million.

14. In response to the economic downturn, the Debtor proactively implemented numerous strategic initiatives to address the changed business environment. These initiatives included: (i) significant geographic redeployment of its rental fleet from Las Vegas to other markets, (ii) the opening of 24 branches in 2009 and 2010 in new markets, (iii) cost reductions, (iv) reduced capital expenditures and (v) a focus on customers in segments other than non-residential construction. These initiatives, which are also described in detail later in this document, have been highly successful as demonstrated by a strong recovery in financial performance by the Debtor in the past 18 months. Since its LTM Adjusted EBITDA bottomed at $46.7 million in June of 2010, the Debtor's Adjusted EBITDA has increased 63.8% to $76.5 million for the LTM period ending November 30, 2011 (based on a preliminary close of the Debtor's November 2011 financial statements).

15. The chart below details the cycle of Debtor's revenue, Adjusted EBITDA and other key data for the fiscal years 2005 through 2010, and the LTM period ending November 30, 2011.

**SUMMARY REVENUE, EBITDA AND OTHER OPERATING DATA**
**Twelve Months Ended November 30, 2011 and Fiscal Years 2005 to 2010**
**(In millions, rounded)**

| | LTM Nov-11 | Twelve Months Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 |
| **REVENUES** | | | | | | | |
| Equipment rentals and related | $ 295.8 | $ 246.8 | $ 250.1 | $ 329.5 | $ 293.4 | $ 236.9 | $ 179.9 |
| Sales of rental equipment | 13.3 | 24.2 | 11.8 | 19.7 | 24.9 | 16.6 | 11.4 |
| Sales of new equipment & other | | 21.7 | 22.3 | 32.3 | 21.8 | 12.4 | 12.4 |

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

20.7

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total Revenue | 329.8 | 292.7 | 284.2 | 381.4 | 340.1 | 265.8 | 203.6 |
| *Revenue Growth* | *12.6%[2]* | *3.0%* | *(25.5%)* | *12.1%* | *27.9%* | *30.6%* | - |
| **ADJUSTED EBITDA** | 76.5[3] | 53.0[4] | 67.7 | 150.1 | 144.7 | 116.5 | 80.2 |
| *EBITDA Growth* | *44.3%[5]* | *(21.7%)* | *(54.9%)* | *3.7%* | *24.2%* | *45.2%* | - |
| **ADDITIONAL INFORMATION** | | | | | | | |
| Fleet Capital Expenditures (Net) | $ (4.2) | $ (5.1) | $ 15.9 | $ 111.4 | $ 191.6 | $ 178.6 | $ 116.2 |
| Average High Reach Time Utilization | 65.1% | 57.3% | 55.0% | 67.0% | 69.7% | 72.5% | 72.9% |
| Dollar Utilization | 37.2% | 31.0% | 30.3% | 41.5% | 45.9% | 50.0% | 50.8% |

16. The Debtor also uses both "Time Utilization" and "Dollar Utilization" to measure the health of its rental business. Time Utilization measures the number of total high-reach units on rent for the Debtor's primary equipment category, compared to the total number of high-reach units available for rent. Dollar Utilization measures, for the entire rental fleet, the interaction of changes in rental rates, product mix, average length of rental, and time utilization. Dollar Utilization is the annualized ratio of equipment rentals and related revenues on Debtor's entire fleet of rental equipment for a period of time compared to the average original cost of Debtor's rental fleet during the same period. Debtor's Time Utilization and Dollar Utilization metrics follow a similar pattern as its revenue and EBITDA, illustrating strength in the 2005 and 2006 timeframe, declining significantly during the economic recession, and rebounding strongly over the past 18 months as the Debtor's business has recovered.

17. In 2011, Debtor has realized the benefits of both its proactive response to the economic recession and an ongoing cyclical recovery in the equipment rental industry as demonstrated by its significant increase in both Time and Dollar Utilization, and improved financial performance.

---

[2] LTM November 2011 growth over full-year 2010
[3] Adjusted for $0.7 million non-cash loss on aircraft sale in April 2011 and $0.9 million non-cash lease termination cost in June 2011
[4] Adjusted for $1.0 million litigation settlement payment in September 2010
[5] LTM November 2011 growth over full-year 2010

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

18. Debtor's operating results have traditionally been highly dependent on the strength of the economy of Las Vegas, Nevada, accounting for approximately 18.7% of revenues in 2010 and 25% of revenues in 2009, and the rapid growth of the Las Vegas population and accompanying economic growth contributed significantly to Debtor's growth in revenues over years prior.

**3.    Debtor's Prepetition Equity and Management Structure**

19. Don F. Ahern has been Debtor's President, Chief Executive Officer and a member of Debtor's board of directors since February 1994. Prior to that, since 1978, Mr. Ahern was the sole proprietor of Los Arcos Equipment, an equipment rental company. Mr. Ahern has over 30 years of experience in the equipment rental industry.  He receives an annual base salary of $824,000 without an employment contract.

20.   Evan B. Ahern has been Debtor's Executive Vice President since March 2004 and joined Debtor's board of directors in April 2004. He served as Chief Information Officer from 1998 to May 2007. Between 1993 and 1998, Mr. Ahern was responsible for managing and implementing Debtor's technology infrastructure. From 1990 through 1993, Mr. Ahern held various other positions with Debtor. Mr. Ahern has been and continues to be involved in nearly every aspect of Debtor's operations. He spends much of his current time in business development activities, branch level process reengineering and training, and technology integration into every aspect of Debtor's business to improve operational efficiencies and effectiveness.  He receives an annual base salary of $400,000 without an employment contract.

21. I have been Debtor's Chief Financial Officer since September 1997. I joined Debtor's board of directors in April 2004. I have over 35 years of finance experience. Prior to joining Debtor, from October 1995 through September 1997, I was Chief Financial Officer of the H&O Foods division of Rykoff-Sexton, Inc. (now known as U.S. Foodservice, Inc.), the largest food service distributor in Las Vegas, Nevada. From September 1992 through October 1995, I was Chief Financial Officer of H&O Foods, Inc.  I receive an annual base salary of $180,000 without an employment contract.

22. Mark J. Wattles joined Debtor's board of directors in April 2004. Mr. Wattles

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

founded Hollywood Entertainment Corporation ("Hollywood"), a chain of video rental and game stores, in June 1988, and until September 1998 he served as Hollywood's Chairman of the Board, President, and Chief Executive Officer. From August 1998 through June 2000, Mr. Wattles left his full-time position at Hollywood and served as Chief Executive Officer of Reel.com, then a wholly owned subsidiary of Hollywood. In August 2000, Mr. Wattles returned full time to Hollywood to assist with changes in its business strategy. He served as President of Hollywood from January 2001 until January 2004 and as Chief Executive Officer from January 2001 until February 2005. Since January 2005, Mr. Wattles has served as President of Wattles Capital Management, LLC, a capital management company that invests in public and private companies providing consumer products and services. In April 2005, Ultimate Acquisition Partners, L.P., an entity owned by Wattles Capital Management, LLC, purchased from Ultimate Electronics, Inc. the assets associated with 32 Ultimate Electronics and SoundTrack stores. Since that time, Mr. Wattles has served as Chairman of Ultimate Acquisition Partners, L.P., which does business as Ultimate Electronics, a retailer of home entertainment and consumer electronics products.

23. P. Enoch Stiff joined Debtor's board of directors in April 2004. Mr. Stiff has been the managing partner of the Executive Management Group, a consulting firm specializing in effective management practices for senior executive teams of midsize businesses, since November 2002. Additionally, since January 2004, Mr. Stiff has been a partner in the Value Management Group, a Chicago-based investment management company that focuses on manufacturing companies.  In February 2008, Mr. Stiff became President and Chief Executive Officer of American Sportworks, a company that manufactures various types of utility vehicles. From September 2000 to November 2002, Mr. Stiff provided independent business consulting services to executive management groups. From September 1996 to September 2000, Mr. Stiff was the President, Chief Executive Officer and a member of the board of directors of OmniQuip International, Inc., a North American manufacturer of telescopic material handlers, aerial work platforms and other material handling equipment. From August 1989 to September 1996, Mr. Stiff was the President and Chief Executive Officer

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

7

104500-001/1387234_15

1   of TRAK International, Inc. ("TRAK"), a wholly owned subsidiary of OmniQuip

2   International, Inc. He previously served as the Chief Operating Officer of TRAK from

3   November 1987 to August 1989.

4          24. Timothy N. Lotspeich has been Debtor's Senior Vice President of Risk

5   Management and Transportation since April 2005. From December 1995 until April 2005, he

6   served as Debtor's Senior Vice President and was responsible for Debtor's floating fleet,

7   transportation and risk management. Mr. Lotspeich has approximately 23 years of experience

8   in the equipment rental industry. From July 1986 through December 1995, Mr. Lotspeich

9   served as Debtor's California regional manager responsible for supervising operations and

10  sales of all of Debtor's California branches. From April 1983 through June 1986,

11  Mr. Lotspeich served as manager of Debtor's Bloomington, California branch and was

12  responsible for operations and sales of that branch. Prior to joining us, from 1972 through

13  June 1982, Mr. Lotspeich was a customer service representative for Grove Manufacturing, a

14  large manufacturer of high reach equipment.  He receives an annual base salary of $130,000

15  without an employment contract.

16         25. D. Kirk Hartle has been Debtor's Senior Vice President of Finance and Treasurer

17  since March 2009; previously, Mr. Hartle served as Vice President of Finance since

18  September 2007 and prior to that he served as Debtor's Director of Finance from the time he

19  was hired in February 2004. His responsibilities include oversight of all accounting and

20  financial reporting for Debtor. During his career, Mr. Hartle has held senior management

21  positions with KPMG LLP and Deloitte LLP. Prior to joining Ahern Rentals, Mr. Hartle was

22  chief financial officer for five years with a publicly held golf retail and sports entertainment

23  company.  Mr. Hartle also is a past-president of the University of Nevada, Las Vegas Alumni

24  Association and served on its Board of Directors for 13 years.  He receives an annual base

25  salary of $200,000 without an employment contract.

26  **B.    Debtor's Prepetition Capital Structure**

27         **1.    Credit Facility and Term Loan**

28         26. On August 18, 2005, Debtor as Borrower entered into an Amended and Restated

8

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

Loan and Security Agreement ("2005 Loan Agreement") among certain as lenders named therein (the "Initial Lenders"), Bank of America, N.A. ("Bank of America") as administrative agent, Wachovia Bank, National Association ("Wachovia") as collateral agent and as syndication Agent, and Bank of America Securities LLC and Wachovia Capital Markets, LLC as co-lead arrangers.  A true and correct copy of the 2005 Loan Agreement is attached hereto as **Exhibit "1."**  The 2005 Loan Agreement provided for a revolving credit facility (as thereafter amended, the "Revolving Credit Facility"), consisting of certain revolving loans and letters of credit with a "Maximum Revolver Amount" (as therein defined) of $175,000,000, which Revolving Loan incurred interest at the "Base Rate" (defined therein as the greater of Bank of America's prime rate or the Federal Funds Rate plus .5% per annum) plus the "Applicable Margin" (defined therein as initially 0.375% per annum with respect to "Base Rate Revolving Loans" (as defined therein), but varying between 0.125% to 0.625% per annum based upon a "Leverage Ratio" (as defined therein) and initially 2.2125% with respect to "LIBOR Rate Revolving Loans" (as therein defined)), but varying between 0.125% to 0.625% per annum based upon a Leverage Ratio)) for all Base Rate Revolving Loans and at the LIBOR Rate plus the Applicable Margin for all LIBOR Rate Revolving Loans.

27. On August 18, 2005, Debtor as Borrower entered into an Intercreditor Agreement (as amended, supplemented or otherwise modified, the "Intercreditor Agreement") among Wachovia, as First Lien Collateral Agent and Control Agent for the First Lien Collateral Agent and the Second Lien Collateral Agent (each as defined therein) and Wells Fargo Bank, N.A. ("Wells Fargo Bank") as Trustee under the Indenture and as Second Lien Collateral Agent (each as defined therein) providing the Revolving Credit Facility in connection with the 2005 Loan Agreement, which Intercreditor Agreement made the Revolving Credit Facility available to Debtor consisting of a $175,000,000 Revolving Credit Facility.  A true and correct copy of the Intercreditor Agreement is attached hereto as **Exhibit "2."**

28. On August 21, 2006, Debtor entered into an Amendment No. 1 to Amended and Restated Loan Security Agreement ("2006 Loan Amendment") with lenders as denoted therein, Bank of America as Administrative Agent and Wachovia as Collateral Agent.  A true

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

9

104500-001/1387234_15

and correct copy of the 2006 Loan Amendment is attached hereto at **Exhibit "3."**  Under the 2006 Loan Amendment, the Revolving Credit Facility's maximum was increased to $250,000,000, the maturity date on the Revolving Credit Facility was set at August 21, 2011, and the Applicable Margin was adjusted to .5% and 2.25% for Base Rate Revolving Loans and LIBOR Rate Revolving Loans at greater than 4.75:1.00 leverage ratio respectively, .250% and 2.0% for between 4.75:1.00 and 3.50:1.00 leverage ratio respectively, and 0.0% and 1.75% for leverage ratios less than 3.50:1.00 respectively.

29. On October 24, 2007, Debtor entered into an Amendment No. 3 and Consent to Amended and Restated Loan and Security Agreement ("2007 Loan Amendment") with lenders as denoted therein, Bank of America as Administrative Agent and Wachovia as Collateral Agent.  A true and correct copy of the 2007 Loan Amendment is attached hereto as **Exhibit "4."**  Under the 2007 Loan Amendment, the Revolving Credit Facility's maximum was increased to $300,000,000.

30. On December 23, 2009, Debtor entered into an Amendment No. 1 to Intercreditor Agreement ("2009 First Intercreditor Amendment") with Wachovia and Wells Fargo Bank, which 2009 First Intercreditor Amendment permitted credit facilities available to Debtor consisting of a maximum $396,000,000 revolving credit facility.  A true and correct copy of the 2009 First Intercreditor Amendment is attached hereto as **Exhibit "5."**

31. On January 8, 2010, Debtor, as "Borrower" (as defined therein), entered into a Second Amended and Restated Loan and Security Agreement (as amended, supplemented or otherwise modified, "First Lien Credit Agreement"; and, together with all security, pledge and guaranty agreements and all other documentation executed and/or delivered in connection with any of the foregoing, including without limitation, the Intercreditor Agreement, each as amended, supplemented, or otherwise modified, the "First Lien Documents") with Bank of America as administrative agent (in such capacity, the "First Lien Agent"), Wells Fargo Bank as collateral agent (in such capacity, the "First Lien Collateral Agent") and certain Revolving Lenders (as defined therein) and "last out" Term Lenders (as defined therein, and, collectively with the Revolving Lenders, the "First Lien Lenders")  The First Lien Credit Agreement made

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

10

104500-001/1387234_15

credit facilities available to Debtor consisting of a $350,000,000 Revolving Credit Facility and a $95,000,000 term loan (as thereafter amended, the "<u>Term Loan</u>" and, together with the Revolving Credit Facility, as amended, restated, supplemented, or otherwise modified, the "<u>First Lien Credit Facility</u>").   Pursuant to the First Lien Documents, the "<u>Revolving Obligations</u>" under, and as defined in, the First Lien Credit Agreement are payable prior to the Term Loan Obligations under, and as defined in, the First Lien Credit Agreement.  A true and correct copy of the First Lien Credit Agreement is attached hereto as **Exhibit "6."**

32. The First Lien Credit Agreement provides that the Revolving Credit Facility shall be limited to:

> (a) an amount equal to the lesser of (i) the Maximum Revolver Amount or (ii) the sum of, without duplication, (1) up to eighty-five percent (85%) of the Net Amount of Eligible Accounts, plus (2) up to the lesser of (A) ninety-five percent (95%) of the Net Book Value of Eligible Rental and Sale Equipment and (B) eighty-five percent (85%) of the Net Orderly Liquidation Value of Eligible Rental and Sale Equipment, plus (3) up to the lesser of (A) ninety-five percent (95%) of the Net Book Value of Eligible Transportation Equipment and (B) eighty-five percent (85%) of the Net Orderly Liquidation Value of Eligible Transportation Equipment, plus (4) up to the lesser of (A) sixty percent (60%) of the value (at the lower of cost, on an average cost basis, or market) of Eligible Spare Parts Inventory and (B) eighty-five percent (85%) of the Net Orderly Liquidation Value of Eligible Spare Parts Inventory, minus (5) if the sum of the Aggregate Revolver Outstandings and the aggregate unpaid principal balance of the Term Loans exceeds or will exceed the difference of $435,000,000 minus the Supplemental Blocked Availability Amount as in effect from time to time, the amount of such excess, minus (6) the aggregate amount, if any, by which the Revolving Credit Commitments and the Maximum Revolver Amount have been permanently reduced in accordance with Section 4.3(f) or the Term Loans have been paid in accordance with Section 4.3(f), minus (b) such Reserves as are established from time to time by either or both of the Agents in its or their reasonable credit judgment (including in any event the Reserve established pursuant to the last sentence of the definition of Reserves) minus (c) the sum of the Blocked Availability Amount and the Supplemental Blocked Availability Amount.

This provision generally serves to provide for a functional limitation on the Revolving Credit

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

11

104500-001/1387234_15

Facility as the lesser of $310,000,000 or the borrowing base.

33. The Revolving Credit Facility and the Term Loan are both secured by a first lien on substantially all of Debtor's assets and property (as defined in the Frist Lien Credit Agreement, the "<u>Collateral</u>").

34. Interest rates applicable to the Revolving Credit Facility are a fluctuating per annum rate equal to the lesser of (A) a rate selected by Debtor of either (i) the Base Rate, plus the Applicable Margin (250 to 300 basis points), or (ii) the LIBOR Rate, plus the Applicable Margin (350 to 400 basis poi nts) or (B) the Maximum Rate (maximum allowed under law). As of September 30, 2011, the Revolving Credit Facility had a weighted average interest rate of 6.25% per annum.

35. Interest rates applicable to the Term Loans and other Term Loan Obligations (as defined in the First Lien Credit Agreement) are a per annum rate equal to the lesser of (A) 16% per annum or (B) the Maximum Rate (the maximum allowed under law).

36. Pursuant to the First Lien Credit Agreement, the original maturity date for the Revolving Credit Facility was August 21, 2011 (the "<u>Revolving Maturity Date</u>"), at which time all outstanding principal and interest amounts became due, subject to Debtor's attempts to obtain an extension on this date from creditors.

37. Pursuant to the First Lien Credit Agreement, the maturity date for the Term Loan is December 15, 2012.

**2.      <u>Second Priority Notes</u>**

38. Under the Indenture, dated as of August 18, 2005 (as amended, supplemented or otherwise modified, the "<u>Second Lien Indenture</u>"; the notes issued thereunder; and together with the Second Lien Indenture and all security, pledge and guaranty agreements and all other documentation executed and/or delivered in connection with the foregoing, including without limitation, the Intercreditor Agreement, each as amended, supplemented or otherwise modified, the "<u>Second Lien Documents</u>" and the indebtedness owed to the Second Lien Lenders pursuant to the Second Lien Documents ,plus accrued and unpaid interest thereon and fees and expenses as provided in the Second Lien Documents, collectively, the "<u>Second Lien Obligations</u>" )

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

among Debtor, as Borrower, and Wells Fargo Bank, as collateral agent and trustee  (in such capacity, the "Second Lien Agent") and the lenders (collectively, the "Second Lien Lenders"). Under the Second Lien Indenture, second priority senior secured notes (the "Second Priority Senior Secured Notes") are due August 15, 2013, bearing interest at 9.25% payable semi-annually on February 15 and August 15.  A true and correct copy of the Second Lien Indenture is attached hereto as **Exhibit "7."** Pursuant to the Second Lien Indenture, the Second Priority Senior Secured Notes were sold in two tranches for an aggregate purchase price of $200,000,000 in the first tranche and $90,000,000 in the second tranche.  The Second Priority Senior Secured Notes are secured on a second-priority basis by liens on all of Debtor's assets that secure Debtor's obligations under the Revolving Credit Facility.

39. On December 23, 2009, Debtor and Wells Fargo Bank entered into that certain First Supplemental Indenture.  A true and correct copy of the First Supplemental Indenture is attached hereto as **Exhibit "8."** Through the First Supplemental Indenture, the holders of 87% of the aggregate principal amount of notes outstanding approved an increase of the minimum Priority Lien Cap (as defined therein) from $175,000,000 to $396,000,000.

40. As of September 30, 2011, outstanding liabilities from Second Priority Senior Notes payable totaled $236,666,667 in actual principal outstanding..  As of December 31, 2009, the outstanding principal of the Second Priority Senior Secured Notes amounted to $290,000,000, after which $53,300,000 in Second Priority Senior Secured Notes were exchanged at 75% of par value for $40,000,000 in the Term Loan in January 2010.

**C.    Events Leading to the Chapter 11 Case**

**1.    Economic Pressures and Debtor's Responses**

41. Through Debtor's primary business of equipment rental, Debtor undertakes the risk of capital investment to expand its rental fleet in exchange for the potential rental revenue streams generated from customers including construction and industrial companies, municipalities, manufacturers, utilities, and homeowners for whom the purchase of equipment is economically unwarranted or who prefer to rent equipment as an alternative to buying the equipment.  To generate rental revenue streams in excess of the capital invested into the

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

13

104500-001/1387234_15

continually depreciating equipment so as to turn a profit, Debtor is consequently dependent upon its customers' continuing demand for the rental of such equipment over the lifetime of that equipment.  As such, Debtor's business is highly dependent on the level of equipment utilization, at acceptable rates, in order to generate ongoing rental revenue and operating profitability.  In addition, Debtor attempts to balance capital expenditures in new equipment to meet increases in demand for new rental opportunities with the risk of reduced demand for such equipment before the value of that equipment has been recouped through rental revenue.

42. Because of its dependence on rental revenue from the non-residential construction industry, Debtor was adversely impacted by the severity and depth of the downturn in construction activity during the recent economic recession.  Specifically, Debtor was impacted by a dramatic reduction in both new construction projects as well as the often-abrupt cancellation of projects for which construction had already begun, which caused the return to the Debtor of a significant amount of equipment on rent, causing a significant decline in equipment utilization compounded by pressure on rental rates, leading to reduced revenues and levels of operating performance.  Debtor's revenues were necessarily harmed in the wake of economic concerns both nationally and to a greater extent in the Las Vegas market as Debtor's ability to successfully rent its equipment inventory purchased during periods of growth in the construction industry was adversely impacted during the recession.

43. To adapt to the construction downturn, Debtor has proactively employed a number of strategies since 2009 to both retain and develop new rental streams.  Among these strategies, Debtor redeployed unutilized rental units to existing branch locations with higher demand and also opened branches in new geographies with high growth potential.  Debtor opened 17 new rental branches in 2009, and opened 7 new rental branches in 2010.  Such branch openings required limited capital expenditure because Debtor was able to redeploy its existing rental units to these new locations from existing branch locations, and not purchase new equipment. This strategy was used in part to relocate rental equipment following the completion of the City Center project in Las Vegas, which was completed in late 2009 and resulted in a surplus of rental units in Las Vegas.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

44. By redeploying existing rental fleet and opening new branches in 2009 and 2010, Debtor was able to actively reduce capital expenditures directed for purchases of new rental equipment. Additionally, Debtor was able to limit new capital expenditures by selling excess rental fleet as market conditions warranted. In 2007 and 2008, Debtor invested $191.6 million and $178.6 million, respectively, in net purchases of rental equipment, which investments were reduced to $15.9 million in 2009 and negative $5.1 million in 2010. This significant reduction in capital expenditures, coupled with the redeployment of Debtor's existing rental fleet inventory to stronger existing and new markets, has subsequently resulted in a significant increase in Debtor's fleet utilization, improvements in rental rates, and improvements in operating performance since the Debtor's business cycle bottomed in the second quarter of 2010. This is demonstrated by increases in revenues as well as by a significant improvement in the Debtor's level of Adjusted EBITDA throughout 2011, as described earlier in this document.

45. Debtor's equipment rental fleet has a large concentration of aerial equipment, which has both longer useful lives and superior value retention characteristics than general rental equipment. As a consequence of the reduced capital expenditures, however, the average age of the rental fleet has increased and will likely continue to increase, which has led and will continue to lead to increased repair, maintenance, and equipment replacement costs. Debtor believes, however, that the quality of its rental fleet continues to be high and within a similar range by age as the rental fleets of its industry competitors.

46. Additionally, in response to the economic downturn, Debtor has undertaken cost containment through reductions in personnel and employee benefits, renegotiation of vendor pricing structures, reduced commissions and bonuses for senior management, and increased scrutiny of all operational and administrative processes to reduce expenses.

47. To maintain and increase equipment utilization, Debtor has also expanded its customer base into infrastructure-related industries, alternative energy, and other end-user markets to participate in rental demand distinct from the non-residential construction sector.

**2.      Financial Performance**

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

15

104500-001/1387234_15

48. As a result of the significant actions taken by Debtor to respond to the economic downturn, including the redeployment of rental equipment, the opening of multiple new rental locations, the reduction in capital expenditures for new equipment and the implementation of cost containment measures, the Debtor's financial performance has improved.  Revenues for the nine months ended September 30, 2011 have increased to $241.1 million from $213.0 million compared to the nine month period ended September 30, 2010.  Further evidence of the ongoing recovery in Debtor's business is the significant improvement in Debtor's Adjusted EBITDA.  From a trough Adjusted EBITDA of $46.7 million for the LTM period ended June 30, 2010, Debtor's Adjusted EBITDA for the LTM period ended September 30, 2011 has improved to $71.4 million, and has continued to increase in the period leading up to the date of this filing.  Subsequent to the quarter ended September 30, 2011, Debtor's Adjusted EBITDA has improved to $76.5 million based on preliminary closing of Debtor's most recent monthly financial statements.[6]

49. In 2011, Debtor has realized the benefits of both its proactive response to the economic recession and an ongoing cyclical recovery in the equipment rental industry as demonstrated by its significant increase of utilization, rental rates, and improved financial performance.

50. The chart below details Debtor's revenue, EBITDA and additional financial data for the nine months and three months ending September 30, 2011 and 2010.

**SUMMARY FINANCIAL AND OTHER OPERATING DATA (unaudited)**
**Three And Nine Months Ended September 30, 2011 and 2010**
**(In millions, rounded)**

|  | Three Months | | Nine Months | |
| --- | --- | --- | --- | --- |
|  | **Sep-11** | **Sep-10** | **Sep-11** | **Sep-10** |
| **REVENUES** | | | | |
| Equipment rentals and related | $ 82.3 | $ 68.1 | $ 217.6 | $ 179.1 |
| Sales of rental equipment | 1.9 | 6.3 | 8.1 | 16.8 |
| Sales of new equipment & other | 6.0 | 5.8 | 15.4 | 17.1 |

---

[6] These statements closed on November 30, 2011.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

| | | | | |
|---|---|---|---|---|
| Total Revenue | 90.1 | 80.2 | 241.1 | 213.0 |
| *Revenue Growth* | *12.4%* | *-* | *13.2%* | *-* |
| **ADJUSTED EBITDA** | 22.8 | 19.2[7] | 54.4[8] | 36.0 |
| *EBITDA Growth* | *19.1%* | *-* | *51.2%* | *-* |
| **ADDITIONAL INFORMATION** | | | | |
| Fleet Capital Expenditures (Net) | $ 0.5 | $ (1.3) | $ (1.9) | $ (0.9) |
| High Reach Time Utilization | 69.7% | 62.7% | 65.3% | 56.1% |
| Dollar Utilization | 44.0% | 34.5% | 38.6% | 29.7% |

### 3.    Attempts to Reorganize Debt Outside of Bankruptcy

51. On July 1, 2010, Debtor engaged Oppenheimer & Co. Inc. ("Oppenheimer") to assist Debtor in obtaining a one-year extension of its Revolving Credit Facility.  Thereafter, Debtor and Oppenheimer engaged in negotiations with Debtor's creditors to obtain the requisite approval of all Lenders for an extension of the Revolving Maturity Date.

52. As part of the negotiations, Debtor did not make a February 15, 2011 interest payment on Second Lien Notes as well as monthly interest payments on the Term Loan.  On February 14, 2011, Debtor entered into forbearance agreements with the Lenders, Liberty Harbor (as Term Loan Lender) and Platinum (as majority Second Lien Notes Holder).  On February 15, 2011, Debtor failed to make a $10,945,833 interest payment on the Second Lien Notes.  On March 1, 2011, Debtor failed to make a $1,266,667 monthly interest payment on the Term Loan, and no monthly payments have been made since this time.  On August 15, 2011, Debtor failed to make a $10,945,833 interest payment on the Second Lien Notes.

53. By June 2011, Ahern had received preliminary approval for the one year extension from all but three of the Revolving Lenders, from all of the Term Lenders and from almost 90% of the Second Lien Lenders. The three holdout Revolving Lenders represent approximately 25% of the Revolving Credit Facility and approximately 10% of the total debt of Ahern. In order to effectuate the one-year extension, Ahern needed 100% of the Revolving

---

[7] Adjusted for $1.0 million litigation settlement payment in September 2010
[8] Adjusted for $0.7 million non-cash loss on aircraft sale in April 2011 and $0.9 million non-cash lease termination cost in June 2011

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

17

104500-001/1387234_15

Lenders to approve it. Notwithstanding Ahern's improving financial performance and the Revolving Lenders being substantially over-collateralized based on improving asset appraisals, the three holdout Revolving Lenders would not consent.

54. On August 21, 2011, the Revolving Credit Facility matured. At this time, Bank of America began to make advances to Debtor as Agent (the "Agent Advances") to fund Debtor's continuing operations. Ahern continued to negotiate with Bank of America, the Term Lenders and the Second Lien Lenders for the past four months to effectuate the extension of the Revolving Credit Facility and agreed upon the proposed DIP financing to essentially effectuate the terms of the extension in bankruptcy.

55. Ahern's financial performance continues to improve. Ahern has been forced to seek bankruptcy protection to address the maturity of its Revolving Credit Facility despite the fact that approximately 90% of Ahern's creditors would have consented to an extension.

## II.
## FIRST DAY MOTIONS

56. The Debtor's transition into Chapter 11 proceedings must be comprehensively and effectively organized to ensure that it will be able to operate smoothly in bankruptcy and be afforded the opportunity to successfully emerge from this Chapter 11 Case.  Accordingly, it is critical that Debtor maintain strong relationships with its customers, employees, partners, vendors, creditors, and such other parties that enable Debtor to conduct its business.  To maintain and foster these relationships, it is important to minimize the distractions to the Debtor's business operations that could result from Debtor's petitioning for Chapter 11 relief.

57. I have reviewed and am generally familiar with the contents of each of the First Day Motions.  Based on that familiarity and information supplied to me by other members of Debtor's staff and Debtor's legal advisors, I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor to operate in this Chapter 11 Case with minimal disruption or loss of productivity or value.  I also believe that the First Day Motions are vital to Debtor's successful reorganization and are in the best interests of the Debtor and its creditors.

A. **Emergency Motion for Order (i) Authorizing Debtor to Pay Wages, Salaries, Benefits, Reimbursable Business Expenses, and Other Employee Obligations, and**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

18

104500-001/1387234_15

### (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations.

58. As of the Petition Date, Debtor employed approximately 1,800 people (the "Employees") in the ordinary course of its business. Of the Employees, approximately 500 are paid on salary and 1,300 are paid hourly.  In addition, Debtor also utilizes the services of approximately 15 independent contractors (the "Independent Contractors").  Continued service by the Employees and Independent Contractors is vital to Debtor's ongoing operations; their skills, knowledge, and understanding of Debtor's operations, customer relations, and infrastructure are essential to the effective reorganization of Debtor.

59. Just as Debtor depends on its Employees to operate, the vast majority of the Employees depend on Debtor for their livelihood.  In this current economic climate, and with the bulk of the Employees relying exclusively on their compensation from Debtor to continue to pay their daily living expenses, the Employees would be exposed to significant financial hardships if Debtor is not permitted to pay them.

60. Debtor pays its salaried and hourly Employees on a weekly basis. Debtor's payrolls are paid one week in arrears. The average gross payroll per period is approximately $1,715,000; $1,045,000 for hourly Employees and $655,000 for salaried Employees. Additionally, vacation payout for hourly Employees is included in payroll the first week of the month, increasing the average gross payroll in that first week of each month by approximately $125,000.  The total estimated amount of wages, salaries, and vacation payouts[9] (collectively, the "Wages") that will have accrued but remain unpaid as of the Petition Date is approximately $2,800,000.

61. Three additional forms of performance-based compensation (collectively, "Performance-Based Compensation") are paid on the fifteenth of each month.  Sales commissions of approximately $500,000 are paid out for rental and retail sales made by sales Employees in the prior month; approximately 220 Employees are eligible to receive sales

---

[9] Vacation payouts are amounts paid to hourly employees in the month of their anniversary of employment with Debtor.  Hourly employees do not get paid for any vacation time when taken.  Rather, after one year of employment with Debtor, Debtor pays the Employee its accrued vacation pay for that year.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

commissions.  Referral bonuses of approximately $3,300 are paid out to Employees who refer customers to the sales department; on average, approximately 13 Employees receive referral bonuses each month.  Lastly, profit commissions of approximately $100,000 are paid to branch managers and others for meeting various profit requirements; approximately 25 Employees received profit commissions for November 2011.  As of the Petition Date, Debtor owed its Employees approximately $400,000 in Performance-Based Compensation.

62. In the ordinary course of Debtor's business, Employees are compensated by the payment of Wages and Performance-Based Compensation and Independent Contractors are compensated by the payment of commissions ("Commissions").[10]  As of the Petition Date, Employees and Independent Contractors were owed, or had accrued in their favor, various sums of Wages, Performance-Based Compensation, and Commissions, including prepetition amounts (collectively, the "Wage Obligations").  As of the Petition Date, the total estimated amount of Wage Obligations that will have accrued but remain unpaid is approximately $3,300,000.

63. Debtor is required by law to withhold from the Employees' Wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes and to remit the same to the appropriate taxing authorities.  To the extent Debtor has deducted funds from the Employees' Wages sufficient to pay prepetition taxes, withholding taxes, and FICA contributions attributable to Wage Obligations which are due but have not yet been paid to any governmental entity, Debtor seeks authorization to continue to deduct these funds and pay them to such governmental entities in the ordinary course of business.

64. In addition, Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state and federal unemployment insurance.  Debtor seeks authorization to continue to pay these funds in the ordinary course of business.

---

[10] As of the Petition Date, the total estimated amount of Commissions that will have accrued but remain unpaid to Independent Contractors is approximately $100,000.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

20

104500-001/1387234_15

65. In the ordinary course of processing payroll checks for its Employees, Debtor also withholds certain amounts for various garnishments (such as tax levies, child support, payments to bankruptcy trustees, and student loans) (collectively, the "Garnishments"), which amounts have not yet been forwarded to the respective law firms and government agencies who are tasked with collecting the funds.  As of the Petition Date, Debtor estimates approximately $25,000 in Garnishments have been withheld.  Debtor requests permission to pay over any such withholdings in the ordinary course of business.

66. Debtor has also accrued, in the ordinary course of its business, amounts for contributions (the "Employee Benefit Contributions") to 401(k) retirement plans, health and benefit programs, and voluntary insurance plans (collectively, the "Employee Benefit Plans") pertaining to services rendered by the Employees prior to the Petition Date.  Specifically, the Employee Benefit Plans include, but are not limited to, 401(k) contributions, medical and dental benefits, life insurance, long-term and short-term disability insurance, flexible spending accounts for health care and dependent care, and employee assistance program benefits.  The Employee Benefit Contributions include (i) monies withheld from the Employees' Wages and (ii) monies contributed by the Debtor on behalf of the Employees in accordance with the Employee Benefit Plans.  The Employee Benefit Contributions are an integral part of the compensation to which the Employees are entitled.  The amount of Employee Benefit Contributions which will have accrued, but will remain unpaid, prior to the Petition Date are estimated to be $500,000 in nonunion contributions and $25,000 in union contributions, for a total of $525,000.

67. Certain authorized Employees may have used their own personal credit cards or expended their own personal funds, in the ordinary course of their employment, on behalf of and for the benefit of Debtor ("Reimbursable Business Expenses").  As of the Petition Date, Employees may not have been reimbursed by Debtor for these Reimbursable Business Expenses.  Debtor cannot provide a definitive amount of Reimbursable Business Expenses as of the Petition Date, but based upon prior business practices, Debtor estimates that such amount does not exceed $100,000.  Debtor seeks authorization to pay such Reimbursable

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

Business Expenses in the ordinary course of business.

68. This Chapter 11 Case was filed during Debtor's normal payroll periods for hourly and salaried Employees and during its normal reimbursement cycle for Reimbursable Business Expenses.  Employees rendered services and incurred Reimbursable Business Expenses in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations are unpaid and unreimbursed.

69. If Debtor is unable to take the necessary steps to ensure that Wage Obligations, Employee Benefit Contributions, and Reimbursable Business Expenses are paid for the pay period commencing immediately prior to the Petition Date and concluding post-petition, there is a significant risk that a large number of essential Employees will resign and remaining Employees will be discontented and demoralized, thus negatively affecting a successful reorganization.

70. Debtor also provides workers' compensation benefits to its Employees at the statutorily-required levels (the "Workers' Compensation System").  Debtor maintains the Workers' Compensation System through Zurich American Insurance Company, subject to a $500,000 self-insured retention per occurrence.

71.  Debtor expects that it will have ample liquidity, based upon cash flow from operations and available postpetition liquidity under Debtor's proposed debtor-in-possession financing, to pay the Wage Obligations, Employee Benefit Contributions, and Reimbursable Business Expenses.

**B.      Emergency Motion for Order Authorizing Maintenance of Prepetition Cash Management System and Bank Accounts.**

72. Debtor has an elaborate centralized cash management system (the "Cash Management System") to collect and transfer funds generated by its operations and disburse those funds to satisfy the obligations required to operate its business.  As is typical with most large corporate enterprises, in the ordinary course of its business, Debtor utilizes the Cash Management System to efficiently collect, transfer, and disburse funds generated through Debtor's operations and to accurately record such collections, transfers, and disbursements as

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

they are made.

73. Debtor's master depository operating account is located at Bank of America (the "Master Account") (Acct. No. ****9787).  Debtor generates revenue and cash primarily through the sale and rental of construction equipment and related contractor supplies at stores located in 22 states.

74. Any sale proceeds or payments made by cash or check and received at Ahern's corporate offices are deposited into the Master Account each business day.  Any sale proceeds or payments made by cash or check and received at an Ahern operating branch location (except Utah, Colorado, Nebraska, and North Dakota branch locations) are deposited each business day into that branch's specific Bank of America sub-deposit account (collectively, the "BofA Sub-Deposit Accounts").  Bank of America sweeps all funds in the BofA Sub-Deposit Accounts into the Master Account every day.  Any sale proceeds or payments made by cash or check and received at an Ahern operating branch location in Utah, Colorado, Nebraska, or North Dakota are deposited each business day into a Wells Fargo sub-deposit account (the "WF Sub-Deposit Account").  A standing wire of all funds in the WF Sub-Deposit Account is made each day to the Master Account.  Sales proceeds or payments received by wire or ACH are deposited electronically into the Master Account.

75. Sales proceeds or payments received by credit card are processed through First National Merchant Services and are electronically deposited directly into the applicable Debtor-maintained deposit account based on the type of credit card used, i.e., Visa/Mastercard, American Express, or Discover.  All deposits into the credit card deposit accounts are swept to a master credit card deposit account and then swept to the Master Account.

76. The foregoing deposit accounts are not used to pay operating expenses and serve only as temporary holding accounts (often referred to as "zero balance accounts").  Moreover, funds held in the Master Account are then automatically swept and applied to Debtor's outstanding prepetition revolving loan to reduce the balance on a daily basis.

77. Debtor also maintains a master funding account (the "Master Funding Account") to facilitate the outflow of funds.  Debtor uses the Master Funding Account to make necessary

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

and periodic disbursements of funds into Debtor's accounts payable account (the "AP Account"), payroll account (the "Payroll Account"), and petty cash account (the "Petty Cash Account").

78. Specifically, Debtor uses the AP Account to satisfy all accounts payable obligations as they become due. Debtor utilizes the Payroll Account to satisfy Debtor's payroll obligations; the Payroll Account is funded on a weekly basis. Debtor's Gross payroll averages approximately $1,715,000 per pay period. Debtor also maintains the Petty Cash Account in order to pay small miscellaneous expenses arising from time to time.

79. Debtor also maintains a few bank accounts for insurance purposes only (the "Insurance Accounts"). The Insurance Accounts pay Debtor's insurance premium obligations such as employees' medical and dental claims under Ahern's existing medical and dental insurance policies.

80. Debtor proposes to maintain its Cash Management System and Bank Accounts postpetition, as they are essential to Debtor's continued operations.

81. Debtor's Cash Management System is an ordinary, usual, and important business practice. The Cash Management System enables Debtor to maintain control over the receipt and disbursement of cash, and to generate timely and accurate financial information critical to managing Debtor's business during the pendency of this Chapter 11 Case. If these practices and procedures are disrupted, Debtor's effort to reorganize may be jeopardized.

82. Debtor's Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity. Many corporate enterprises use these cash management systems because such systems provide numerous benefits. Among the most important of these benefits is the ability to control corporate funds and ensure cash availability, to reduce the cost of borrowed funds, to reduce administrative expenses, and to have easy access to timely and accurate financial information.

83. Establishing a new cash management system would entail significant delay and cost. At a minimum, substantial disruptions to Debtor's business would occur by, among other things, delaying collection and disbursement of the payments to vendors, lessees, employees,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

24

104500-001/1387234_15

1    and customers.  This would in turn harm stakeholder confidence, thus disrupting mutually

2    beneficial relationships with trade creditors, customers, and employees, among others.  Such a

3    negative impact on Debtor's operations would hinder a successful reorganization.

4    84. Further, maintaining the existing Cash Management System would not prejudice

5    any party.  Debtor will maintain strict records with respect to all transfers of cash so that they

6    are able to readily account for all transactions.  Debtor's maintenance of its existing Cash

7    Management System is not only of critical importance to Debtor's business operations, but is

8    also in the best interests of Debtor's estate and creditors.

9    **C.    Emergency Motion for Order Authorizing Debtor to Honor its Prepetition
       Obligations to its Customers and to Continue its Customer and Rental Programs in
10     the Ordinary Course of Business.**

11    85. As of the Petition Date, Debtor has been in the equipment rental business for more

12    than 50 years and remains one of the largest and leading equipment rental companies in the

13    United States, particularly in the Southwest.  As stated previously, through 74 branches located

14    throughout 22 states, Debtor has available for rent more than 37,000 different pieces of

15    equipment ranging from high reach equipment such as boom lifts and scissor lifts, heavy

16    equipment, lawn and garden equipment, and hand tools.  To accommodate its customers'

17    needs, Debtor offers daily, weekly, and monthly rental terms and rates.

18    86. Debtor's equipment rentals and related revenues generate approximately $285

19    million in annual revenue, 89% of Debtor's total revenue.  Debtor's other revenue is derived

20    from the sale of rental equipment (5%) and sales of new equipment and other (6%).

21    87. Debtor's business remains operationally sound and generates significant EBITDA

22    and positive cash flow before debt service.  However, with approximately $620,000,000 in

23    funded debt, Debtor's business is over-leveraged.  Debtor's leverage issue became problematic

24    as a result of the severe downturn in the United States economy and resultant decrease in

25    construction activity (both residential and commercial), which negatively impacted customer

26    demand for rental equipment and the value of Debtor's rental fleet.  As a consequence, over the

27    last few years, Debtor has experienced lower equipment rental volumes, operating cash flows,

28    and borrowing capacity.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

25

104500-001/1387234_15

88. As Debtor operates in a highly competitive industry, Debtor must actively cultivate customer support and constantly work to ensure that it is able to respond to its customers' rental equipment needs.  Over the course of its history, Debtor has developed a number of programs to help develop customer loyalty and maximize efficient use of its assets, including rebates, re-rentals, rental splits, and credits (collectively, the "Customer and Rental Programs"), each of which are described in greater detail below.

89. Debtor maintains approximately 165 rebate and discount programs (collectively, the "Rebate Programs") with certain of its customers, particularly with larger regional or national accounts.  Each Rebate Program is generally based on the volume of business the customer transacts with Debtor and tailored to the specific pricing and rental needs of the customer.  Certain Rebate Programs may also be provided pursuant to a pricing agreement between Debtor and the particular customer.

90. Debtor implements the Rebate Programs by issuing checks or credits in respect of past business (collectively, the "Rebates").  Debtor will typically accrue obligations to its customers on account of the Rebate Programs over the course of the year, with Rebates being paid to or credited against a particular account on an annual basis.  Debtor estimates that the obligations arising under Rebate Programs from the prepetition period is approximately $415,000.

91. Occasionally, Debtor is unable to meet a particular customer's rental needs for equipment because the requested equipment is not in stock.  In such instances, Debtor may rent equipment from a third party (each, a "Third Party," and in reference to more than one Third Party, "Third Parties")[11] and then re-rent such equipment (the "Re-Rentals") to the customer. Debtor generally returns the equipment to the respective Third Party upon the customer's rental expiration in the ordinary course of business.  Debtor will typically execute short-term rental agreements with the applicable Third Party in connection with these transactions.  Generally,

---

[11] The primary Third Parties Debtor has Re-Rentals arrangements with are Acme Lift Company, Allied Rent-All, JLG Industries, Inc., and Xtreme Manufacturing, LLC.  Debtor notes that Xtreme Manufacturing, LLC an affiliated entity to Debtor.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

26

the rates charged by Third Parties under these agreements are significantly discounted when compared with retail rental rates. Re-Rentals enable Debtor to retain its customer base and maintain its rental business on profitable terms even when its own inventory may not be readily available or would require Debtor to incur significant shipping costs.

92. Debtor believes that customers holding Re-Rentals could be irreparably harmed if Debtor was not able to honor prepetition obligations to Third Parties arising from Re-Rentals (collectively, the "Re-Rental Obligations"). As of the Petition Date, Debtor anticipates that certain equipment rented from Third Parties may be in the possession of its customers. If Debtor cannot, and does not, honor the Re-Rental Obligations, the Third Parties may seek to repossess this equipment notwithstanding their being subject to the automatic stay. Although Debtor would vigorously oppose any such actions and seek to enforce the automatic stay against the Third Parties, such Third Parties' attempts to repossess equipment in the possession of Debtor's customers could significantly damage Debtor's reputation and invaluable customer relationships, thus jeopardizing Debtor's potential for a successful reorganization.

93. Moreover, Debtor's ability to profitably meet its customer needs depends on reciprocal relationships and associated goodwill from Third Parties—many of whom are also competitors. The favorable rates offered by Third Parties are often based on strong professional relationships and "handshake" understandings between Debtor and the Third Parties. Debtor also generates significant revenue from renting equipment to Third Parties under reciprocal re-rental arrangements with the Third Parties, making these mutually beneficial relationships even more important to the success of Debtor's reorganization efforts.

94. Because these relationships and agreements with the Third Parties are not governed by long-term contracts, the Third Parties are under no obligation to continue to provide discounted rental rates to Debtor in the future; nor are Third Parties under any binding obligation to provide future Re-Rentals. As such, the Third Parties may refuse to provide Debtor with either customary discounts and/or in-demand and on-demand equipment if Debtor fails to satisfy the Re-Rental Obligations. Third Parties might also view Debtor's failure to honor Re-Rental Obligations and the negative stigmas associated with the seeking of a Chapter

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

11 reorganization as motivation to aggressively capture market share at Debtor's expense. Accordingly, failure to honor prepetition Re-Rental Obligations could severely, if not fatally, damage vital commercial relationships that otherwise represent a profitable element of Debtor's operations.

95. Debtor estimates it remits $1,200,000 per month to Third Parties in Re-Rental Obligations. As of the Petition Date, Debtor estimates that certain Third Parties were entitled to approximately $1,000,000 in Re-Rental Obligations. Re-Rental Obligations arise only where Debtor is already set, based on a rental agreement with one of its own customers, to receive rental receipts in excess of the costs associated with the corresponding Re-Rentals. As such, payment of the Re-Rental Obligations as provided herein will not impose any net cost on Debtor's estate.

96. Debtor also partners with original equipment manufacturers and other parties (collectively, the "OEMs") under which Debtor takes possession of certain equipment owned by the OEMs, which Debtor then leases to customers (the "Rental Split Program"). Instead of purchasing rental equipment from the OEM, Debtor merely takes possession and control of the equipment and splits the rental income with the OEM supplying the equipment (the "Rental Splits").

97. The specific legal structure around Rental Splits can vary significantly by transaction. In certain instances, Rental Splits will be documented by short form agreements between Debtor and the applicable OEM, through which Debtor will hold possession of the equipment and is required to pay a monthly fee to the OEM. This fee may be structured as either a flat monthly fee or a percentage of the rent paid by Debtor's customers for the use of such equipment. In other instances, agreements governing the Rental Splits are not comprehensively documented, and Debtor may simply hold and rent the equipment through either purchase orders or informal arrangements with the OEM. Debtor often has the non-binding option to purchase equipment subject to Rental Splits. Under those circumstances, amounts paid to OEMs as part of the Rental Split will generally be credited against the ultimate

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

purchase price of the equipment.[12]  Nevertheless, OEMs are generally under no continuing obligation to supply Debtor with rental equipment on the highly favorable terms provided through the Rental Splits.

98. Rental Splits provide Debtor and its customers substantial benefits.  Debtor can obtain access to expensive equipment without the burden of making a large, up-front capital expenditure, which, in turn, allows Debtor to offer its customers a wider variety of rental equipment at competitive pricing terms.  If Debtor is not authorized to perform its obligations under the Rental Splits, its cost structure, access to new and expensive rental equipment, and customer relationships would all suffer substantially at a time most critical for Debtor to maintain operational stability and customer relationships.  Debtor would also forfeit substantial savings on the purchase price of equipment if it was unable to continue operating under its current Rental Splits because, if forced to purchase similar equipment from alternative sources, Debtor would not receive the benefit of amounts that would otherwise be credited against the purchase price of such rental equipment through the Rental Splits.  Debtor's inability to continue the Rental Splits or otherwise honor prepetition obligations arising from the Rental Splits could also severely damage Debtor's relationships with OEMs, which could result in Debtor losing the opportunity to provide necessary rental equipment at favorable rates to its customers.

99. As of the Petition Date, certain OEMs were entitled to proceeds from Rental Splits based on equipment held by Debtor.  The estimated value of prepetition Rental Splits proceeds that are outstanding is approximately $450,000.

100.  In the ordinary course of business, Debtor offers credits for, among other things, refunds and billing adjustments (each, a "Credit," and collectively, the "Credits").  Such Credits may occur, for example, when a customer leases equipment from Debtor for a specific project, pays Debtor a deposit in advance based on an estimated time of use, and the deposit exceeds the actual charge.  Sometimes Debtor's payment of such Credit is necessary to obtain

---

[12] When Debtor does not exercise this option, Debtor will generally return the rental equipment to the OEM in the ordinary course of business.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

lien releases from the customer's lenders and/or subcontractors.  Additionally, Credits may be given when a customer disputes a particular charge on a billing statement or simply overpays on its account for any number of reasons.  On average, Debtor processes approximately 50 Credits per month, each Credit averaging approximately $600.

101.  Without doubt, the Customer and Rental Programs generate customer loyalty and goodwill, increase Debtor's competitive position, and ensure customer satisfaction.  Moreover, the Customer and Rental Programs enable Debtor to utilize equipment fleet in an efficient manner in response to customer demand.  Debtor believes ongoing business relationships and market share may deteriorate if customers, Third Parties, or OEMs perceive that Debtor is unable or unwilling to fulfill prepetition promises made through the Rental Programs.  The same would be true if customers perceived that Debtor will no longer be offering the types or quality of services upon which its customers have come to rely.   Further, Debtor's competitors will likely increase their efforts to lure away customers and to create doubts as to Debtor's ability to successfully emerge from Chapter 11.

**D.**    **Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing Debtor to pay Prepetition Claims of Warehousemen, Distributors, Shippers, Freight Brokers, and Other Logistics Providers.**

102.  Debtor's equipment inventory and delivery system depends upon a network of third-party warehousemen, distributors, shippers, freight brokers, and other logistic providers (collectively, the "Freight Claimants") that transport and store equipment throughout the United States on behalf of Debtor.  Debtor's 2011 average monthly expenses with respect to the Freight Claimants was approximately $1,400,000.

103.  Debtor's business operations primarily consist of the sale or rental of construction equipment.  Debtor's ability to satisfy its customer obligations depends on the frequent, and often daily, delivery of equipment to Debtor, customers, or Third Parties.[13]   Debtor employs

---

[13] Third Parties are defined and described more fully in Debtor's *Emergency Motion for Order Authorizing Debtor to honor its Prepetition Obligations to its Customers and to Continue its Customer and Rental Programs in the Ordinary Course of Business*, filed contemporaneously with this Motion.  Therein, Third Parties are defined as those entities with which Debtor rents equipment from so that it can, in turn, re-rent such equipment to its own customers. Third Parties may also rent equipment from Debtor and then re-rent such equipment to their own customers.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

numerous parties, including the Freight Claimants, to ensure that its supply-chain system runs smoothly. Specifically, Debtor contracts with warehousemen to store equipment after its sale or rental to and from customers or Third Parties; Debtor engages distributors, shippers, and other logistic providers to transport, store, and deliver equipment to Debtor's customers.

104. As a result, in the ordinary course of business, the Freight Claimants regularly have possession of equipment being provided to Debtor as well as equipment intended for delivery to its customers and Third Parties. As of the Petition Date, certain of the Freight Claimants have outstanding invoices for, and are in possession of, equipment that was, or is to be, delivered to Debtor, its customers, or Third Parties prior to the Petition Date. Debtor estimates the total outstanding amount owed to the Freight Claimants as of the Petition Date does not exceed $1,300,000.[14]

105. Under state laws, Freight Claimants may have a lien[15] on the equipment in their possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such equipment.[16] Additionally, pursuant to Section 363(e) of the Bankruptcy Code, certain of the Freight Claimants, as bailees, may be entitled to adequate protection in the form of a possessory lien. As a result, these Freight Claimants may refuse to deliver or release equipment in their possession or control before the prepetition amounts owed to them by Debtor (collectively, the "Freight Claims") have been satisfied and any applicable liens revoked.

106. It is essential for Debtor's business operations and reorganization efforts that

---

[14] Due to the nature of the Freight Claimants' and Debtor's invoicing procedures, there is a 3-week delay before invoices are entered into Debtor's accounts payable system. As such, Debtor expects there will be amounts owed to the Freight Claimants for prepetition services that were not in Debtor's accounts payable system and thus not included in this amount.

[15] By this Motion, Debtor does not concede that any liens (contractual, common law, statutory, or otherwise) described in this Motion are valid. To the extent that Debtor makes any payments with respect to Freight Claims, no such payment shall be deemed a waiver of any of Debtor's rights, and Debtor expressly reserves the right to contest the extent, validity, and perfection of all such liens, and/or to seek avoidance thereof.

[16] For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the equipment covered by a bill of lading for charges subsequent to the date of its receipt of the equipment for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the equipment incident to their transportation or reasonably incurred in their sale pursuant to law." See U.C.C. § 7-307(1) (2003).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

Debtor maintains a reliable and efficient supply and distribution network.  If Debtor's customers and Third Parties are unable to receive equipment on a timely and uninterrupted basis, Debtor likely will suffer, at a minimum, a significant loss of revenue and customer goodwill, thereby causing substantial and potentially irreparable harm to its businesses and reorganization efforts.  Indeed, even if the Freight Claimants did not have valid liens under applicable state law, their control, possession, and retention of Debtor's equipment would severely disrupt the flow of equipment between Debtor and its customers and Third Parties.

107. Debtor believes that the value of the equipment in the Freight Claimants' possession, and the potential injury to Debtor if such equipment is not timely released, is likely to substantially exceed the amount of Freight Claims asserted by such parties.  Finally, Debtor believes that, in most instances, there are no viable, timely, and cost-effective alternatives to the Freight Claimants.  Thus, for the foregoing reasons, Debtor believes that it is necessary and essential to its reorganization efforts and the enhancement and preservation of the value of its estate that it be permitted to make payments, in its sole discretion, on account of certain Freight Claims.

**E.** **Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for an Order Determining that Adequate Assurance has been Provided to Debtor's Utility Providers.**

108. In the ordinary course of its business, Debtor incurs utility expenses for water, sewer service, electricity, gas, telephone service, internet service, cable television, and waste management.  These utility services are provided by the utilities (as such term is used in Section 366, collectively, the "Utility Providers") and limited to those listed on Exhibit "2" (the "Utility Service List") to the *Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for Order Determining That Adequate Assurance Has Been Provided to Debtor's Utility Providers* (the "Utilities Motion").[17]

---

[17] Although the Debtor believes that the Utility Service List includes all of its Utility Providers, the Debtor reserves the right, without the need for further order of the Court, to supplement the Utility Service List if any Utility Provider has been omitted.  Additionally, the listing of an entity on the Utility Service List is not an admission that such entity is a utility within the meaning of Section 366, and the Debtor reserves the right to contest any such characterization in the future.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

32

104500-001/1387234_15

109. On average, Debtor spends approximately $416,000 each month on utility service costs. As of the Petition Date, Debtor believes it is substantially current on its utility service payments.

110. Preserving utility services on an uninterrupted basis is essential to Debtor's ongoing operations and, therefore, to the success of its reorganization. Any interruption of utility services, even for a brief period of time, would disrupt Debtor's ability to continue servicing its customers, thereby negatively impacting customer relationships, revenues, and profits. Such a result could jeopardize Debtor's reorganizations efforts and, ultimately, decrease the value of the estate and creditor recoveries. It is therefore critical that utility services continue uninterrupted during this Chapter 11 Case.

111. Debtor intends to pay postpetition obligations owed to the Utility Providers in a timely manner. Debtor expects that it will have ample liquidity, based upon cash flow from operations and available postpetition liquidity under Debtor's proposed debtor-in-possession financing, to pay its postpetition obligations to its Utility Providers.

112. To provide additional assurance of payment to the Utility Providers, Debtor proposes to deposit $208,000 (a sum equal to more than 50% of Debtor's estimated cost of its monthly utility consumption) into a separate, interest-bearing account (the "Utility Deposit Account") for the benefit of any Utility Provider, unless (a) a Utility Provider agrees to a lesser amount or (b) a Utility Provider currently holds a security deposit or surety bond in an amount equal to or greater than 50% of Debtor's average monthly cost of utility service from that Utility Provider. The Utility Deposit Account will provide still further assurance of future payment, over and above Debtor's ability to pay for future utility services in the ordinary course of business based upon its cash flow from operations and available postpetition liquidity under Debtor's proposed debtor-in-possession financing (collectively with the Utility Deposit Account, the "Proposed Adequate Assurance"). Debtor submits that the Proposed Adequate Assurance provides protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

**F.** **Application for Order Authorizing the Employment of Kurtzman Carson**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

33

104500-001/1387234_15

**Consultants LLC as Claims and Noticing Agent for Debtor.**

113. The Debtor has determined that in order to carry out its duties as provided for under Sections 1107 and 1108 of the Bankruptcy Code, it is necessary and in the best interest of the estates to employ an experienced claims and noticing agent. The Debtor desires to employ KCC as its claims and notice agent.

114. Debtor believes that engaging KCC in such capacity will expedite the service of Rule 2002 notices, streamline the claims administration process, and permit the Debtor to focus on its reorganization efforts.

115. Debtor respectfully submits that KCC's rates for its services in connection with the notice, claims processing and solicitation services are competitive and comparable to the rates charged by their competitors for similar services.

**G.    Motion for Interim and Final Orders (I) Authorizing Debtor to:   (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, and (C) Grant Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (II) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)).**

116. I participated in the negotiation of the DIP Credit Agreement and am familiar with its material terms. The Debtor's Board of Directors discussed the proposed DIP Loan at length in consultation with our professionals. After these deliberations, the Board unanimously agreed that the DIP Credit Agreement was reasonable, that entering into the DIP Credit Agreement would be in the best interests of the Debtor and a vital component of the Debtor's ability to reorganize, and that entering into the DIP Credit Agreement represented a proper business judgment of the Debtor.

117. The use of cash collateral and the interim availability under the DIP Credit Agreement as reflected in the Initial Budget, attached hereto as **Exhibit "9,"** is necessary to ensure the Debtor's liquidity through approximately March 17, 2012, and is essential from the Debtor's perspective. The interim availability will allow for the orderly transition into the Chapter 11 Case and provide assurances to the Debtor's suppliers, vendors, and employees that they will be paid for postpetition services. These assurances will be vital to the Debtor's

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

34

104500-001/1387234_15

efforts to persuade our vendors to continue shipping goods and providing services to the Debtor on customary trade credit. The liquidity provided by the DIP Financing will permit the Debtor to, among other things, sustain its operations, purchase new inventory and provide assurances to the Debtor's customers that the Debtor will be able to deliver products and services during this Chapter 11 Case. The interim financing will also permit the Debtor to begin the process of restructuring through evaluation of executory contracts and operational restructuring in conjunction with its outside advisors, steps which are an important component of an overall restructuring plan.

118. With the funds from the DIP Loan, together with cash collateral, the Debtor will have sufficient time and breathing room to adjust its capital structure, address its operational issues, realign cash flows and business cycles, and achieve EBITDA that will allow it to emerge from Chapter 11 as strong, viable operating enterprise, better equipped to survive in this changed economic environment. The DIP Loan allows the Debtor to continue operations and adjust its capital, and will result in an increase in the going-concern value of the Debtor's business and the value of the Prepetition Lenders' liens.

119. [Paragraph 119 intentionally omitted.]

120. By contrast, absent immediate access to cash collateral and the working capital that will be available to the Debtor under the DIP Loan, as provided in the Initial Budget, the Debtor will have insufficient cash to continue its business operations. Absent immediate access to cash, the Debtor will be unable to meet payroll, honor its Customer and Rental Programs, maintain a reliable and efficient supply and distribution network, maintain its equipment, purchase new inventory, or preserve utility services on an uninterrupted basis, all of which are critical to the Debtor's ability to assure its suppliers, vendors, and employees that they will be paid for postpetition services and assure its customers that the Debtor will be able to deliver products and services during this Chapter 11 Case, which are critical to preserve the Debtor's going-concern value for the benefit of its Estate and its creditors. A failure to secure the DIP Loan and the use of the cash collateral would likely result in liquidation, severe employee dislocation, including the layoffs of over 1,000 employees, and losses for vendors and customers. In sum, the denial of the Motion would result in immediate and irreparable

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104500-001/1387234_15

1   harm to the Debtor.

2       121. I understand that the effect of the March 2013 Maturity Date is that the Debtor

3   will have to meet deadlines for the filing of its disclosure statement and plan of reorganization.

4   Provided that no atypical delays in the Chapter 11 Case occur, we believe that these are

5   achievable deadlines, in part because the Debtor began working with its financial advisors

6   several months before the commencement of the Chapter 11 Case and a significant amount of

7   work has already been completed.

8       I declare under penalty of perjury of the laws of the United States that these facts are true

9   to the best of my knowledge and belief.

10       DATED this **22** day of December, 2011.

11

                             HOWARD L. BROWN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

36

104500-001/1387234_15