GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail:  ggordon@gordonsilver.com
WILLIAM M. NOALL, ESQ.
Nevada Bar No. 3549
E-mail:  wnoall@gordonsilver.com
THOMAS H. FELL, ESQ.
Nevada Bar No. 3717
E-mail: tfell@gordonsilver.com
GABRIELLE A. HAMM, ESQ.
Nevada Bar No. 11588
E-mail:  ghamm@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666

Attorneys for Debtor

and

DLA PIPER (US) LLP
GREGG M. GALARDI, ESQ.
New York Bar No. 4535506
E-mail: gregg.galardi@dlapiper.com
*Admitted pro hac vice*
1251 Avenue of the Americas
New York, New York 10020
Telephone (212) 335-4640
Facsimile (212) 884-8540

Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 11-53860-BTB |
| | Chapter 11 |
| AHERN RENTALS, INC., | |
| Debtor. | |
| | Date:   TBD |
| | Time:  TBD |

## DISCLOSURE STATEMENT TO ACCOMPANY DEBTOR'S
## PLAN OF REORGANIZATION

# TABLE OF CONTENTS

DISCLAIMER .................................................................................................................. IV

TABLE OF APPENDICES ............................................................................................. VI

I. INTRODUCTION .......................................................................................................... 1

II. INFORMATION REGARDING THE PLAN AND THIS DISCLOSURE
STATEMENT ............................................................................................................ 3

III. SUMMARY OF THE PLAN TREATMENT OF CREDITORS ............................................ 6

    A.      Non-Classified Claims. ................................................................................ 7

    B.      Summary of Treatment of Claims and Interests under the Plan ........................... 8

IV. GENERAL INFORMATION ABOUT THE DEBTOR'S BUSINESS,
RESTRUCTURING EFFORTS AND THE FILING OF THE CHAPTER 11
CASE ...................................................................................................................... 15

    A.      Debtor's Business. ..................................................................................... 15

          1.      Corporate Structure. ......................................................................... 15

          2.      Operations and Past Performance. ........................................................ 15

          3.      Debtor's Prepetition Equity and Management Structure. ........................ 17

          4.      Affiliated Entities and Transactions ..................................................... 19

    B.      Debtor's Prepetition Capital Structure. ......................................................... 20

          1.      Credit Facility and Term Loan. ............................................................ 20

          2.      Second Priority Notes. ....................................................................... 23

    C.      Events Leading to the Chapter 11 Case. ......................................................... 23

          1.      Economic Pressures and Debtor's Responses. ....................................... 23

          2.      Financial Performance. ...................................................................... 25

          3.      Attempts to Reorganize Debt Outside of Bankruptcy. ........................... 26

    D.      Significant Events During the Chapter 11 Case. .............................................. 27

          1.      First Day Motions. ............................................................................ 27

          2.      The DIP Loan and Cash Collateral ...................................................... 28

          3.      Other Significant Motions and Post-Petition Events. ............................. 28

V. SUMMARY OF THE PLAN OF REORGANZATION ....................................................... 32

    A.      Overall Structure of the Plan. ...................................................................... 32

    B.      Classification and Treatment of Claims and Interests. ..................................... 33

          1.      Treatment of Administrative Claims. ................................................... 34

           2.      Treatment of Classes of Claims and Equity Interests. ........................... 35

          3.      Allowed Claims. .............................................................................. 40

          4.      Postpetition Interest. ......................................................................... 40

          5.      Special Provision Regarding Unimpaired Claims. ................................. 40

    C.      Means for Implementation. .......................................................................... 40

D.      Executory Contracts and Unexpired Leases. ...................................... 43

E.      Manner of Distribution of Property Under the Plan. ........................... 45

F.      Procedures for Resolving Disputed Claims. ...................................... 50

G.      Conditions Precedent to Confirmation and the Effective Date. .......................... 52

H.      Title to Property; Discharge; and Injunction. ................................... 53

I.      Retention of Jurisdiction. ............................................................... 56

J.      Modification and Amendment of Plan. ............................................ 57

K.      Miscellaneous. ........................................................................... 58

VI. CERTAIN RISK FACTORS TO BE CONSIDERED ......................................... 62

A.      General Considerations ............................................................... 62

B.      Certain Bankruptcy Considerations .............................................. 62

C.      Class Estimations ....................................................................... 62

D.      Conditions Precedent to Consummation; Timing ............................ 63

E.      Competition................................................................................. 63

F.      Environmental and Other Regulations .......................................... 63

G.      Leverage...................................................................................... 63

H.      Litigation .................................................................................... 64

I.      Adverse Publicity ....................................................................... 64

J.      Certain Tax Considerations.......................................................... 64

VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............................... 65

A.      U.S. Federal Income Tax Consequences to the Claimholders.......................... 66

B.      Information Reporting and Backup Withholding ................................ 66

C.      Importance of Obtaining Professional Tax Assistance ...................... 67

VIII. CONFIRMATION OF THE PLAN.................................................................. 67

A.      Confirmation Hearing. ................................................................. 67

B.      Plan Confirmation Requirements Under the Bankruptcy Code.......................... 68

C.      Plan Consummation. .................................................................... 69

D.      Feasibility of the Plan ................................................................. 69

E.      Acceptance of the Plan................................................................. 70

F.      Best Interests Test ....................................................................... 71

G.      Liquidation Analysis ................................................................... 71

H.      Valuation of Reorganized Ahern .................................................. 72

I.      Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation ................................................................ 72

J.      Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative ................................................................ 72

K.      Notice to Holders of Claims and Interests. ..................................... 73

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

L.      Voting Rights. ................................................................................................ 74

M.      Solicitation Materials. .................................................................................. 74

IX. PREFERENCE AND OTHER AVOIDANCE ACTIONS .................................................. 75

X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....... 76

A.      Alternative Plan(s) of Reorganization ..................................................... 76

B.      Liquidation under Chapter 7 or Chapter 11 ........................................... 76

XI. RECOMMENDATION AND CONCLUSION .................................................................. 77

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA AS COMPLYING WITH THE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE.  THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED. INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION AND AMENDMENT.**

## <u>DISCLAIMER</u>

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF REORGANIZATION OF AHERN RENTALS, INC. AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

THIS DISCLOSURE STATEMENT SETS FORTH CERTAIN INFORMATION REGARDING THE DEBTOR'S PREPETITION OPERATING AND FINANCIAL HISTORY, THE NEED TO SEEK CHAPTER 11 PROTECTION, SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE, AND THE ANTICIPATED ORGANIZATION, OPERATIONS AND FINANCING OF THE DEBTOR UPON SUCCESSFUL EMERGENCE FROM CHAPTER 11. THIS DISCLOSURE STATEMENT ALSO DESCRIBES TERMS AND PROVISIONS OF THE PLAN, CERTAIN EFFECTS OF CONFIRMATION OF THE PLAN, CERTAIN RISK FACTORS, AND THE CONFIRMATION PROCESS AND VOTING PROCEDURES THAT HOLDERS OF CLAIMS ENTITLED TO VOTE UNDER THE PLAN MUST FOLLOW FOR THEIR VOTES TO BE COUNTED.

EXCEPT AS OTHERWISE PROVIDED HEREIN, CAPITALIZED TERMS NOT OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.  UNLESS OTHERWISE NOTED, ALL DOLLAR AMOUNTS PROVIDED IN THIS DISCLOSURE STATEMENT AND THE PLAN ARE GIVEN IN UNITED STATES DOLLARS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS, ANNEXES AND/OR SCHEDULES ATTACHED TO THE PLAN, THE PLAN SUPPLEMENT DOCUMENTS ONCE FILED, AND THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(c) OF

iv

THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.    THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.    PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF AHERN RENTALS, INC. SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE EVIDENTIARY RULES.    THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, AHERN RENTALS, INC.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

1

**<u>TABLE OF APPENDICES</u>**

2

3

APPENDIX "A":  PLAN OF REORGANIZATION

APPENDIX "B":  FINANCIAL PROJECTIONS

APPENDIX "C":  LIQUIDATION ANALYSIS

APPENDIX "D":  VALUATION ANALYSIS

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EAST\52216559. 5                                                                                        104500-002/1750782.doc

# I.
## INTRODUCTION

Ahern Rentals, Inc., the debtor and debtor in possession in the above-referenced Chapter 11 Case (No. 11-53860-BTB), submits this disclosure statement (the "Disclosure Statement") pursuant to Section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), for use in the solicitation of votes on the Plan of Reorganization of Ahern Rentals, Inc., dated November 30, 2012 (the "Plan"). **A copy of the Plan is attached as Appendix A to this Disclosure Statement. All capitalized terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in Section I of the Plan**.

This Disclosure Statement sets forth certain information regarding the Debtor's pre-petition operating and financial history, its reasons for seeking protection and reorganization under Chapter 11, significant events that have occurred during the Chapter 11 Case and the anticipated organization, operations, and financing of the Debtor upon its successful emergence from Chapter 11. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are (i) "impaired" by the Plan and (ii) entitled to receive a distribution under such Plan are entitled to vote on the Plan. In the Debtor's case, only Claims and Equity Interests in **Classes 1, 2, 3, 6, 7, 8, and 9** are impaired by and entitled to receive a Distribution under the Plan, and only the Holders of Claims and Equity Interests in those Classes are entitled to vote to accept or reject the Plan. Claims and Equity Interests in **Classes 4, 5 and 10** are unimpaired by the Plan, and such holders are conclusively presumed to have accepted the Plan.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE ARTICLE V OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN OF REORGANIZATION" AND ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASE, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT ALL SUCH SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF UNDERLYING DOCUMENTS AND TO THE EXTENT THAT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FINANCIAL

INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR SHALL IT BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF ALLOWED CLAIMS OR INTERESTS.  YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR WITH RESPECT TO ANY QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.  Except with respect to the financial projections set forth in the attached Appendix B (the "Financial Projections") and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  The Debtor does not undertake any obligation to, and does not intend to, update the Financial Projections; thus, the Financial Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.  Further, the Debtor does not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences.  Accordingly, the delivery of this Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.  Moreover, the Financial Projections are based on assumptions that, although believed to be reasonable by the Debtor, may differ from actual results.

**THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE THE DEBTOR TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS, INCLUDING THE HOLDERS OF CLAIMS AND EQUITY INTERESTS IN CLASSES 1, 2, 3, 6, 7, 8, and 9.  THE DEBTOR URGES SUCH HOLDERS TO VOTE TO ACCEPT THE PLAN.**

The Appendices to this Disclosure Statement included in the Appendix are incorporated into, and are a part of, this Disclosure Statement.  The Plan is attached as Appendix A.  Any interested party desiring further information should contact:

Gordon Silver
Attn:  Thomas H. Fell, Esq.
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169
Telephone:  (702) 796-5555
Email: tfell@gordonsilver.com

and

DLA Piper (US) LLP
Attn: Gregg M. Galardi, Esq.
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 335-4640
Email: gregg.galardi@dlapiper.com

Interested parties may also obtain further information from the Bankruptcy Court at the following websites:  http://www.nvb.uscourts.gov, or from the Chapter 11 Case website of Kurtzman Carson Consultants, LLC located at http://www.kccllc.net/ahern.  Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Appendices hereto including the Plan, and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes.

## II.
## INFORMATION REGARDING THE PLAN AND THIS DISCLOSURE STATEMENT

*1.*     ***What is Chapter 11?***
Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and equity interest holders.  The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

*2.*     ***What is the objective of a Chapter 11 bankruptcy case?***
The objective of a Chapter 11 bankruptcy case is confirmation (i.e. approval by the bankruptcy court) of a plan of reorganization.

*3.*     ***What is a plan of reorganization?***
A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying claims against, and equity interests in, a debtor.

*4.*     ***What happens after a plan is filed?***
After a plan has been filed, the holders of such claims and equity interests that are impaired (as defined in Section 1124 of the Bankruptcy Code) and receiving some cash and/or property on account of such claims or equity interests are permitted to vote to accept or reject the plan.

*5.*     ***What is a disclosure statement and its purpose?***
Before a debtor or other plan proponent can solicit acceptances of a plan, Section 1125 of the Bankruptcy Code requires the debtor or other plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed voting decision about whether to accept or reject the plan.

EAST\52216559. 5                                                    104500-002/1750782.doc

The purpose of this Disclosure Statement is to provide sufficient information about the Debtor and the Plan to enable Holders of Impaired Claims to make an informed voting decision about whether to accept or reject the Plan (Holders of other Claims will be deemed to have accepted or rejected the Plan, as the case may be, without the need for them to vote).

**6.     What will happen after the Bankruptcy Court approves this Disclosure Statement?**

This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court has found that this Disclosure Statement provides adequate information in accordance with Section 1125 of the Bankruptcy Code and has entered an order approving this Disclosure Statement. Approval by the Bankruptcy Court is not an opinion or ruling on the merits of the Plan and it does not mean that the Plan has been or will be approved by the Bankruptcy Court.

**7.     Who may vote to accept or reject a plan?**

Generally, holders of allowed claims or equity interests that are "impaired" under a plan of reorganization and who are receiving some cash or property on account of such claims or equity interests are permitted to vote on the plan. A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor. In order to vote, a creditor must have an Allowed Claim. The solicitation of votes on the Plan will be sought only from Holders of Claims whose Claims are Impaired and who will receive property or rights under the Plan.

**8.     Do I have an Allowed Claim?**

You have an Allowed Claim if you have a Claim against the Debtor (i) that has been scheduled as a liquidated, non-contingent, and undisputed Claim in an amount greater than zero on the Schedules, subject to Debtor's right to amend the Schedules on or before the Claims Objection Deadline, (ii) as to which no objection or request for estimation has been filed on or before the Administrative Claims Objection Deadline, the Claims Objection Deadline or the expiration of any other applicable period fixed by the Bankruptcy Court or the Plan; (iii) as to which any and all objections have been settled, waived, withdrawn or denied by a Final Order or in accordance with the Plan; or (iv) that is allowed (a) by a Final Order, (b) by an agreement between the Holder of such Claim and the Debtor or Reorganized Ahern or (c) pursuant to the terms of the Plan. Under the Plan, the deadline for filing objections to Claims is the first Business Day following (i) 180 days following the Effective Date; or (ii) such other date as may be established by an order of the Bankruptcy Court. If your Claim is not an Allowed Claim, it is a Disputed Claim under the Plan for payment purposes; however, you are still entitled to vote to accept or reject the Plan if your Claim is a Disputed Claim. If you are uncertain as to the status of your Claim or if you have a dispute with the Debtor, you should check the Bankruptcy Court record carefully, including the Schedules of the Debtor, and seek appropriate legal advice. Neither the Debtor nor its professionals can advise you about such matters.

**9.     Is my Claim Impaired?**

Holders of Impaired Claims include those whose legal, equitable, or contractual rights are altered by the Plan, even if the alteration is beneficial to the Creditor, or if the full amount of the Allowed Claims will not be paid under the Plan. Holders of Claims which are not Impaired

under the Plan will be deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and the Debtor need not solicit acceptance of the Plan by Holders of such Unimpaired Claims.  Holders of Claims which are to receive nothing under the Plan will be deemed to have voted to reject the Plan.  Consequently, only Impaired Holders of Claims in Classes 1, 2, 3, 6, 7, 8, and 9 are entitled to vote on the Plan.

### 10.    *How is a plan approved?*

Generally, in order for a plan to be confirmed, it must be accepted by at least one impaired class of claims, excluding the votes of any insiders within that class.  A class of claims is deemed to have accepted the plan if and when allowed votes representing at least two-thirds in amount and a majority in number of the claims of the class actually voting cast votes in favor of the plan.

### 11.    *Which Creditors get to vote on the Plan?*

Claims in Classes 1, 2, 3, 6, 7, 8, and 9 are Impaired and the Holders of such Impaired Claims are entitled to vote.  The Debtor is soliciting votes from Holders of these Claims.  Classes 4, 5, and 10 will not vote on the Plan.

**A VOTE FOR ACCEPTANCE OF THE PLAN BY HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT.  THE DEBTOR BELIEVES THAT THE TREATMENT OF HOLDERS OF IMPAIRED CLAIMS UNDER THE PLAN IS THE BEST ALTERNATIVE FOR EACH OF THEM, AND THE DEBTOR RECOMMENDS THAT THE HOLDERS OF THOSE ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.**

**EACH HOLDER OF AN IMPAIRED CLAIM WHO IS ENTITLED TO VOTE SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS/APPENDICES TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT.**

### 12.    *What happens after the voting is completed?*

After the appropriate Persons have voted to accept or reject the Plan, there will be a Confirmation Hearing to determine whether the Plan should be confirmed by the Bankruptcy Court.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code.  The Bankruptcy Court will also receive and consider a ballot summary, which will present a tally of the votes cast by those Classes of Creditors entitled to vote on the Plan.

### 13.    *What is the Effect of Plan Confirmation and Occurrence of the Effective Date?*

Confirmation of a plan of reorganization by the Bankruptcy Court and occurrence of the effective date make the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of the debtor, regardless of whether such creditor (i) is impaired under, or has accepted, the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order and occurrence of the effective date

discharge the debtor from any debt that arose prior to the date of confirmation of the plan and substitute the obligations specified under the confirmed plan.

**14.    Can I rely upon the Disclosure Statement for purposes other than in connection with solicitation or voting on the Plan?**

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  THIS DISCLOSURE STATEMENT THEREFORE DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT OR LIABILITY, A STIPULATION OR A WAIVER IN ANY PROCEEDING OTHER THAN THE SOLICITATION OF ACCEPTANCES OF THE PLAN AND CONFIRMATION OF THE PLAN.  FOR ALL PURPOSES OTHER THAN THE SOLICITATION OF ACCEPTANCES OF THE PLAN, THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

**15.    Should I consult with my own financial and legal advisors?**

This Disclosure Statement does not constitute legal, business, financial, or tax advice. All persons desiring such advice or any other advice should consult with their own advisors.

**16.    I have heard statements from the media regarding the Plan.  Can I rely on these statements?**

The Debtor has not authorized any representations about the Plan, itself, or the value of its property other than those set forth in this Disclosure Statement.  Holders of Claims proceed at their own risk to the extent they rely on any information, representations, or inducements made or given to obtain their approval of the Plan that differ from, or are inconsistent with, the information contained herein and in the Plan.

**17.    What if there is an inconsistency between this Disclosure Statement and the Plan?**

This Disclosure Statement summarizes certain provisions of the Plan and certain other documents and financial information that are incorporated by reference herein (collectively, the "Incorporated Documents").  The summaries contained herein are qualified in their entirety by reference to the Incorporated Documents.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the actual content of any of the Incorporated Documents, the Incorporated Documents shall govern for all purposes.

**III.**
**SUMMARY OF THE PLAN TREATMENT OF CREDITORS**

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders.  In compliance therewith, the Plan divides Claims into various Classes and sets forth the treatment for each Class.  The Debtor is also required under Section 1122 of the Bankruptcy Code to place a Claim into a particular Class

EAST\52216559. 5
104500-002/1750782.doc

only if such Claim is substantially similar to other Claims in such Class. The Debtor believes that the Plan has classified all Claims in compliance with the provisions of Section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim will challenge the Plan's classifications and that the Bankruptcy Court will find that different classifications are required in order for the Plan to be confirmed. In such event, the Debtor reserves the right, to the extent permitted by the Bankruptcy Code, to make reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holders are ultimately deemed members.

The following is a brief overview of the treatment of creditors under the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article V of this Disclosure Statement, entitled "Summary of the Plan of Reorganization."

The Plan designates nine (9) Classes of Claims and one (1) Class of Equity Interests. These Classes take into account the differing nature and priority of the various Claims and Equity Interests under the Bankruptcy Code.

The Debtor believes that the Plan provides the best means currently available for the Debtor's emergence from chapter 11.

## A.    Non-Classified Claims.

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Claims and Priority Tax Claims are not designated as Classes under the Plan. The Holders of such unclassified Claims are not entitled to vote on the Plan.

Each Holder of an Allowed Administrative Claim shall be paid in full and final satisfaction of such Claim by Reorganized Ahern (or otherwise satisfied in accordance with its terms), upon the latest of (i) the Distribution Date, (ii) the date on which its Administrative Claim becomes an Allowed Administrative Claim, (iii) the date on which its Administrative Claim becomes payable under any agreement with the Debtor relating thereto, (iv) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of the Debtor's business, consistent with past practice, or (v) such other date as may be agreed upon between the Holder of such Allowed Administrative Claim and the Debtor or Reorganized Ahern, as the case may be.

Each Holder of an Allowed Priority Tax Claim, if any, will, in full and final satisfaction of such Claim, be paid in full (or be treated in compliance with Section 1129(a)(9)(C) of the Bankruptcy Code) by Reorganized Ahern on the later of (i) the Effective Date or as soon thereafter as practicable, (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the fourteenth (14th) day after the date on which an order allowing such Claim becomes a Final Order; or (iv) such date as is agreed to by the Holder of such Claim and Debtor or Reorganized Ahern, as the case may be.

**B.**     <u>Summary of Treatment of Claims and Interests under the Plan</u>

The table below summarizes the classification and treatment of the pre-petition Claims and Equity Interests under the Plan. Estimated Claim amounts assume a calculation date of the Petition Date. Estimated percentage recoveries are also set forth below for certain Classes of Claims. Estimated percentage recoveries have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims in each Class.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. The Debtor has not yet reviewed and fully analyzed all proofs of Claim filed in the Chapter 11 Case. Estimated Claim amounts for each Class set forth below are based upon the Debtor's review of its books and records and of certain proofs of Claim, and include estimates of a number of Claims that are contingent, disputed, and/or unliquidated.

The foregoing estimates were compiled by combining the undisputed claims listed on the Debtor's bankruptcy schedules on file as of the time of the Debtor's filing of their motion to approve this Disclosure Statement with the Debtor's best estimate. As such, these amounts are estimates only, and may change as more proofs of claim are filed, and the adjudication or other resolution of pending contingent, unliquidated or disputed claims.

| Description and Amount of Claims or Interests | Summary of Treatment |
| --- | --- |
| Class 1: Term Loan Claims<br><br>Estimated Aggregate Amount: $111.5 million | • Impaired<br>• Class 1 consists of the Term Loan Claims<br>• Each Holder of a Term Loan Claim shall have the right to make the Term Loan Election. In the event that the Holder of a Term Loan Claim makes the Term Loan Election, then on the Effective Date, or as soon as reasonably practicable, such Holder will receive in full satisfaction, settlement, release and discharge of and in exchange for that Holder's Allowed Term Loan Claim, Cash in the amount of its Pro Rata share of $90 million for each dollar of that Holder's Allowed Term Loan Claim; provided, that, such Holder (i) votes to accept the Plan and (ii) exercises the right to make the Term Loan Election on its Ballot. In the event that the Holder of a Term Loan Claim does not make the Term Loan Election, that Holder shall receive, on the Effective Date, or as soon as reasonably practicable, Senior Secured Notes in an amount equal to such Holder's Pro Rata share of the Allowed Senior Secured Notes, which Pro Rata share will reflect the reduction, if any, necessary to reflect any Holders of Allowed Term Loan Claims making the Term Loan Election, in full satisfaction, settlement, release and discharge of and in exchange for that Holder's Allowed Term Loan Claims.<br>• The Senior Secured Notes shall be secured by the Senior Secured Note Collateral, which Collateral will include the Term Loan Collateral.<br>• Entitled to vote to accept or reject the Plan<br>• Estimated Recovery: 100% |

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| Class 2: Second Lien Loan Secured Claims<br><br>Estimated Aggregate Amount: $18.5 million | • Impaired<br><br>• Class 2 consists of the Second Lien Loan Secured Claims<br><br>• Each Holder of a Second Lien Loan Secured Claim shall have the right to make the Second Lien Loan Election.  In the event that a Holder of a Second Lien Loan Secured Claim makes the Second Lien Loan Election, then, on the Effective Date, or as soon as reasonably practicable, such Holder will receive in full satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Second Lien Loan Secured Claim, Cash in the amount of its Pro Rata share of $135 million for each dollar of such Holder's Allowed Second Lien Loan Secured Claim; provided, that, such Holder (i) votes to accept the Plan and (ii) exercises the right to make the Second Lien Loan Election on its Ballot.  Any Holder of a Second Lien Loan Secured Claim that does not make the Second Lien Loan Election shall receive, on the Effective Date, or as soon as reasonably practicable, (i) Junior Secured Notes in an amount equal to such Holder's Pro Rata share of the aggregate amount of the Allowed Second Lien Loan Secured Claims, which Pro Rata share will reflect the reduction, if any, of the Allowed Second Lien Loan Secured Claims held by those Holders of Allowed Second Lien Loan Note Claims that make the Second Lien Loan Election and (ii) a Second Lien Loan Deficiency Claim in an amount equal to such Holder's Pro Rata share of the aggregated amount of the Allowed Second Lien Loan Deficiency Claims, which Pro Rata share will reflect the reduction, if any, of the Allowed Second Lien Loan Deficiency Claim held by the Holders of Allowed Second Lien Loan Secured Claims that make the Second Lien Loan Election, in full satisfaction, settlement, release and discharge of and in exchange for the Holder's Allowed Second Lien Loan Secured Claims.<br><br>• The Junior Secured Notes shall be secured by the Junior Secured Note Lien on the Junior Secure Note Collateral.<br><br>• Consistent with the terms of the Intercreditor Agreement, on the Effective Date, the Liens in the Second Lien Collateral to secure the Junior Secured Notes will be expressly junior and subordinate in all respects to the Liens in the Exit Financing Facility and the Liens in the Senior Secured Note Collateral to secure the Senior Secured Notes and the Holders of the Allowed Second Lien Loan Note Claims that do not make the Second Lien Loan Election will not receive any Cash payments until the Holders of Allowed Term Loan Claims are paid in full.<br><br>• Entitled to vote to accept or reject the Plan<br><br>• Estimated Recovery: 100% |
| Class 3: Kubota Claims<br><br>Estimated Aggregate Amount: $143,500 | • Impaired<br><br>• Class 3 consists of the Kubota Claims<br><br>• Unless the Holder of a Kubota Claim and the Debtor agree to a different treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for the Kubota Claims, the Holder of any Allowed Kubota Claims shall be paid (i) on the Effective Date, or as soon as reasonably practicable, Cash in the principal amount of 5% of such Holder's Allowed |

9

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | Kubota Claim; (ii) 90 days after the Effective Date, Cash in the principal amount of 5% of such Holder's remaining Allowed Kubota Claim (reflecting a reduction in the principal amount of such Holder's Allowed Kubota Claims as a result of the first payment); and (iii) 180 days after the Effective Date, Cash the aggregate amount of the remaining balance of such Holder's Allowed Kubota Claims (reflecting a reduction in the principal amount of such Holder's Allowed Kubota Claims as a result of the first and second payments). The Allowed Kubota Claims shall bear interest as set forth in the Kubota Flooring Agreement.<br><br>• Entitled to vote to accept or reject the Plan<br><br>• Estimated Recovery: 100% |
| Class 4: Other Secured Claims[1]<br><br>Estimated Aggregate Amount: $115,000 | • Unimpaired<br><br>• Class 4 consists of the Allowed Other Secured Claims<br><br>• Unless the Holder of an Allowed Other Secured Claim and the Debtor agree to a different treatment, on the Effective Date, or as soon as reasonably practicable, each Holder of an Allowed Other Secured Claim shall (i) have its Claim Reinstated, or (ii) receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Secured Claim, either (a) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to Section 506(b) of the Bankruptcy Code, (b) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the Holder's secured interest in such Collateral, (c) the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to Section 506(b) of the Bankruptcy Code, or (d) such other distribution as necessary to satisfy the requirements of Section 1129 of the Bankruptcy Code. If the Claim of a Holder of an Allowed Other Secured Claim exceeds the value of the Collateral that secures it, such Holder will have an Other Secured Claim equal to the Collateral's value and a General Unsecured Claim for the deficiency.<br><br>• Not entitled to vote to accept or reject the Plan<br><br>• Estimated Recovery: 100% |
| Class 5: Other Priority Claims<br><br>Estimated Aggregate Amount: $71,400 | • Unimpaired<br><br>• Class 5 consists of the Allowed Other Priority Claims<br><br>• Unless the Holder of an Allowed Other Priority Claim and the Debtor agree to a different treatment, each Holder of an Allowed Other Priority Claim, if any, shall, in full satisfaction, settlement, release, and discharge of, and in exchange for the Allowed Other Priority Claims, be paid in full in Cash by Reorganized Ahern upon the latest of: (i) the Effective Date or as soon |

---

[1] Secured Claims for ad valorem property taxes and Priority Claims under Section 507(a) of the Bankruptcy Code were substantially reduced by payments made by the Debtor after the Petition Date pursuant to various First Day Orders. See [ECF Nos. 333, 336, 337, and 338].

10

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and Debtor or Reorganized Ahern. <br><br> • Not entitled to vote to accept or reject the Plan <br><br> • Estimated Recovery: 100% |
| Class 6: Personal Injury Claims <br><br> Estimated Aggregate Amount: $2,377,000[2] <br><br> Class 6a <br> General Liability (GL) Claims falling in policy year: 5/10/2007 – 5/10/2008 <br> Carrier: *Chartis Insurance*, f/k/a *Lexington (Lexington)* <br> Estimated Amount: $250,000 <br><br> Class 6b <br> GL Claims falling in policy year: 5/10/2008 – 5/10/2009 <br> Carrier: *Lexington* <br> Estimated Amount: $750,000 <br><br> Class 6c <br> GL Claims falling in policy year: 5/10/2009 – 5/10/2010 <br> Carrier: *Ironshore Specialty Insurance Company (Ironshore)* <br> Estimated Amount: $250,000 <br><br> Class 6d <br> GL Claims falling in policy year: 5/10/2010 – 5/10/2011 <br> Carrier: *Ironshore* <br> Estimated Amount: $650,000 | • Impaired <br><br> • Class 6 consists of the Personal Injury Claims <br><br> • Unless the Holder of a Personal Injury Claim and the Debtor agree to a different treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for the Personal Injury Claims, the Allowed Personal Injury Claims incurred in each policy year shall be placed into a separate subclass under Class 6. The first $250,000 of each insured Allowed Personal Injury Claim, less defense costs expended on each such insured Allowed Personal Injury Claim (the self-insured retention, or "SIR"), will be paid in full by Reorganized Ahern on the later of (i) the Effective Date or as soon as reasonably practicable, or (ii) such date as all Claims in the applicable subclass have been liquidated, not to exceed the maximum SIR for such subclass pursuant to the applicable policy. Each Allowed Personal Injury Claim not paid in full from the SIR shall be paid its Pro Rata share of the policy proceeds remaining as of the Petition Date of the Liability Insurance Policies applicable and payable for each such policy year promptly after all Claims in the applicable subclass have been liquidated. The Holder of each Allowed Personal Injury Claim not paid in full by the SIR and the policy proceeds shall be paid the remaining balance of such Personal Injury Claim in sixty (60) equal monthly installments, together with interest at the Federal Judgment Rate, commencing on the later of: (i) the date all Personal Injury Claims in the applicable subclass are liquidated; and (ii) the Effective Date, though Reorganized Ahern may pay such Claim(s) earlier in its discretion. <br><br> • Entitled to vote to accept or reject the Plan <br><br> • Estimated Recovery: 100% |

---

[2] This figure represents the total maximum self-insured retention ("SIR") and deductibles based upon the Claims asserted against all of the Debtor's Insurance Policies for the subject years. The Debtor's Insurance Policies and the SIR is discussed in Section IV.D.3, below.

EAST\52216559. 5

104500-002/1750782.doc

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| <u>Class 6e</u><br>GL Claims falling in policy year:  5/10/2011 – 5/10/2012<br>Carrier:  *Ironshore*<br>Estimated Amount: $278,000 | |
| <u>Class 6f</u><br>Auto claims falling in policy year 5/10/2005 – 5/10/2006<br>Carrier:  *Continental Insurance Company (CNA)*<br>Estimated Amount: $10,000 | |
| <u>Class 6g</u><br>Auto claims falling in policy year 5/10/2006 – 5/10/2007<br>Carrier:  *CNA*<br>Estimated Amount: $0.00 | |
| <u>Class 6h</u><br>Auto claims falling in policy year 5/10/2007 – 5/10/2008<br>Carrier:  *CNA*<br>Estimated Amount: $10,000 | |
| <u>Class 6i</u><br>Auto claims falling in policy year 5/10/2008 – 5/10/2009<br>Carrier:  *Liberty Mutual Fire Insurance Co. (Liberty)*<br>Estimated Amount: $0.00 | |
| <u>Class 6j</u><br>Auto claims falling in policy year 5/10/2009 – 5/10/2010<br>Carrier:  *Great American Insurance Companies (Great American)*<br>Estimated Amount: $0.00 | |
| <u>Class 6k</u><br>Auto claims falling in policy year 5/10/2010 – 5/10/2011<br>Carrier:  *Great American*<br>Estimated Amount: $150,000 | |
| <u>Class 6l</u><br>Auto claims falling in policy year 5/10/2011 – Petition Date<br>Carrier:  *Great American*<br>Estimated Amount: $10,000 | |

104500-002/1750782.doc

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | |
| Class 7: General Unsecured Claims<br><br>Estimated Aggregate Amount: $3 million | • Impaired<br><br>• Class 7 consists of the General Unsecured Claims.<br><br>• Each Holder of a General Unsecured Claim shall have the right to make the Convenience Class Election.  In the event that Class 7 votes to accept the Plan, on the Effective Date, or as soon as reasonably practicable, each Holder of any Allowed General Unsecured Claims shall receive (i) Cash payments in the aggregate Allowed amount of such Holder's Allowed General Unsecured Claim which Claim shall be paid in equal quarterly installments over two (2) years which Claim shall bear no interest and (ii) a waiver of any and all Avoidance Actions that have or could be asserted against such Holder, in full satisfaction, settlement, release and discharge of and in exchange for the Holder's Allowed General Unsecured Claims.  In the event that Class 7 does not vote to accept the Plan, then on the Effective Date, or as soon as reasonably practicable, each Holder of any Allowed General Unsecured Claim shall receive Cash payments in the aggregate Allowed amount of such Holder's Allowed General Unsecured Claim which Claim shall be paid in equal quarterly installments over five (5) years and shall accrue interest at the rate of 2% per annum or such other interest rate as the Bankruptcy Court determines at the Confirmation Hearing or otherwise, in full satisfaction, settlement, release and discharge of and in exchange for the Holder's Allowed General Unsecured Claims.<br><br>• Entitled to vote to accept or reject the Plan<br><br>• Estimated Recovery: 100% |
| Class 8: Second Lien Loan Deficiency Claims<br><br>Estimated Aggregate Amount: $249.2 million | • Impaired<br><br>• Class 8 consists of the Second Lien Loan Deficiency Claims<br><br>• Each Holder of a Second Lien Loan Deficiency Claim shall have the right to make the Second Lien Loan Election or the Convenience Class Election.  In the event that a Holder of a Second Lien Loan Deficiency Claim neither makes the Second Lien Loan Election nor makes the Convenience Class Election, then, on the Effective Date, or as soon as reasonably practicable, such Holder will receive in full satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Second Lien Loan Deficiency Claim, Cash payments equal to its Pro Rata share of the aggregate amount of the Allowed Second Lien Loan Deficiency Claims (which aggregate amount shall reflect reductions for Holders of Allowed Second Lien Loan Note Claims making either the Second Lien Loan Election or the Convenience Class Election) which will accrue interest at 2% per annum or such other interest rate as the Bankruptcy Court determines that shall be paid such accrued interest commencing on the fifth (5th) anniversary of the Effective Date and be paid in full on the seventh (7th) anniversary of the Effective Date. |

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | • Entitled to vote to accept or reject the Plan<br>• Estimated Recovery: 100% |
| Class 9: Convenience Claims<br><br>Estimated Aggregate Amount: Unknown | • Impaired<br>• Class 9 consists of the Convenience Claims<br>• Unless the Holder of a Convenience Claim and the Debtor agree to a different treatment, on the Effective Date, or as soon as reasonably practicable, in full satisfaction, settlement, release and discharge of and in exchange for the Convenience Claims, each Holder of any Allowed Unsecured Claims that makes the Convenience Class Election shall receive Cash in an amount equal to 85% of such Holder's Allowed Unsecured Claim.<br>• Entitled to vote to accept or reject the Plan<br>• Estimated Recovery: 85% |
| Class 10: Equity Interests | • Unimpaired<br>• Class 10 consists of the Allowed Equity Interests of the Debtor<br>• Unless the Holder of an Allowed Equity Interest and the Debtor agree to a different treatment, the legal, equitable, contractual and ownership rights of the Holders of Allowed Equity Interests are unaltered by the Plan. Upon the Effective Date, the Holders of Allowed Equity Interests shall retain their Equity Interests.<br>• Not entitled to vote to accept or reject the Plan<br>• Estimated Recovery: 100% |

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AND EQUITY INTERESTS AGAINST THE DEBTOR AND THUS **STRONGLY RECOMMENDS** THAT YOU VOTE TO **ACCEPT** THE PLAN.

**IV.**
**GENERAL INFORMATION ABOUT THE DEBTOR'S BUSINESS, RESTRUCTURING EFFORTS AND THE FILING OF THE CHAPTER 11 CASE**

**A.**     **Debtor's Business.**

    **1.**     **Corporate Structure.**

Debtor is a Nevada corporation organized on December 23, 1997 through the merger of Ahern Renters Center, Inc., a Nevada corporation, and Ahern Rentals SW, Inc., a Nevada corporation.  Debtor's shares are held 97% by Don F. Ahern as Trustee of the DFA Separate Property Trust and 3% by John Paul Ahern, Jr.

    **2.**     **Operations and Past Performance.**

Debtor operates an equipment rental company that additionally sells new and used rental equipment, parts, and supplies related to its rental equipment, and merchandise used by the construction industry.  Further, Debtor provides maintenance and repair services.  As of September 30, 2012, Debtor's rental fleet contained 37,750 total rental items, including 20,063 high reach units, including fork lifts, boom lifts, and scissor lifts.  As of that same date, Debtor's rental fleet also contained 17,687 general rental units, including backhoes, skid steers, skiploaders, trenchers, compressors, generators, light towers, welders, lawn and garden equipment, and hand tools.  Debtor's business operates through 74 rental branches located in 22 states.

Debtor's level of equipment rental revenue is sensitive to overall macro-economic conditions, particularly the level of activity within the non-residential construction industry, as well as to factors specific to Debtor, such as the size and condition of the Debtor's equipment rental fleet, the utilization level of this rental fleet, the level of rental rates, the length of time the equipment is on rent, and general weather conditions within the Debtor's geographic markets.

For financial reporting purposes, Debtor's revenues are divided into three categories: (a) equipment rentals and related, including revenues from renting equipment and related revenues such as fees charged for equipment delivery, damage waivers, repair of rental equipment, and fuel; (b) sales of rental equipment; and (c) sales of new equipment and other.

In order to measure the health of its business, the Debtor reports and monitors its level of "EBITDA" (Earnings Before Interest Expense, Income Taxes, Depreciation and Amortization) generation as an important financial metric.  Adjusted EBITDA represents an adjustment to the company's EBITDA for items considered extraordinary and non-recurring ("Adjusted EBITDA").  EBITDA is a commonly used financial metric utilized by companies within the equipment rental industry.  In the 2005 through 2008 timeframe, Debtor's Adjusted EBITDA increased from $80.2 million to $150.1 million as the Debtor benefited from strong growth of non-residential construction activity, particularly in the Las Vegas market.  Subsequent to 2008, the Debtor's financial performance was adversely impacted by the severe economic recession, and resulting significant reduction in non-residential construction spending, as more fully described later in this document in "Events Leading to the Chapter 11 Case."  Debtor's Adjusted EBITDA declined from $150.1 million in 2008 to $67.5 million in 2009 and to $52.7 million in 2010. The trough of the Debtor's financial performance was realized midway through 2010 when

15

the Debtor's Last Twelve Months ("LTM") Adjusted EBITDA through the quarter ended June 30, 2010 bottomed at $46.4 million.

In response to the economic downturn, the Debtor proactively implemented numerous strategic initiatives to address the changed business environment.  These initiatives included:  (i) significant geographic redeployment of its rental fleet from Las Vegas to other markets, (ii) the opening of twenty-four (24) branches in 2009 and 2010 in new markets, (iii) cost reductions, (iv) reduced capital expenditures, and (v) a focus on customers in segments other than non-residential construction.  These initiatives, which are also described in detail later in this document, have been highly successful as demonstrated by a strong recovery in financial performance by the Debtor since June 2010.  Since its LTM Adjusted EBITDA bottomed at $46.4 million in June of 2010, the Debtor's Adjusted EBITDA has increased 117.4% to $101.5 million for the LTM period ending September 30, 2012.

The chart below details the cycle of Debtor's revenue, Adjusted EBITDA and other key data for the fiscal years 2006 through 2011, and the LTM period ending September 30, 2012.

### SUMMARY REVENUE, EBITDA AND OTHER OPERATING DATA
### Twelve Months Ended September 30, 2012 and Fiscal Years 2006 to 2011
### (In millions, rounded)

| | LTM | Twelve Months Ended December 31 | | | | | |
|---|---|---|---|---|---|---|---|
| | Sep-12 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 |
| **REVENUES** | | | | | | | |
| Equipment rentals and related | $ 331.8 | $301.4 | $246.5 | $249.8 | $329.5 | $293.4 | $236.9 |
| Sales of rental equipment | 13.5 | 11.3 | 24.2 | 11.8 | 19.7 | 24.9 | 16.6 |
| Sales of new equipment & other | 21.9 | 20.8 | 21.7 | 22.3 | 32.3 | 21.8 | 12.4 |
| Total Revenue | 367.2 | 333.5 | 292.4 | 283.9 | 381.4 | 340.1 | 265.8 |
| *Revenue Growth* | *10.1%[3]* | *14.0%* | *3.0%* | *(25.5%)* | *12.1%* | *27.9%* | *30.6%* |
| | | | | | | | |
| **ADJUSTED EBITDA** | 101.5[4] | 77.3[5] | 52.7[6] | 67.5 | 150.1 | 144.7 | 116.5 |
| *EBITDA Growth* | *31.2%[7]* | *46.6%* | *(21.8%)* | *(54.9%)* | *3.7%* | *24.2%* | *45.2%-* |
| | | | | | | | |
| **ADDITIONAL INFORMATION** | | | | | | | |
| Fleet Capital Expenditures (Net) | $13.3 | $(2.2) | $(5.1) | $15.9 | $111.4 | $191.6 | $178.6 |
| Average High Reach Time Utilization | 66.2% | 65.6% | 57.3% | 55.0% | 67.0% | 69.7% | 72.5% |
| Dollar Utilization | 44.6% | 40.2% | 31.0% | 30.3% | 41.5% | 45.9% | 50.0% |

[3] LTM September 2012 growth over full-year 2011.
[4] Adjusted for $2.6 million non-cash lease termination cost and $7.4 million of reorganization costs.
[5] Adjusted for $0.7 million non-cash loss on aircraft sale, $2.9 million non-cash lease termination cost and $1.2 million of reorganization costs.
[6] Adjusted for $1.0 million litigation settlement payment in September 2010.
[7] LTM September 2012 growth over full-year 2011.

16

The Debtor also uses both "Time Utilization" and "Dollar Utilization" to measure the health of its rental business.  Time Utilization measures the number of total high-reach units on rent for the Debtor's primary equipment category, compared to the total number of high-reach units available for rent.  Dollar Utilization measures, for the entire rental fleet, the interaction of changes in rental rates, product mix, average length of rental and time utilization.  Dollar Utilization is the annualized ratio of equipment rentals and related revenues on Debtor's entire fleet of rental equipment for a period of time compared to the average original cost of Debtor's rental fleet during the same period.  Debtor's Time Utilization and Dollar Utilization metrics follow a similar pattern as its revenue and EBITDA, illustrating strength in the 2005 and 2006 timeframe, declining significantly during the economic recession, and rebounding strongly since June of 2010 as the Debtor's business has recovered.

In 2011 and 2012, Debtor has realized the benefits of both its proactive response to the economic recession and an ongoing cyclical recovery in the equipment rental industry as demonstrated by its significant increase in both Time Utilization and Dollar Utilization, and improved financial performance.  In addition, the Debtor has continued to focus on additional operating initiatives to enhance financial performance.  As part of a continual review of costs, the Debtor recently eliminated 125 positions, which results in approximately $6.5 million of lower salaries and wages on an annual basis.

Debtor's operating results have traditionally been highly dependent on the strength of the economy of Las Vegas, Nevada, accounting for approximately 25% of revenues in 2009, 19% of revenues in 2010, and 12% of revenues in 2011, and the rapid growth of the Las Vegas population and accompanying economic growth contributed significantly to Debtor's growth in revenues over years prior to 2008.

### 3.    Debtor's Prepetition Equity and Management Structure.

Don F. Ahern has been Debtor's President, Chief Executive Officer and a member of Debtor's board of directors since February 1994.  Prior to that, since 1978, Mr. Ahern was the sole proprietor of Los Arcos Equipment, an equipment rental company. Mr. Ahern has over thirty (30) years of experience in the equipment rental industry.

Evan B. Ahern has been Debtor's Executive Vice President since March 2004 and joined Debtor's board of directors in April 2004.  He served as Chief Information Officer from 1998 to May 2007.  Between 1993 and 1998, Mr. Ahern was responsible for managing and implementing Debtor's technology infrastructure.  From 1990 through 1993, Mr. Ahern held various other positions with Debtor.  Mr. Ahern has been and continues to be involved in nearly every aspect of Debtor's operations.  He spends much of his current time in business development activities, branch level process reengineering and training, and technology integration into every aspect of Debtor's business to improve operational efficiencies and effectiveness.

Howard Brown has been Debtor's Chief Financial Officer since September 1997.  He joined Debtor's board of directors in April 2004. He has over thirty-five (35) years of finance experience.  Prior to joining Debtor, from October 1995 through September 1997, he was Chief Financial Officer of the H&O Foods division of Rykoff-Sexton, Inc. (now known as U.S. Foodservice, Inc.), the largest food service distributor in Las Vegas, Nevada. From September 1992 through October 1995, he was Chief Financial Officer of H&O Foods, Inc.

17

Mark J. Wattles joined Debtor's board of directors in April 2004. Mr. Wattles founded Hollywood Entertainment Corporation ("Hollywood"), a chain of video rental and game stores, in June 1988, and until September 1998 he served as Hollywood's Chairman of the Board, President, and Chief Executive Officer. From August 1998 through June 2000, Mr. Wattles left his full-time position at Hollywood and served as Chief Executive Officer of Reel.com, then a wholly-owned subsidiary of Hollywood. In August 2000, Mr. Wattles returned full time to Hollywood to assist with changes in its business strategy. He served as President of Hollywood from January 2001 until January 2004 and as Chief Executive Officer from January 2001 until February 2005. Since January 2005, Mr. Wattles has served as President of Wattles Capital Management, LLC, a capital management company that invests in public and private companies providing consumer products and services.

P. Enoch Stiff joined Debtor's board of directors in April 2004. Mr. Stiff has been the managing partner of the Executive Management Group, a consulting firm specializing in effective management practices for senior executive teams of midsize businesses, since November 2002. Additionally, since January 2004, Mr. Stiff has been a partner in the Value Management Group, a Chicago-based investment management company that focuses on manufacturing companies. In February 2008, Mr. Stiff became President and Chief Executive Officer of American Sportworks, a company that manufactures various types of utility vehicles. From September 2000 to November 2002, Mr. Stiff provided independent business consulting services to executive management groups. From September 1996 to September 2000, Mr. Stiff was the President, Chief Executive Officer and a member of the board of directors of OmniQuip International, Inc., a North American manufacturer of telescopic material handlers, aerial work platforms and other material handling equipment. From August 1989 to September 1996, Mr. Stiff was the President and Chief Executive Officer of TRAK International, Inc. ("TRAK"), a wholly owned subsidiary of OmniQuip International, Inc. He previously served as the Chief Operating Officer of TRAK from November 1987 to August 1989.

Timothy N. Lotspeich has been Debtor's Senior Vice President of Risk Management and Transportation since April 2005. From December 1995 until April 2005, he served as Debtor's Senior Vice President and was responsible for Debtor's floating fleet, transportation and risk management. Mr. Lotspeich has approximately twenty-three (23) years of experience in the equipment rental industry. From July 1986 through December 1995, Mr. Lotspeich served as Debtor's California regional manager responsible for supervising operations and sales for all of Debtor's California branches. From April 1983 through June 1986, Mr. Lotspeich served as manager of Debtor's Bloomington, California branch and was responsible for operations and sales for that branch. Prior to joining the Debtor, from 1972 through June 1982, Mr. Lotspeich was a customer service representative for Grove Manufacturing, a large manufacturer of high reach equipment.

D. Kirk Hartle has been Debtor's Senior Vice President of Finance and Treasurer since March 2009; previously, Mr. Hartle served as Vice President of Finance beginning in September 2007 and prior to that he served as Debtor's Director of Finance from the time he was hired in February 2004. His responsibilities include oversight of all accounting and financial reporting for Debtor. During his career, Mr. Hartle has held senior management positions with KPMG LLP and Deloitte LLP. Prior to joining Ahern Rentals, Mr. Hartle was chief financial officer for five years with a publicly-held golf retail and sports entertainment company.

Mr. Hartle also is a past-president of the University of Nevada, Las Vegas Alumni Association and served on its Board of Directors for thirteen (13) years.

**4.**      **Affiliated Entities and Transactions.**

(i)      Ahern IT, LLC ("Ahern IT").  Evan Ahern owns 100% of Ahern IT.  Ahern IT is an information technology (IT) reseller that purchased dark fiber and other equipment for Debtor, which provided Debtor improved connectivity to its data center and enhanced its disaster recovery system.  Ahern IT manages Debtor's bandwidth with respect to its data and communication needs.

(ii)      American Sportworks ("AS").  P. Enoch Stiff, a board director of Debtor, owns 100% of AS.  AS manufactures utility trucks similar to golf carts that transport tools and other equipment on jobs sites.  Debtor buys and sells AS vehicles for a profit.  Mr. Stiff sold his interest in AS on or about November 7, 2012.

(iii)      A & K 67, LLC ("A&K").  Don F. Ahern owns 25% of A&K. A&K owns a 77-foot boat located in the San Diego Bay.  As consideration for Debtor's sales force having access to the boat to entertain and develop customer relationships, Debtor pays 25% of A&K's costs.

(iv)      DFA, LLC ("DFA").  Don F. Ahern owns 100% of DFA.  DFA locates and acquires real property, arranges the financing, and leases such property under triple net lease arrangements.  The majority of DFA's real property is leased by Debtor.  DFA locates and purchases real property based on Debtor's needs, specifications, and target markets, thus limiting Debtor's upfront capital investments in new stores and markets.  Debtor's lease rates for DFA properties are at prevailing market rates, and such leases are approved by Debtor's independent board members.

(v)      The DFA Family Limited Partnership (the "DFA LP").  Don F. Ahern is a general partner owning 1% of DFA LP, and Evan Ahern and Ryan Ahern are both limited partners each owning 49.5%.  DFA LP owns the real property located at 4241 S. Arville in Las Vegas, Nevada, which property is a maintenance, paint, and cosmetic machine shop leased to Debtor.  DFA LP also owns life insurance policies insuring Don F. Ahern.

(vi)      Diamond A Equipment, LLC ("Diamond A").  Don F. Ahern owns 100% of Diamond A.  Diamond A is a case tractor dealership located in Oxnard, California, and also sells Debtor's equipment at book value plus a reasonable mark-up, resulting in a profit for Debtor.  As a case tractor dealer, Diamond A can buy parts and has access to technical services that support Debtor's rental fleet.  Diamond A sells such parts to Debtor at below list price.

(vii)      Don and Paul, LLC ("D&P").  Don F. Ahern owns 85.5% of D&P, and John Paul Ahern, Jr. owns 14.5%.  D&P owns various parcels of real property located on West Bonanza in Las Vegas, Nevada, which property is a high reach and general rental store leased to Debtor.

(viii)      Equipment Connections, LLC ("EC").  Janis Ahern owns 100% of EC.  EC performs consulting work and special projects for Debtor, and uses its relationships to

19

sell and rent Debtor's equipment.

(ix)     Fanterior, LLC ("Fanterior").  Don F. Ahern owns 49% of Fanterior.  Fanterior imports promotional items such as plastic cups and other products displaying Debtor's name(s) and logo(s).  Debtor obtains promotional items from Fanterior at a discount.

(x)     Hutt Aviation, Inc. ("Hutt").  Don F. Ahern owns 50% of Hutt.  Hutt operates a facility at the Minden-Tahoe airport in Minden, Nevada, where it provides aircraft fuel pumping and other aircraft support.  Approximately 1% of Hutt's sales are to Debtor.  In addition, Debtor receives a discount on aircraft fuel, and from time to time, Hutt rents snow removal equipment from Debtor.

(xi)     XFS, Inc. d/b/a Xtreme Financial Services ("XFS").  Don F. Ahern owns 100% of XFS.  XFS provides financing for customers who do not qualify under Debtor's credit specifications.  XFS ordinarily provides financing on transactions of approximately $10,000.  XFS allows Debtor to make sales and/or rent equipment to less credit-worthy customers without risk to Debtor.

(xii)     Xtreme Manufacturing, LLC ("Xtreme").  Don F. Ahern owns 96.74% of Xtreme.  Xtreme is a manufacturer of forklifts, related parts, and heavy duty steel cubes for offices, housing, and other uses that require reinforced structure for remote operations.  Extreme is an original equipment manufacturer (an "OEM"), and thus has access to parts from other OEMs that Debtor would not ordinarily have access to as a rental operation.  Xtreme sells forklifts and metal cubes to Debtor at or near cost, and sells parts to Debtor at slightly above cost but well below the standard mark-up.  Debtor sells forklifts manufactured by Xtreme at a profit for Debtor.

**B.     Debtor's Prepetition Capital Structure.**

**1.     Credit Facility and Term Loan.**

On August 18, 2005, Debtor, as borrower, entered into an Amended and Restated Loan and Security Agreement (the "2005 Loan Agreement") among certain lenders named therein (the "Initial Lenders"), Bank of America, National Association ("Bank of America"), as administrative agent, Wachovia Bank, National Association ("Wachovia") as collateral agent and as syndication Agent, and Bank of America Securities LLC and Wachovia Capital Markets, LLC, as co-lead arrangers.  The 2005 Loan Agreement provided for a revolving credit facility (as thereafter amended, the "Revolving Credit Facility"), consisting of certain revolving loans and letters of credit with a "Maximum Revolver Amount" (as therein defined) of $175,000,000, which Revolving Credit Facility incurred interest at the "Base Rate" (defined therein as the greater of Bank of America's prime rate or the Federal Funds Rate plus .5% per annum) plus the "Applicable Margin" (defined therein as initially 0.375% per annum with respect to "Base Rate Revolving Loans" (as defined therein), but varying between 0.125% to 0.625% per annum based upon a "Leverage Ratio" (as defined therein) and initially 2.2125% with respect to "LIBOR Rate Revolving Loans" (as therein defined), but varying between 0.125% to 0.625% per annum based upon a Leverage Ratio) for all Base Rate Revolving Loans and at the LIBOR Rate plus the Applicable Margin for all LIBOR Rate Revolving Loans.

20

On August 18, 2005, Debtor, as borrower, entered into an Intercreditor Agreement (as amended, supplemented or otherwise modified, the "Intercreditor Agreement") among Wachovia, as First Lien Collateral Agent and Control Agent for the First Lien Collateral Agent and the Second Lien Collateral Agent (each as defined therein) and Wells Fargo Bank, National Association ("Wells Fargo Bank"), as Trustee under the Indenture and as Second Lien Collateral Agent (each as defined therein), providing the Revolving Credit Facility in connection with the 2005 Loan Agreement, which Intercreditor Agreement made the Revolving Credit Facility available to Debtor consisting of a $175,000,000 revolving credit facility.

On August 21, 2006, Debtor entered into an Amendment No. 1 to Amended and Restated Loan Security Agreement (the "2006 Loan Amendment") with lenders as denoted therein, Bank of America, as Administrative Agent, and Wachovia, as Collateral Agent.  Under the 2006 Loan Amendment, the Revolving Credit Facility's maximum was increased to $250,000,000, the maturity date on the Revolving Credit Facility was set at August 21, 2011, and the Applicable Margin was adjusted to .5% and 2.25% for Base Rate Revolving Loans and LIBOR Rate Revolving Loans at greater than a 4.75:1.00 leverage ratio respectively, .250% and 2.0% for between a 4.75:1.00 and 3.50:1.00 leverage ratio respectively, and 0.0% and 1.75% for leverage ratios less than 3.50:1.00 respectively.

On October 24, 2007, Debtor entered into an Amendment No. 3 and Consent to Amended and Restated Loan and Security Agreement (the "2007 Loan Amendment") with lenders as denoted therein, Bank of America, as Administrative Agent, and Wachovia, as Collateral Agent. Under the 2007 Loan Amendment, the Revolving Credit Facility's maximum was increased to $300,000,000.

On December 23, 2009, Debtor entered into an Amendment No. 1 to Intercreditor Agreement (the "2009 First Intercreditor Amendment") with Wachovia and Wells Fargo Bank, which 2009 First Intercreditor Amendment permitted credit facilities available to Debtor consisting of a maximum $396,000,000 revolving credit facility.

On January 8, 2010, Debtor, as "Borrower" (as defined therein), entered into a Second Amended and Restated Loan and Security Agreement (as amended, supplemented or otherwise modified, the "First Lien Credit Agreement"; and, together with all security, pledge and guaranty agreements and all other documentation executed and/or delivered in connection with any of the foregoing, including without limitation, the Intercreditor Agreement, each as amended, supplemented, or otherwise modified, the "First Lien Documents") with Bank of America, as administrative agent (in such capacity, the "First Lien Agent"), Wells Fargo Bank, as collateral agent (in such capacity, the "First Lien Collateral Agent") and certain Revolving Lenders (as defined therein) and "last out" Term Lenders (as defined therein, and, collectively with the Revolving Lenders, the "First Lien Lenders").  The First Lien Credit Agreement made credit facilities available to Debtor consisting of a $350,000,000 revolving credit facility and a $95,000,000 term loan (as thereafter amended, the "Term Loan" and, together with the Revolving Credit Facility, as amended, restated, supplemented, or otherwise modified, the "First Lien Credit Facility").  Pursuant to the First Lien Documents, the "Revolving Obligations" under, and as defined in, the First Lien Credit Agreement are payable prior to the "Term Loan Obligations" under, and as defined in, the First Lien Credit Agreement.

The First Lien Credit Agreement provides that the Revolving Credit Facility shall be limited to:

> (a) an amount equal to the lesser of (i) the Maximum Revolver Amount or (ii) the sum of, without duplication, (1) up to eighty-five percent (85%) of the Net Amount of Eligible Accounts, plus (2) up to the lesser of (A) ninety-five percent (95%) of the Net Book Value of Eligible Rental and Sale Equipment and (B) eighty-five percent (85%) of the Net Orderly Liquidation Value of Eligible Rental and Sale Equipment, plus (3) up to the lesser of (A) ninety-five percent (95%) of the Net Book Value of Eligible Transportation Equipment and (B) eighty-five percent (85%) of the Net Orderly Liquidation Value of Eligible Transportation Equipment, plus (4) up to the lesser of (A) sixty percent (60%) of the value (at the lower of cost, on an average cost basis, or market) of Eligible Spare Parts Inventory and (B) eighty-five percent (85%) of the Net Orderly Liquidation Value of Eligible Spare Parts Inventory, minus (5) if the sum of the Aggregate Revolver Outstandings and the aggregate unpaid principal balance of the Term Loans exceeds or will exceed the difference of $435,000,000 minus the Supplemental Blocked Availability Amount as in effect from time to time, the amount of such excess, minus (6) the aggregate amount, if any, by which the Revolving Credit Commitments and the Maximum Revolver Amount have been permanently reduced in accordance with Section 4.3(f) or the Term Loans have been paid in accordance with Section 4.3(f), minus (b) such Reserves as are established from time to time by either or both of the Agents in its or their reasonable credit judgment (including in any event the Reserve established pursuant to the last sentence of the definition of Reserves) minus (c) the sum of the Blocked Availability Amount and the Supplemental Blocked Availability Amount.

This provision generally serves to provide for a functional limitation on the Revolving Credit Facility as the lesser of $310,000,000 or the borrowing base.

The Revolving Credit Facility and the Term Loan are both secured by a first lien on substantially all of Debtor's assets and property (as defined in the Frist Lien Credit Agreement, the "Collateral"). Interest rates applicable to the Revolving Credit Facility are a fluctuating per annum rate equal to the lesser of (A) a rate selected by Debtor of either (i) the Base Rate, plus the Applicable Margin (250 to 300 basis points), or (ii) the LIBOR Rate, plus the Applicable Margin (350 to 400 basis points), or (B) the Maximum Rate (maximum allowed under law). As of September 30, 2011, the Revolving Credit Facility had a weighted average interest rate of 6.25% per annum. Interest rates applicable to the Term Loans and other Term Loan Obligations (as defined in the First Lien Credit Agreement) are a per annum rate equal to the lesser of (A) 16% per annum, or (B) the Maximum Rate (the maximum allowed under law).

Pursuant to the First Lien Credit Agreement, the original maturity date for the Revolving Credit Facility was August 21, 2011 (the "Revolving Maturity Date"), at which time all outstanding principal and interest amounts became due, subject to Debtor's attempts to obtain an extension on this date from creditors. Pursuant to the First Lien Credit Agreement, the maturity

date for the Term Loan is December 15, 2012.

2.    **Second Priority Notes.**

The Debtor is also a party to that certain Indenture, dated as of August 18, 2005 (as amended, supplemented or otherwise modified, the "Second Lien Indenture"; the notes issued thereunder; and together with the Second Lien Indenture and all security, pledge and guaranty agreements and all other documentation executed and/or delivered in connection with the foregoing, including without limitation, the Intercreditor Agreement, each as amended, supplemented or otherwise modified, the "Second Lien Documents" and the indebtedness owed to the Second Lien Lenders pursuant to the Second Lien Documents, plus accrued and unpaid interest thereon and fees and expenses as provided in the Second Lien Documents, collectively, the "Second Lien Obligations") among Debtor, as borrower, and Wells Fargo Bank, as collateral agent and trustee (in such capacity, the "Second Lien Agent"), and the Lenders (collectively, the "Second Lien Lenders"; and together with the Revolving Lenders and the Term Lenders, the "Lenders"). Under the Second Lien Indenture, second priority senior secured notes (the "Second Priority Senior Secured Notes") are due August 15, 2013, bearing interest at 9.25% payable semi-annually on February 15 and August 15. Pursuant to the Second Lien Indenture, the Second Priority Senior Secured Notes were sold in two tranches for an aggregate purchase price of $200,000,000 in the first tranche and $90,000,000 in the second tranche. The Second Priority Senior Secured Notes are secured on a second-priority basis by liens on all of Debtor's assets that secure Debtor's obligations under the Revolving Credit Facility.

On December 23, 2009, Debtor and Wells Fargo Bank entered into that certain First Supplemental Indenture. Through the First Supplemental Indenture, the holders of 87% of the aggregate principal amount of notes outstanding approved an increase of the minimum "Priority Lien Cap" (as defined therein) from $175,000,000 to $396,000,000.

As of December 31, 2009, the outstanding principal of the Second Priority Senior Secured Notes amounted to $290,000,000, after which $53,300,000 in Second Priority Senior Secured Notes were exchanged at 75% of par value for $40,000,000 in the Term Loan in January 2010. As of September 30, 2011, outstanding liabilities from Second Priority Senior Notes payable totaled $236,666,667 in actual principal outstanding.

C.    **Events Leading to the Chapter 11 Case.**

1.    **Economic Pressures and Debtor's Responses.**

Through Debtor's primary business of equipment rental, Debtor undertakes the risk of capital investment to expand its rental fleet in exchange for the potential rental revenue streams generated from customers including construction and industrial companies, municipalities, manufacturers, utilities and homeowners for whom the purchase of equipment is economically unwarranted or who prefer to rent equipment as an alternative to buying the equipment. To generate rental revenue streams in excess of the capital invested into the continually depreciating equipment so as to turn a profit, Debtor is consequently dependent upon its customers' continuing demand for the rental of such equipment over the lifetime of that equipment. As such, Debtor's business is highly dependent on the level of equipment utilization, at acceptable rates, in order to generate ongoing rental revenue and operating profitability. In addition, Debtor

attempts to balance capital expenditures in new equipment to meet increases in demand for new rental opportunities with the risk of reduced demand for such equipment before the value of that equipment has been recouped through rental revenue.

Because of its dependence on rental revenue from the non-residential construction industry, Debtor was adversely impacted by the severity and depth of the downturn in construction activity during the recent economic recession. Specifically, Debtor was impacted by a dramatic reduction in both new construction projects as well as the often-abrupt cancellation of projects for which construction had already begun, which caused the return to the Debtor of a significant amount of equipment on rent, resulting in a significant decline in equipment utilization compounded by pressure on rental rates, which in turn resulted in reduced revenues and levels of operating performance. Debtor's revenues were necessarily harmed in the wake of economic concerns both nationally and to a greater extent in the Las Vegas market as Debtor's ability to successfully rent its equipment inventory purchased during periods of growth in the construction industry was adversely impacted during the recession.

To adapt to the construction downturn, Debtor has proactively employed a number of strategies since 2009 to both retain and develop new rental streams. Among these strategies, Debtor redeployed unutilized rental units to existing branch locations with higher demand and also opened branches in new geographies with high growth potential. Debtor opened seventeen (17) new rental branches in 2009, and opened seven (7) new rental branches in 2010. Such branch openings required limited capital expenditure because Debtor was able to redeploy its existing rental units to these new locations from existing branch locations, and not purchase new equipment. This strategy was used in part to relocate rental equipment following the completion of the City Center project in Las Vegas, which was completed in late 2009 and resulted in a surplus of rental units in Las Vegas.

By redeploying existing rental fleet and opening new branches in 2009 and 2010, Debtor was able to actively reduce capital expenditures directed for purchases of new rental equipment. Additionally, Debtor was able to limit new capital expenditures by selling excess rental fleet as market conditions warranted. In 2007 and 2008, Debtor invested $191.6 million and $178.6 million, respectively, in net purchases of rental equipment, which investments were reduced to $15.9 million in 2009 and negative $5.1 million in 2010. This significant reduction in capital expenditures, coupled with the redeployment of Debtor's existing rental fleet inventory to stronger existing and new markets, has subsequently resulted in a significant increase in Debtor's fleet utilization, improvements in rental rates, and improvements in operating performance since the Debtor's business cycle bottomed in the second quarter of 2010. This is demonstrated by increases in revenues as well as by a significant improvement in the Debtor's level of Adjusted EBITDA throughout 2011 and 2012, as described earlier in this Disclosure Statement.

Debtor's equipment rental fleet has a large concentration of aerial equipment, which has both longer useful lives and superior value retention characteristics than general rental equipment. As a consequence of the reduced capital expenditures, however, the average age of the rental fleet has increased, which has led and will continue to lead to increased repair, maintenance and equipment replacement costs. Debtor believes, however, that the quality of its rental fleet continues to be high and in a similar overall condition as the rental fleets of its industry competitors.

Additionally, in response to the economic downturn, Debtor has undertaken cost containment through reductions in personnel and employee benefits, renegotiation of vendor pricing structures, reduced commissions and bonuses for senior management, and increased scrutiny of all operational and administrative processes to reduce expenses.  To maintain and increase equipment utilization, Debtor has also expanded its customer base into infrastructure-related industries, alternative energy, and other end-user markets to participate in rental demand distinct from the non-residential construction sector.

**2.**     **Financial Performance.**

As a result of the significant actions taken by Debtor to respond to the economic downturn, including the redeployment of rental equipment, the opening of multiple new rental locations, the reduction in capital expenditures for new equipment and the implementation of cost containment measures, the Debtor's financial performance has improved.  Revenues for the nine months ended September 30, 2012 have increased to $274.8 million from $241.1 million compared to the nine month period ended September 30, 2011 and from $213 million compared to the nine month period ended September 30, 2010.  Further evidence of the ongoing recovery in Debtor's business is the significant improvement in Debtor's Adjusted EBITDA.  From a trough Adjusted EBITDA of $46.4 million for the LTM period ended June 30, 2010, Debtor's Adjusted EBITDA for the LTM period ended September 30, 2012 has improved to $101.5 million.

In 2011 and 2012, Debtor has realized the benefits of both its proactive response to the economic recession and an ongoing cyclical recovery in the equipment rental industry as demonstrated by its significant increase of utilization, rental rates, and improved financial performance.  In addition, the Debtor has continued to focus on additional operating initiatives to enhance financial performance.  As part of a continual review of costs, the Debtor recently implemented a 125 person reduction in headcount, which results in approximately $6.5 million of lower salaries and wages on an annual basis.

The chart below details Debtor's revenue, EBITDA and additional financial data for the nine months and three months ending September 30, 2012 and 2011.

**SUMMARY FINANCIAL AND OTHER OPERATING DATA (unaudited)**
**Three And Nine Months Ended September 30, 2012 and 2012**
**(In millions, rounded)**

| | Three Months | | Nine Months | |
|---|---|---|---|---|
| | Sep-12 | Sep-11 | Sep-12 | Sep-11 |
| **REVENUES** | | | | |
| Equipment rentals and related | $ 88.1 | $ 82.3 | $248.0 | $217.6 |
| Sales of rental equipment | 2.2 | 1.9 | 10.2 | 8.1 |
| Sales of new equipment & other | 5.9 | 6.0 | 16.6 | 15.4 |
| Total Revenue | 96.2 | 90.1 | 274.8 | 241.1 |
| *Revenue Growth* | *6.7%* | - | *14.0%* | - |
| | | | | |
| **ADJUSTED EBITDA** | 30.0[8] | 22.8 | 78.5[9] | 54.4[10] |
| *EBITDA Growth* | *31.4%* | - | *44.4%* | - |
| | | | | |
| **ADDITIONAL INFORMATION** | | | | |
| Fleet Capital Expenditures (Net) | $8.1 | $0.5 | $13.5 | $ (1.9) |
| High Reach Time Utilization | 67.2% | 69.7% | 66.1% | 65.3% |
| Dollar Utilization | 47.3% | 44.0% | 44.5% | 38.6% |

### 3.   Attempts to Reorganize Debt Outside of Bankruptcy.

On July 1, 2010, Debtor engaged Oppenheimer & Co. Inc. ("Oppenheimer") to assist Debtor in obtaining a one-year extension of its Revolving Credit Facility.  Thereafter, Debtor and Oppenheimer engaged in negotiations with Debtor's creditors to obtain the requisite approval of all Lenders for an extension of the Revolving Maturity Date.

As part of the negotiations, Debtor did not make a February 15, 2011 interest payment on the Second Lien Notes or monthly interest payments on the Term Loan.  On February 14, 2011, Debtor entered into forbearance agreements with the Lenders, Liberty Harbor Master Fund I, L.P. (as Term Loan Lender) and Platinum Equity (as majority Second Lien Notes Holder).  On February 15, 2011, Debtor failed to make a $10,945,833 interest payment on the Second Lien Notes.  On August 15, 2011, Debtor failed to make a $10,945,833 interest payment on the Second Lien Notes, and no payments have been made on the Second Lien Notes since that time. On March 1, 2011, Debtor failed to make a $1,266,667 monthly interest payment on the Term Loan, and no further payments were made on the Term Lender until the Petition Date, after which the Debtor began making payments to the Term Lender pursuant to the Final DIP Order.

---

[8] Adjusted for $2.2 million of reorganization costs associated with the Debtor's bankruptcy filing and $0.1 million non-cash lease termination costs.

[9] Adjusted for $6.2 million of reorganization costs associated with the Debtor's bankruptcy filing and $0.6 million non-cash lease termination costs.

[10] Adjusted for $0.7 million non-cash loss on aircraft sale and $0.9 million non-cash lease termination costs.

26

By June 2011, Debtor had received preliminary approval for the one year extension from all but three of the Revolving Lenders and from all of the Term Lenders. The three holdout Revolving Lenders represented approximately 25% of the Revolving Credit Facility and approximately 10% of the total debt of Debtor. In order to effectuate the one-year extension, Debtor needed 100% of the Revolving Lenders to approve it. Notwithstanding Debtor's improving financial performance and the Revolving Lenders being substantially over-collateralized based on improving asset appraisals, the three holdout Revolving Lenders would not consent.

On August 21, 2011, the Revolving Credit Facility matured. At this time, Bank of America began to make advances to Debtor as Agent (the "Agent Advances") to fund Debtor's continuing operations. Debtor continued to negotiate with Bank of America, the Term Lenders and the Second Lien Lenders for the four months leading up to the Petition Date to effectuate the extension of the Revolving Credit Facility and agreed upon the DIP Loan (defined below) to essentially effectuate the terms of the extension in bankruptcy.

Ahern's financial performance continues to improve. Ahern was forced to seek bankruptcy protection to address the maturity of its Revolving Credit Facility despite the fact that approximately 90% of Ahern's creditors would have consented to an extension.

**D.    Significant Events During the Chapter 11 Case.**

**1.    First Day Motions.**

Concurrently with the filing of the petition, the Debtor filed various first day motions designed to assist the Debtor in making a smooth transition into Chapter 11, including:

(i)    Application for Order Authorizing the Employment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent for Debtor [ECF No. 9];

(ii)    Emergency Motion for Order Authorizing Maintenance of Prepetition Cash Management System and Bank Accounts [ECF No. 4];

(iii)    Emergency Motion for Order (i) Authorizing Debtor to Pay Wages, Salaries, Benefits, Reimbursable Business Expenses, and Other Employee Obligations, and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligation [ECF No. 5];

(iv)    Emergency Motion Pursuant to 11 U.S.C. §§ 105(A) and 366 for an Order Determining that Adequate Assurance Has Been Provided to Debtor's Utility Providers [ECF No. 6];

(v)    Emergency Motion for Order Authorizing Debtor to (i) Honor its Prepetition Obligations to its Customers and to (ii) Continue its Customer and Rental Programs in the Ordinary Course of Business [ECF No. 7];

(vi)    Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing Debtor to Pay Prepetition Claims of Warehousemen, Distributors, Shippers, Freight Brokers, and Other Logistics Providers [ECF No. 8];

(vii)    Motion for Interim and Final Orders (I) Authorizing Debtor to: (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, and (C) Grant Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (II) Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(b) and (c) [ECF No. 17]; and

(viii)    Omnibus Declaration of Howard L. Brown in Support of Debtor's First Day Motions [ECF No. 16].

These first day motions were heard on December 23, 2011, and were approved on an interim basis with the final hearings held on January 27, 2012.  Corresponding orders have been subsequently entered by the Bankruptcy Court.  See ECF Nos. 333, 336, 337, 338, 339, and 381 (the "First Day Orders").

**2.    The DIP Loan and Cash Collateral**

Concurrently with the above-mentioned first day motions, Debtor filed a motion to approve post-petition financing under, *inter alia*, Section 364 of the Bankruptcy Code (the "DIP Financing Motion") [ECF No. 17].  On January 3, 2012, an interim order was entered [ECF No. 95].

Following the filing of the DIP Financing Motion and prior to the hearing on January 27, 2012, the Debtor negotiated with the DIP Lenders[11] regarding the terms of the final order on the DIP Financing Motion.  The Debtor also extensively negotiated the terms of a stipulation with the Majority Term Lenders[12] regarding the relief requested in the DIP Financing Motion and the provision of adequate protection to the Term Lenders.  On January 31, 2012, the Court entered a final order approving the DIP Financing Motion [ECF No. 329] (the "Final DIP Order") and the stipulation with the Majority Term Lenders regarding the Debtor's use of cash collateral and adequate protection.  The Final DIP Order authorized the Debtor to obtain postpetition financing under an asset-based revolving credit facility in an amount up to the aggregate principal amount of $350 million outstanding at any time on a final basis (including a $10 million sub-limit for letters of credit) (the "DIP Loan").

Under the Final DIP Order, the Revolving Credit Facility was repaid in full and replaced by the DIP Loan.  The Debtor expects that at the time of the Confirmation Hearing, the aggregate outstanding liability under the DIP Loan will be approximately $218.7 million.

**3.    Other Significant Motions and Post-Petition Events.**

a.    Retention and Employment of Professionals.

Various applications were filed, and subsequently approved, for employment of professionals in connection with the Chapter 11 Case.  Such applications included:

---

[11]  As defined in the DIP Financing Motion, and including, without limitation, Bank of America, N.A., as administrative agent, for itself and the DIP Lenders, and Wells Fargo Bank, N.A., as collateral agent.

[12]  Liberty Harbor Master Fund I, L.P., and Goldman Sachs Palmetto State Credit Fund, L.P., and any successors thereto or assigns thereof.

(i)    Debtor's application to employ Gordon Silver as its general bankruptcy counsel [ECF No. 126];

(ii)    Debtor's application to employ CRG Partners Group, LLC as its financial and restructuring advisor [ECF No. 128];

(iii)    Debtor's application to employ Piercy Bowler Taylor & Kern as its auditor and accountant [ECF No. 96];

(iv)    Debtor's application to employ Stoel Rives LLP as its special counsel  [ECF No. 132];

(v)    Debtor's application to employ Oppenheimer & Co., Inc., as its financial advisor and investment banker [ECF No. 162];

(vi)    Debtor's application to employ Sea Port Group Securities, LLC as its financial advisor and investment banker  [ECF No. 164];

(vii)    Debtor's application to employ DLA Piper LLP (US) as its bankruptcy co-counsel [ECF No. 429]; and

(viii)    Debtor's application to employ and compensate certain professionals in the ordinary course of business [ECF No. 76] (professionals covered by this application consist of various outside professionals whom the Debtor employed prior to filing its Chapter 11 petition, including law firms and accountants in various non-bankruptcy matters ranging from defending personal injury and workers' compensation suits, to providing advice on various general litigation and corporate related issues).

b.    Schedules and Statements

On January 26, 2012, the Debtor filed its schedules of assets and liabilities and statements of financial affairs, other than Schedule F.  On January 27, 2012, the Debtor filed Schedule F.

c.    Administration of Personal Injury Claims

The Debtor maintains automobile, general liability, and umbrella policies covering personal injury liability.  The Debtor renews its policies or purchases new policies on or about May 10 of each year.  Generally, the Debtor's automobile policies have a coverage limit of $1 million per accident, with no aggregate limits.  Up to and including the 2007-2008 policy year, Debtor's per-accident deductible under its automobile policies was $10,000.  For the 2008-2009 through 2011-2012 policy years, the Debtor's per-accident deductible under its automobile policies was $50,000.  The present automobile policy does not have a deductible requirement.

The Debtor's general liability policies have $1,000,000 per-occurrence limits with $2,000,000 aggregate limits.  The SIR obligation under the general liability policies is $250,000 per-occurrence.  The 2009-2010 general liability policy limited the Debtor's aggregate SIR

obligation to a maximum of $750,000.  For the 2010-2011 through 2011-2012 policy years, the general liability policies limited Debtor's aggregate SIR obligation to a maximum of $650,000. The present general liability policy limits Debtor's aggregate SIR obligation to a maximum of $750,000.

The Debtor also maintains umbrella insurance, which policies provide coverage for personal injury liability that exceeds the automobile or general liability policy coverage.  Up to and including the 2010-2011 policy year, the umbrella policies had $5,000,000 coverage limits. The 2011-2012 and present umbrella policies have $10,000,000 coverage limits.  The Debtor's coverage for personal injury claims from May 10, 2005 to the present is summarized in the following tables:

**Auto Policies**

| Policy Year | Carrier | Deductible – per occurrence | Limit – per occurrence |
|---|---|---|---|
| 5/10/2005–5/10/2006 | CNA | $10,000 | $1,000,000 |
| 5/10/2006–5/10/2007 | CNA | $10,000 | $1,000,000 |
| 5/10/2007–5/10/2008 | CNA | $10,000 | $1,000,000 |
| 5/10/2008–5/10/2009 | Liberty Mutual | $50,000 | $1,000,000 |
| 5/10/2009–5/10/2010 | Great American | $50,000 | $1,000,000 |
| 5/10/2010–5/10/2011 | Great American | $50,000 | $1,000,000 |
| 5/10/2011–Petition Date | Great American | $50,000 | $1,000,000 |

**General Liability Policies**

| Policy Year | Carrier | SIR – per occurrence / maximum | GL limit – per occurrence | GL limit - aggregate | Umbrella limit |
|---|---|---|---|---|---|
| 5/10/2005–5/10/2006 | Lexington | None active | None active | None active | None active |
| 5/10/2006–5/10/2007 | Lexington | None active | None active | None active | None active |
| 5/10/2007–5/10/2008 | Lexington | $250,000 | $1,000,000 | $2,000,000 | $5,000,000 |
| 5/10/2008–5/10/2009 | Lexington | $250,000 | $1,000,000 | $2,000,000 | $5,000,000 |
| 5/10/2009–5/10/2010 | Ironshore | $250,000 / $750,000 | $1,000,000 | $2,000,000 | $5,000,000 |
| 5/10/2010–5/10/2011 | Ironshore | $250,000 / $650,000 | $1,000,000 | $2,000,000 | $5,000,000 |
| 5/10/2011–Petition Date | Ironshore | $250,000 / $650,000 | $1,000,000 | $2,000,000 | $10,000,000 |

Total claims against each of the Debtor's policies in each of the above policy years range from $10,000 to $13.5 million.  Except with respect to the 2008-2009 policy period, the Debtor faces no real risk of liability in excess of its policy limits even if the plaintiffs' claims were allowed in full.  Moreover, the Debtor believes many of the asserted claims, including the claims in the 2008-2009 policy period, are entirely without merit.  As a result, the Debtor does not believe it is likely it will face any liability in excess of its SIR limits.

In order to centralize and streamline the process of liquidating these personal injury claims, the Debtor moved for implementation of alternative dispute resolution procedures pursuant to Bankruptcy Rule 9019(b).  On March 12, 2012, the Debtor filed its *Amended Motion for Order, Pursuant to Section 105(a) of the Bankruptcy Code and Local Rule 9019, Requiring Each Personal Injury Claimant Attend and Participate in a Settlement Conference as a Condition Precedent to Relief from the Automatic Stay* [ECF No. 721] (the "ADR Motion").

Pursuant to the Order approving the ADR Motion, any personal injury claimant was required to file its Claim by April 30, 2012, thereby ensuring the number of claims asserted will not continue to increase.  See ECF No. 782.  Also pursuant to the Order, with certain limited exceptions, each personal injury claimant is required to participate in a settlement conference as a condition precedent to relief from the automatic stay to liquidate his or her personal injury claim in a non-bankruptcy forum.  See id.

### d.    Affiliated Leases

The Debtor is a lessee under numerous leases (the "Affiliated Leases") with DFA, LLC and other entities which are Affiliates of the Debtor by virtue of ownership interests held therein by Don F. Ahern.  The locations of the Affiliated Leases include, among other things, branch locations, administrative offices, storage locations, aircrafts hangers and a ranch intended to be used as a training facility for employees of the Debtor.  On July 2, 2012 the Debtor filed its *Motion to Assume Certain Affiliated Nonresidential Real Property Leases*, [ECF No. 806] (the "Affiliated Leases Motion"), pursuant to which the Debtor sought approval from the Bankruptcy Court to, among other things, assume, and in some cases modify the terms of, certain of the Affiliated Leases.  Subsequent to the filing of the Affiliated Leases Motion, several parties objected to the relief requested therein and the hearing on such motion was adjourned several times.  The hearing on the Affiliated Leases Motion is currently scheduled to be heard in connection with the Confirmation Hearing.

### e.    Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed a petition for voluntary relief (which may be extended by the Court for a period of up to 18 months from the petition date).  If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan (which may be extended by the Court for a period of up to 20 months from the petition date).  During a debtor's exclusive periods, no other party in interest may file a competing chapter 11 plan; however, a court may terminate the debtor's exclusive periods upon request of a party in interest and "for cause."  During the Chapter 11 Case the Debtor requested, and was granted, extensions of the exclusivity period to file the Plan and this Disclosure Statement, up to and including November 30, 2012.

### f.    Mediation

In conjunction with Debtor's request to extend its exclusive right to file a plan, by order entered on August 10, 2012, [ECF No. 959], the Bankruptcy Court ordered Debtor and various parties in interest to participate in a settlement conference pertaining to plan confirmation issues. The settlement conference was conducted on September 6-7, 2012 by Judge William T. Thurman of the United States Bankruptcy Court for the District of Utah and several parties in interest attended including the Debtor, the Majority Term Lenders, the Committee, Sphere Capital LLC – Series B, certain noteholders, the Second Lien Indenture Trustee, certain of the DIP Loan Agents and Kubota.  Although all parties participated in good faith, no consensual resolution was reached concerning plan issues; however, the parties did agree to further mediation with Judge Thurman, which was conducted on September 27, 2012.  Again, the parties were unable to resolve their disagreements regarding plan confirmation issues.

# V.
## SUMMARY OF THE PLAN OF REORGANZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR, REORGANIZED AHERN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

A.      **Overall Structure of the Plan.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. Upon the filing of a petition for relief under Chapter 11, Section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of a Chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against the interests in a debtor. Confirmation of plan of reorganization by the Bankruptcy Court and occurrence of the effective date make the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order and occurrence of the effective date discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Debtor's Plan are the result of negotiations between and among the Debtor and certain of the Debtor's creditors. Accordingly, the Plan reflects the Debtor's best assessment of its ability to achieve the goals of its business plan, to offer creditors and equity interest holders the significant and substantial recoveries set forth more fully in the Plan, and to pay its continuing obligations in the ordinary course of its business.

Under the Plan, Claims against and Equity Interests in the Debtor are divided into Classes according to their relative seniority and other criteria. If the Plan is confirmed by the Bankruptcy Court and consummated, (i) the Claims in certain Classes will be reinstated or modified and receive Distributions equal to the full amount of such Claims, and (ii) the Claims of certain other Classes will be modified and receive Distributions constituting a partial recovery on such Claims. On the date of Distribution and at certain times thereafter, the Disbursing Agent will distribute Cash and other property in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against and Equity Interests in the Debtor created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are described below.

**B.      Classification and Treatment of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with Section 1122 of the Bankruptcy Code, the Plan divides Claims and Equity Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which, pursuant to Section 1123(a)(1) of the Bankruptcy Code, do not need to be classified). The Debtor also is required, under Section 1122 of the Bankruptcy Code, to classify Claims against and Equity Interests in the Debtor into Classes that contain Claims and Equity Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtor believes that the Plan has classified all Claims and Equity Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Equity Interest may challenge the Debtor's classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the

aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Equity Interests and the nature of Distributions to members of each Class are summarized below.  The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims and Equity Interests reflects an appropriate resolution of their Claims and Equity Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Equity Interests and the fair value of the Debtor's assets.  To the extent necessary, the Debtor will request confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code.  Specifically, Section 1129(b) of the Bankruptcy Code permits confirmation of a Chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests.  Although the Debtor believes that the Plan can be confirmed under Section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

**1.**       **Treatment of Administrative Claims.**

a.       General.

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, the Claims against Debtor set forth in this Article 2 are not classified within any Classes.  The Holders of such Claims are not entitled to vote on the Plan.  The treatment of the Claims set forth below is consistent with the requirements of Section 1129(a)(9)(A) of the Bankruptcy Code.

b.       Treatment of Administrative Claims.

Except with respect to Administrative Claims that are Professional Fee Claims, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Administrative Claim, on the latest of (i) the Distribution Date, (ii) the date on which its Administrative Claim becomes an Allowed Administrative Claim, (iii) the date on which its Administrative Claim becomes payable under any agreement with the Debtor relating thereto, (iv) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of the Debtor's business, consistent with past practice, or (v) such other date as may be agreed upon between the Holder of such Allowed Administrative Claim and the Debtor or Reorganized Ahern, as the case may be, (i) Cash equal to the unpaid portion of its Allowed Administrative Claim or (ii) such other treatment as to which the Holder of such Allowed Administrative Claim may agree.

(i)       Professional Compensation.

(a)       Claims for Accrued Professional Compensation. Professionals or other Persons asserting a Professional Fee Claim for services rendered before the Effective Date must file and serve on the Debtor and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Claim for accrued professional compensation no later than forty-five (45) days after the Effective Date. Objections to any Claim for accrued professional compensation must be filed and served on Reorganized Ahern and the Office of the U.S. Trustee and the requesting party no later than

34

sixty-five (65) days after the Effective Date.  The Holder of a Professional Fee Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for its Professional Fee Claim Cash equal to the unpaid portion of its Professional Fee Claim which is an Allowed Professional Fee Claim.

(b)    Post-Effective Date Fees and Expenses.  Upon the Effective Date, any requirement that Professionals comply with Sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Reorganized Ahern may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court. Allowed Priority Tax Claims.

Each Holder of an Allowed Priority Tax Claim, if any, will, in full and final satisfaction of such Claim, be paid in full (or be treated in compliance with Section 1129(a)(9)(C) of the Bankruptcy Code) by Reorganized Ahern on the later of (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the fourteenth (14th) day after the date on which an order allowing such Claim becomes a Final Order; or (iv) such date as is agreed to by the Holder of such Claim and Debtor or Reorganized Ahern, as the case may be.

## 2.    Treatment of Classes of Claims and Equity Interests.

a.    Class 1: Term Loan Claims.

(i)    *Claims in Class:* Class 1 consists of the Term Loan Claims.

(ii)    *Treatment:* Each Holder of a Term Loan Claim shall have the right to make the Term Loan Election.  In the event that the Holder of a Term Loan Claim makes the Term Loan Election, then on the Effective Date, or as soon as reasonably practicable, such Holder will receive in full satisfaction, settlement, release and discharge of and in exchange for that Holder's Allowed Term Loan Claim, Cash in the amount of its Pro Rata share of $90 million for each dollar of that Holder's Allowed Term Loan Claim; provided, that, such Holder (i) votes to accept the Plan and (ii) exercises the right to make the Term Loan Election on its Ballot.  In the event that the Holder of a Term Loan Claim does not make the Term Loan Election, that Holder shall receive, on the Effective Date, or as soon as reasonably practicable, Senior Secured Notes in an amount equal to such Holder's Pro Rata share of the Allowed Senior Secured Notes, which Pro Rata share will reflect the reduction, if any, necessary to reflect any Holders of Allowed Term Loan Claims making the Term Loan Election, in full satisfaction, settlement, release and discharge of and in exchange for that Holder's Allowed Term Loan Claims.

The Senior Secured Notes shall be secured by the Senior Secured Note Collateral, which Collateral will include the Term Loan Collateral.

The Holders of Term Loan Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

b.      Class 2: Second Lien Loan Secured Claims.

(i)      *Claims in Class:* Class 2 consists of the Second Lien Loan Secured Claims.

(ii)      *Treatment:* Each Holder of a Second Lien Loan Secured Claim shall have the right to make the Second Lien Loan Election. In the event that a Holder of a Second Lien Loan Secured Claim makes the Second Lien Loan Election, then, on the Effective Date, or as soon as reasonably practicable, such Holder will receive in full satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Second Lien Loan Secured Claim, Cash in the amount of its Pro Rata share of $135 million for each dollar of such Holder's Allowed Second Lien Loan Secured Claim; provided, that, such Holder (i) votes to accept the Plan and (ii) exercises the right to make the Second Lien Loan Election on its Ballot. Any Holder of a Second Lien Loan Secured Claim that does not make the Second Lien Loan Election shall receive, on the Effective Date, or as soon as reasonably practicable, (i) Junior Secured Notes in an amount equal to such Holder's Pro Rata share of the aggregate amount of the Allowed Second Lien Loan Secured Claims, which Pro Rata share will reflect the reduction, if any, of the Allowed Second Lien Loan Secured Claims held by those Holders of Allowed Second Lien Loan Note Claims that make the Second Lien Loan Election and (ii) a Second Lien Loan Deficiency Claim in an amount equal to such Holder's Pro Rata share of the aggregated amount of the Allowed Second Lien Loan Deficiency Claims, which Pro Rata share will reflect the reduction, if any, of the Allowed Second Lien Loan Deficiency Claim held by the Holders of Allowed Second Lien Loan Secured Claims that make the Second Lien Loan Election, in full satisfaction, settlement, release and discharge of and in exchange for the Holder's Allowed Second Lien Loan Secured Claims.

The Junior Secured Notes shall be secured by the Junior Secured Note Lien on the Junior Secure Note Collateral.

Consistent with the terms of the Intercreditor Agreement, on the Effective Date, the Liens in the Second Lien Collateral to secure the Junior Secured Notes will be expressly junior and subordinate in all respects to the Liens in the Exit Financing Facility and the Liens in the Senior Secured Note Collateral to secure the Senior Secured Notes and the Holders of the Allowed Second Lien Loan Note Claims that do not make the Second Lien Loan Election will not receive any Cash payments until the Holders of Allowed Term Loan Claims are paid in full.

The Holders of Second Lien Loan Note Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

c.      Class 3: Kubota Claims.

(i)      *Claims in Class:* Class 3 consists of the Kubota Claims.

(ii)      *Treatment:* Unless the Holder of a Kubota Claim and the Debtor agree to a different treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for the Kubota Claims, the Holder of any Allowed Kubota Claims shall be paid (i) on the Effective Date, or as soon as reasonably practicable, Cash in the principal amount of 5% of

36

such Holder's Allowed Kubota Claim; (ii) 90 days after the Effective Date, Cash in the principal amount of 5% of such Holder's remaining Allowed Kubota Claim (reflecting a reduction in the principal amount of such Holder's Allowed Kubota Claims as a result of the first payment); and (iii) 180 days after the Effective Date, Cash the aggregate amount of the remaining balance of such Holder's Allowed Kubota Claims (reflecting a reduction in the principal amount of such Holder's Allowed Kubota Claims as a result of the first and second payments).  The Allowed Kubota Claims shall bear interest as set forth in the Kubota Flooring Agreement.

The Holders of Kubota Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

d.    Class 4: Other Secured Claims.

(i)    *Claims in Class:* Class 4 consists of the Allowed Other Secured Claims.

(ii)    *Treatment:* Unless the Holder of an Allowed Other Secured Claim and the Debtor agree to a different treatment, on the Effective Date, or as soon as reasonably practicable, each Holder of an Allowed Other Secured Claim shall (i) have its Claim Reinstated, or (ii) receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Secured Claim, either (a) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to Section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the Holder's secured interest in such Collateral, (b) the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to Section 506(b) of the Bankruptcy Code, or (c) such other distribution as necessary to satisfy the requirements of Section 1129 of the Bankruptcy Code.  If the Claim of a Holder of an Allowed Other Secured Claim exceeds the value of the Collateral that secures it, such Holder will have an Other Secured Claim equal to the Collateral's value and a General Unsecured Claim for the deficiency.

The Holders of Other Secured Claims are Unimpaired under the Plan and are not entitled to vote to accept or reject the Plan.

e.    Class 5: Other Priority Claims.

(i)    *Claims in Class:* Class 5 consists of the Allowed Other Priority Claims.

(ii)    *Treatment:* Unless the Holder of an Allowed Other Priority Claim and the Debtor agree to a different treatment, each Holder of an Allowed Other Priority Claim, if any, shall, in full satisfaction, settlement, release, and discharge of, and in exchange for the Allowed Other Priority Claims, be paid in full in Cash by Reorganized Ahern upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and Debtor or Reorganized Ahern.

37

The Holders of Other Priority Claims are Unimpaired under the Plan and are not entitled to vote to accept or reject the Plan.

f.       Class 6: Personal Injury Claims.

(i)      *Claims in Class:* Class 6 consists of the Personal Injury Claims.

(ii)      *Treatment:* Unless the Holder of a Personal Injury Claim and the Debtor agree to a different treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for the Personal Injury Claims, the Allowed Personal Injury Claims incurred in each policy year shall be placed into a separate subclass under Class 6.  The first $250,000 of each insured Allowed Personal Injury Claim, less defense costs expended on each such insured Allowed Personal Injury Claim (the self-insured retention, or "SIR"), will be paid in full by Reorganized Ahern on the later of (i) the Effective Date or as soon as reasonably practicable, or (ii) such date as all Claims in the applicable subclass have been liquidated, not to exceed the maximum SIR for such subclass pursuant to the applicable policy.  Each Allowed Personal Injury Claim not paid in full from the SIR shall be paid its Pro Rata share of the policy proceeds remaining as of the Petition Date of the Liability Insurance Policies applicable and payable for each such policy year promptly after all Claims in the applicable subclass have been liquidated. The Holder of each Allowed Personal Injury Claim not paid in full by the SIR and the policy proceeds shall be paid the remaining balance of such Personal Injury Claim in sixty (60) equal monthly installments, together with interest at the Federal Judgment Rate, commencing on the later of: (i) the date all Personal Injury Claims in the applicable subclass are liquidated; and (ii) the Effective Date, though Reorganized Ahern may pay such Claim(s) earlier in its discretion.

The Holders of Personal Injury Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

g.       Class 7: General Unsecured Claims.

(i)      *Claims in Class:* Class 7 consists of the General Unsecured Claims.

(ii)      *Treatment:* Each Holder of a General Unsecured Claim shall have the right to make the Convenience Class Election.  In the event that Class 7 votes to accept the Plan, on the Effective Date, or as soon as reasonably practicable, each Holder of any Allowed General Unsecured Claims shall receive (i) Cash payments in the aggregate Allowed amount of such Holder's Allowed General Unsecured Claim which Claim shall be paid in equal quarterly installments over two (2) years which Claim shall bear no interest and (ii) a waiver of any and all Avoidance Actions that have or could be asserted against such Holder, in full satisfaction, settlement, release and discharge of and in exchange for the Holder's Allowed General Unsecured Claims.  In the event that Class 7 does not vote to accept the Plan, then on the Effective Date, or as soon as reasonably practicable, each Holder of any Allowed General Unsecured Claim shall receive Cash payments in the aggregate Allowed amount of such Holder's Allowed General Unsecured Claim which Claim shall be paid in equal quarterly installments over five (5) years and shall accrue interest at the rate of 2% per annum or such other interest rate as the Bankruptcy Court determines at the Confirmation Hearing or otherwise, in full satisfaction, settlement, release and discharge of and in exchange for the Holder's

Allowed General Unsecured Claims.

The Holders of General Unsecured Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

h.    Class 8: Second Lien Loan Deficiency Claims.

(i)    *Claims in Class:* Class 8 consists of the Second Lien Loan Deficiency Claims.

(ii)    *Treatment:* Each Holder of a Second Lien Loan Deficiency Claim shall have the right to make the Second Lien Loan Election or the Convenience Class Election. In the event that a Holder of a Second Lien Loan Deficiency Claim neither makes the Second Lien Loan Election nor makes the Convenience Class Election, then, on the Effective Date, or as soon as reasonably practicable, such Holder will receive in full satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Second Lien Loan Deficiency Claim, Cash payments equal to its Pro Rata share of the aggregate amount of the Allowed Second Lien Loan Deficiency Claims (which aggregate amount shall reflect reductions for Holders of Allowed Second Lien Loan Note Claims making either the Second Lien Loan Election or the Convenience Class Election) which will accrue interest at 2% per annum or such other interest rate as the Bankruptcy Court determines that shall be paid such accrued interest commencing on the fifth (5th) anniversary of the Effective Date and be paid in full on the seventh (7th) anniversary of the Effective Date.

The Holders of Second Lien Loan Deficiency Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

i.    Class 9: Convenience Claims.

(i)    *Claims in Class:* Class 9 consists of the Convenience Claims.

(ii)    *Treatment:* Unless the Holder of a Convenience Claim and the Debtor agree to a different treatment, on the Effective Date, or as soon as reasonably practicable, in full satisfaction, settlement, release and discharge of and in exchange for the Convenience Claims, each Holder of any Allowed Unsecured Claims that makes the Convenience Class Election shall receive Cash in an amount equal to 85% of such Holder's Allowed Unsecured Claim.

The Holders of Convenience Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

j.    Class 10: Equity Interests.

(i)    *Claims in Class:* Class 10 consists of the Allowed Equity Interests.

(ii)    *Treatment:* Unless the Holder of an Allowed Equity Interest and the Debtor agree to a different treatment, the legal, equitable, contractual and ownership rights of the Holders of Allowed Equity Interests are unaltered by the Plan. Upon the Effective Date, the Holders of Allowed Equity Interests shall retain their Equity Interests.

39

The Holders of Equity Interests are Unimpaired under the Plan and are not entitled to vote to accept or reject the Plan.

### 3. Allowed Claims.

Notwithstanding any provision herein to the contrary, the Debtor and/or Reorganized Ahern shall only make Distributions to Holders of Allowed Claims. No Holder of a Disputed Claim will receive any Distribution on account thereof unless and until and only to the extent that its Disputed Claim becomes an Allowed Claim.

### 4. Postpetition Interest.

In accordance with Section 502(b)(2) of the Bankruptcy Code, the amount of all Claims against the Debtor shall be calculated as of the Petition Date. Except as otherwise explicitly provided herein, in an order of the Bankruptcy Court or in a section of the Bankruptcy Code, no Holder of a Claim shall be entitled to or receive postpetition interest.

### 5. Special Provision Regarding Unimpaired Claims.

Except as otherwise provided in the Plan, and to the extent permitted by the Bankruptcy Code, nothing shall affect the Debtor's rights and defenses, both legal and equitable, with respect to any Unimpaired Claim (including Claims that are Allowed pursuant to the Plan), including, without limitation, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims, and the Debtor's failure to object to such Claims in the Chapter 11 Case shall be without prejudice to Reorganized Ahern's right to contest or defend against such Claims in (i) any appropriate non-bankruptcy forum as if such Chapter 11 Case had not been commenced or (ii) the Bankruptcy Court (such forum to be selected at the Debtor's or Reorganized Ahern's option).

## C. Means for Implementation.

### a. Plan Funding

Cash payments under the Plan shall be funded from existing Cash balances, earnings from the operations of Reorganized Ahern after the Effective Date, and borrowings under the Exit Financing Facility.

### b. Reorganized Ahern.

On or before the Effective Date, the Reorganized Ahern Organizational Documents shall be executed and, to the extent required, filed with the Nevada Secretary. The Reorganized Ahern Organizational Documents shall (i) include, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code; and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, Reorganized Ahern shall be responsible for the preparation of all reports, tax returns and other governmental filings required to be filed by the Debtor and Reorganized Ahern and all obligations related thereto.

40

c.     <u>Additional Reorganized Ahern Provisions.</u>

The Reorganized Ahern Organizational Documents, and resolutions or similar documents related to the formation and governance of Reorganized Ahern under the Plan, shall be subject to applicable bankruptcy and/or Nevada law.

d.     <u>New Financing.</u>

On the Effective Date, the Exit Financing Facility, together with new promissory notes and guarantees evidencing the obligations of Reorganized Ahern thereunder, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, shall become effective.  The obligations incurred by Reorganized Ahern pursuant to the Exit Financing Facility and related documents shall be paid as set forth in the Exit Financing Facility Documents.  A commitment letter or term sheet with respect to the Exit Financing Facility shall be attached to the Plan as <u>Exhibit 4.4</u>.

e.     <u>Effective Date Events.</u>

On the Effective Date, or as soon as reasonably practicable thereafter:

(i)     The DIP Loan Notes, Term Loan Notes and Second Lien Loan Notes shall be cancelled and extinguished and of no further force or effect.

(ii)     Reorganized Ahern shall execute and deliver the Senior Secured Note Documents and the Junior Secured Note Documents to the applicable Senior Secured Note Agents and Junior Secured Note Agents.

(iii)     The Senior Secured Note Agents and Junior Secured Note Agents shall distribute the Senior Secured Notes and Junior Secured Notes, as applicable, to the parties legally entitled thereto, including Holders of Allowed Claims in Classes 1 and 2 of the Plan in accordance with the provisions of <u>Sections 3.4.1 and 3.4.2</u> of the Plan.

(iv)     The DIP Loan Documents, Term Loan Documents and Second Lien Loan Documents shall be of no further effect except as otherwise provided in the Plan, for effectuating the Distributions under the Plan and allowing the DIP Loan Agent, Term Loan Agents and Second Lien Indenture Trustee with respect to the Distributions required to be made by any of them pursuant to the Plan and/or the DIP Loan Documents, Term Loan Documents and Second Lien Loan Documents.

f.     <u>Post-Effective Date Officers and Directors of Reorganized Ahern.</u>

On the Effective Date, the initial board of directors of Reorganized Ahern shall include the five (5) individuals serving on Debtor's Board of Directors on the Confirmation Date. Thereafter, members of the Board of Directors shall be selected pursuant to the Reorganized Ahern Organizational Documents.  The initial officers shall be comprised of the individuals employed as officers on the Confirmation Date, pursuant to each such individual's employment agreement, if any, as may have been modified, amended or extended prior to Confirmation. Debtor will disclose, at or prior to the Confirmation Hearing, the identity of such individuals.

Reorganized Ahern shall be responsible for the payment of all Allowed Claims to be paid pursuant to the Plan which are not paid on or before the Effective Date, as well as all Allowed Claims, including Taxes and Professional Fees, incurred by Debtor in operating its business up to and including the Effective Date, whether due and payable before or after the Effective Date.

g.    Establishment of Professional Fee Reserve.

Under the Plan, the Debtor or Reorganized Ahern will create and fund the Professional Fee Reserve on the Effective Date (or as soon thereafter as is practicable) in the estimated amount of accrued and unpaid Professional Fees through the Effective Date, which amount will be used to pay Allowed Professional Fee Claims held by (i) any Professionals working on behalf of the Debtor and (ii) counsel and any advisors to the Committee.  Reorganized Ahern will be obligated to pay all such Allowed Professional Fee Claims designated to be paid from the proceeds of the Professional Fee Reserve in excess of the amounts actually deposited in the Professional Fee Reserve.  In the event that any Cash remains in the Professional Fee Reserve after payment of all such Allowed Professional Fee Claims, such Cash will be returned to the operating accounts of Reorganized Ahern.

h.    No Corporate Action Required.

As of the Effective Date: (i) the adoption, execution, delivery and implementation or assignment of all contracts, leases, instruments, releases and other agreements related to or contemplated by the Plan; and (ii) the other matters provided for under or in furtherance of the Plan involving corporate action to be taken by or required of Debtor, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by Reorganized Ahern's Board of Directors or officers of Debtor.  In particular, the adoption of the Reorganized Ahern Organizational Documents, the selection of directors and officers of Debtor or Reorganized Ahern, and all other actions contemplated by or described in the Plan with respect thereto, shall be authorized and approved and be binding and in full force and effect in all respects (subject to the provisions of the Plan and the Confirmation Order), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule (other than filing such organizational documents with the applicable governmental unit as required by applicable law) or the vote, consent, authorization, or approval of any Person. Notwithstanding the forgoing, Reorganized Ahern shall take all action required to effectuate the Exit Financing  Facility Documents, Senior Secured Note Documents and Junior Secured Note Documents and any other action required to implement the Plan.

i.    Effectuation of Transactions.

On the Effective Date, the appropriate officers of Debtor and Reorganized Ahern, as applicable,  and members of the applicable Board of Directors are authorized to issue, execute, and deliver the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions, and instruments contemplated by or described in the Plan in the name of and on behalf of Debtor and Reorganized Ahern, and to otherwise fully consummate the transactions contemplated by the Plan, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person.

j.      Filing with Nevada Secretary.

To the extent applicable, in accordance with NRS 78.622, on the Effective Date a certified copy of the Plan and the Confirmation Order shall be filed with the Nevada Secretary. Debtor, from the Confirmation Date until the Effective Date, is authorized and directed to take any action or carry out any proceeding necessary to effectuate the Plan pursuant to NRS 78.622.

**D.      Executory Contracts and Unexpired Leases.**

a.      Executory Contracts.

Except for Executory Contracts and Unexpired Leases specifically addressed in the Plan or set forth on the schedule of Rejected Executory Contracts and Unexpired Leases attached as **Exhibit 5.1** to the Plan (which may be supplemented and amended up to the date the Bankruptcy Court enters the Confirmation Order and thereafter pursuant to **Section 5.3** of the Plan), all Executory Contracts and Unexpired Leases that exist on the Confirmation Date shall be deemed assumed by Reorganized Ahern on the Effective Date.

b.      Approval of Assumption or Rejection.

Entry of the Confirmation Order shall constitute as of the Effective Date: (i) approval, pursuant to Section 365(a) of the Bankruptcy Code, of the assumption by Debtor of each Executory Contract and Unexpired Lease to which Debtor is a party and which is not listed on **Exhibit 5.1**, to the Plan not otherwise provided for in the Plan and neither assumed, assumed and assigned, nor rejected by separate order prior to the Effective Date; and (ii) rejection by Debtor of each Executory Contract and Unexpired Lease to which Debtor is a party listed on **Exhibit 5.1** to the Plan.  Upon the Effective Date, each counter party to an assumed Executory Contract or Unexpired Lease listed shall be deemed to have consented to assumption contemplated by Section 365(c)(1)(B) of the Bankruptcy Code, to the extent such consent is necessary for such assumption.    To the extent applicable, all Executory Contracts or Unexpired Leases of Reorganized Ahern assumed pursuant to **Section 5** of the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant Executory Contract or Unexpired Lease and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by entry of the Confirmation Order.  Also, to the extent applicable, all Executory Contracts or Unexpired Leases of Debtor assumed pursuant to **Section 5** of the Plan shall be assigned to Reorganized Ahern on the Effective Date, and such assignment shall not be a "change of control," however such term may be defined in the relevant Executory Contract or Unexpired Lease, and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by entry of the Confirmation Order.

c.      Cure of Defaults.

Debtor or Reorganized Ahern shall Cure any defaults respecting each Executory Contract or Unexpired Lease assumed pursuant to **Section 5** of the Plan upon the latest of (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court or agreed upon by Debtor, and after the Effective Date, Reorganized Ahern; or (iii) the first Business Day following the fourteenth (14th) day after the entry of a Final Order resolving any dispute regarding (a) a Cure amount; (b) the ability of Debtor or Reorganized Ahern to provide

43

adequate assurance of future performance under the Executory Contract or Unexpired Lease assumed pursuant to the Plan in accordance with Section 365(b)(1) of the Bankruptcy Code; *provided, however*, that upon resolution of a dispute over a Cure amount, Reorganized Ahern may reject the Executory Contract or Unexpired Lease notwithstanding a previous listing as assumed; or (c) any other disputed matter pertaining to assumption, assignment or the Cure of a particular Executory Contract or an Unexpired Lease. **Exhibit 5.3** to the Plan lists Debtor's proposed Cure amounts, if any, that will be paid as provided for above, which **Exhibit 5.3** to the Plan may be amended up to and including the commencement of the Confirmation Hearing.

d.      Objection to Cure Amounts.

Any party to an Executory Contract or Unexpired Lease who objects to the Cure amount(s) with respect to such party's Executory Contract(s) or Unexpired Lease(s) listed on **Exhibit 5.3** to the Plan must file and serve an objection on Debtor's counsel no later than the deadline set by the Bankruptcy Court for filing Plan objections.  Failure to file and serve a timely objection shall be deemed consent to the Cure amounts listed on **Exhibit 5.3** to the Plan.  Any Cure Amounts shall be the responsibility of Reorganized Ahern.  If there is a dispute regarding: (i) the amount of any Cure payment; (ii) the ability of Reorganized Ahern to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease to be assumed or assigned; or (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption, except as provided in **Section 5.3** of the Plan.

e.      Confirmation Order.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in **Section 5** of the Plan, pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date.  Notwithstanding the foregoing, if, as of the date the Bankruptcy Court enters the Confirmation Order, there is pending before the Bankruptcy Court a dispute concerning the Cure amount or adequate assurance for any particular Executory Contract or Unexpired Lease (or if the time period for a non-Debtor to object to the Cure has not yet lapsed), the assumption of such Executory Contract or Unexpired Lease shall be effective as of the date the Bankruptcy Court enters an order resolving any such dispute and authorizing assumption by Debtor.

f.      Post-Petition Date Contracts and Leases.

Each Executory Contract and Unexpired Lease entered into by the Debtor after the Petition Date shall be performed by Debtor or Reorganized Ahern, as applicable, in the ordinary course of its business.

g.      Rejection Claims Bar Date.

All proofs of Claims with respect to Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be filed no later than thirty (30) days after the Effective Date. Any Claim not filed within such time shall be forever barred.

h.      Director and Officer Liability Insurance.

Debtor will assume and, if applicable, assign to Reorganized Ahern all of its existing D&O Liability Insurance Policies pursuant to Section 365(a) of the Bankruptcy Code as of the Effective Date.  Entry of the Confirmation Order will constitute approval by the Bankruptcy Court of Debtor's foregoing assumption and assignment by Debtor to Reorganized Ahern of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, entry of the Confirmation Order shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by Debtor and assigned to Reorganized Ahern under the Plan as to which no proof of Claim need be filed.

i.      Indemnification.

All indemnification obligations currently in place (whether in the bylaws, articles or certificates of incorporation, articles of limited partnership, limited liability company agreements, board resolutions (or resolutions of similar bodies), or employment contracts) for the directors, officers, employees, attorneys, or other Professionals and agents of Debtor (from the Petition Date forward) shall be assumed as of the Effective Date, and shall survive effectiveness of the Plan.  All indemnification provisions in place on and prior to the Effective Date for current directors and officers of Debtor (from the Petition Date forward) shall (i) survive the Effective Date of the Plan for Claims related to or in connection with any actions, omissions, or transactions occurring prior to the Effective Date, and (ii) remain liabilities of Reorganized Ahern specifically on behalf of Debtor.

**E.      Manner of Distribution of Property Under the Plan.**

a.      Distributions.

Except as otherwise explicitly provided for in the Plan, the Disbursing Agent shall be responsible for making Distributions described in the Plan.  Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for Reorganized Ahern to make payments pursuant to the Plan shall be obtained from existing Cash balances, earnings from the operations of Reorganized Ahern after the Effective Date, and borrowings under the Exit Financing Facility.

b.      Timing and Calculation of Amounts to Be Distributed.

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, on the next Distribution Date or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  All Distributions provided for in the Plan shall be made only to the extent permitted by applicable law.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed

Claims shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

c.    Rights and Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ Professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by Reorganized Ahern in its reasonable discretion.

With respect to a Holder of a Claim or Equity Interest whose Distribution is governed by an agent or other agreement which is administered by an indenture trustee, agent or servicer, such Distributions shall be deposited with the appropriate agent or servicer, who shall then deliver such Distributions to the Holders of Claims or Equity Interests in accordance with the provisions of the Plan and the terms of the relevant indenture or other governing agreement; *provided, however*, that Distributions to the Disbursing Agent (other than the Debtor or Reorganized Ahern) under the Plan will be deemed payment in full, regardless of whether such agent (other than the Debtor or Reorganized Ahern) ultimately distributes such Distribution to the appropriate Claim or Interest Holder.

d.    Providing for Claims Payments.

Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent: (i) at the addresses set forth on the proofs of Claim filed by such Holders (or at the last known addresses of such Holders if no proof of Claim is filed or if Debtor has not been notified of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of Claim; or (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address.  If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then-current address, at which time all returned Distributions shall be made to such Holder without interest.  Amounts in respect of undeliverable Distributions made through the Disbursing Agent shall be returned to Reorganized Ahern until such Distributions are claimed.  All claims for undeliverable Distributions shall be made on or before the second (2nd) anniversary of the Effective Date.  After such date, all unclaimed property shall revert to Reorganized Ahern and the Claim of any Holder or successor to such Holder with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.  Nothing contained in the Plan shall require

46

Reorganized Ahern or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

e.    Means of Cash Payment.

Payments of Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the discretion of the Debtor or the Disbursing Agent, as the case may be, by (a) checks drawn on, or (b) wire transfer from, a domestic bank selected by the Debtor or the Disbursing Agent, as the case may be.  Cash payments to foreign Creditors may be made, at the option of the Debtor or the Disbursing Agent, in such funds and by such means as are necessary or customary in the applicable foreign jurisdiction.

f.    Application of Record Date.

At the close of business on the Record Date, the claims registers for all Claims shall be closed, and there shall be no further changes in the record holders of Claims.  Except as provided in the Plan, the Debtor, Reorganized Ahern, the Disbursing Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims occurring after the Record Date and shall be entitled instead to recognize and deal for all purposes under the Plan with only those record holders stated on the claims registers as of the close of business on the Distribution Date irrespective of the number of Distributions to be made under the Plan to such Persons or the date of such Distributions.

g.    Claims Paid or Payable by Third Parties.

(i)    Claims Paid by Third Parties.

The Debtor, or the Disbursing Agent, as applicable, shall reduce in part or in full a Claim to the extent that the Holder of such Claim receives payment in part or in full on account of such Claim from a party that is not the Debtor or the Disbursing Agent.  To the extent a Holder of a Claim receives a Distribution on account of such Claim from a party that is not the Debtor or the Disbursing Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the Distribution to Reorganized Ahern, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

(ii)    Insurance Claims.

Except as otherwise provided in the Plan, no Distributions under the Plan shall be made on account of Allowed Claims covered by the Debtor's Insurance Policies until the insurance coverage with respect to such Allowed Claims has been exhausted.  To the extent that the Debtor's insurers agree to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurer's agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

(iii)    Applicability of Insurance Policies.

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

h.    Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of principal and accrued but unpaid interest thereon, such Distribution shall, for the Debtor's federal income tax purposes, be allocated on the Debtor's books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

i.    Setoffs.

Except as provided in the Plan, the Debtor or Reorganized Ahern may, but shall not be required to, set off or offset against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtor may have against the Claim's Holder; *provided, however*, that neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor or Reorganized Ahern of any claim that the Debtor may have against such Holder.  Nothing in the Plan shall be deemed to expand rights to setoff under applicable law.

j.    Fractional Distributions.

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

k.    *De Minimis* Distributions.

Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent will not be required to distribute, and will not distribute, Cash or other property to the Holder of any Allowed Claim or Equity Interest if the amount of Cash or other property to be distributed on account of such Claim or Equity Interest is less than $25.  Any Holder of an Allowed Claim or Equity Interest on account of which the amount of Cash or other property to be distributed is less than $25 will have such Claim or Equity Interest discharged and will be forever barred from asserting such Claim or Equity Interest against the Debtor, Reorganized Ahern, or their respective property.  Any Cash or other property not distributed pursuant to this provision will be the property of Reorganized Ahern, free of any restrictions thereon.

l.      Prepayment.

Except as otherwise provided in the Plan, any ancillary documents entered into in connection with the Plan, or the Confirmation Order, Reorganized Ahern will have the right to prepay, without penalty, all or any portion of an Allowed Claim entitled to payment in Cash at any time; *provided, however*, that any such prepayment will not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

m.      No Distribution in Excess of Allowed Amounts.

Notwithstanding anything to the contrary set forth in the Plan, no Holder of an Allowed Claim or Equity Interest will receive in respect of such Claim or Equity Interest any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim or Equity Interest (excluding payments on account of interest due and payable from and after the Effective Date pursuant to the Plan, if any).

n.      Joint Distributions.

The Debtor or the Disbursing Agent may, in their sole discretion, make Distributions jointly to any Holder of a Claim or Equity Interest and any other entity who has asserted, or whom the Debtor has determined to have, an interest in such Claim or Equity Interest.  Except as otherwise provided in the Plan or in the Confirmation Order, and notwithstanding the joint nature of any Distribution, all Distributions made by the Debtor or the Disbursing Agent will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any nature whatsoever against the Debtor and Reorganized Ahern or any of its assets or properties as set forth in Section III of the Plan.

o.      No Recourse.

No recourse shall ever be had, directly or indirectly, against Debtor or Reorganized Ahern or against any director, agent, attorney, accountant, or other professional for Debtor or Reorganized Ahern, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or agreement whatsoever executed by Debtor or Reorganized Ahern under the Plan, or by reason of the creation of any indebtedness by Debtor or Reorganized Ahern under the Plan for any purpose authorized by the Plan, it being expressly understood and agreed that all such liabilities, covenants, and agreements of Debtor and Reorganized Ahern, whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Assets or such part thereof as shall under the terms of any such agreement be liable therefore or shall be evidence only of a right of payment out of the Assets.

p.      Statements.

Debtor and the Disbursing Agent shall maintain a record of the names and addresses of all Holders of Allowed General Unsecured Claims as of the Effective Date for purposes of mailing Distributions to them.  Debtor and Reorganized Ahern shall file all tax returns and other filings with governmental authorities on behalf of Debtor and Reorganized Ahern and the Assets it holds.

q.      Further Authorization.

Reorganized Ahern shall be entitled to seek such orders, judgments, injunctions, and rulings as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions of the Plan.

**F.      Procedures for Resolving Disputed Claims.**

a.      Resolution of Disputed Claims.

Holders of Claims generally must file proofs of Claims on or prior to the applicable Bar Date.   No later than the Claims Objection Deadline (unless extended by an order of the Bankruptcy Court), the Debtor or Reorganized Ahern, as the case may be, shall file objections to Claims that were required to be filed by the applicable Bar Date with the Bankruptcy Court and serve such objections upon the Holders of such Claims to which objections are made.  Nothing contained herein, however, shall limit Reorganized Ahern's right to object to Claims, if any, filed or amended after the Claims Objection Deadline.

Holders of Administrative Claims must file a request for payment on or prior to the Administrative Claims Bar Date.  No later than the Administrative Claims Objection Deadline (unless extended by an order of the Bankruptcy Court), the Debtor or Reorganized Ahern, as the case may be, shall file objections to the Administrative Claims with the Bankruptcy Court and serve such objection upon the Holders of such Administrative Claims to which objections are made.  Nothing contained herein, however, shall limit Reorganized Ahern's right to object to Administrative Claims, if any, filed or amended after the Administrative Claims Objection Deadline.

b.      No Distribution Pending Allowance.

No payments or Distributions, if any contemplated by the Plan, will be made with respect to all or any portion of a Disputed Claim or interest unless and until all objections to such Disputed Claims or interests have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim or interest.

c.      Resolution of Objections After Effective Date.

From and after the Effective Date, Reorganized Ahern may litigate to judgment, propose settlements of, or withdraw objections to, all pending or filed Disputed Claims and may settle or compromise any Disputed Claim without notice and a hearing and without approval of the Bankruptcy Court.

d.      Resolution of Objections After Effective Date.

From and after the Effective Date, Reorganized Ahern may propose settlements of, or withdraw objections to, all pending or filed Disputed Claims and may settle or compromise any Disputed Claim without notice and a hearing and without approval of the Bankruptcy Court.

e.    Distributions After Allowance.

On each Quarterly Distribution Date (or such earlier date as determined by the Disbursing Agent in its sole discretion but subject to Section 7.2 of the Plan), the Disbursing Agent will make Distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims that would have been distributed to the Holders of such Claims or Equity Interests on the dates Distributions previously were made to Holders of Allowed Claims and Equity Interests in such Class had the Disputed Claims or Equity Interests that have become Allowed Claims or Equity Interests been Allowed on such dates.  Such Distributions will be made pursuant to the applicable provisions of Section VI of the Plan.

f.    Estimation of Claims.

The Debtor (before the Effective Date) or Reorganized Ahern (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Person, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor (before the Effective Date) or Reorganized Ahern (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.  All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

g.    Deadline to File Objections to Claims.

The Debtor reserves its right to file objections to Claims, if any, on or before the applicable Claim Objection Deadline.

h.    Late-Filed Claims.

Except with respect to Claims, proof of which is made in compliance with the requirements of Sections 502(e) and 509 of the Bankruptcy Code, no Claim filed after the Bar Date or, as applicable, the Administrative Claims Bar Date, shall be allowed, and all such Claims are hereby disallowed in full.  After the Bar Date or the Administrative Claim Bar Date, as applicable, no Creditor shall be permitted to amend any claim to increase the claimed amount, unless permitted by the Bankruptcy Court, subject to the Debtor's or Reorganized Ahern's right to object to such increase; and any such amendment shall be disallowed, unless permitted by the Bankruptcy Court, subject to the Debtor's or Reorganized Ahern's right to object to such increase, to the extent of the late-filed increase in the claimed amount.

51

i.    Reservation of Right to Object to Allowance or Asserted Priority of Claims.

Nothing herein will waive, prejudice or otherwise affect the rights of the Debtor, Reorganized Ahern or the Holders of any Claim to object at any time, including after the Effective Date, to the allowance or asserted priority of any Claim, except with respect to any Allowed Claim.

**G.    Conditions Precedent to Confirmation and the Effective Date.**

a.    Conditions to Confirmation.

As a condition precedent to entry of the Confirmation Order, the Confirmation Order shall be in form and substance acceptable to Debtor. The Bankruptcy Court shall have entered an order, which shall not be subject to any stay or subject to an unresolved request for revocation under Section 1144 of the Bankruptcy Code, approving the Disclosure Statement with respect to the Plan, as containing adequate information within the meaning of Section 1125 of the Bankruptcy Code, in form and substance acceptable to the Debtor.

b.    Conditions to Effectiveness.

The following are conditions precedent to the occurrence of the Effective Date:

(i)    No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending, including any appeal;

(ii)    The Exit Financing Facility shall have been executed and delivered by all of the Persons that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived, or satisfied in accordance with the terms thereof, and funding pursuant to the Exit Financing Facility shall have occurred.

(iii)    All documents necessary to implement the transactions contemplated by the Plan shall be in form and substance acceptable to Debtor and approved by the Bankruptcy Court.

(iv)    All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

(v)    The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtor as contemplated herein in form and substance acceptable to the Debtor.

(vi)    Sufficient Cash and other Assets shall be set aside, reserved and withheld by Debtor to make the Distributions required to be paid on the Effective Date or within sixty (60) days thereafter by the Bankruptcy Code and the Plan.

(vii)    All actions reasonably necessary to establish the Professional Fee Reserve as set forth in Section 4.7 of the Plan shall have been effectuated to the extent necessary to establish the Professional Fee Reserve on the Effective Date (or as soon thereafter as is practicable).

c.    Notice of Effectiveness.

When all of the steps contemplated by Section 8.2 of the Plan have been completed, Debtor shall file with the Bankruptcy Court and serve upon all Creditors and all potential Holders of Administrative Claims known to Debtor (whether or not disputed), a Notice of Effective Date of Plan.   The Notice of Effective Date of Plan shall include notice of the Administrative Claims Bar Date.

d.    Waiver of Conditions.

The Debtor, and if applicable, Reorganized Ahern, may waive (each for themselves but not for others) any or all of the other conditions set forth in this Article 8 and specifically Sections 8.2.1, 8.2.3, 8.2.5, and 8.2.7 of the Plan without leave of or order of the Bankruptcy Court and without any formal action.   The failure of a party to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time prior to the filing of the Notice of Effectiveness described in Section 8.3.

## H.    Title to Property; Discharge; and Injunction.

a.    Vesting of Assets.

Subject to and as provided for in the Plan, the Assets shall be vested and/or transferred to Reorganized Ahern on the Effective Date, subject to the Liens on behalf of Holders of Class 1, Class 2, Class 3, and Class 4 Claims granted under the Plan.   On and after the Effective Date, Reorganized Ahern may operate its business and may use, acquire, and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

b.    Preservation of Litigation Claims.

In accordance with Section 1123(b)(3) of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, on the Effective Date all Litigation Claims shall be assigned to Reorganized Ahern, and Reorganized Ahern shall have the exclusive right to enforce, prosecute, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Litigation Claims, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtor as of the Effective Date.

c.    Settlement of Litigation Claims.

At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, Debtor may settle any or all of the Litigation Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.   After the Effective

Date, Reorganized Ahern may, and shall have the exclusive right to, compromise and settle any Claims against it and claims it may have against any other Person, including, without limitation, the Litigation Claims, without notice to or approval from the Bankruptcy Court, including, without limitation, any and all derivative actions pending or otherwise existing against Debtor as of the Effective Date.

d.    Discharge.

On the Effective Date, except as otherwise provided in the Plan, Debtor shall be discharged from any and all Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 to the fullest extent provided in Sections 524 and 1141 of the Bankruptcy Code.  The discharge shall be to the fullest extent provided under Section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, and, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any kind or nature whatsoever against Debtor or any of its assets or property, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims.

e.    Compromise and Settlement.

The allowance, classification, and treatment of all Allowed Claims and their respective Distributions under the Plan take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, Section 510(c) of the Bankruptcy Code, or otherwise, including without limitation, the subordination provisions of the Intercreditor Agreement.  As of the Effective Date, any and all such rights described in the preceding sentence will be settled, compromised, and released pursuant to the Plan and any and all such Causes of Action related thereto are settled, compromised, and released pursuant to the Plan.

f.    Releases.

**On the Effective Date and effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, but not limited to: (i) the discharge of debt and all other good and valuable consideration provided pursuant to the Plan ; and (ii) the services of Debtor's officers and directors serving on and since the Petition Date in facilitating the expeditious implementation of the reorganization contemplated by the Plan, Debtor and Reorganized Ahern shall provide a full discharge and release to the Released Parties (and each such Released Party so released shall be deemed released and discharged by Debtor and Reorganized Ahern) and their respective properties from any and all Causes of Action, whether known or unknown, whether for torts, including fraud, contract, violations of federal or state securities laws, or otherwise, arising from or related in any way to Debtor or Reorganized Ahern, including, without limitation, those that either Debtor or Reorganized Ahern would have been legally entitled to assert in its own right (whether individually or collectively) or that any Holder of a Claim or other Person would have been legally entitled to assert on behalf of Debtor or its Estate but for this release and further including those in any way related to the Chapter 11**

54

**Case or the Plan to the fullest extent of the law;** *provided, however*, **that the foregoing releases shall not operate to waive or release any Released Party from (a) any Causes of Action expressly set forth in and preserved by the Plan, any Plan Supplement, or related documents or (b) as a result of actual fraud, gross negligence, or willful misconduct.**

g.    Third Party Releases.

**[RESERVED].**

h.    Injunction.

**From and after the Effective Date, and except as provided in the Plan, the Confirmation Order and any orders of the Bankruptcy Court implementing the provisions of the Plan and Confirmation Order, all entities that have held, currently hold, or may hold a Claim that is terminated, modified or restructured pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of such Claims: (i) commencing or continuing in any manner any action or other proceeding against Reorganized Ahern or its property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Reorganized Ahern or its property; (iii) creating, perfecting or enforcing any Lien or encumbrance against Reorganized Ahern or its property; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to Reorganized Ahern or its property; and (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.  By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunctions set forth in Section 9.8 of the Plan.**

i.    Exculpation.

**From and after the Effective Date, none of Debtor, Reorganized Ahern, the DIP Loan Agents, solely in their capacity as agents for the DIP Loan, the DIP Lenders, solely in their capacity as DIP Loan Lenders, and the Committee, nor any of their respective directors, officers, managers, employees, advisors, attorneys, Professionals, or agents on and from the Petition Date forward, shall have or incur any liability to any Holder of a Claim or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, Affiliates, professionals, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (from the Petition Date forward) the Chapter 11 Case, Reorganized Ahern, the pursuit of confirmation of the Plan, or the Substantial Consummation of the Plan, including the issuance and distribution of the Exit Financing Facility Documents, the Senior Secured Note Documents or the Junior Secured Note Documents as provided for in the Plan or any orders of the Bankruptcy Court, except for gross negligence and willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Chapter 11 Case. No Holder of a Claim, nor any other party-in-interest, including their respective agents, employees, representatives, financial advisors, attorneys, Affiliates, professionals, or their successors and assigns, shall have any right of action against Debtor, Reorganized Ahern, the DIP Loan Agents, the DIP Lenders, and the Committee, or any of their respective**

present or former members, officers, directors, managers, employees, advisors, attorneys, Professionals, or agents, relating to, or arising out of (from the Petition Date forward) the Chapter 11 Case, the pursuit of Confirmation of the Plan, the Substantial Consummation of the Plan, including the issuance and distribution of the Exit Financing Facility Documents, the Senior Secured Note Documents or the Junior Secured Note Documents as provided for in the Plan or any orders of the Bankruptcy Court, or the administration of the Plan, except for: (i) their willful misconduct and gross negligence; (ii) matters specifically contemplated by either the Plan or Reorganized Ahern; and (iii) any liability of an attorney to its client not subject to exculpation under the Bankruptcy Code.

**I.**     **Retention of Jurisdiction.**

    a.     Jurisdiction.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case and Reorganized Ahern after the Effective Date as is legally permissible, including jurisdiction to:

(i)     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Disputed Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Disputed Claims;

(ii)     Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

(iii)     Resolve any matters related to the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which Debtor or Reorganized Ahern is a party and to hear, determine and, if necessary, liquidate any Claims arising therefrom or Cure amounts related thereto;

(iv)     Ensure that Distributions to or for the benefit of Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(v)     Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications or motions involving Debtor or Reorganized Ahern that may be pending on the Effective Date or commenced thereafter as provided for by the Plan;

(vi)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order except as otherwise provided in the Plan;

(vii)     Decide or resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of any Final Order, the Plan, the Confirmation Order, or obligations of any Persons incurred in connection with such Final Order, the Plan, or the Confirmation Order;

    

(viii)   Modify the Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code and Section 11 of the Plan or modify any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, the Confirmation Order, or Reorganized Ahern; or remedy any defect or omission or reconcile any inconsistency in any Final Order, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

(ix)   Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation, or enforcement of any Final Order, the Plan, or the Confirmation Order, except as otherwise provided in the Plan;

(x)   Enter and implement such orders as are necessary or appropriate if a Final Order or the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(xi)   Determine any other matters that may arise in connection with or relate to the Plan, any Final Order, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, any Final Order or the Confirmation Order (unless such contract, instrument, release, or other agreement or document expressly provides otherwise), except as otherwise provided in the Plan;

(xii)   Enter an order closing the Chapter 11 Case;

(xiii)   Hear and decide Litigation Claims and any other Claim or Cause of Action of Debtor and Reorganized Ahern pending on the Effective Date; and

(xiv)   Decide or resolve any matter over which the Bankruptcy Court has jurisdiction pursuant to Section 505 of the Bankruptcy Code.

**J.**    **Modification and Amendment of Plan.**

Prior to Confirmation, Debtor may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time.  After the Confirmation Date and prior to the Effective Date, Debtor may, under Sections 1127(b), (c), and (d) of the Bankruptcy Code, alter, amend, or modify the Plan or institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, and to make appropriate adjustments and modifications to the Plan or the Confirmation Order as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially adversely affect the treatment of Holders of Claims under the Plan.

## K.    <u>Miscellaneous.</u>

a.    <u>Effectuating Documents; Further Transactions; and Timing.</u>

Each of the officers of Debtor and Reorganized Ahern are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any obligations issued, transferred, or cancelled pursuant to the Plan and transactions contemplated by the Plan. All transactions that are required to occur on the Effective Date under the terms of the Plan shall be deemed to have occurred simultaneously. Debtor and Reorganized Ahern are authorized and directed to do such acts and execute such documents as are necessary to implement the Plan.

b.    <u>Cancellation of Existing Agreements.</u>

On the latest to occur of (i) the Effective Date; (ii) the entry of a Final Order resolving all Claims in the Chapter 11 Case; and (iii) the final Distribution made to Holders of Allowed Claims in accordance with the terms of the Plan, unless otherwise provided in the Plan, any document, agreement, or instrument evidencing any Disputed Claim that is disallowed shall be deemed automatically cancelled and terminated without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of Debtor under such documents, agreements, or instruments evidencing such Claims shall be discharged.

c.    <u>Exemption from Transfer Taxes.</u>

Pursuant to Section 1146(a) of the Bankruptcy Code, (i) the issuance, distribution, transfer, or exchange of Estate property; (ii) the creation, modification, consolidation, or recording of any deed of trust or other interest, or the securing of additional indebtedness by such means or by other means in furtherance of, or in connection with the Plan or the Confirmation Order; (iii) the making, assignment, modification, or recording of any lease or sublease; or (iv) the making, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, Confirmation Order, or any transaction contemplated above, or any transactions arising out of, contemplated by, or in any way related to the foregoing shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act or real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment and the appropriate state or local government officials or agents shall be, and hereby are, directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

d.    <u>Revocation or Withdrawal of the Plan.</u>

Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is withdrawn or revoked or if the Bankruptcy Court denies confirmation of the Plan, then the Plan shall be deemed null and void and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against Debtor or any other Person, nor shall the withdrawal or revocation of the Plan prejudice in any manner the rights of Debtor or any Person in any further proceedings involving Debtor. In the event the Plan

is withdrawn or revoked, nothing set forth in the Plan shall be deemed an admission of any sort and the Plan and any transaction contemplated thereby shall be inadmissible into evidence in any proceeding.

In the event that the Effective Date does not occur, upon notification submitted by Debtor to the Bankruptcy Court: (i) the Confirmation Order shall be vacated; (ii) no Distributions under the Plan shall be made; (iii) Debtor and all Holders of Claims shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (iv) Debtor's obligations with respect to the Claims shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims by or against Debtor or any other Person or to prejudice in any manner the rights of Debtor or any Person in any further proceedings involving Debtor.

> e.    Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Upon the Effective Date, the injunction provided in Section IX of the Plan shall apply.

> f.    Enforcement of Subordination.

Unless otherwise set forth herein, in accordance with Section 510(a) of the Bankruptcy Code, all subordination rights that the Debtor or a Holder of a Claim or Equity Interest may have with respect to any Claim or Distribution to be made pursuant to the Plan will not be discharged and terminated, except to the extent that such subordination rights conflict with other provisions of the Bankruptcy Code.  All actions to request or direct subordination arising in law or in equity, including rights under Section 510(b) of the Bankruptcy Code, are not waived and expressly preserved.

> g.    Binding Effect.

The Plan shall be binding upon and inure to the benefit of the Debtor and the Estate, Reorganized Ahern and all present and former Holders of Claims against and interests in the Debtor, whether or not such Holders will receive or retain any property or interest in property under the Plan, their respective successors and assigns, including, without limitation, all other parties in interest in the Chapter 11 Case.

> h.    Plan Supplement.

The Plan Supplement shall be filed with the Bankruptcy Court no later than ten (10) Business Days before the Voting Deadline, and additional Plan Supplement documents shall be filed before the Effective Date as amendments to the Plan Supplement.  Any document included in the Plan Supplement (and amendments thereto) filed by the Debtor shall be deemed an integral part of the Plan and shall be incorporated by reference as if fully set forth in the Plan. To the extent any exhibit or schedule to the Plan is inconsistent with the terms of the Plan, the Plan shall control.

i.      Committees.

On the Effective Date, the Committee shall cease to exist, except with respect to any application for compensation or reimbursement of costs and expenses in connection with services rendered prior to the Effective Date.

j.      Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable or as provided in any contract, instrument, release, or other agreement entered into in connection with the Plan or in any document which remains unaltered by the Plan, the rights, duties, and obligations of Debtor and any other Person arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Nevada without giving effect to Nevada choice of law provisions.

k.      Modification of Payment Terms.

Reorganized Ahern reserves the right to modify the treatment of any Allowed Claim in any manner adverse only to the Holder of such Allowed Claim at any time after the Effective Date upon the prior written consent of the Holder whose Allowed Claim treatment is being adversely affected.

l.      Notices.

Any notice required or permitted to be provided under the Plan shall be in writing and served by either: (a) certified mail, return receipt requested, postage prepaid; (b) hand delivery, or (c) reputable overnight courier service, freight prepaid, to be addressed as follows:

If to Debtor or Reorganized Ahern:    Ahern Rentals, Inc.
                                      Attn: Howard Brown, Chief Financial Officer
                                      1401 Mineral Avenue
                                      Las Vegas, NV 89106-4342
                                      Tel: (702) 362-0623
                                      Fax: (702) 367-7652

With a Copy to:                       GORDON SILVER
                                      Attn:  William M. Noall, Esq.
                                      3960 Howard Hughes Pkwy, 9th Floor
                                      Las Vegas, NV  89109
                                      Tel:  (702) 796-5555
                                      Fax:  (702) 369-2666

                                      and

                                      DLA PIPER (US) LLP
                                      Attn: Gregg M. Galardi, Esq.
                                      1251 Avenue of the Americas
                                      New York, New York 10020
                                      Tel:  (212) 335-4640
                                      Fax:  (212) 884-8680

60

m.    <u>Severability.</u>

If any provision of the Plan is determined by the Bankruptcy Court to be invalid, illegal, or unenforceable or the Plan is determined to be not confirmable pursuant to Section 1129 of the Bankruptcy Code, the Bankruptcy Court, at the request of Debtor or Reorganized Ahern, as applicable, shall have the power to alter and interpret such term to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall provide and shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

n.    <u>Withholding and Reporting Requirements.</u>

In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, Reorganized Ahern shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all Distributions under the Plan shall be subject to any such withholding and reporting requirements. Reorganized Ahern shall be authorized to take any and all action that may be necessary to comply with such withholding and recording requirements. Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding, and other tax obligation on account of such Distribution.

o.    <u>Post Confirmation Reporting and Quarterly Fees to the United States Trustee.</u>

Prior to the Effective Date, Debtor, and after the Effective Date, Reorganized Ahern, shall pay all quarterly fees payable to the U.S. Trustee consistent with the sliding scale set forth in 28 U.S.C. § 1930(a)(6) and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.   These fees accrue throughout the pendency of the Chapter 11 Case, until entry of a final decree.   U.S. Trustee fees paid prior to confirmation of the Plan will be reported in operating reports required by Sections 704(8), 1106(a)(1), and 1107(a), as well as the United States Trustee Guidelines.   All U.S. Trustee quarterly fees accrued prior to confirmation of the Plan will be paid on or before the Effective Date pursuant to Section 1129(a)(12).   All U.S. Trustee fees accrued post-confirmation will be timely paid on a calendar quarterly basis and reported on post-confirmation operating reports.   Final fees will be paid on or before the entry of a final decree in the Chapter 11 Case.

p.    <u>Section 1125(e) of the Bankruptcy Code.</u>

As of the Confirmation Date, the Debtor shall be deemed to have acted in good faith and in compliance with Section 1125(e) of the Bankruptcy Code.

# VI.
## CERTAIN RISK FACTORS TO BE CONSIDERED

The Holders of Claims and Equity Interests in Classes **1, 2, 3, 6, 7, 8, and 9** should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    General Considerations

The Plan sets forth the means for satisfying the Claims against the Debtor. The reorganization of the Debtor's business and operations under the proposed Plan avoids the potentially adverse impact of a sale or liquidation on the Debtor's customers, suppliers, employees, communities, and the recoveries that Creditor and Equity Interests are projected to receive under the Plan.

### B.    Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtor, see Article X hereto, and that the value of distributions to dissenting Holders of Claims and Equity Interests will not be less than the value such Holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. See Article X hereto. Although the Debtor believes that the Plan meets such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Appendix C for a liquidation analysis of the Debtor (the "Liquidation Analysis").

The Debtor's future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtor's operating results materially, as the Debtor's ability to obtain financing to fund its operations and its relations with customers and suppliers may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtor cannot predict the ultimate amount of all settlement terms for its liabilities that will be subject to a plan of reorganization. Once a plan of reorganization is approved and implemented, the Debtor's operating results may be adversely affected by the possible reluctance of prospective lenders, customers, and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

### C.    Class Estimations

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual allowed amount of Claims might differ materially in some respect from the estimates as the estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, the actual allowed amount of Claims may vary materially from those estimated herein.

**D.    Conditions Precedent to Consummation; Timing**

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

**E.    Competition**

As did the Debtor, Reorganized Ahern will face intense competition which could adversely affect its operations and harm financial condition.  For example, Reorganized Ahern cannot ensure that a new equipment rental or sales company will not commence operations in the same markets in which the Debtor currently operates or that an existing competitor will not increase capacity or lower prices in such markets.

**F.    Environmental and Other Regulations**

The Debtor is not aware of any environmental condition at any of its properties that it considers material.  However, it is possible that future environmental laws and regulations, or new interpretations of existing environmental laws, will impose material environmental liabilities on the Debtor, or that current environmental conditions of properties that the Debtor owns or operates will be adversely affected by hazardous substances associated with other nearby properties or the actions of unrelated third parties.  The cost to defend any future environmental claims, perform any future environmental remediation, satisfy any environmental liabilities, or respond to changed environmental conditions could have a material adverse effect on the Debtor's financial condition and operating results.

**G.    Leverage**

The Debtor believes that it will emerge from Chapter 11 with a reasonable level of debt that can be effectively serviced in accordance with its business plan.  Circumstances, however, may arise which might cause the Debtor to conclude that it is overleveraged, which could have significant negative consequences, including:

(i)    it may become more difficult for Reorganized Ahern to satisfy its obligations with respect to all of its obligations;

(ii)    Reorganized Ahern may be vulnerable to a downturn in the markets in which it operates or a downturn in the economy in general;

(iii)    Reorganized Ahern may be required to dedicate a substantial portion of its cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements;

(iv)    Reorganized Ahern may be limited in its flexibility to plan for, or react to, changes in its business and the industry in which it operates or entry of new competitors

63

into its markets;

(v)    Reorganized Ahern may be placed at a competitive disadvantage compared to its competitors that have less debt, including with respect to implementing effective pricing and promotional programs; and

(vi)    Reorganized Ahern may be limited in borrowing additional funds.

Additionally, there may be factors beyond the control of Reorganized Ahern that could impact its ability to meet debt service requirements.  The ability of Reorganized Ahern to meet debt service requirements will depend on its future performance, which, in turn, will depend on Reorganized Ahern's ability to sustain sales or rental conditions in the markets in which Reorganized Ahern operates, the economy generally, and other factors that are beyond its control.  The Debtor can provide no assurance that the business of Reorganized Ahern will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable Reorganized Ahern to pay its indebtedness or to fund its other liquidity needs.  Moreover, Reorganized Ahern may need to refinance all or a portion of its indebtedness on or before maturity.  The Debtor cannot make assurances that Reorganized Ahern will be able to refinance any of its indebtedness on commercially reasonable terms or at all.  If Reorganized Ahern is unable to make scheduled debt payments or comply with the other provisions of its debt instruments, its various lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

## H.    <u>Litigation</u>

Reorganized Ahern will be subject to various claims and legal actions arising in the ordinary course of its business.  The Debtor is not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on Reorganized Ahern.

## I.    <u>Adverse Publicity</u>

Adverse publicity or news coverage relating to Reorganized Ahern, including but not limited to publicity or news coverage in connection with the Chapter 11 Case, may negatively impact Reorganized Ahern's efforts to establish and promote name recognition and a positive image after the Effective Date.

## J.    <u>Certain Tax Considerations</u>

There are a number of income tax considerations, risks, and uncertainties associated with (i) the consummation of the Plan or (ii) in the alternative, if the Plan is not confirmed, the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.  Interested parties should carefully read (x) the discussions set forth in Article VII of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtor and Reorganized Ahern and to certain Holders of Claims or Equity Interests who are entitled to vote to accept or reject the Plan and (y) the Liquidation Analysis set forth in Appendix C to this Disclosure Statement.

# VII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtor and certain Holders of Claims or Equity Interests that are entitled to vote to accept or reject the Plan. This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. federal income tax consequences described below.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim or Equity Interests in light of such Holder's particular facts and circumstances or to certain types of Holders of Claims or Equity Interests subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," "constructive" sale or straddle transaction, persons holding claims through a partnership or other pass through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who acquired or expect to acquire either an equity interest or other security in a Debtor or a Claim in connection with the performance of services). In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation and does not address the U.S. federal income tax consequences to Holders of Claims or Equity Interests that are Unimpaired under the Plan or Holders of Claims or Equity Interests that are not entitled to receive or retain any property under the Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed herein. No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect thereto.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

EAST\52216559. 5

104500-002/1750782.doc

**A.    U.S. Federal Income Tax Consequences to the Claimholders**

The U.S. federal income tax consequences to Holders of Allowed Claims or Equity Interests arising from the Distributions to be made in satisfaction of their Claims or Equity Interests pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the Holder of a Claim or Equity Interest in exchange for such Claim; (b) the nature of such Claim or Equity Interest; (c) whether the Holder has previously claimed a bad debt or worthless security deduction in respect of such Claim or Equity Interest; (d) whether such Claim or Equity Interest constitutes a security; (e) whether the Holder of such Claim or Equity Interest is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the Holder of such Claim or Equity Interest reports income on the accrual or cash basis; and (g) whether the Holder of such Claim or Equity Interest receives Distributions under the Plan in more than one taxable year.  For U.S. federal income tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place.  In addition, where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim or Equity Interest constitutes a capital asset in the hands of the Holder and how long it has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the underlying Claim.  A Holder who purchased its/his/her Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.  Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

In general, to the extent a Holder of a debt instrument receives property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the Holder as interest income (if not previously included in the holder's gross income).  Conversely, such a Holder generally recognizes a deductible loss to the extent that any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full.

The extent to which property received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear.  Pursuant to the Plan, all Distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any.  However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

**Each Holder of an Allowed Claim or Equity Interest is urged to consult its/his/her own tax advisor regarding the allocation of consideration and the deductibility of previously included unpaid interest and OID for tax purposes.**

**B.    Information Reporting and Backup Withholding**

Certain payments, including certain payments of Claims pursuant to the Plan, payments

66

of interest, and the proceeds from the sale or other taxable disposition of the Claims may be subject to information reporting to the IRS.  Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) or (ii) provides a correct taxpayer identification number and otherwise complies with applicable backup withholding provisions.  In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

## C.    **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ASSOCIATED WITH THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## VIII.
## CONFIRMATION OF THE PLAN

## A.    **Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a Plan.  As of the date of the filing of the Plan and Disclosure Statement, the Debtor has requested, pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors, equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to Section 1128(b) of the Bankruptcy Code, any party in interest may object to confirmation of a plan of reorganization.  Any objection to Confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon:  (i) Ahern Rentals, Inc., 1401 Mineral Avenue, Las Vegas, NV 89106 (Attn: Howard L. Brown), Debtor; (ii) Gordon Silver, 3960 Howard Hughes Parkway, 9th Floor, Las Vegas, NV 89160 (Attn: Thomas H. Fell, Esq.), attorneys for the Debtor; (iii) DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn: Gregg M. Galardi, Esq.),

attorneys for the Debtor; (iv) Office of the United States Trustee for the District of Nevada, C. Clifton Young Federal Building, 300 Booth Street, Room 3009, Reno, NV 89509 (Attn: William B. Cossitt, Esq., Trial Attorney); (v) Covington & Burling LLP, 1201 Pennsylvania Avenue, NW, Washington, DC 20004 (Attn: Michael St. Patrick Baxter, Esq.), attorneys for the Committee; (vi) Downey Brand LLP, 100 W. Liberty Street, Suite 900, Reno, NV 89501-1958 (Attn: Sallie B. Armstrong, Esq.), attorneys for the Committee; (vii) Kaye Scholer LLP, 425 Park Avenue, New York, NY 10022 (Attn: Marc. D. Rosenberg, Esq.), attorneys for the DIP Agent and First Lien Agent; (viii) Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017 (Attn: Robert J. Moore, Esq.), attorneys for the Majority Term Lenders; and (ix) such other parties as the Bankruptcy Court may order.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING WHETHER TO CONFIRM THE PLAN.**

**B.      Plan Confirmation Requirements Under the Bankruptcy Code.**

At the Confirmation Hearing, the Bankruptcy Court will consider the terms of the Plan and determine whether the Plan terms satisfy the requirements set out in Section 1129 of the Bankruptcy Code. The Debtor believes that the Plan satisfies or will satisfy the following requirements of Section 1129 of the Bankruptcy Code, certain of which are discussed in more detail below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as a proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtor or by a person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment: (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the approval of the Bankruptcy Court as reasonable, if such payment is to be fixed after Confirmation of the Plan.

- Each Holder of an Impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Holder's Claim or Equity Interest, property of a value as of the Effective Date that is not less than the amount such Holder would receive or retain if the Debtor was liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code.

- Except to the extent the Plan meets the requirements of Section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests either has accepted the

68

Plan or is not an Impaired Class under the Plan.

▪ Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims will be paid in full as required by the Bankruptcy Code.

**C.    Plan Consummation.**

Upon Confirmation of the Plan by the Bankruptcy Court, the Plan will be deemed consummated on the Effective Date.  Distributions to Holders of Claims receiving a Distribution pursuant to the terms of the Plan will follow consummation of the Plan.

**D.    Feasibility of the Plan**

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

To support its belief in the feasibility of the Plan, the Debtor has relied upon the Financial Projections, which are annexed to this Disclosure Statement as Appendix B.

The Financial Projections indicate that Reorganized Ahern should have sufficient cash flow to pay and service its debt obligations and to fund its operations.  Accordingly, the Debtor believes that the Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of Reorganized Ahern; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; Reorganized Ahern's retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of Reorganized Ahern and some or all of which may not materialize.

To the extent that the assumptions inherent in the Financial Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates underlying the Financial Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of Reorganized Ahern.  Accordingly, the Financial Projections are only estimates and are necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Financial Projections will not be realized and that actual results will vary from the Financial Projections, which variations may be material and are likely to increase over time.  In light of the foregoing, readers are cautioned not to place undue reliance on the Financial

69

Projections. The Financial Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Financial Projections have not been audited, reviewed, or compiled by the Debtor's independent public accountants. The Debtor will be required to adopt a "fresh start" accounting upon its emergence from Chapter 11. The actual adjustments for "fresh start" accounting that the Debtor may be required to adopt upon emergence, may differ substantially from those "fresh start" adjustments in the Financial Projections. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtor, the Debtor's advisors, or any other Person that Financial Projections can or will be achieved.

The Financial Projections should be read together with the information in Article VI of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Financial Projections.

The Debtor does not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtor does not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

The Debtor will face a number of risks with respect to its continuing business operations upon emergence from Chapter 11, including but not limited to the following: the Debtor's ability to improve profitability and generate positive operating cash flow; the Debtor's ability to sustain sales and rental increases in the 2013 fiscal year; the Debtor's ability to increase capital expenditures in the future to invest in its inventory; the Debtor's response to the entry of new competitors into its markets; the Debtor's ability to upgrade its information systems and implement new technology and business processes; the Debtor's ability to implement new customer service programs; the Debtor's ability to implement effective pricing and promotional programs; the Debtor's ability to successfully implement effective business continuity and IT recovery planning; the Debtor's ability to reserve appropriately for self-insurance liabilities; changes in federal, state or local laws or regulations; general economic conditions in the Debtor's operating regions; stability of product costs; increases in labor and employee benefit costs, such as health care and pension expenses; or changes in accounting standards, taxation requirements and bankruptcy laws.

## E.    Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims or Equity Interests vote to accept the Plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, Holders of Claims or Equity Interests in each of **Class 1, 2, 3, 6, 7, 8, and 9** will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number of the Claims or Interests actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims or Equity Interests who fail to vote are not counted as

either accepting or rejecting the Plan.

**F.**    **Best Interests Test**

As noted above, even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 cases, litigation costs, and claims arising from the operations of the debtor during the pendency of the Chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

**G.**    **Liquidation Analysis**

The Liquidation Analysis prepared with respect to the Debtor is attached to this Disclosure Statement as Appendix C. The Debtor believes that any liquidation analysis is inherently speculative. For example, the Liquidation Analysis for the Debtor necessarily contains

71

estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that will ultimately become Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

**H.    Valuation of Reorganized Ahern**

Solely for purposes of the Plan, the Debtor has estimated that the enterprise value of Reorganized Ahern falls in a range from $680 million to $790 million and that the equity value falls in a range between $69.6 million to $179.6 million. These estimated ranges of values represent hypothetical values that reflect the estimated intrinsic value of Reorganized Ahern derived through the application of various valuation techniques.

The valuation of Reorganized Ahern is based on a number of assumptions as set forth in the Valuation Analysis attached hereto as Appendix D.

**I.    Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation**

It is impossible to determine with any specificity the value each Holder of an Unsecured Claim will receive as a percentage of its Allowed Claim. Notwithstanding the difficulty in quantifying recoveries with precision, the Debtor believes that the financial disclosures and projections contained in this Disclosure Statement imply a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a Chapter 7 liquidation. Accordingly, the Debtor believes that the "best interests" test of Section 1129 of the Bankruptcy Code is satisfied.

**J.    Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

The Debtor reserves the right to seek a "cramdown" confirmation of the Plan with respect to the Claims and Equity Interests in Classes **1, 2, 3, 6, 7, 8, and 9** in the event the Holders of such Claims or Equity Interests vote to reject the Plan. Specifically, Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

72

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (ii) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtor believes the Plan does not discriminate unfairly with respect to the Claims and Equity Interests in Classes **1, 2, 3, 6, 7, 8, and 9**.  In the event it becomes necessary to "cramdown" the Plan over the rejection of any such Classes, the Debtor will demonstrate at the Confirmation Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to such Classes.  The fair and equitable tests set forth above for unsecured claims and interests applies to Classes **6, 7, 8, and 9**.  The fair and equitable test for secured claims, which is applicable to Classes **1, 2, and 3** is that the plan provides (i) that the holders of secured claims retain the liens in the property securing such claims to the extent of the allowed amount of such claims, and that the holders of such claims receive on account of such claims deferred cash payments totaling at least the allowed amount of such claims, of a value, as of the effective date of the plan, of at least the value of such holders' interest in the estate's interest in such property; (ii) for the sale of any property subject to the liens securing such claims, free and clear of such liens, with the liens attaching to the proceeds of such sale, and such liened proceeds being treated either pursuant to (i) or (ii); or (iii) for the realization by such holders of the indubitable equivalent of such claims.  The treatment proposed for Classes **1, 2 and 3** satisfies the fair and equitable test and can be crammed down, if necessary.

### K.    Notice to Holders of Claims and Interests.

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable holders of Claims and Interests entitled to vote on the Plan to make an informed judgment about whether to accept or reject the Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTEREST IN, THE DEBTOR, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS ALL HOLDERS OF CLAIMS OR INTERESTS AGAINST THE DEBTOR ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES, SUPPLEMENTS AND/OR EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor other than the information contained herein or therein.  No such information should be relied upon in making a determination to vote to accept or reject the Plan.

**L.    Voting Rights.**

Pursuant to the provisions of the Bankruptcy Code, only holders of claims and interests, established as of the record date, in classes that are (a) treated as "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan, are entitled to vote on the Plan.  Under the Plan, only Holders of Claims and Equity Interests in Classes **1, 2, 3, 6, 7, 8, and 9**, established as of the Record Date, are entitled to vote on the Plan.  Claims in other Classes are Unimpaired and their Holders are deemed to have accepted the Plan.

Only Holders of Claims and Equity Interests in the voting Classes are entitled to vote on the Plan.  Pursuant to Bankruptcy Code Section 105(a) and Bankruptcy Rule 3003(c)(2), any Holder of a Claim (a) that is either (i) not scheduled or (ii) scheduled in the schedules and statements at zero, as unknown or as disputed, contingent or unliquidated, and (b) that is not the subject of a proof of Claim filed by the applicable Bar Date set by the Court will not be treated as a creditor with respect to such Claim for purposes of voting on or objecting to the Plan.

**M.    Solicitation Materials.**

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtor, through its balloting agent, Kurtzman Carson Consultants, LLC (the "Balloting Agent"), will send to Holders of Claims and Equity Interests who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time, and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more Ballots (and return envelopes) to be used in voting to accept or to reject the Plan, and (d) other materials as authorized by the Bankruptcy Court.

If you are the Holder of a Claim or Equity Interest who believes you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the following:

> Ahern Equipment Rentals Ballot Processing Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, California 90245
> Tel:  (877) 606-7652

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.  You should complete and sign your original Ballot (copies will not be accepted) and return it as instructed in

the envelope provided.

Each Ballot has been coded to reflect the Class of Claims or Equity Interests it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot(s) sent to you with this Disclosure Statement.

All votes to accept or reject the Plan must be cast by using the Ballot enclosed with the Disclosure Statement.  IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN [  ], AT [  ] P.M. PACIFIC TIME (THE "VOTING DEADLINE").

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, BALLOTS CAST BY FACSIMILE, E-MAIL OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED.  BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED.  DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS, OR OTHER EVIDENCES OF YOUR CLAIM WITH YOUR BALLOT.

If you have any questions about (a) the procedure for voting your Claim or Equity Interest, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact:

> Ahern Rentals, Inc. Ballot Processing Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, California 90245
> Tel:  (877) 606-7652

For further information and general instruction on voting to accept or reject the Plan, see the instructions accompanying your Ballot.

THE DEBTOR URGES ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT TO ACCEPT THE PLAN BY COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

## IX.
## PREFERENCE AND OTHER AVOIDANCE ACTIONS

A bankruptcy trustee (or the debtor as a debtor-in-possession) may avoid as a preference a transfer of property made by a debtor to a creditor on account of an antecedent debt while a debtor was insolvent, where that creditor receives more than it would have received in a liquidation of the entity under Chapter 7 had the payment not been made, if (i) the payment was made within ninety (90) days before the date the bankruptcy case was commenced or (ii) the creditor is found to have been an "insider," as defined in the Bankruptcy Code, within one year before the commencement of the bankruptcy case.  A debtor is presumed to have been insolvent

during the ninety (90) days preceding the commencement of the case.

A bankruptcy trustee (or the debtor as a debtor-in-possession) may avoid as a fraudulent transfer a transfer of property made by a debtor within two years (and under applicable Nevada law, four years) before the date the bankruptcy case was commenced if the debtor (i) received less than reasonably equivalent value in exchange for such transfer and (ii) was insolvent on the date of such transfer or became insolvent as a result of such transfer, such transfer left the debtor with an unreasonably small capital, or the debtor intended to incur debts that would be beyond the debtor's ability to pay as such debts matured.

Although the Debtor has not fully analyzed various potential preference or other Avoidance Actions, it is possible that some pre-petition transactions may be avoidable. The Debtor thus hereby expressly reserves its right to commence any appropriate actions pursuant to Chapter 5 of the Bankruptcy Code to the extent not waived in Section 3.4.7 of the Plan, including but not limited to Avoidance Actions against Persons listed in (i) items 3(b) and 3(c) of the Debtor's Statement of Financial Affairs [ECF No. 303] (the "SOFA"); (ii) schedule 3(b) to the SOFA [ECF No. 303-6]; (iii) schedules 3(c)(i)-(vii) to the SOFA [ECF No. 303-7]; and (iv) any exhibit to the Plan Supplement.

## X.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan affords Holders of Claims and Equity Interests in Classes **1, 2, 3, 6, 7, 8, and 9** the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtor under Chapter 7 or Chapter 11 of the Bankruptcy Code.

### A.    Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of assets.

The Debtor believes that the Plan enables creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

### B.    Liquidation under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtor's case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Equity Interests in the Debtor.

The Debtor believes that in a liquidation under Chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtor's Estate. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtor's assets. More importantly, conversion to Chapter 7 liquidation would likely result in the immediate cessation of the Debtor's business, as most Chapter 7 trustees are disinclined to continue operations.

The Debtor could also be liquidated pursuant to the provisions of a Chapter 11 plan of liquidation. In a liquidation under Chapter 11, the Debtor's assets theoretically could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent the Debtor's business incurs operating loss, the Debtor's effort to liquidate its assets over a longer period of time theoretically could result in a lower net distribution to creditors than they would receive through Chapter 7 liquidation. Nevertheless, because there would be no need to appoint a Chapter 7 trustee and to hire new professionals, Chapter 11 liquidation might be less costly than Chapter 7 liquidation and thus provide larger net distributions to creditors than in Chapter 7 liquidation. Any recovery in a Chapter 11 liquidation, while potentially greater than in a Chapter 7 liquidation, would also be highly uncertain. Although preferable to a Chapter 7 liquidation, the Debtor believes that any alternative liquidation under Chapter 11 is a much less attractive alternative to creditors than the Plan because of the greater return anticipated by the Plan.

The full Liquidation Analysis is annexed as Appendix C to this Disclosure Statement.

## XI.
## RECOMMENDATION AND CONCLUSION

The Plan provides the best possible recovery for all parties-in-interest. Accordingly, the Debtor recommends that all Creditors who are entitled to vote on the Plan should vote to accept the Plan.

77

DATED this 30th day of November, 2012.

GORDON SILVER

By:  *Gabrielle A. Hm*
GERALD M. GORDON, ESQ.
WILLIAM M. NOALL, ESQ.
THOMAS H. FELL, ESQ.
GABRIELLE A. HAMM
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Attorneys for Debtor

and

DLA PIPER (US) LLP

By:  /s/ Gregg M. Galardi
GREGG M. GALARDI, ESQ.
1251 Avenue of the Americas
New York, New York 10020
Attorneys for Debtor

EAST\52216559. 5                                        104500-002/1750782.doc

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX A**

**PLAN OF REORGANIZATION**

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
WILLIAM M. NOALL, ESQ.
Nevada Bar No. 3549
E-mail: wnoall@gordonsilver.com
THOMAS H. FELL, ESQ.
Nevada Bar No. 3717
E-mail: tfell@gordonsilver.com
GABRIELLE A. HAMM, ESQ.
Nevada Bar No. 11588
E-mail: ghamm@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666

Attorneys for Debtor

and

DLA PIPER (US) LLP
GREGG M. GALARDI, ESQ.
New York Bar No. 4535506
E-mail: gregg.galardi@dlapiper.com
(admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone (212) 335-4640
Facsimile (212) 884-8540

Attorneys for Debtor

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 11-53860-BTB<br>Chapter 11 |
| AHERN RENTALS, INC., | |
| Debtor. | |
| | Date:   TBD<br>Time:   TBD |

### DEBTOR'S PLAN OF REORGANIZATION

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151. 11

104500-002/1750777.DOC

# TABLE OF CONTENTS

Page

1.  DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME .......................................................................................................... 1
    1.1.    Definitions ...................................................................................... 1
    1.2.    Rules of Interpretation ................................................................. 14
    1.3.    Computation of Time ................................................................... 14
    1.4.    Exhibits, Annexes and Plan Schedules ....................................... 14
2.  TREATMENT OF UNCLASSIFIED CLAIMS .......................................... 15
    2.1.    General ......................................................................................... 15
    2.2.    Treatment of Administrative Claims ........................................... 15
    2.3.    Allowed Priority Tax Claims ...................................................... 15
3.  DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS ............... 16
    3.1.    Summary of Classification ........................................................... 16
    3.2.    Acceptance by Impaired Class .................................................... 17
    3.3.    Cramdown ..................................................................................... 17
    3.4.    Treatment of Classes ................................................................... 17
            3.4.1   Class 1: Term Loan Claims ............................................. 17
            3.4.2   Class 2: Second Lien Loan Secured Claims .................... 18
            3.4.3   Class 3: Kubota Claims .................................................... 19
            3.4.4   Class 4: Other Secured Claims ........................................ 19
            3.4.5   Class 5: Other Priority Claims ........................................ 19
            3.4.6   Class 6: Personal Injury Claims ...................................... 20
            3.4.7   Class 7: General Unsecured Claims ................................. 20
            3.4.8   Class 8: Second Lien Loan Deficiency Claims ................ 21
            3.4.9   Class 9: Convenience Claims ........................................... 21
            3.4.10  Class 10: Equity Interests ................................................ 21
    3.5.    Allowed Claims ............................................................................ 21
    3.6.    Postpetition Interest .................................................................... 22
    3.7.    Special Provision Regarding Unimpaired Claims ....................... 22
4.  MEANS FOR IMPLEMENTATION OF PLAN ......................................... 22
    4.1.    Plan Funding ................................................................................ 22
    4.2.    Reorganized Ahern ...................................................................... 22
    4.3.    Additional Reorganized Ahern Provisions .................................. 22
    4.4.    New Financing .............................................................................. 22
    4.5.    Effective Date Events ................................................................... 22
    4.6.    Post-Effective Date Officers and Directors of Reorganized Ahern ................... 23

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11                                                                     104500-002/1750777.DOC

| | | | |
|---|---|---|---|
| | 4.7. | Establishment of Professional Fee Reserve | 23 |
| | 4.8. | No Corporate Action Required | 23 |
| | 4.9. | Effectuation of Transactions | 24 |
| | 4.10. | Filing with Nevada Secretary | 24 |
| 5. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 24 |
| | 5.1. | Executory Contracts | 24 |
| | 5.2. | Approval of Assumption or Rejection | 24 |
| | 5.3. | Cure of Defaults | 25 |
| | 5.4. | Objection to Cure Amounts | 25 |
| | 5.5. | Confirmation Order | 25 |
| | 5.6. | Post-Petition Date Contracts and Leases | 25 |
| | 5.7. | Rejection Claims Bar Date | 25 |
| | 5.8. | Director and Officer Liability Insurance | 25 |
| | 5.9. | Indemnification | 26 |
| 6. | | MANNER OF DISTRIBUTION OF PROPERTY UNDER THE PLAN | 26 |
| | 6.1. | Distributions | 26 |
| | 6.2. | Timing and Calculation of Amounts to Be Distributed | 26 |
| | 6.3. | Rights and Powers of Disbursing Agent | 26 |
| | 6.4. | Providing for Claims Payments | 27 |
| | 6.5. | Means of Cash Payment | 27 |
| | 6.6. | Application of Record Date | 27 |
| | 6.7. | Claims Paid or Payable by Third Parties | 27 |
| | 6.8. | Allocation of Plan Distributions Between Principal and Interest | 28 |
| | 6.9. | Setoffs | 28 |
| | 6.10. | Fractional Distributions | 28 |
| | 6.11. | De Minimis Distributions | 28 |
| | 6.12. | Prepayment | 29 |
| | 6.13. | No Distribution in Excess of Allowed Amounts | 29 |
| | 6.14. | Joint Distributions | 29 |
| | 6.15. | No Recourse | 29 |
| | 6.16. | Statements | 29 |
| | 6.17. | Further Authorization | 29 |
| 7. | | PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS | 29 |
| | 7.1. | Resolution of Disputed Claims | 29 |
| | 7.2. | No Distribution Pending Allowance | 30 |
| | 7.3. | Resolution of Objections After Effective Date | 30 |

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

ii

104500-002/1750777.DOC

| | | |
|---|---|---|
| 7.4. | Distributions After Allowance | 30 |
| 7.5. | Estimation of Claims | 30 |
| 7.6. | Deadline to File Objections to Claims | 31 |
| 7.7. | Late-Filed Claims | 31 |
| 7.8. | Reservation of Right to Object to Allowance or Asserted Priority of Claims | 31 |
| 8. | CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE | 31 |
| 8.1. | Conditions to Confirmation | 31 |
| 8.2. | Conditions to Effectiveness | 31 |
| 8.3. | Notice of Effectiveness | 32 |
| 8.4. | Waiver of Conditions | 32 |
| 9. | TITLE TO PROPERTY; DISCHARGE; AND INJUNCTION | 32 |
| 9.1. | Vesting of Assets | 32 |
| 9.2. | Preservation of Litigation Claimsf | 32 |
| 9.3. | Settlement of Litigation Claims | 32 |
| 9.4. | Discharge | 32 |
| 9.5. | Compromise and Settlement | 33 |
| 9.6. | Releases | 33 |
| 9.7. | Third Party Releases | 33 |
| 9.8. | Injunction | 33 |
| 9.9. | Exculpation | 34 |
| 10. | RETENTION OF JURISDICTION | 34 |
| 10.1. | Jurisdiction | 34 |
| 11. | MODIFICATION AND AMENDMENT OF PLAN | 36 |
| 12. | MISCELLANEOUS | 36 |
| 12.1. | Effectuating Documents; Further Transactions; and Timing | 36 |
| 12.2. | Cancellation of Existing Agreements | 36 |
| 12.3. | Exemption from Transfer Taxes | 36 |
| 12.4. | Revocation or Withdrawal of the Plan | 36 |
| 12.5. | Term of Bankruptcy Injunction or Stays | 37 |
| 12.6. | Enforcement of Subordination | 37 |
| 12.7. | Binding Effect | 37 |
| 12.8. | Plan Supplement | 37 |
| 12.9. | Committees | 37 |
| 12.10. | Governing Law | 37 |
| 12.11. | Modification of Payment Terms | 38 |

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

12.12.  Notices ........................................................................................................ 38

12.13.  Severability .................................................................................................. 38

12.14.  Withholding and Reporting Requirements .......................................... 38

12.15.  Fees and Reporting to the U.S. Trustee ............................................... 39

12.16.  Section 1125(e) of the Bankruptcy Code ............................................ 39

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

Ahern Rentals, Inc., a Nevada corporation ("Debtor"), proposes this Plan of Reorganization ("Plan") for the resolution of Debtor's outstanding Claims and Equity Interests. All Creditors (as defined herein), Holders of Equity Interests (as defined herein) and other parties-in-interest should refer to the Disclosure Statement (as defined herein) for a discussion of Debtor's history, assets, historical financial data, and for a summary and analysis of the Plan and certain related matters.

All Holders of Claims and Equity Interests against Debtor are encouraged to read the Plan, the Disclosure Statement, and the related solicitation materials in their entirety before voting to accept or reject the Plan.

Subject to the restrictions on modifications set forth in Section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and Local Rule 3019, and those restrictions or modifications set forth in **Article 11** to the Plan, Debtor expressly reserves the right to alter, amend, strike, withdraw or modify the Plan one or more times before the Effective Date.

## 1.  DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### 1.1.  Definitions.

For purposes of the Plan, and except as expressly provided herein or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this **Article 1**. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed thereto in the Bankruptcy Code or the Bankruptcy Rules, in that order of priority. Whenever the context requires, such terms shall include the plural as well as the singular, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

**1.1.1. Administrative Claim.**  A Claim for any cost or expense of administration of the Estate allowed under Sections 503(b), 507(b), 546(c)(2) and 1114(e)(2) of the Bankruptcy Code and entitled to priority under Section 507(a)(2) of the Bankruptcy Code, including, but not limited to: (i) any fees payable pursuant to Section 1930 of Title 28 of the United States Code; (ii) the actual and necessary costs and expenses, including Taxes, incurred on or after the Petition Date of preserving the Estate and operating the business of Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (iii) the value of any goods received by Debtor within twenty (20) days before the Petition Date which goods have been sold to Debtor in the ordinary course of its business; (iv) the Superpriority Claims (as defined in the Majority Term Lender Cash Collateral Stipulation) granted in favor of the DIP Loan Agent and approved by the Bankruptcy Court in the DIP Loan/Cash Collateral Order; and (v) the administrative claim granted in favor of the DIP Loan Agent and the Term Loan Agent and approved by the Bankruptcy Court in the DIP Loan/Cash Collateral Order; *provided*, *however*, that an Administrative Claim shall not include a Professional Fee Claim, Other Priority Claim or Priority Tax Claim. To the extent that a Claim is allowed as an Administrative Claim pursuant to Section 365(d)(3) and (d)(5) of the Bankruptcy Code, such Claim shall also be deemed an Administrative Claim under this paragraph.

**1.1.2. Administrative Claims Bar Date.**  5:00 p.m. (Prevailing Pacific Time) on the first Business Day occurring after the sixtieth (60th) day following the Effective Date.

**1.1.3. Administrative Claims Objection Deadline.**  The first Business Day following the later of (i) 120 days following the Effective Date and (ii) such other date as may be established by an order of the Bankruptcy Court.

**1.1.4. Affiliate.**  This term has the meaning set forth in Section 101(2) of the

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

1

104500-002/1750777.DOC

Bankruptcy Code.

**1.1.5. Allowed.**  Any Claim or Equity Interest that is not a Disputed Claim or a Disallowed Claim.

**1.1.6. Allowed Administrative Claim.**  An Administrative Claim as to which: (i) no objection has been filed by the Administrative Claims Objection Deadline; (ii) any objection to such Claim has been resolved by the allowance of such Administrative Claim by a Final Order of the Bankruptcy Court; or (iii) the Claim arises after the Petition Date and before the Effective Date, and requires payment in the ordinary course of Debtor's business and as to which there is no Final Order of the Bankruptcy Court in effect that prohibits any such payment.

**1.1.7. Allowed Claim.**  A Claim against the Debtor (i) that has been scheduled as a liquidated, non-contingent, and undisputed Claim in an amount greater than zero on the Schedules, subject to Debtor's right to amend the Schedules on or before the Claims Objection Deadline, (ii) as to which no objection or request for estimation has been filed on or before the Administrative Claims Objection Deadline, the Claims Objection Deadline or the expiration of any other applicable period fixed by the Bankruptcy Court or the Plan; (iii) as to which any and all objections have been settled, waived, withdrawn or denied by a Final Order or in accordance with the Plan; or (iv) that is allowed (a) by a Final Order, (b) by an agreement between the Holder of such Claim and the Debtor or Reorganized Ahern or (c) pursuant to the terms of the Plan.  For the avoidance of doubt, an Allowed Claim (i) shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law and (ii) unless otherwise specified herein, or required by Section 506(b) of the Bankruptcy Code or specified in a Final Order of the Bankruptcy Court, shall not include any interest on such Claim accruing from or after the Petition Date through the Effective Date.

**1.1.8. Allowed . . . Claim.**  An Allowed Claim of the particular type or Class described.

**1.1.9. Allowed Equity Interest.**  An Equity Interest that is allowed pursuant to: (i) the Plan; (ii) any stipulation executed with Debtor prior to the Confirmation Date and approved by the Bankruptcy Court; (iii) any stipulation with Debtor or Reorganized Ahern, as applicable, executed on or after the Confirmation Date and approved by the Bankruptcy Court; or (iv) any contract, instrument, indenture or other agreement entered into or assumed in connection herewith.

**1.1.10. Assets.**  All of the assets, property, interests, including Equity Interests, and effects, Cash, receivables, real and personal, tangible and intangible, wherever situated, of Debtor, as they exist on the Effective Date.

**1.1.11. Avoidance Actions.**   All avoidance, recovery, subordination and other similar actions preserved for the Estate under the Bankruptcy Code, including but not limited to those set forth in Sections 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code regardless of whether or not such action has been commenced prior to the Effective Date.

**1.1.12. Ballot(s).**  Each of the ballot forms distributed to each Holder of a Claim or Equity Interest entitled to vote to accept or reject the Plan.

**1.1.13. Balloting Agent.**  Kurtzman Carson Consultants, LLC.

**1.1.14. Bankruptcy Code.**  The Bankruptcy Reform Act of 1978, Title 11, United States Code, as applicable to the Chapter 11 Case, as now in effect or hereafter amended, 11

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

2

EAST\52150151.11

104500-002/1750777.DOC

U.S.C. §§ 101 *et seq.*

**1.1.15. Bankruptcy Court.** The United States Bankruptcy Court for the District of Nevada, having jurisdiction over the Chapter 11 Case and, to the extent of the withdrawal of any reference under Section 157 of Title 28 of the United States Code and/or the General Order of the District Court pursuant to Section 151 of Title 28 of the United States Code, the United States District Court for the District of Nevada.

**1.1.16. Bankruptcy Rules.** The Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 and the general, local and chambers rules of the Bankruptcy Court.

**1.1.17. Bar Date.** The date or dates established by the Plan, orders of the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules for the filing of proofs of Claim or requests for payment pursuant to Bankruptcy Code sections 501, 502, and 503.

**1.1.18. Business Day.** Any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York, New York.

**1.1.19. Cash.** The legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, wire transfers and other cash equivalents.

**1.1.20. Causes of Action.** Any action, proceeding, agreement, Claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) Avoidance Action; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in Section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

**1.1.21. Chapter 11 Case.** The above-captioned bankruptcy case of Ahern Rentals, Inc. pending in the Bankruptcy Court.

**1.1.22. Claim.** Any (i) claim against the Debtor as defined in Section 101(5) of the Bankruptcy Code or (ii) any request for payment or expense of the Debtor that arises on or after the Petition Date and before the Effective Date.

**1.1.23. Class.** A category of Holders of Claims or Equity Interests pursuant to Section 1122(a) of the Bankruptcy Code as classified in the Plan.

**1.1.24. Collateral.** Any property or interest in property of the Estate subject to a lien or security interest to secure the payment or performance of a Claim, which lien or security interest is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

**1.1.25. Committee.** Collectively, any committee appointed pursuant to Section 1102 of the Bankruptcy Code in the Chapter 11 Case, as such committee may be reconstituted

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

3

104500-002/1750777.DOC

from time to time.

**1.1.26. Confirmation Date.**  The date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

**1.1.27. Confirmation Hearing.**  The duly noticed initial hearing held by the Bankruptcy Court to confirm the Plan pursuant to Section 1128 of the Bankruptcy Code, and any subsequent hearing held by the Bankruptcy Court from time to time to which the initial hearing is adjourned without further notice other than the announcement of the adjourned dates at the Confirmation Hearing.

**1.1.28. Confirmation Order.**  The order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

**1.1.29. Contingent Claim.**  A Claim that is contingent or unmatured on or immediately before the Confirmation Date.

**1.1.30. Convenience Claim.**  An Unsecured Claim for which the Allowed amount of such Claim is less than or equal to $5,000 and the Holder of which makes the Convenience Class Election.

**1.1.31. Convenience Class Election.** The right of each Holder of an Unsecured Claim for which the amount of such Holder's Allowed Unsecured Claim is less than or equal to $5,000 to elect to receive Cash in an amount equal to 85% of such Holder's Allowed Unsecured Claim.

**1.1.32. Creditor.**  A "creditor" as defined in Section 101(10) of the Bankruptcy Code.

**1.1.33. Cure.**  The payment of Cash or the distribution of other property by the Debtor (as the parties may agree or the Bankruptcy Court may order) that is necessary for the Debtor to cure monetary defaults under an executory contract or unexpired lease so as to permit the Debtor to assume that contract or lease under Section 365(a) of the Bankruptcy Code.

**1.1.34. D&O Liability Insurance Policies.**  All insurance policies of the Debtor or current or past officers, directors, and managers providing liability coverage for the Debtor and such officers, directors and/or managers.

**1.1.35. Debtor.**  As defined in the introduction above.

**1.1.36. DIP Lenders.**  The lenders, including all successors and assigns, to Debtor pursuant to the DIP Loan Agreement.

**1.1.37. DIP Loan.**  The borrowings by the Debtor pursuant to the DIP Loan Agreement and the DIP Loan/Cash Collateral Order.

**1.1.38. DIP Loan Agents.**  Bank of America, National Association, in its capacity as Administrative Agent and Decision Agent, Wells Fargo Bank, National Association, in its capacity as Collateral Agent and Decision Agent under the DIP Loan Agreement and General Electric, as Decision Agent, under the DIP Loan Agreement.

**1.1.39. DIP Loan Agreement.**  The Debtor-in-Possession Loan and Security Agreement, dated as of December 27, 2011, together with all amendments, modifications and supplements thereto, executed by, among others, the DIP Lenders, Debtor and the DIP Loan

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

4

104500-002/1750777.DOC

Agents.

**1.1.40. DIP Loan/Cash Collateral Motion.** The Emergency Motion for Interim and Final Orders (i) Authorizing Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, (II) Approving Related Stipulation(s), and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c), filed on December 22, 2011, that provided for a refinancing of the Term Loan Revolving Credit Facility and appearing on the docket of the Chapter 11 Case as Dkt. 17.

**1.1.41. DIP Loan/Cash Collateral Order.** The Final Order entered on January 31, 2012, approving the DIP Loan/Cash Collateral Motion and the Majority Term Lender Cash Collateral Stipulation and appearing on the docket of the Chapter 11 Case as Dkt. 329.

**1.1.42. DIP Loan Claims.** All Claims arising under or related to the DIP Loan.

**1.1.43. DIP Loan Collateral.** The Collateral subject to the Lien under the DIP Loan Documents.

**1.1.44. DIP Loan Documents.** The DIP Loan Agreement, together with all other documents related to the DIP Loan and DIP Loan Claims, including the DIP Loan/Cash Collateral Order, and any and all other amendments, supplements, or modification to the foregoing.

**1.1.45. DIP Loan Notes.** The DIP Loan Notes issued by Debtor pursuant to the DIP Loan Agreement.

**1.1.46. Disallowed Claim.** Any Claim against the Debtor that has been disallowed, in whole or in part, by Final Order or written agreement between the Debtor and the Holder of such Claim, to the extent of such disallowance.

**1.1.47. Disbursing Agent.** Reorganized Ahern or the Person or Persons chosen by Reorganized Ahern to make or facilitate Distributions pursuant to the Plan.

**1.1.48. Disclosure Statement.** The disclosure statement for the Plan, as amended, supplemented or modified from time to time, describing the Plan, which disclosure statement is prepared and distributed in accordance with, among others, Sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and any other applicable law.

**1.1.49. Disputed Claim or Disputed Equity Interest.** Any Claim or Equity Interest or any portion of a Claim or Equity Interest against the Debtor that is not an Allowed Claim or a Disallowed Claim. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no proof of Claim has been timely filed, is a Disputed Claim and shall be resolved in accordance with Article 7 of the Plan.

**1.1.50. Distribution.** Any distribution by Debtor or Reorganized Ahern to the Holders of Allowed Claims and Holders of Allowed Equity Interests.

**1.1.51. Distribution Date.** The date, occurring as soon as practicable after the Effective Date, on which the Disbursing Agent first makes Distributions to Holders of Allowed Claims as provided in Article VI hereof and any date thereafter on which the Disbursing Agent makes Distributions to Holders of Allowed Claims as provided in Article VI hereof.

**1.1.52. Effective Date.** The first Business Day after the fourteenth (14th) day following the entry of the Confirmation Order on which the conditions set forth in **Section 8.2**

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

5

EAST\52150151.11

104500-002/1750777.DOC

below have been satisfied or waived.

**1.1.53. Equity Interest.**  Any share of common stock, preferred stock, membership interest or other instrument evidencing an ownership interest in Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in the Debtor that existed immediately prior to the Effective Date.

**1.1.54. Estate.**  As to Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code.

**1.1.55. Exculpated Claim.**  Any Claim related to any act or omission in connection with, relating to, or arising out of Debtor's in or out of court restructuring efforts, the Chapter 11 Case, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, the Plan (including any term sheets related thereto) or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, or the Distribution of Assets under the Plan or any other agreement.

**1.1.56. Executory Contract.**  A contract to which Debtor is a party that is subject to assumption or rejection under Section 365 of the Bankruptcy Code.

**1.1.57. Exit Financing.**  Any financing provided to Reorganized Ahern on the Effective Date pursuant to the Exit Financing Facility Documents.

**1.1.58. Exit Financing Facility.**  The credit facility or facilities established pursuant to the Exit Financing Facility Documents.

**1.1.59. Exit Financing Facility Collateral Agent.**  The collateral agent with respect to the Exit Financing Facility Documents to be appointed prior to or on the Effective Date.

**1.1.60. Exit Financing Facility Documents.**  The agreements and related documents and instruments evidencing the new financing to be obtained by Reorganized Ahern as of the Effective Date, including revolving credit, term credit and/or letters of credit as determined by Reorganized Ahern to be reasonably necessary to satisfy the DIP Loan Claims and support other payments required to be made under the Plan, substantially in the form attached as an exhibit to the Plan Supplement.

**1.1.61. Exit Lenders.**  The banks, financial institutions and other lender parties to the Exit Financing Facility Agreement from time to time, each in their capacity as such.

**1.1.62. Federal Judgment Rate.**  The post-judgment interest rate established by Section 1961 of Title 28 of the United States Code and provided by the Federal Reserve and published every Monday for the preceding week.

**1.1.63. Final Order.**  An order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, entered on the docket of such court, that has not been reversed, rescinded, stayed, modified or amended, that is in full force and effect, and as to which order or judgment: (i) the time to appeal, seek review or rehearing, or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (ii) any appeal taken or petition for certiorari or request for reargument or further review or rehearing filed (a) has been resolved by the appellate court to which the order or judgment was appealed or from which review, rehearing or certiorari was sought or (b) has not yet been resolved by such appellate court, but such order has not been stayed pending appeal.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

Notwithstanding the foregoing, the Confirmation Order shall become a Final Order on the 14th day following entry of such Confirmation Order unless any appeal of such Confirmation Order is accompanied by a stay pending appeal.

**1.1.64. General Unsecured Claim.**  Any Unsecured Claim against the Debtor that arose or accrued prior to the Petition Date that is not an Administrative Claim, Other Priority Claim, Priority Tax Claim, Personal Injury Claim, Second Lien Deficiency Claim, or Convenience Claim.

**1.1.65. Governmental and Regulatory Authority.**  Any court, tribunal, arbiter, authority, agency, commission, official or other governmental body or instrumentality in the United States, any foreign country or any domestic or foreign county, city or other political subdivision.

**1.1.66. Holder.**  Each Person that has an Equity Interest or a Claim.

**1.1.67. Impaired.**  This term shall have the meaning set forth in Section 1124 of the Bankruptcy Code.

**1.1.68. Insurance Policies.**  Collectively, all of the Debtor's insurance policies issued to the Debtor, including, but not limited to, the D&O Liability Insurance Policies, automobile liability policies, workers' compensation policies and general liability policies.

**1.1.69. Intercreditor Agreement.**  The Intercreditor Agreement executed on August 18, 2005 (as amended, supplemented or otherwise modified, including by the Amendment No. 1 entered into on December 23, 2009), among Debtor, the Term Loan Agents, the Second Lien Collateral Agent and the Second Lien Indenture Trustee, which governs the rights and obligations between Debtor, the Term Loan Agents, the Holders of Term Loan Claims and Second Lien Loan Note Claims, and the Second Lien Agents.  Pursuant to the Intercreditor Agreement, the Liens granted by Debtor to the Second Lien Agents to secure the Second Lien Loan Note Claims are expressly junior and subordinate in all respects to the Liens granted by Debtor to the Term Loan Agents to secure the Term Loan Claims.

**1.1.70. Interest.**  Any legal, equitable, contractual or other right of any Person in the ownership of the Debtor, whether or not transferable and whether or not reflected in a note or agreement that is not a Claim, and the legal, equitable, contractual or other rights of any Person to acquire or receive any of the foregoing that is not a Claim.

**1.1.71. Interim Compensation Order.**  The Order Granting Motion for Administrative Order Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals, entered by the Bankruptcy Court on February 1, 2012 and appearing on the docket of the Chapter 11 Case as Dkt. 340.

**1.1.72. IRS.**  The Internal Revenue Service.

**1.1.73. Junior Secured Note Agents.**  Collectively, the Junior Secured Note Collateral Agent and Junior Secured Note Indenture Trustee, or their successors appointed in accordance with the Junior Secured Note Indenture.

**1.1.74. Junior Secured Note Collateral.**  The Assets subject to the Junior Secured Note Liens, which Assets shall include the Second Lien Collateral as of the Effective Date.

**1.1.75. Junior Secured Note Collateral Agent.**  The collateral agent with respect to the Junior Secured Notes to be appointed prior to or on the Effective Date or its successor appointed in accordance with the Junior Secured Note Indenture.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

**1.1.76. Junior Secured Note Documents.** The Junior Secured Note Indenture, together with all other documents related to the Junior Secured Notes.

**1.1.77. Junior Secured Note Indenture.** That certain 6% Junior Secured Notes Due 2020 indenture, dated as of the Effective Date, substantially in the form attached hereto as **Exhibit 1.1.77**.

**1.1.78. Junior Secured Note Indenture Trustee.** The indenture trustee with respect to the Junior Secured Note Indenture, to be identified on or immediately before the commencement of the Confirmation Hearing or any successor thereto.

**1.1.79. Junior Secured Note Liens.** The Liens granted in favor of the Junior Secured Note Collateral Agent with respect to the Junior Secured Note Collateral under the Junior Secured Note Documents, which Liens shall be junior to both the Liens provided to secure the Exit Financing Facility and the Liens provided to secure the Senior Secured Notes.

**1.1.80. Junior Secured Notes.** The Junior Secured Notes issued by Reorganized Ahern pursuant to the Junior Secured Note Indenture on the Effective Date of the Plan. The Junior Secured Notes shall be in the principal amount of $18.5 million, or such other amount as the Bankruptcy Court determines to be the Allowed Second Lien Loan Secured Claim (reduced to reflect the Second Lien Election), bear interest at the rate of six percent (6%) per annum, or such other interest rate as determined by the Bankruptcy Court at the Confirmation Hearing or such other hearing prior to the Confirmation Hearing, and shall mature on the first Business Day following the date that is the seventh (7th) anniversary of the Effective Date.

**1.1.81. Kubota.** Kubota Tractor Corporation.

**1.1.82. Kubota Claims.** All Claims of Kubota related to the Kubota Flooring Agreement and Kubota Order.

**1.1.83. Kubota Flooring Agreement.** The Dealer Sales and Service Agreement entered into by Debtor and Kubota on August 31, 2004, providing for Debtor to serve as an authorized dealer of Kubota products and providing for the extension to Kubota of a purchase money security interest in all tractors, engines, parts, attachments and accessories sold by Kubota to Debtor from time to time.

**1.1.84. Kubota Order.** The Order Authorizing Debtor (I) to Assume Dealer Agreement with Kubota Tractor Corporation Pursuant to 11 U.S.C. § 365 and (II) to Extend Purchase Money Security Interest Pursuant to 11 U.S.C. § 364, entered by the Bankruptcy Court on March 22, 2012 and appearing on the docket of the Chapter 11 Case as Dkt. 622.

**1.1.85. Liability Insurance Policies.** Comprehensive liability insurance policies maintained by Debtor with CNA Insurance Company and Lexington Insurance Company.

**1.1.86. Lien.** This term shall have the meaning set forth in Section 101(37) of the Bankruptcy Code and, with respect to any Asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a perfected security interest, in respect of such Asset.

**1.1.87. Litigation Claims.** All rights, claims, torts, Liens, liabilities, obligations, actions, Causes of Action, Avoidance Actions, derivative actions, proceedings, debts, contracts, judgments, damages and demands whatsoever in law or in equity, whether known or unknown, contingent or otherwise, that Debtor or its Estate may have against any Person, including but not limited to those listed on **Exhibit 1.1.87** hereto, except any Claims or Causes of Action that are

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

8

104500-002/1750777.DOC

released under the Plan or the Confirmation Order.  Failure to list a Litigation Claim on **Exhibit 1.1.87** shall not constitute a waiver or release by Debtor or Reorganized Ahern of such Litigation Claim.

**1.1.88. Local Rules.**  The local, administrative and chambers rules of the Bankruptcy Court.

**1.1.89. Majority Term Lender Cash Collateral Stipulation.**  The Stipulation between Debtor and Majority Term Lenders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P .4001(b) and (c) Regarding Debtor's Use of Term Lenders' Cash Collateral, Entry into DIP Agreement, and Adequate Protection, filed on January 27, 2012 and appearing on the docket of the Chapter 11 Case as Dkt. 319.

**1.1.90. Majority Term Lenders.**  Liberty Harbor Master Fund I, L.P., and Goldman Sachs Palmetto State Credit Fund, L.P., and any successors thereto or assigns thereof.

**1.1.91. Nevada Secretary.**  The Secretary of State of the State of Nevada.

**1.1.92. NRS.**  The Nevada Revised Statutes, as amended from time to time.

**1.1.93. Other Priority Claims.**  Any and all Claims accorded priority in right of payment under Section 507(a) of the Bankruptcy Code, other than Administrative Claims and Priority Tax Claims.

**1.1.94. Other Secured Claims.**  Any Secured Claim that existed on the Petition Date other than a Term Loan Claim, Second Lien Loan Secured Claim or a Kubota Claim.

**1.1.95. Person.**  An individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, estate, trust, governmental unit or other entity as defined in Section 101(15) of the Bankruptcy Code.

**1.1.96. Personal Injury Claims.**  All Claims for personal injuries or wrongful death that arose prior to the Petition Date and are subject to coverage under the Liability Insurance Policies.

**1.1.97. Petition Date.**  December 22, 2011, the date on which Debtor filed its voluntary petition commencing the Chapter 11 Case.

**1.1.98. Plan.**  The plan of reorganization, either in its present form or as it may be amended, supplemented or modified from time to time, including all exhibits and schedules annexed hereto or referenced herein.

**1.1.99. Plan Supplement.**  The compilation of documents, including any exhibits to the Plan not included herewith, to be filed with the Bankruptcy Court ten (10) days before the Voting Deadline.

**1.1.100. Pre-Petition Claims Objection Deadline.**  The first Business Day after (i) the 180th day following the Effective Date or (ii) such other date as may be established by an order of the Bankruptcy Court.

**1.1.101. Priority Tax Claim.**  Any Unsecured Claim against the Debtor entitled to priority in payment under Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.1.102. Pro Rata.**  With reference to any Distribution on account of or in

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

exchange for any Claim in any Class, the proportion that the amount of an Allowed Claim (numerator) bears to the aggregate amount of all Disputed Claims (denominator) in such Class upon the final resolution of all Disputed Claims.

**1.1.103. Professional.** A Person: (i) retained pursuant to an order of the Bankruptcy Court in accordance with Sections 327, 328, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to Sections 327, 328, 329, 330, 363 or 331 of the Bankruptcy Code, or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

**1.1.104. Professional Fee Claims.** Claims for compensation and reimbursement submitted pursuant to Sections 330, 331 or 503(b) of the Bankruptcy Code of Persons: (i) employed pursuant to an order of the Bankruptcy Court under Sections 327, 328 or 1103 of the Bankruptcy Code; or (ii) for whom compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code or by other Final Order, in each case, to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and after applying any retainer that has been provided to such Professional. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Allowed Professional Fees.

**1.1.105. Professional Fee Reserve.** The reserve of Cash established on the Effective Date and maintained by the Reorganized Ahern as a segregated account to pay Allowed Professional Fee Claims.

**1.1.106. Quarterly Distribution Date.** The last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided, however,* that if the Effective Date is within thirty (30) days of the end of a calendar quarter, then the first Quarterly Distribution Date will be the last Business Day of the month following the end of the first calendar quarter after the calendar quarter in which the Effective Date falls.

**1.1.107. Record Date.** The date that the order approving the Disclosure Statement with respect to the Plan is entered.

**1.1.108. Reinstate, Reinstated, or Reinstatement.** Means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (a) curing any such default that *occurred* before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder of such Claim; *provided, however,* that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish reinstatement and shall be deemed cured on the Effective Date.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

**1.1.109. Rejection Claims Bar Date.** 5:00 p.m. (Prevailing Pacific Time) on the first Business Day after the thirtieth (30th) day following the Effective Date.

**1.1.110. Released Party.** Collectively: (i) Debtor; (ii) Debtor's officers, directors, employees, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals, and representatives solely in their capacity as such, serving on the Petition Date or on the Effective Date; (iii) the DIP Loan Agents, solely in their capacity as DIP Loan Agents with regard to the DIP Loan, and the DIP Loan Lenders, solely in their capacity as DIP Loan Lenders; and (iv) the Committee and its members, in consideration for their support of the Plan and actions in accordance with **Section 9.6** of the Plan, and each of their officers, directors, employees, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, Professionals, and representatives solely in their capacity as such.

**1.1.111. Releasing Parties.** [Reserved].

**1.1.112. Reorganized Ahern.** Debtor, as such entity exists on or after the Effective Date, or any successor thereto, by merger, consolidation or otherwise.

**1.1.113. Reorganized Ahern Bylaws.** The bylaws of Reorganized Ahern in effect under the laws of the State of Nevada, substantially in the form annexed to the Plan Supplement.

**1.1.114. Reorganized Ahern Organizational Documents.** Collectively, the Reorganized Certificate of Reorganization and the Reorganized Ahern Bylaws.

**1.1.115. Reorganized Certificate of Incorporation.** The certificate of incorporation of Reorganized Ahern in effect under the laws of the State of Nevada, substantially in the form annexed to the Plan Supplement.

**1.1.116. Schedules.** The schedules of assets and liabilities and any amendments thereto filed by Debtor with the Bankruptcy Court in accordance with Section 521(1) of the Bankruptcy Code.

**1.1.117. Second Lien Agents.** Collectively, the Second Lien Collateral Agent and Second Lien Indenture Trustee.

**1.1.118. Second Lien Collateral.** The Collateral subject to the Lien under the Second Lien Loan Documents.

**1.1.119. Second Lien Collateral Agent.** Wells Fargo Bank, National Association, as successor in interest to Wachovia Bank, National Association, in its capacity as the collateral agent with respect to the Second Lien Notes or any successor thereto.

**1.1.120. Second Lien Indenture.** That certain 9¼% Senior Secured Notes Due 2013 Indenture, dated August 18, 2005, as amended by the First Supplemental Indenture dated December 23, 2009.

**1.1.121. Second Lien Indenture Trustee.** U.S. Bank, National Association, as successor trustee to Wells Fargo Bank, National Association, in its capacity as the indenture trustee with respect to the Second Lien Indenture or any successor thereto.

**1.1.122. Second Lien Loan.** The loan pursuant to the Second Lien Loan Documents.

**1.1.123. Second Lien Loan Deficiency Claim.** Means that portion of the Second

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

11

104500-002/1750777.DOC

Lien Loan Note Claims that exceeds the Allowed Second Lien Loan Secured Claim held by the Holders of the Second Lien Loan Note Claims. Unless the Bankruptcy Court determines otherwise the Allowed Second Lien Loan Deficiency Amount shall be $249.2 million.

**1.1.124. Second Lien Loan Documents.** The Second Lien Indenture, together with all other documents related to the Second Lien Loan Notes, together with any and all other amendments, supplements, or modification to the foregoing.

**1.1.125. Second Lien Loan Election.** The right of each Holder of a Second Lien Loan Note Claim to elect to receive Cash in the amount of its Pro Rata share of $135 million (approximately a 50% recovery) on account of that Holder's Allowed Second Lien Loan Note Claim on the Effective Date; *provided, that*, such Holder (i) makes the election on its Ballot and (ii) votes to accept the Plan.

**1.1.126. Second Lien Loan Note Claims.** All Claims arising under or in any way related to the Second Lien Loan Notes, other than a Subordinated Section 510(b) Claim. Unless the Bankruptcy Court determines otherwise, the Allowed aggregate amount of the Second Lien Loan Note Claims is $267.7.

**1.1.127. Second Lien Loan Notes.** The 9¼% Senior Secured Notes Due 2013 issued pursuant to the Second Lien Indenture.

**1.1.128. Second Lien Loan Secured Claim.** The Secured Claim held by the Holders of the Second Lien Loan Note Claims. The Allowed amount of the Second Lien Loan Secured Claim shall be $18.5 million or such other amount as the Bankruptcy Court determines at the Confirmation Hearing or otherwise.

**1.1.129. Secured Claim.** A Claim that is secured by a Lien against property of the Estate to the extent of the value of any interest in such property of the Estate securing such Claim as of the Petition Date, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or to the extent of the amount of such Claim subject to setoff in accordance with Section 553 of the Bankruptcy Code, in either case as determined pursuant to Section 506(a) of the Bankruptcy Code.

**1.1.130. Senior Secured Note Agents.** Collectively, the Senior Secured Note Collateral Agent and Senior Secured Note Indenture Trustee, or their successors appointed in accordance with the Senior Secured Note Indenture.

**1.1.131. Senior Secured Note Collateral.** The Assets subject to the Senior Secured Note Liens, which Assets shall include the Term Loan Collateral as of the Effective Date.

**1.1.132. Senior Secured Note Collateral Agent.** The collateral agent with respect to the Senior Secured Notes to be appointed in accordance with the Senior Secured Note Indenture or its successor appointed in accordance with the Senior Secured Note Indenture.

**1.1.133. Senior Secured Note Documents.** The Senior Secured Note Indenture and the Senior Secured Notes, together with all other documents related to Senior Secured Notes.

**1.1.134. Senior Secured Note Indenture.** That certain 5% Senior Secured Notes Due 2017 indenture, dated as of the Effective Date, substantially in the form attached hereto as **Exhibit 1.1.134**.

**1.1.135. Senior Secured Note Indenture Trustee.** The indenture trustee with respect to the Senior Secured Note Indenture, to be identified on or immediately before the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

12

EAST\52150151.11

104500-002/1750777.DOC

commencement of the Confirmation Hearing or any successor thereto.

**1.1.136. Senior Secured Note Liens.** The Liens granted to the Senior Secured Notes Collateral Agent with respect to the Senior Secured Note Collateral pursuant to the Senior Secured Note Documents, which Liens shall be junior only to the Liens provided to secure the Exit Financing Facility and liens permitted to be senior thereto and which shall be senior to the Junior Secured Note Liens.

**1.1.137. Senior Secured Notes.** The Senior Secured Notes to be issued by Reorganized Ahern on the Effective Date pursuant to the Senior Secured Note Indenture. The Senior Secured Notes shall be issued in the principal amount of $111 million (reduced to reflect the Second Lien Loan Election), bear interest at the rate of four and one quarter percent (4.25%) per annum, or such other interest rate as determined by the Bankruptcy Court at the Confirmation Hearing or such other hearing prior to the Confirmation Hearing, receive interest and principal on a quarterly basis, and mature on the first Business Day following the date that is the fourth (4th) anniversary of the Effective Date.

**1.1.138. Subordinated Section 510(b) Claim.** Any Claim subordinated pursuant to Section 510(b) of the Bankruptcy Code, which shall include any Claim (a) arising from the rescission of a purchase or sale of any security of the Debtor, (b) for damages arising from the purchase or sale of such security, or (c) for reimbursement, contribution or indemnification on account of any such Claim.

**1.1.139. Substantial Consummation.** This term shall have the meaning ascribed to it in Section 1101(2) of the Bankruptcy Code.

**1.1.140. Taxes.** All income, franchise, excise, sales, use, employment, withholding, property, payroll or other taxes, assessments, of governmental charges, together with any interest penalties, additions to tax, fines, and similar amounts relating thereto, whether or not yet assessed or imposed, collected by, or due to any federal, state, local or foreign governmental authority. This shall include all Taxes arising out of or attributable to the business of Debtor up to and including the Effective Date, whether assessed or determined or payable prior to or after the Effective Date.

**1.1.141. Term Loan.** The $95,000,000 term loan facility provided to Debtor under the Term Loan Credit Agreement.

**1.1.142. Term Loan Agents.** Collectively, Gleacher Products Corp., as successor to Bank of America, National Association, in its capacity as administrative agent, and Wells Fargo Bank, National Association, as successor to Wachovia Bank, National Association, in its capacity as collateral agent, under the Term Loan Credit Agreement.

**1.1.143. Term Loan Claims.** Any and all Claims arising under, or related to, the Term Loan, including all accrued, unpaid interest and fees and costs allowable under Section 506(b) of the Bankruptcy Code.

**1.1.144. Term Loan Collateral.** The Collateral subject to the Lien under the Term Loan Documents.

**1.1.145. Term Loan Credit Agreement.** The Second Amended and Restated Loan and Security Agreement, dated as of January 8, 2010, which provided, in part, for the Term Loan to Debtor.

**1.1.146. Term Loan Documents.** The Term Loan Credit Agreement together with all other documents related to the Term Loan and any and all other amendments,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

13

supplements, or modification to the foregoing.

**1.1.147. Term Loan Election.** The right of each Holder of a Term Loan Claim to elect to receive Cash in the amount of its Pro Rata share of $90 million on account of that Holder's Allowed Term Loan Claim on the Effective Date; *provided*, *that*, such Holder (i) makes the election on its Ballot and (ii) votes to accept the Plan.

**1.1.148. Term Loan Notes.** The Term Loan Notes issued by Debtor pursuant to the Term Loan Credit Agreement.

**1.1.149. Third Party Releasee.** [Reserved].

**1.1.150. U.S. Trustee.** The Office of the United States Trustee for the District of Nevada.

**1.1.151. Unexpired Lease.** A lease of non-residential real property to which Debtor is a party that is subject to assumption or rejection under Section 365 of the Bankruptcy Code.

**1.1.152. Unimpaired.** Not Impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.1.153. Unsecured Claim.** A Claim against the Debtor arising prior to the Petition Date that is neither a Secured Claim nor entitled to priority under Section 507 of the Bankruptcy Code or any order of the Bankruptcy Court.

**1.1.154. Voting Deadline.** The deadline provided for in the order approving the Disclosure Statement for the receipt of Ballots voting to accept or reject the Plan.

**1.2.    Rules of Interpretation.** For purposes of the Plan only: (i) any reference in the Plan to a contract, instrument, release, or other agreement or documents being in particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (ii) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (iii) unless otherwise specified, all references in the Plan to Sections, Articles, Schedules and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to the Plan; (iv) the words "herein," "hereof," "hereto," and "hereunder" refer to the Plan in its entirety rather than to a particular portion of the Plan; (v) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (vi) the rules of construction and definitions set forth in Sections 101 and 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply unless otherwise expressly provided. All Exhibits, Annexes and/or Plan Schedules attached hereto are incorporated into and are a part of the Plan as if set forth in full herein.

**1.3.    Computation of Time.** In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply.

**1.4.    Exhibits, Annexes and Plan Schedules.** All Exhibits, Annexes and/or Plan Schedules attached hereto are incorporated into and are a part of the Plan as if set forth in full herein.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11                                                                                              104500-002/1750777.DOC

## 2. TREATMENT OF UNCLASSIFIED CLAIMS.

**2.1.    General.**  Pursuant to Section 1123(a)(1) of the Bankruptcy Code, the Claims against Debtor set forth in this Article 2 are not classified within any Classes. The Holders of such Claims are not entitled to vote on the Plan.  The treatment of the Claims set forth below is consistent with the requirements of Section 1129(a)(9)(A) of the Bankruptcy Code.

### 2.2.    Treatment of Administrative Claims.

**2.2.1.  Administrative Claims.**    Except with respect to Administrative Claims that are Professional Fee Claims, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Administrative Claim, on the latest of (i) the Distribution Date, (ii) the date on which its Administrative Claim becomes an Allowed Administrative Claim, (iii) the date on which its Administrative Claim becomes payable under any agreement with the Debtor relating thereto, (iv) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of the Debtor's business, consistent with past practice, or (v) such other date as may be agreed upon between the Holder of such Allowed Administrative Claim and the Debtor or Reorganized Ahern, as the case may be, (i) Cash equal to the unpaid portion of its Allowed Administrative Claim or (ii) such other treatment as to which the Holder of such Allowed Administrative Claim may agree.

### 2.2.2. Professional Compensation.

(a)    **Claims for Accrued Professional Compensation.**  Professionals or other Persons asserting a Professional Fee Claim for services rendered before the Effective Date must file and serve on the Debtor and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Claim for accrued professional compensation no later than forty-five (45) days after the Effective Date.  Objections to any Claim for accrued professional compensation must be filed and served on Reorganized Ahern and the Office of the U.S. Trustee and the requesting party no later than sixty-five (65) days after the Effective Date.  The Holder of a Professional Fee Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for its Professional Fee Claim Cash equal to the unpaid portion of its Professional Fee Claim.

(b)    **Post-Effective Date Fees and Expenses.**  Upon the Effective Date, any requirement that Professionals comply with Sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Reorganized Ahern may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

**2.3.    Allowed Priority Tax Claims.**  Each Holder of an Allowed Priority Tax Claim, if any, will, in full and final satisfaction of such Claim, be paid in full (or be treated in compliance with Section 1129(a)(9)(C) of the Bankruptcy Code) by Reorganized Ahern on the later of (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the fourteenth (14th) day after the date on which an order allowing such Claim becomes a Final Order; or (iv) such date as is agreed to by the Holder of such Claim and Debtor or Reorganized Ahern, as the case may be.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

## 3.    DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS

Pursuant to the Plan and in accordance with Section 1123(a)(1) of the Bankruptcy Code, all Claims of Creditors (except Administrative Claims and Priority Tax Claims) are placed in the Classes described below.  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim qualifies within the description of such other Classes. Each subclass in Class 6 is deemed to be a separate class for purposes of voting pursuant to Section 1122 of the Bankruptcy Code and will receive a different Ballot for the purpose of accepting or rejecting the Plan pursuant to Section 1126 of the Bankruptcy Code.  A Claim is also classified in a particular Class only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date. Notwithstanding the foregoing, any Holder of a Claim in the Classes below described as "entitled to vote" to which no objection to the Claim has been filed on or before the commencement of the Confirmation Hearing or such other date as the Bankruptcy Court determines, shall be entitled to vote to accept or reject the Plan.

### 3.1.    Summary of Classification.

| Class 1 | Term Loan Claims | Impaired – entitled to vote |
|---------|------------------|------------------------------|
| Class 2 | Second Lien Loan Secured Claims | Impaired – entitled to vote |
| Class 3 | Kubota Claims | Impaired – entitled to vote |
| Class 4 | Other Secured Claims | Unimpaired – deemed accepted |
| Class 5 | Other Priority Claims | Unimpaired – deemed accepted |
| Class 6 | Personal Injury Claims: | Impaired – entitled to vote |
| | Class 6a<br>Claims falling in policy year:  5/10/2007 – 5/10/2008<br>Carrier:  *Chartis Insurance*, f/k/a *Lexington (Lexington)* | |
| | Class 6b<br>Claims falling in policy year:  5/10/2008 – 5/10/2009<br>Carrier:  *Lexington* | |
| | Class 6c<br>Claims falling in policy year:  5/10/2009 – 5/10/2010<br>Carrier:  *Ironshore Specialty Insurance Company (Ironshore)* | |
| | Class 6d<br>Claims falling in policy year:  5/10/2010 – 5/10/2011<br>Carrier:  *Ironshore* | |
| | Class 6e<br>Claims falling in policy year:  5/10/2011 – 5/10/2012<br>Carrier:  *Ironshore* | |
| | Class 6f<br>Auto claims falling in policy year 5/10/2005 – 5/10/2006<br>Carrier:  *Continental Insurance Company (CNA)* | |
| | Class 6g | |

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

| | | |
|---|---|---|
| | Auto claims falling in policy year 5/10/2006 – 5/10/2007 Carrier: *CNA* | |
| | Class 6h Auto claims falling in policy year 5/10/2007 – 5/10/2008 Carrier: *CNA* | |
| | Class 6i Auto claims falling in policy year 5/10/2008 – 5/10/2009 Carrier: *Liberty Mutual Fire Insurance Co. (Liberty)* | |
| | Class 6j Auto claims falling in policy year 5/10/2009 – 5/10/2010 Carrier: *Great American Insurance Companies (Great American)* | |
| | Class 6k Auto claims falling in policy year 5/10/2010 – 5/10/2011 Carrier: *Great American* | |
| | Class 6l Auto claims falling in policy year 5/10/2011 – Petition Date Carrier: *Great American* | |
| Class 7 | General Unsecured Claims | Impaired – entitled to vote |
| Class 8 | Second Lien Loan Deficiency Claim | Impaired – entitled to vote |
| Class 9 | Convenience Claims | Impaired – entitled to vote |
| Class 10 | Equity Interests | Unimpaired – deemed accepted |

**3.2.     Acceptance by Impaired Class.**     All Classes of Claims are Impaired, except Class 4: Other Secured Claims, Class 5: Other Priority Claims and Class 10: Equity Interests. Any one of the Impaired Classes of Claims shall have accepted the Plan if (i) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Impaired Class have voted to accept the Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan, in each case not counting the vote of any insider or any Holder whose vote is designated under Section 1126(e) of the Bankruptcy Code.

**3.3.     Cramdown.**   To the extent necessary, the Debtor will request confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code.  The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

**3.4.     Treatment of Classes.**

**3.4.1    Class 1: Term Loan Claims.**

(a)     *Claims in Class:* Class 1 consists of the Term Loan Claims.

(b)     *Treatment:* Each Holder of a Term Loan Claim shall have the right to make the Term Loan Election.  In the event that the Holder of a Term Loan Claim makes the Term Loan Election, then on the Effective Date, or as soon as reasonably practicable, such

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

Holder will receive in full satisfaction, settlement, release and discharge of and in exchange for that Holder's Allowed Term Loan Claim, Cash in the amount of its Pro Rata share of $90 million for each dollar of that Holder's Allowed Term Loan Claim; *provided, that,* such Holder (i) votes to accept the Plan and (ii) exercises the right to make the Term Loan Election on its Ballot.  In the event that the Holder of a Term Loan Claim does not make the Term Loan Election, that Holder shall receive, on the Effective Date, or as soon as reasonably practicable, Senior Secured Notes in an amount equal to such Holder's Pro Rata share of the Allowed Senior Secured Notes, which Pro Rata share will reflect the reduction, if any, necessary to reflect any Holders of Allowed Term Loan Claims making the Term Loan Election, in full satisfaction, settlement, release and discharge of and in exchange for that Holder's Allowed Term Loan Claims.

The Senior Secured Notes shall be secured by the Senior Secured Note Collateral, which Collateral will include the Term Loan Collateral.

The Holders of Term Loan Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

### 3.4.2    Class 2: Second Lien Loan Secured Claims.

(a)    *Claims in Class:* Class 2 consists of the Second Lien Loan Secured Claims.

(b)    *Treatment:* Each Holder of a Second Lien Loan Secured Claim shall have the right to make the Second Lien Loan Election.  In the event that a Holder of a Second Lien Loan Secured Claim makes the Second Lien Loan Election, then, on the Effective Date, or as soon as reasonably practicable, such Holder will receive in full satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Second Lien Loan Secured Claim, Cash in the amount of its Pro Rata share of $135 million for each dollar of such Holder's Allowed Second Lien Loan Secured Claim; *provided, that*, such Holder (i) votes to accept the Plan and (ii) exercises the right to make the Second Lien Loan Election on its Ballot. Any Holder of a Second Lien Loan Secured Claim that does not make the Second Lien Loan Election shall receive, on the Effective Date, or as soon as reasonably practicable, (i) Junior Secured Notes in an amount equal to such Holder's Pro Rata share of the aggregate amount of the Allowed Second Lien Loan Secured Claims, which Pro Rata share will reflect the reduction, if any, of the Allowed Second Lien Loan Secured Claims held by those Holders of Allowed Second Lien Loan Note Claims that make the Second Lien Loan Election and (ii) a Second Lien Loan Deficiency Claim in an amount equal to such Holder's Pro Rata share of the aggregated amount of the Allowed Second Lien Loan Deficiency Claims, which Pro Rata share will reflect the reduction, if any, of the Allowed Second Lien Loan Deficiency Claim held by the Holders of Allowed Second Lien Loan Secured Claims that make the Second Lien Loan Election, in full satisfaction, settlement, release and discharge of and in exchange for the Holder's Allowed Second Lien Loan Secured Claims.

The Junior Secured Notes shall be secured by the Junior Secured Note Lien on the Junior Secure Note Collateral.

Consistent with the terms of the Intercreditor Agreement, on the Effective Date, the Liens in the Second Lien Collateral to secure the Junior Secured Notes will be expressly junior and subordinate in all respects to the Liens in the Exit Financing Facility and the Liens in the Senior Secured Note Collateral to secure the Senior Secured Notes and the Holders of the Allowed Second Lien Loan Note Claims that do not make the Second Lien Loan Election will not receive any Cash payments until the Holders of Allowed Term Loan Claims are paid in full.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

The Holders of Second Lien Loan Note Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

### 3.4.3    Class 3: Kubota Claims.

(a)    *Claims in Class:* Class 3 consists of the Kubota Claims.

(b)    *Treatment:* Unless the Holder of a Kubota Claim and the Debtor agree to a different treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for the Kubota Claims, the Holder of any Allowed Kubota Claims shall be paid (i) on the Effective Date, or as soon as reasonably practicable, Cash in the principal amount of 5% of such Holder's Allowed Kubota Claim; (ii) 90 days after the Effective Date, Cash in the principal amount of 5% of such Holder's remaining Allowed Kubota Claim (reflecting a reduction in the principal amount of such Holder's Allowed Kubota Claims as a result of the first payment); and (iii) 180 days after the Effective Date, Cash the aggregate amount of the remaining balance of such Holder's Allowed Kubota Claims (reflecting a reduction in the principal amount of such Holder's Allowed Kubota Claims as a result of the first and second payments).  The Allowed Kubota Claims shall bear interest as set forth in the Kubota Flooring Agreement.

The Holders of Kubota Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

### 3.4.4    Class 4: Other Secured Claims.

(a)    *Claims in Class:* Class 4 consists of the Allowed Other Secured Claims.

(b)    *Treatment:* Unless the Holder of an Allowed Other Secured Claim and the Debtor agree to a different treatment, on the Effective Date, or as soon as reasonably practicable, each Holder of an Allowed Other Secured Claim shall (i) have its Claim Reinstated, or (ii) receive, in full satisfaction, settlement, release and discharge of and in exchange for, such Secured Claim, either (a) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to Section 506(b) of the Bankruptcy Code, (b) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the Holder's secured interest in such Collateral, (c) the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to Section 506(b) of the Bankruptcy Code, or (d) such other distribution as necessary to satisfy the requirements of Section 1129 of the Bankruptcy Code.  If the Claim of a Holder of an Allowed Other Secured Claim exceeds the value of the Collateral that secures it, such Holder will have an Other Secured Claim equal to the Collateral's value and a General Unsecured Claim for the deficiency.

The Holders of Other Secured Claims are Unimpaired under the Plan and are not entitled to vote to accept or reject the Plan.

### 3.4.5    Class 5: Other Priority Claims.

(a)    *Claims in Class:* Class 5 consists of the Allowed Other Priority Claims.

(b)    *Treatment:* Unless the Holder of an Allowed Other Priority Claim and the Debtor agree to a different treatment, each Holder of an Allowed Other Priority Claim, if any, shall, in full satisfaction, settlement, release and discharge of and in exchange for the Allowed Other Priority Claims, be paid in full in Cash by Reorganized Ahern upon the latest of:

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

(i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and Debtor or Reorganized Ahern.

The Holders of Other Priority Claims are Unimpaired under the Plan and are not entitled to vote to accept or reject the Plan.

### 3.4.6    Class 6: Personal Injury Claims.

(a)    *Claims in Class:* Class 6 consists of the Personal Injury Claims.

(b)    *Treatment:* Unless the Holder of a Personal Injury Claim and the Debtor agree to a different treatment, in full satisfaction, settlement, release and discharge of and in exchange for the Personal Injury Claims, the Allowed Personal Injury Claims incurred in each policy year shall be placed into a separate subclass under Class 6.  The first $250,000 of each insured Allowed Personal Injury Claim, less defense costs expended on each such insured Allowed Personal Injury Claim (the self-insured retention, or "SIR"), will be paid in full by Reorganized Ahern on the later of (i) the Effective Date or as soon as reasonably practicable, or (ii) such date as all Claims in the applicable subclass have been liquidated, not to exceed the maximum SIR for such subclass pursuant to the applicable policy.  Each Allowed Personal Injury Claim not paid in full from the SIR shall be paid its Pro Rata share of the policy proceeds remaining as of the Petition Date of the Liability Insurance Policies applicable and payable for each such policy year promptly after all Claims in the applicable subclass have been liquidated. The Holder of each Allowed Personal Injury Claim not paid in full by the SIR and the policy proceeds shall be paid the remaining balance of such Personal Injury Claim in sixty (60) equal monthly installments, together with interest at the Federal Judgment Rate, commencing on the later of: (i) the date all Personal Injury Claims in the applicable subclass are liquidated; and (ii) the Effective Date, though Reorganized Ahern may pay such Claim(s) earlier in its discretion.

The Holders of Personal Injury Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

### 3.4.7    Class 7: General Unsecured Claims.

(a)    *Claims in Class:* Class 7 consists of the General Unsecured Claims.

(b)    *Treatment:* Each Holder of a General Unsecured Claim shall have the right to make the Convenience Class Election.  In the event that Class 7 votes to accept the Plan, on the Effective Date, or as soon as reasonably practicable, each Holder of any Allowed General Unsecured Claims shall receive (i) Cash payments in the aggregate Allowed amount of such Holder's Allowed General Unsecured Claim which Claim shall be paid in equal quarterly installments over two (2) years which Claim shall bear no interest and (ii) a waiver of any and all Avoidance Actions that have or could be asserted against such Holder, in full satisfaction, settlement, release and discharge of and in exchange for the Holder's Allowed General Unsecured Claims.  In the event that Class 7 does not vote to accept the Plan, then on the Effective Date, or as soon as reasonably practicable, each Holder of any Allowed General Unsecured Claim shall receive Cash payments in the aggregate Allowed amount of such Holder's Allowed General Unsecured Claim which Claim shall be paid in equal quarterly installments over five (5) years and shall accrue interest at the rate of 2% per annum or such other interest rate as the Bankruptcy Court determines at the Confirmation Hearing or otherwise, in full satisfaction, settlement, release and discharge of and in exchange for the Holder's Allowed General Unsecured Claims.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

20

104500-002/1750777.DOC

The Holders of General Unsecured Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

### 3.4.8 Class 8: Second Lien Loan Deficiency Claims.

(a) *Claims in Class:* Class 8 consists of the Second Lien Loan Deficiency Claims.

(b) *Treatment:* Each Holder of a Second Lien Loan Deficiency Claim shall have the right to make the Second Lien Loan Election or the Convenience Class Election. In the event that a Holder of a Second Lien Loan Deficiency Claim neither makes the Second Lien Loan Election nor makes the Convenience Class Election, then, on the Effective Date, or as soon as reasonably practicable, such Holder will receive in full satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Second Lien Loan Deficiency Claim, Cash payments equal to its Pro Rata share of the aggregate amount of the Allowed Second Lien Loan Deficiency Claims (which aggregate amount shall reflect reductions for Holders of Allowed Second Lien Loan Note Claims making either the Second Lien Loan Election or the Convenience Class Election) which will accrue interest at 2% per annum or such other interest rate as the Bankruptcy Court determines that shall be paid such accrued interest commencing on the fifth (5th) anniversary of the Effective Date and be paid in full on the seventh (7th) anniversary of the Effective Date.

The Holders of Second Lien Loan Deficiency Claims are Impaired under the Plan and are entitled to accept or reject the Plan.

### 3.4.9 Class 9: Convenience Claims.

(a) *Claims in Class:* Class 9 consists of the Convenience Claims.

(b) *Treatment:* Unless the Holder of a Convenience Claim and the Debtor agree to a different treatment, on the Effective Date, or as soon as reasonably practicable, in full satisfaction, settlement, release and discharge of and in exchange for the Convenience Claims, each Holder of any Allowed Unsecured Claims that makes the Convenience Class Election shall receive Cash in an amount equal to 85% of such Holder's Allowed Unsecured Claim.

The Holders of Convenience Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

### 3.4.10 Class 10: Equity Interests.

(a) *Claims in Class:* Class 10 consists of the Allowed Equity Interests.

(b) *Treatment:* Unless the Holder of an Allowed Equity Interest and the Debtor agree to a different treatment, the legal, equitable, contractual and ownership rights of the Holders of Allowed Equity Interests are unaltered by the Plan. Upon the Effective Date, the Holders of Allowed Equity Interests shall retain their Equity Interests.

The Holders of Equity Interests are Unimpaired under the Plan and are not entitled to vote to accept or reject the Plan.

**3.5.** **Allowed Claims.** Notwithstanding any provision herein to the contrary, the Debtor and/or Reorganized Ahern shall only make Distributions to Holders of Allowed Claims. No Holder of a Disputed Claim will receive any Distribution on account thereof unless and until and only to the extent that its Disputed Claim becomes an Allowed

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

Claim.

**3.6.** **Postpetition Interest.** In accordance with Section 502(b)(2) of the Bankruptcy Code, the amount of all Claims against the Debtor shall be calculated as of the Petition Date. Except as otherwise explicitly provided herein, in an order of the Bankruptcy Court or in a section of the Bankruptcy Code, no Holder of a Claim shall be entitled to or receive postpetition interest.

**3.7.** **Special Provision Regarding Unimpaired Claims.** Except as otherwise provided in the Plan, and to the extent permitted by the Bankruptcy Code, nothing shall affect the Debtor's rights and defenses, both legal and equitable, with respect to any Unimpaired Claim (including Claims that are Allowed pursuant to the Plan), including, without limitation, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims, and the Debtor's failure to object to such Claims in the Chapter 11 Case shall be without prejudice to Reorganized Ahern's right to contest or defend against such Claims in (i) any appropriate non-bankruptcy forum as if such Chapter 11 Case had not been commenced or (ii) the Bankruptcy Court (such forum to be selected at the Debtor's or Reorganized Ahern's option).

## 4. MEANS FOR IMPLEMENTATION OF PLAN

**4.1.** **Plan Funding.** Cash payments under the Plan shall be funded by Cash on hand and borrowings under the Exit Financing Facility.

**4.2.** **Reorganized Ahern.** On or before the Effective Date, the Reorganized Ahern Organizational Documents shall be executed and, to the extent required, filed with the Nevada Secretary. The Reorganized Ahern Organizational Documents shall (i) include, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code; and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, Reorganized Ahern shall be responsible for the preparation of all reports, tax returns and other governmental filings required to be filed by the Debtor and Reorganized Ahern and all obligations related thereto.

**4.3.** **Additional Reorganized Ahern Provisions.** The Reorganized Ahern Organizational Documents, and resolutions or similar documents related to the formation and governance of Reorganized Ahern under the Plan, shall be subject to applicable bankruptcy and/or Nevada law.

**4.4.** **New Financing.** On the Effective Date, the Exit Financing Facility, together with new promissory notes and guarantees evidencing the obligations of Reorganized Ahern thereunder, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, shall become effective. The obligations incurred by Reorganized Ahern pursuant to the Exit Financing Facility and related documents shall be paid as set forth in the Exit Financing Facility Documents. A commitment letter or term sheet with respect to the Exit Financing Facility shall be attached hereto as **Exhibit 4.4**.

**4.5.** **Effective Date Events.**

On the Effective Date, or as soon as reasonably practicable thereafter:

**4.5.1.** The DIP Loan Notes, Term Loan Notes and Second Lien Loan Notes shall

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

be cancelled and extinguished and of no further force or effect.

**4.5.2.** Reorganized Ahern shall execute and deliver the Senior Secured Note Documents and the Junior Secured Note Documents to the applicable Senior Secured Note Agents and Junior Secured Note Agents.

**4.5.3.** The Senior Secured Note Agents and Junior Secured Note Agents shall distribute the Senior Secured Notes and Junior Secured Notes, as applicable, to the parties legally entitled thereto, including Holders of Allowed Claims in Classes 1 and 2 of the Plan in accordance with the provisions of **Sections 3.4.1 and 3.4.2** of the Plan.

**4.5.4.** The DIP Loan Documents, Term Loan Documents and Second Lien Loan Documents shall be of no further effect except as otherwise provided in the Plan, for effectuating the Distributions under the Plan and allowing the DIP Loan Agent, Term Loan Agents and Second Lien Indenture Trustee with respect to the Distributions required to be made by any of them pursuant to the Plan and/or the DIP Loan Documents, Term Loan Documents and Second Lien Loan Documents.

**4.6.**    **Post-Effective Date Officers and Directors of Reorganized Ahern.**

**4.6.1.** On the Effective Date, the initial board of directors of Reorganized Ahern shall include the five (5) individuals serving on Debtor's Board of Directors on the Confirmation Date.   Thereafter, members of the Board of Directors shall be selected pursuant to the Reorganized Ahern Organizational Documents.  The initial officers shall be comprised of the individuals employed as officers on the Confirmation Date, pursuant to each such individual's employment agreement, if any, as may have been modified, amended or extended prior to Confirmation.  Debtor will disclose, at or prior to the Confirmation Hearing, the identity of such individuals.

**4.6.2.** Reorganized Ahern shall be responsible for the payment of all Allowed Claims to be paid pursuant to the Plan which are not paid on or before the Effective Date, as well as all Allowed Claims, including Taxes and Professional Fees, incurred by Debtor in operating its business up to and including the Effective Date, whether due and payable before or after the Effective Date.

**4.7.**    **Establishment of Professional Fee Reserve.**   Under the Plan, the Debtor or Reorganized Ahern will create and fund the Professional Fee Reserve on the Effective Date (or as soon thereafter as is practicable) in the estimated amount of accrued and unpaid Professional Fees through the Effective Date, which amount will be used to pay Allowed Professional Fee Claims held by (i) any Professionals working on behalf of the Debtor, and (ii) counsel and any advisors to the Committee.  Reorganized Ahern will be obligated to pay all such Allowed Professional Fee Claims designated to be paid from the proceeds of the Professional Fee Reserve in excess of the amounts actually deposited in the Professional Fee Reserve.  In the event that any Cash remains in the Professional Fee Reserve after payment of all such Allowed Professional Fee Claims, such Cash will be returned to the operating accounts of Reorganized Ahern.

**4.8.**    **No Corporate Action Required.**   As of the Effective Date: (i) the adoption, execution, delivery and implementation or assignment of all contracts, leases, instruments, releases and other agreements related to or contemplated by the Plan; and (ii) the other matters provided for under or in furtherance of the Plan involving corporate action to be taken by or required of Debtor, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by Reorganized Ahern's Board of

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

Directors or officers of Debtor. In particular, the adoption of the Reorganized Ahern Organizational Documents, the selection of directors and officers of Debtor or Reorganized Ahern, and all other actions contemplated by or described in the Plan with respect thereto, shall be authorized and approved and be binding and in full force and effect in all respects (subject to the provisions of the Plan and the Confirmation Order), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule (other than filing such organizational documents with the applicable governmental unit as required by applicable law) or the vote, consent, authorization, or approval of any Person. Notwithstanding the forgoing, Reorganized Ahern shall take all action required to effectuate the Exit Financing Facility Documents, Senior Secured Note Documents and Junior Secured Note Documents and any other action required to implement the Plan.

**4.9. Effectuation of Transactions.** On the Effective Date, the appropriate officers of Debtor and Reorganized Ahern, as applicable, and members of the applicable Board of Directors are authorized to issue, execute, and deliver the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions, and instruments contemplated by or described in the Plan in the name of and on behalf of Debtor and Reorganized Ahern, and to otherwise fully consummate the transactions contemplated by the Plan, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person.

**4.10. Filing with Nevada Secretary.** To the extent applicable, in accordance with NRS 78.622, on the Effective Date a certified copy of the Plan and the Confirmation Order shall be filed with the Nevada Secretary. Debtor, from the Confirmation Date until the Effective Date, is authorized and directed to take any action or carry out any proceeding necessary to effectuate the Plan pursuant to NRS 78.622.

## 5. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1. Executory Contracts.** Except for Executory Contracts and Unexpired Leases specifically addressed in the Plan or set forth on the schedule of Rejected Executory Contracts and Unexpired Leases attached as **Exhibit 5.1** to the Plan (which may be supplemented and amended up to the date the Bankruptcy Court enters the Confirmation Order and thereafter pursuant to **Section 5.3** of the Plan), all Executory Contracts and Unexpired Leases that exist on the Confirmation Date shall be deemed assumed by Reorganized Ahern on the Effective Date.

**5.2. Approval of Assumption or Rejection.** Entry of the Confirmation Order shall constitute as of the Effective Date: (i) approval, pursuant to Section 365(a) of the Bankruptcy Code, of the assumption by Debtor of each Executory Contract and Unexpired Lease to which Debtor is a party and which is not listed on **Exhibit 5.1**, not otherwise provided for in the Plan and neither assumed, assumed and assigned, nor rejected by separate order prior to the Effective Date; and (ii) rejection by Debtor of each Executory Contract and Unexpired Lease to which Debtor is a party listed on **Exhibit 5.1**. Upon the Effective Date, each counter party to an assumed Executory Contract or Unexpired Lease listed shall be deemed to have consented to assumption contemplated by Section 365(c)(1)(B) of the Bankruptcy Code, to the extent such consent is necessary for such assumption. To the extent applicable, all Executory Contracts or Unexpired Leases of Reorganized Ahern assumed pursuant to this **Section 5** shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant Executory Contract or Unexpired Lease and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by entry of the Confirmation Order. Also, to the extent applicable, all Executory Contracts or Unexpired Leases of Debtor assumed pursuant to this **Section 5** shall be assigned to Reorganized Ahern on the Effective Date, and such assignment shall not be a

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

24

104500-002/1750777.DOC

"change of control," however such term may be defined in the relevant Executory Contract or Unexpired Lease, and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by entry of the Confirmation Order.

**5.3.** **Cure of Defaults.** Debtor or Reorganized Ahern shall Cure any defaults respecting each Executory Contract or Unexpired Lease assumed pursuant to this **Section 5** upon the latest of (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court or agreed upon by Debtor, and after the Effective Date, Reorganized Ahern; or (iii) the first Business Day following the fourteenth (14th) day after the entry of a Final Order resolving any dispute regarding (a) a Cure amount; (b) the ability of Debtor or Reorganized Ahern to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease assumed pursuant to the Plan in accordance with Section 365(b)(1) of the Bankruptcy Code; *provided, however*, that upon resolution of a dispute over a Cure amount, Reorganized Ahern may reject the Executory Contract or Unexpired Lease notwithstanding a previous listing as assumed; or (c) any other disputed matter pertaining to assumption, assignment or the Cure of a particular Executory Contract or an Unexpired Lease. **Exhibit 5.3** to the Plan lists Debtor's proposed Cure amounts, if any, that will be paid as provided for above, which **Exhibit 5.3** may be amended up to and including the commencement of the Confirmation Hearing.

**5.4.** **Objection to Cure Amounts.** Any party to an Executory Contract or Unexpired Lease who objects to the Cure amounts listed on **Exhibit 5.3** to the Plan must file and serve an objection on Debtor's counsel no later than the deadline set by the Bankruptcy Court for filing Plan objections. Failure to file and serve a timely objection shall be deemed consent to the Cure amounts listed on **Exhibit 5.3**. Any Cure Amounts shall be the responsibility of Reorganized Ahern. If there is a dispute regarding: (i) the amount of any Cure payment; (ii) the ability of Reorganized Ahern to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease to be assumed or assigned; or (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption, except as provided in **Section 5.3** of the Plan.

**5.5.** **Confirmation Order.** The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in this **Section 5**, pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date. Notwithstanding the foregoing, if, as of the date the Bankruptcy Court enters the Confirmation Order, there is pending before the Bankruptcy Court a dispute concerning the Cure amount or adequate assurance for any particular Executory Contract or Unexpired Lease (or if the time period for a non-Debtor to object to the Cure has not yet lapsed), the assumption of such Executory Contract or Unexpired Lease shall be effective as of the date the Bankruptcy Court enters an order resolving any such dispute and authorizing assumption by Debtor.

**5.6.** **Post-Petition Date Contracts and Leases.** Each such Executory Contract and Unexpired Lease shall be performed by Debtor or Reorganized Ahern, as applicable, in the ordinary course of its business.

**5.7.** **Rejection Claims Bar Date.** All proofs of Claims with respect to Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be filed no later than thirty (30) days after the Effective Date. Any Claim not filed within such time shall be forever barred.

**5.8.** **Director and Officer Liability Insurance.** Debtor will assume and, if applicable, assign to Reorganized Ahern all of its existing D&O Liability Insurance Policies pursuant to Section 365(a) of the Bankruptcy Code as of the Effective Date. Entry of the Confirmation Order will constitute approval by the Bankruptcy Court of Debtor's

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

foregoing assumption and assignment by Debtor to Reorganized Ahern of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, entry of the Confirmation Order shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by Debtor and assigned to Reorganized Ahern under the Plan as to which no proof of Claim need be filed.

**5.9.    Indemnification.**    All indemnification obligations currently in place (whether in the bylaws, articles or certificates of incorporation, articles of limited partnership, limited liability company agreements, board resolutions (or resolutions of similar bodies), or employment contracts) for the directors, officers, employees, attorneys, or other Professionals and agents of Debtor (from the Petition Date forward) shall be assumed as of the Effective Date, and shall survive effectiveness of the Plan.  All indemnification provisions in place on and prior to the Effective Date for current directors and officers of Debtor (from the Petition Date forward) shall (i) survive the Effective Date of the Plan for Claims related to or in connection with any actions, omissions, or transactions occurring prior to the Effective Date, and (ii) remain liabilities of Reorganized Ahern specifically on behalf of Debtor.

# 6.    MANNER OF DISTRIBUTION OF PROPERTY UNDER THE PLAN

**6.1.    Distributions.**    Except as otherwise explicitly provided for in the Plan, the Disbursing Agent shall be responsible for making Distributions described in the Plan.  Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for Reorganized Ahern to make payments pursuant to the Plan shall be obtained from existing Cash balances and the operations of Debtor and Reorganized Ahern.

**6.2.    Timing and Calculation of Amounts to Be Distributed.**    Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, on the next Distribution Date or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  All Distributions provided for in the Plan shall be made only to the extent permitted by applicable law.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

**6.3.    Rights and Powers of Disbursing Agent.**

The Disbursing Agent shall be empowered to: (a) affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ Professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

26

104500-002/1750777.DOC

and expenses) made by the Disbursing Agent shall be paid in Cash by Reorganized Ahern in its reasonable discretion.

With respect to a Holder of a Claim or Equity Interest whose Distribution is governed by an agent or other agreement which is administered by an indenture trustee, agent or servicer, such Distributions shall be deposited with the appropriate agent or servicer, who shall then deliver such Distributions to the Holders of Claims or Equity Interests in accordance with the provisions of the Plan and the terms of the relevant indenture or other governing agreement; *provided, however*, that Distributions to the Disbursing Agent (other than the Debtor or Reorganized Ahern) under the Plan will be deemed payment in full, regardless of whether such agent (other than the Debtor or Reorganized Ahern) ultimately distributes such Distribution to the appropriate Claim or Interest Holder.

**6.4.     Providing for Claims Payments.**   Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent: (i) at the addresses set forth on the proofs of Claim filed by such Holders (or at the last known addresses of such Holders if no proof of Claim is filed or if Debtor has not been notified of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of Claim; or (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address.   If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then-current address, at which time all returned Distributions shall be made to such Holder without interest.   Amounts in respect of undeliverable Distributions made through the Disbursing Agent shall be returned to Reorganized Ahern until such Distributions are claimed.   All claims for undeliverable Distributions shall be made on or before the second (2nd) anniversary of the Effective Date.   After such date, all unclaimed property shall revert to Reorganized Ahern and the Claim of any Holder or successor to such Holder with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.   Nothing contained in the Plan shall require Reorganized Ahern or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

**6.5.     Means of Cash Payment.**   Payments of Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the discretion of the Debtor or the Disbursing Agent, as the case may be, by (a) checks drawn on, or (b) wire transfer from, a domestic bank selected by the Debtor or the Disbursing Agent, as the case may be.   Cash payments to foreign Creditors may be made, at the option of the Debtor or the Disbursing Agent, in such funds and by such means as are necessary or customary in the applicable foreign jurisdiction.

**6.6.     Application of Record Date.**   At the close of business on the Record Date, the claims registers for all Claims shall be closed, and there shall be no further changes in the record holders of Claims.   Except as provided herein, the Debtor, Reorganized Ahern, the Disbursing Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims occurring after the Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers as of the close of business on the Distribution Date irrespective of the number of Distributions to be made under the Plan to such Persons or the date of such Distributions.

**6.7.     Claims Paid or Payable by Third Parties.**

**6.7.1. Claims Paid by Third Parties.**   The Debtor, or the Disbursing Agent, as applicable, shall reduce in part or in full a Claim to the extent that the Holder of such Claim receives payment in part or in full on account of such Claim from a party that is not the Debtor or

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11                                                                104500-002/1750777.DOC

the Disbursing Agent. To the extent a Holder of a Claim receives a Distribution on account of such Claim receives payment from a party that is not the Debtor or the Disbursing Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the Distribution to Reorganized Ahern, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

**6.7.2. Insurance Claims.** No Distributions under the Plan shall be made on account of Allowed Claims covered by the Debtor's Insurance Policies until the insurance coverage with respect to such Allowed Claims has been exhausted. To the extent that the Debtor's insurers agree to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurer's agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

**6.7.3. Applicability of Insurance Policies.** Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**6.8. Allocation of Plan Distributions Between Principal and Interest.** To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of principal and accrued but unpaid interest thereon, such Distribution shall, for the Debtor's federal income tax purposes, be allocated on the Debtor's books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**6.9. Setoffs.** Except as provided in the Plan, the Debtor or Reorganized Ahern may, but shall not be required to, set off or offset against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtor may have against the Claim's Holder; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or Reorganized Ahern of any claim that the Debtor may have against such Holder. Nothing herein shall be deemed to expand rights to setoff under applicable law.

**6.10. Fractional Distributions.** Notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**6.11. De Minimis Distributions.** Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent will not be required to distribute, and will not distribute, Cash or other property to the Holder of any Allowed Claim or Equity Interest if the amount of Cash or other property to be distributed on account of such Claim or Equity Interest is less than $25. Any Holder of an Allowed Claim or Equity Interest on account of which the amount of Cash or other property to be distributed is less than $25 will have such Claim or Equity Interest discharged and will be forever barred from asserting such Claim or Equity Interest against the Debtor, Reorganized Ahern, or their respective property. Any Cash or other property not distributed pursuant to this provision will be the property of Reorganized

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

28

104500-002/1750777.DOC

Ahern, free of any restrictions thereon.

**6.12. Prepayment.** Except as otherwise provided in the Plan, any ancillary documents entered into in connection with the Plan, or the Confirmation Order, Reorganized Ahern will have the right to prepay, without penalty, all or any portion of an Allowed Claim entitled to payment in Cash at any time; *provided, however*, that any such prepayment will not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

**6.13. No Distribution in Excess of Allowed Amounts.** Notwithstanding anything to the contrary set forth in the Plan, no Holder of an Allowed Claim or Equity Interest will receive in respect of such Claim or Equity Interest any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim or Equity Interest (excluding payments on account of interest due and payable from and after the Effective Date pursuant to the Plan, if any).

**6.14. Joint Distributions.** The Debtor or the Disbursing Agent may, in their sole discretion, make Distributions jointly to any Holder of a Claim or Equity Interest and any other entity who has asserted, or whom the Debtor has determined to have, an interest in such Claim or Equity Interest. Except as otherwise provided in the Plan or in the Confirmation Order, and notwithstanding the joint nature of any Distribution, all Distributions made by the Debtor or the Disbursing Agent will be in exchange for and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any nature whatsoever against the Debtor and Reorganized Ahern or any of its assets or properties as set forth in Article III of the Plan.

**6.15. No Recourse.** No recourse shall ever be had, directly or indirectly, against Debtor or Reorganized Ahern or against any director, agent, attorney, accountant, or other professional for Debtor or Reorganized Ahern, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or agreement whatsoever executed by Debtor or Reorganized Ahern under the Plan, or by reason of the creation of any indebtedness by Debtor or Reorganized Ahern under the Plan for any purpose authorized by the Plan, it being expressly understood and agreed that all such liabilities, covenants, and agreements of Debtor and Reorganized Ahern, whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Assets or such part thereof as shall under the terms of any such agreement be liable therefore or shall be evidence only of a right of payment out of the Assets.

**6.16. Statements.** Debtor and the Disbursing Agent shall maintain a record of the names and addresses of all Holders of Allowed General Unsecured Claims as of the Effective Date for purposes of mailing Distributions to them. Debtor and the Disbursing Agent may rely on the name and address set forth in the Schedules and/or proofs of Claim as of the Record Date as being true and correct unless and until notified in writing. Debtor and Reorganized Ahern shall file all tax returns and other filings with governmental authorities on behalf of Debtor and Reorganized Ahern and the Assets it holds.

**6.17. Further Authorization.** Reorganized Ahern shall be entitled to seek such orders, judgments, injunctions, and rulings as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions of the Plan.

**7. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

**7.1. Resolution of Disputed Claims.** Holders of Claims must file proofs of Claims on or prior to the applicable Bar Date. No later than the Claims

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

29

104500-002/1750777.DOC

Objection Deadline (unless extended by an order of the Bankruptcy Court), the Debtor or Reorganized Ahern, as the case may be, shall file objections to Claims that were required to be filed by the applicable Bar Date with the Bankruptcy Court and serve such objections upon the Holders of such Claims to which objections are made.  Nothing contained herein, however, shall limit Reorganized Ahern's right to object to Claims, if any, filed or amended after the Claims Objection Deadline.

Holders of Administrative Claims must file a request for payment on or prior to the Administrative Claims Bar Date.  No later than the Administrative Claims Objection Deadline (unless extended by an order of the Bankruptcy Court), the Debtor or Reorganized Ahern, as the case may be, shall file objections to the Administrative Claims with the Bankruptcy Court and serve such objection upon the Holders of such Administrative Claims to which objections are made.  Nothing contained herein, however, shall limit Reorganized Ahern's right to object to Administrative Claims, if any, filed or amended after the Administrative Claims Objection Deadline.

**7.2.     No Distribution Pending Allowance.**     No payments or Distributions, if any contemplated by the Plan, will be made with respect to all or any portion of a Disputed Claim or interest unless and until all objections to such Disputed Claims or interests have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim or interest.

**7.3.     Resolution of Objections After Effective Date.**     From and after the Effective Date, Reorganized Ahern may propose settlements of, or withdraw objections to, all pending or filed Disputed Claims and may settle or compromise any Disputed Claim without notice and a hearing and without approval of the Bankruptcy Court.

**7.4.     Distributions After Allowance.**     On each Quarterly Distribution Date (or such earlier date as determined by the Disbursing Agent in its sole discretion but subject to Section 7.2 of the Plan), the Disbursing Agent will make Distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims that would have been distributed to the Holders of such Claims or Equity Interests on the dates Distributions previously were made to Holders of Allowed Claims and Equity Interests in such Class had the Disputed Claims or Equity Interests that have become Allowed Claims or Equity Interests been Allowed on such dates.  Such Distributions will be made pursuant to the applicable provisions of Article VI of the Plan.

**7.5.     Estimation of Claims.**  The Debtor (before the Effective Date) or Reorganized Ahern (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Person, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor (before the Effective Date) or Reorganized Ahern (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.  All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

**7.6.    Deadline to File Objections to Claims.**    The Debtor reserves its right to file objections to Claims, if any, on or before the applicable Claim Objection Deadline.

**7.7.    Late-Filed Claims.**    Except with respect to Claims, proof of which is made in compliance with the requirements of Sections 502(e) and 509 of the Bankruptcy Code, no Claim filed after the Bar Date or, as applicable, the Administrative Claims Bar Date, shall be allowed, and all such Claims are hereby disallowed in full.  After the Bar Date or the Administrative Claim Bar Date, as applicable, no Creditor shall be permitted to amend any claim to increase the claimed amount, unless permitted by the Bankruptcy Court, subject to the Debtor's or Reorganized Ahern's right to object to such increase; and any such amendment shall be disallowed, unless permitted by the Bankruptcy Court, subject to the Debtor's or Reorganized Ahern's right to object to such increase, to the extent of the late-filed increase in the claimed amount.

**7.8.    Reservation of Right to Object to Allowance or Asserted Priority of Claims.**    Nothing herein will waive, prejudice or otherwise affect the rights of the Debtor, Reorganized Ahern or the Holders of any Claim to object at any time, including after the Effective Date, to the allowance or asserted priority of any Claim, except with respect to any Allowed Claim.

## 8.    CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

**8.1.    Conditions to Confirmation.**    As a condition precedent to entry of the Confirmation Order, the Confirmation Order shall be in form and substance acceptable to Debtor.  The Bankruptcy Court shall have entered an order, which shall not be subject to any stay or subject to an unresolved request for revocation under Section 1144 of the Bankruptcy Code, approving the Disclosure Statement with respect to the Plan, as containing adequate information within the meaning of Section 1125 of the Bankruptcy Code, in form and substance acceptable to the Debtor.

**8.2.    Conditions to Effectiveness.**  The following are conditions precedent to the occurrence of the Effective Date:

**8.2.1.** No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending, including any appeal;

**8.2.2.** The Exit Financing Facility shall have been executed and delivered by all of the Persons that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived, or satisfied in accordance with the terms thereof, and funding pursuant to the Exit Financing Facility shall have occurred.

**8.2.3.** All documents necessary to implement the transactions contemplated by the Plan shall be in form and substance acceptable to Debtor and approved by the Bankruptcy Court.

**8.2.4.** All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

**8.2.5.** The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtor as contemplated herein in form and substance

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

31

EAST\52150151.11

104500-002/1750777.DOC

acceptable to the Debtor.

**8.2.6.** Sufficient Cash and other Assets shall be set aside, reserved and withheld by Debtor to make the Distributions required to be paid on the Effective Date or within sixty (60) days thereafter by the Bankruptcy Code and the Plan.

**8.2.7.** All actions reasonably necessary to establish the Professional Fee Reserve as set forth in Article 4, Section 4.7 of the Plan shall have been effectuated to the extent necessary to establish the Professional Fee Reserve on the Effective Date (or as soon thereafter as is practicable).

**8.3.** **Notice of Effectiveness.** When all of the steps contemplated by Section 8.2 of the Plan have been completed, Debtor shall file with the Bankruptcy Court and serve upon all Creditors and all potential Holders of Administrative Claims known to Debtor (whether or not disputed), a Notice of Effective Date of Plan. The Notice of Effective Date of Plan shall include notice of the Administrative Claims Bar Date.

**8.4.** **Waiver of Conditions.** The Debtor, and if applicable, Reorganized Ahern, may waive (each for themselves but not for others) any or all of the other conditions set forth in this Article 8 and specifically **Sections 8.2.1, 8.2.3, 8.2.5, and 8.2.7** of the Plan without leave of or order of the Bankruptcy Court and without any formal action. The failure of a party to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time prior to the filing of the Notice of Effectiveness described in Section 8.3.

## 9. TITLE TO PROPERTY; DISCHARGE; AND INJUNCTION

**9.1.** **Vesting of Assets.** Subject to and as provided for in the Plan, the Assets shall be vested and/or transferred to Reorganized Ahern on the Effective Date, subject to the Liens on behalf of Holders of Class 1, Class 2, Class 3 and Class 4 Claims. On and after the Effective Date, Reorganized Ahern may operate its business and may use, acquire, and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

**9.2.** **Preservation of Litigation Claims.** In accordance with Section 1123(b)(3) of the Bankruptcy Code, and except as otherwise expressly provided herein, on the Effective Date all Litigation Claims shall be assigned to Reorganized Ahern, and Reorganized Ahern shall have the exclusive right to enforce, prosecute, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Litigation Claims, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtor as of the Effective Date.

**9.3.** **Settlement of Litigation Claims.** At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, Debtor may settle any or all of the Litigation Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019. After the Effective Date, Reorganized Ahern may, and shall have the exclusive right to, compromise and settle any Claims against it and claims it may have against any other Person, including, without limitation, the Litigation Claims, without notice to or approval from the Bankruptcy Court, including, without limitation, any and all derivative actions pending or otherwise existing against Debtor as of the Effective Date.

**9.4.** **Discharge.** On the Effective Date, except as otherwise

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

32

104500-002/1750777.DOC

provided in the Plan, Debtor shall be discharged from any and all Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10 to the fullest extent provided in Sections 524 and 1141 of the Bankruptcy Code. The discharge shall be to the fullest extent provided under Section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, and, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan and shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any kind or nature whatsoever against Debtor or any of its assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date as to Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10, Debtor shall be deemed discharged and released under and to the fullest extent provided under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**9.5.    Compromise and Settlement.**    The allowance, classification, and treatment of all Allowed Claims and their respective Distributions under the Plan take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, Section 510(c) of the Bankruptcy Code, or otherwise, including without limitation, the subordination provisions of the Intercreditor Agreement.  As of the Effective Date, any and all such rights described in the preceding sentence will be settled, compromised, and released pursuant to the Plan and any and all such Causes of Action related thereto are settled, compromised, and released pursuant hereto.

**9.6.    Releases.    On the Effective Date and effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, but not limited to: (i) the discharge of debt and all other good and valuable consideration provided pursuant to the Plan; and (ii) the services of Debtor's officers and directors serving on and since the Petition Date in facilitating the expeditious implementation of the reorganization contemplated by the Plan, Debtor and Reorganized Ahern shall provide a full discharge and release to the Released Parties (and each such Released Party so released shall be deemed released and discharged by Debtor and Reorganized Ahern) and their respective properties from any and all Causes of Action, whether known or unknown, whether for torts, including fraud, contract, violations of federal or state securities laws, or otherwise, arising from or related in any way to Debtor or Reorganized Ahern, including, without limitation, those that either Debtor or Reorganized Ahern would have been legally entitled to assert in its own right (whether individually or collectively) or that any Holder of a Claim or other Person would have been legally entitled to assert on behalf of Debtor or its Estate but for this release and further including those in any way related to the Chapter 11 Case or the Plan to the fullest extent of the law; *provided, however*, that the foregoing releases shall not operate to waive or release any Released Party from (a) any Causes of Action expressly set forth in and preserved by the Plan, any Plan Supplement, or related documents or (b) as a result of actual fraud, gross negligence, or willful misconduct.**

**9.7.    Third Party Releases.        [RESERVED].**

**9.8.    Injunction.    From and after the Effective Date, and except as provided in the Plan, the Confirmation Order and any orders of the Bankruptcy Court implementing the provisions of the Plan and Confirmation Order, all entities that have held, currently hold, or may hold a Claim that is terminated, modified or restructured pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of such Claims: (i) commencing or continuing in any manner**

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

33

EAST\52150151.11                                                                                      104500-002/1750777.DOC

any action or other proceeding against Reorganized Ahern or its property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Reorganized Ahern or its property; (iii) creating, perfecting or enforcing any Lien or encumbrance against Reorganized Ahern or its property; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to Reorganized Ahern or its property; and (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.  By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunctions set forth in this Section 9.8.

**9.9.    Exculpation.  From and after the Effective Date, none of Debtor, Reorganized Ahern, the DIP Loan Agents, solely in their capacity as agents for the DIP Loan, the DIP Lenders, solely in their capacity as DIP Loan Lenders, and the Committee, nor any of their respective directors, officers, managers, employees, advisors, attorneys, Professionals, or agents on and from the Petition Date forward, shall have or incur any liability to any Holder of a Claim or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, Affiliates, professionals, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (from the Petition Date forward) the Chapter 11 Case, Reorganized Ahern, the pursuit of confirmation of the Plan, or the Substantial Consummation of the Plan, including the issuance and distribution of the Exit Financing Facility Documents, the Senior Secured Note Documents or the Junior Secured Note Documents as provided for in the Plan or any orders of the Bankruptcy Court, except for gross negligence and willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Chapter 11 Case.  No Holder of a Claim, nor any other party-in-interest, including their respective agents, employees, representatives, financial advisors, attorneys, Affiliates, professionals, or their successors and assigns, shall have any right of action against Debtor, Reorganized Ahern, the DIP Loan Agents, the DIP Lenders, and the Committee, or any of their respective present or former members, officers, directors, managers, employees, advisors, attorneys, Professionals, or agents, relating to, or arising out of (from the Petition Date forward) the Chapter 11 Case, the pursuit of Confirmation of the Plan, the Substantial Consummation of the Plan, including the issuance and distribution of the Exit Financing Facility Documents, the Senior Secured Note Documents or the Junior Secured Note Documents as provided for in the Plan or any orders of the Bankruptcy Court, or the administration of the Plan, except for: (i) their willful misconduct and gross negligence; (ii) matters specifically contemplated by either the Plan or Reorganized Ahern; and (iii) any liability of an attorney to its client not subject to exculpation under the Bankruptcy Code.**

## 10.    RETENTION OF JURISDICTION.

**10.1.    Jurisdiction.**  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case and Reorganized Ahern after the Effective Date as is legally permissible, including jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Disputed Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Disputed Claims;

2.    Grant or deny any applications for allowance of compensation or

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

34

104500-002/1750777.DOC

reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3.      Resolve any matters related to the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which Debtor or Reorganized Ahern is a party and to hear, determine and, if necessary, liquidate any Claims arising therefrom or Cure amounts related thereto;

4.      Ensure that Distributions to or for the benefit of Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications or motions involving Debtor or Reorganized Ahern that may be pending on the Effective Date or commenced thereafter as provided for by the Plan;

6.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order except as otherwise provided herein;

7.      Decide or resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of any Final Order, the Plan, the Confirmation Order, or obligations of any Persons incurred in connection with such Final Order, the Plan, or the Confirmation Order;

8.      Modify the Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code and Section 11 of the Plan or modify any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, the Confirmation Order, or Reorganized Ahern; or remedy any defect or omission or reconcile any inconsistency in any Final Order, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

9.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation, or enforcement of any Final Order, the Plan, or the Confirmation Order, except as otherwise provided herein;

10.     Enter and implement such orders as are necessary or appropriate if a Final Order or the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

11.     Determine any other matters that may arise in connection with or relate to the Plan, any Final Order, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, any Final Order or the Confirmation Order (unless such contract, instrument, release, or other agreement or document expressly provides otherwise), except as otherwise provided herein;

12.     Enter an order closing the Chapter 11 Case;

13.     Hear and decide Litigation Claims and any other Claim or Cause of Action

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

35

104500-002/1750777.DOC

of Debtor and Reorganized Ahern pending on the Effective Date; and

14. Decide or resolve any matter over which the Bankruptcy Court has jurisdiction pursuant to Section 505 of the Bankruptcy Code.

## 11. MODIFICATION AND AMENDMENT OF PLAN.

Prior to Confirmation, Debtor may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time. After the Confirmation Date and prior to the Effective Date, Debtor may, under Sections 1127(b), (c), and (d) of the Bankruptcy Code, alter, amend, or modify the Plan or institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, and to make appropriate adjustments and modifications to the Plan or the Confirmation Order as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially adversely affect the treatment of Holders of Claims under the Plan.

## 12. MISCELLANEOUS.

**12.1. Effectuating Documents; Further Transactions; and Timing.** Each of the officers of Debtor and Reorganized Ahern are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any obligations issued, transferred, or cancelled pursuant to the Plan and transactions contemplated by the Plan. All transactions that are required to occur on the Effective Date under the terms of the Plan shall be deemed to have occurred simultaneously. Debtor and Reorganized Ahern are authorized and directed to do such acts and execute such documents as are necessary to implement the Plan.

**12.2. Cancellation of Existing Agreements.** On the latest to occur of (i) the Effective Date; (ii) the entry of a Final Order resolving all Claims in the Chapter 11 Case; and (iii) the final Distribution made to Holders of Allowed Claims in accordance with the terms of the Plan, unless otherwise provided in the Plan, any document, agreement, or instrument evidencing any Disputed Claim that is disallowed shall be deemed automatically cancelled and terminated without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of Debtor under such documents, agreements, or instruments evidencing such Claims shall be discharged.

**12.3. Exemption from Transfer Taxes.** Pursuant to Section 1146(a) of the Bankruptcy Code, (i) the issuance, distribution, transfer, or exchange of Estate property; (ii) the creation, modification, consolidation, or recording of any deed of trust or other interest, or the securing of additional indebtedness by such means or by other means in furtherance of, or in connection with the Plan or the Confirmation Order; (iii) the making, assignment, modification, or recording of any lease or sublease; or (iv) the making, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, Confirmation Order, or any transaction contemplated above, or any transactions arising out of, contemplated by, or in any way related to the foregoing shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act or real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment and the appropriate state or local government officials or agents shall be, and hereby are, directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

**12.4. Revocation or Withdrawal of the Plan.** Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

36

104500-002/1750777.DOC

the Plan is withdrawn or revoked or if the Bankruptcy Court denies confirmation of the Plan, then the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against Debtor or any other Person, nor shall the withdrawal or revocation of the Plan prejudice in any manner the rights of Debtor or any Person in any further proceedings involving Debtor. In the event the Plan is withdrawn or revoked, nothing set forth herein shall be deemed an admission of any sort and the Plan and any transaction contemplated thereby shall be inadmissible into evidence in any proceeding.

In the event that the Effective Date does not occur, upon notification submitted by Debtor to the Bankruptcy Court: (i) the Confirmation Order shall be vacated; (ii) no Distributions under the Plan shall be made; (iii) Debtor and all Holders of Claims shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (iv) Debtor's obligations with respect to the Claims shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims by or against Debtor or any other Person or to prejudice in any manner the rights of Debtor or any Person in any further proceedings involving Debtor.

**12.5. Term of Bankruptcy Injunction or Stays.** All injunctions or stays provided for in the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. Upon the Effective Date, the injunction provided in Article IX of the Plan shall apply.

**12.6. Enforcement of Subordination.** Unless otherwise set forth herein, in accordance with Section 510(a) of the Bankruptcy Code, all subordination rights that the Debtor or a Holder of a Claim or Equity Interest may have with respect to any Claim or Distribution to be made pursuant to the Plan will not be discharged and terminated, except to the extent that such subordination rights conflict with other provisions of the Bankruptcy Code. All actions to request or direct subordination arising in law or in equity, including rights under Section 510(b) of the Bankruptcy Code, are not waived and expressly preserved.

**12.7. Binding Effect.** The Plan shall be binding upon and inure to the benefit of the Debtor and the Estate, Reorganized Ahern and all present and former Holders of Claims against and interests in the Debtor, whether or not such Holders will receive or retain any property or interest in property under the Plan, their respective successors and assigns, including, without limitation, all other parties in interest in the Chapter 11 Case.

**12.8. Plan Supplement.** The Plan Supplement shall be filed with the Bankruptcy Court no later than ten (10) Business Days before the Voting Deadline, and additional Plan Supplement documents shall be filed before the Effective Date as amendments to the Plan Supplement. Any document included in the Plan Supplement (and amendments thereto) filed by the Debtor shall be deemed an integral part of the Plan and shall be incorporated by reference as if fully set forth herein. To the extent any exhibit or schedule to the Plan is inconsistent with the terms of the Plan, the Plan shall control.

**12.9. Committees.** On the Effective Date, the Committee shall cease to exist, except with respect to any application for compensation or reimbursement of costs and expenses in connection with services rendered prior to the Effective Date.

**12.10. Governing Law.** Except to the extent that the Bankruptcy Code or other federal law is applicable or as provided in any contract, instrument, release, or other agreement entered into in connection with the Plan or in any document which remains unaltered by the Plan, the rights, duties, and obligations of Debtor and any other Person arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Nevada without giving effect to Nevada choice of law provisions.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

37

104500-002/1750777.DOC

**12.11.  Modification of Payment Terms.**  Reorganized Ahern reserves the right to modify the treatment of any Allowed Claim in any manner adverse only to the Holder of such Allowed Claim at any time after the Effective Date upon the prior written consent of the Holder whose Allowed Claim treatment is being adversely affected.

**12.12.  Notices.**  Any notice required or permitted to be provided under the Plan shall be in writing and served by either: (a) certified mail, return receipt requested, postage prepaid; (b) hand delivery, or (c) reputable overnight courier service, freight prepaid, to be addressed as follows:

If to Debtor or Reorganized Ahern:    Ahern Rentals, Inc.
Attn: Howard Brown, Chief Financial Officer
1401 Mineral Avenue
Las Vegas, NV 89106-4342
Tel: (702) 362-0623
Fax: (702) 367-7652

With a Copy to:    GORDON SILVER
Attn:  Willaim M. Noall, Esq.
3960 Howard Hughes Pkwy, 9th Floor
Las Vegas, NV  89109
Tel:  (702) 796-5555
Fax:  (702) 369-2666

and

DLA PIPER (US) LLP
Attn: Gregg M. Galardi, Esq.
1251 Avenue of the Americas
New York, New York 10020
Tel:  (212) 335-4640
Fax:  (212) 884-8680

**12.13.  Severability.**  If any provision of the Plan is determined by the Bankruptcy Court to be invalid, illegal, or unenforceable or the Plan is determined to be not confirmable pursuant to Section 1129 of the Bankruptcy Code, the Bankruptcy Court, at the request of Debtor or Reorganized Ahern, as applicable, shall have the power to alter and interpret such term to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall provide and shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.14.  Withholding and Reporting Requirements.**  In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, Reorganized Ahern shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  Reorganized Ahern shall be authorized to take any and all action that may be necessary to comply with such withholding and recording requirements.  Notwithstanding any other provision of the Plan, each Holder of an

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

Allowed Claim that has received a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding, and other tax obligation on account of such Distribution.

**12.15.    Fees and Reporting to the U.S. Trustee.**    Prior to the Effective Date, the Debtor, and after the Effective Date, the Reorganized Ahern, is obligated to pay the U.S. Trustee quarterly fees based upon all disbursements in accordance with the sliding scale set forth in 28 U.S.C. § 1930(a)(6).  These fees accrue throughout the pendency of the Chapter 11 Case and until entry of a final decree.  U.S. Trustee fees paid prior to confirmation of the Plan will be reported in operating reports required by Sections 704(8), 1106(a)(1), 1107(a) of the Bankruptcy Code and the United States Trustee  Guidelines.  All U.S. Trustee quarterly fees accrued prior to confirmation of the Plan will be paid on or before the Effective Date pursuant to Section 1129(a)(12) of the Bankruptcy Code.  All U.S. Trustee fees accruing post-confirmation are due on a calendar quarter basis and reported both on post-confirmation operating reports and in post-confirmation operating reports required by the United States Trustee  Guidelines.

**12.16.    Section 1125(e) of the Bankruptcy Code.**  As of the Confirmation Date, the Debtor shall be deemed to have acted in good faith and in compliance with Section 1125(e) of the Bankruptcy Code.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11

104500-002/1750777.DOC

1    DATED this 30th day of November, 2012.

2                                                    Ahern Rentals, Inc., a Nevada corporation,

3                                                    By: _____

4                                                    Its: _____

5

6    PREPARED AND SUBMITTED BY:

7    GORDON SILVER

     By: _____
8        GERALD M. GORDON, ESQ.
         WILLIAM M. NOALL, ESQ.
9        THOMAS H. FELL, ESQ.
         GABRIELLE A. HAMM
10       3960 Howard Hughes Pkwy., 9th Floor
         Las Vegas, Nevada 89169
11       Attorneys for Debtor

12                    and

13   DLA PIPER (US) LLP

14   By: /s/ Gregg M. Galardi
         GREGG M. GALARDI, ESQ.
15       1251 Avenue of the Americas
         New York, New York 10020
16       Attorneys for Debtor

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52150151.11                                      40                                      104500-002/1750777.DOC

**Exhibit 1.1.77 – Junior Secured Note Indenture**

[To Come]

**Exhibit 1.1.86 – Litigation Claims**

[To Come]

Case 11-53860-dhb   Doc 1354   Entered 11/30/12 15:34:26   Page 134 of 156

**Exhibit 1.1.134 – Senior Secured Note Indenture**

[To Come]

## **Exhibit 4.4 – Commitment Letter/Term Sheet for the Exit Financing Facility**

[To Come]

Case 11-58860-dhb   Doc 335   Entered 11/30/12 15:34:22   Page 136 of 156

## Exhibit 5.1 – Rejected Executory Contracts and Unexpired Leases

[To Come]

## **Exhibit 5.3 – Cure Amounts for Assumed Executory Contracts and Unexpired Leases**

[To Come]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX B**

**FINANCIAL PROJECTIONS**

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

**AHERN RENTALS**
**FINANCIAL PROJECTIONS**

| Income Statement | | | | | | |
|---|---|---|---|---|---|---|

*($ in millions)* Year Ending December 31,

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | |
| Equipment rentals and related | $327.1 | $348.9 | $383.8 | $410.4 | $437.1 | $459.5 |
| Sale of rental equipment | 13.8 | 26.5 | 39.8 | 45.6 | 41.8 | 41.1 |
| Sale of new equipment and other | 20.9 | 18.1 | 20.0 | 21.4 | 23.0 | 24.1 |
|  | **361.9** | **393.5** | **443.6** | **477.5** | **501.9** | **524.7** |
| **COST OF REVENUES** | | | | | | |
| Cost of equipment rental operations, excluding depreciation | $168.6 | $165.2 | $174.9 | $182.2 | $188.7 | $194.7 |
| Depreciation, rental equipment | 76.5 | 78.6 | 81.5 | 84.2 | 89.2 | 93.8 |
| Cost of rental equipment sold | 7.4 | 16.6 | 25.8 | 29.3 | 25.2 | 23.6 |
| Cost of new equipment sold and other | 15.1 | 13.3 | 14.7 | 15.8 | 16.9 | 17.8 |
|  | **267.6** | **273.7** | **297.0** | **311.5** | **320.0** | **329.9** |
| **GROSS PROFIT** | **$94.2** | **$119.7** | **$146.7** | **$166.0** | **$181.9** | **$194.9** |
| **OPERATING EXPENSES** | | | | | | |
| Selling, general, and administrative | $65.6 | $66.3 | $69.8 | $71.9 | $73.8 | $75.3 |
| Non-rental equipment depreciation | 10.5 | 11.5 | 12.9 | 14.2 | 15.5 | 16.8 |
|  | **76.1** | **77.8** | **82.6** | **86.1** | **89.3** | **92.1** |
| **OPERATING INCOME** | **$18.1** | **$42.0** | **$64.0** | **$79.9** | **$92.6** | **$102.8** |
| **OTHER INCOME (EXPENSE)** | | | | | | |
| Interest expense | ($34.7) | ($24.3) | ($16.7) | ($15.4) | ($14.3) | ($12.7) |
| Reorganization costs | (8.0) | (12.6) | 0.0 | 0.0 | 0.0 | 0.0 |
| Other, net | (0.6) | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 |
|  | **(43.3)** | **(36.9)** | **(16.6)** | **(15.4)** | **(14.2)** | **(12.7)** |
| **NET INCOME (LOSS)** | **($25.2)** | **$5.0** | **$47.4** | **$64.5** | **$78.4** | **$90.1** |
| **ADJUSTED EBITDA** | **$105.2** | **$132.1** | **$158.5** | **$178.4** | **$197.4** | **$213.4** |

Unaudited, subject to accounting adjustments

i

**AHERN RENTALS**
**FINANCIAL PROJECTIONS**

|  | Balance Sheet | | | | | |
|---|---|---|---|---|---|---|
| | | | As of December 31, | | | |
| *($ in millions)* | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** |
| Cash | $2.0 | $2.0 | $2.0 | $2.0 | $2.0 | $2.0 |
| Accounts Receivable, net | 66.3 | 67.1 | 75.8 | 79.1 | 79.2 | 82.8 |
| Inventory | 29.1 | 30.5 | 31.1 | 32.4 | 34.0 | 34.9 |
| Total Current Assets | 97.3 | 99.6 | 108.9 | 113.5 | 115.2 | 119.7 |
| Net Rental Equipment | $251.6 | $233.2 | $258.6 | $305.1 | $349.0 | $349.1 |
| Net Owned Equipment | 59.2 | 60.8 | 65.0 | 65.7 | 66.6 | 62.3 |
| Net Fixed Assets | 310.8 | 294.0 | 323.7 | 370.8 | 415.7 | 411.3 |
| Other | $14.5 | $11.0 | $13.1 | $13.4 | $14.7 | $15.0 |
| **TOTAL ASSETS** | **422.6** | **404.6** | **445.7** | **497.7** | **545.6** | **546.0** |
| Accounts Payable | $9.9 | $13.5 | $14.3 | $19.9 | $20.6 | $18.4 |
| Accrued Expenses | 11.9 | 9.6 | 9.9 | 10.4 | 11.4 | 11.5 |
| Other | 2.4 | 5.8 | 11.8 | 17.8 | 23.8 | 0.9 |
| Total Current Liabilities | 24.2 | 28.9 | 36.1 | 48.1 | 55.8 | 30.8 |
| Pre - Petition Liabilities | $382.2 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| DIP Loan | 224.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Exit Financing Facility | 0.0 | 216.3 | 230.4 | 234.6 | 226.3 | 169.8 |
| Senior Secured Notes | 0.0 | 92.0 | 65.1 | 36.9 | 7.5 | (0.0) |
| Junior Secured Notes | 0.0 | 18.5 | 18.5 | 18.5 | 18.5 | 18.5 |
| Second Lien Loan Deficiency Claims | 0.0 | 249.2 | 249.2 | 249.2 | 249.2 | 249.2 |
| General Unsecured Claims | 0.0 | 2.6 | 2.0 | 1.4 | 0.8 | 0.2 |
| Total Debt | 606.4 | 578.6 | 565.2 | 540.6 | 502.3 | 437.7 |
| **TOTAL LIABILITIES** | **$630.6** | **$607.5** | **$601.2** | **$588.7** | **$558.2** | **$468.5** |
| Retained Earnings & Equity | ($207.9) | ($202.9) | ($155.5) | ($91.0) | ($12.6) | $77.5 |
| **TOTAL LIABILITIES & EQUITY** | **422.6** | **404.6** | **445.7** | **497.7** | **545.6** | **546.0** |

Unaudited, subject to accounting adjustments

**AHERN RENTALS**
**FINANCIAL PROJECTIONS**

|  | Cash Flow Statement | | | | | |
|---|---|---|---|---|---|---|

| | | | Year Ending December 31, | | | |
|---|---|---|---|---|---|---|
| ($ in millions) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| Net Income (loss) | ($25.2) | $5.0 | $47.4 | $64.5 | $78.4 | $90.1 |
| Depreciation & Amortization | 92.2 | 94.6 | 94.4 | 98.4 | 104.7 | 110.5 |
| Gross Profit on Equipment Sold | (6.4) | (9.9) | (14.1) | (16.4) | (16.6) | (17.5) |
| Accounts Receivable, net | $0.1 | ($4.0) | ($12.2) | ($6.8) | ($3.8) | ($7.4) |
| Inventory | (4.3) | (1.5) | (0.6) | (1.3) | (1.6) | (0.9) |
| Accounts Payable | (0.2) | 3.6 | 0.8 | 5.6 | 0.7 | (2.2) |
| Accrued Expenses | 1.5 | 1.1 | 6.3 | 6.5 | 7.0 | (22.8) |
| Total Change in Working Capital | (2.9) | (0.8) | (5.6) | 3.9 | 2.3 | (33.3) |
| Total Change in Other | $3.2 | $2.1 | $1.1 | $3.2 | $2.2 | $3.3 |
| **Net Cash Flow From Operating Activities** | **61.0** | **91.0** | **123.3** | **153.6** | **171.1** | **153.2** |
| Capital Expenditures | ($44.5) | ($90.0) | ($150.0) | ($175.0) | ($175.0) | ($130.0) |
| Proceeds from Sale of Equipment | 14.1 | 26.8 | 40.1 | 46.0 | 42.2 | 41.5 |
| **Net Cash Used In Investing Activities** | **(30.4)** | **(63.2)** | **(109.9)** | **(129.0)** | **(132.8)** | **(88.5)** |
| Increase (Decrease) in: | | | | | | |
| Pre - Petition Liabilities | $0.0 | ($382.2) | $0.0 | $0.0 | $0.0 | $0.0 |
| DIP Loan | (34.1) | (224.2) | 0.0 | 0.0 | 0.0 | 0.0 |
| Exit Financing Facility | 0.0 | 216.3 | 14.1 | 4.2 | (8.3) | (56.5) |
| Senior Secured Notes | 0.0 | 92.0 | (27.0) | (28.2) | (29.4) | (7.5) |
| Junior Secured Notes | 0.0 | 18.5 | 0.0 | 0.0 | 0.0 | 0.0 |
| Second Lien Loan Deficiency Claims | 0.0 | 249.2 | 0.0 | 0.0 | 0.0 | 0.0 |
| General Unsecured Claims | 0.0 | 2.6 | (0.6) | (0.6) | (0.6) | (0.6) |
| Financing costs paid | (3.1) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Net Cash Used In Financing Activities** | **(37.2)** | **(27.8)** | **(13.4)** | **(24.6)** | **(38.2)** | **(64.6)** |
| Beginning Cash Balance | $8.6 | $2.0 | $2.0 | $2.0 | $2.0 | $2.0 |
| **NET CHANGE IN CASH** | **(6.6)** | **0.0** | **0.0** | **0.0** | **(0.0)** | **0.0** |
| Ending Cash Balance | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |

Unaudited, subject to accounting adjustments

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX C

# LIQUIDATION ANALYSIS

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

EAST\52216559.5

104500-002/1750782.doc

# LIQUIDATION ANALYSIS[1]

### 1. *Introduction*

Pursuant to the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a chapter 11 plan may not be confirmed unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value as of the effective date of the plan that is not less than the amount that such holder would receive or retain if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Debtor's Plan satisfies the "best interests" test, the Debtor, with the assistance of their advisors, has prepared a hypothetical liquidation analysis (the "Liquidation Analysis"). The Liquidation Analysis is based upon certain assumptions discussed in the Disclosure Statement and in the notes accompanying the Liquidation Analysis set forth herein (the "Notes"). Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement.

In the Liquidation Analysis, the Debtor determined a hypothetical liquidation value of its business if a chapter 7 trustee were appointed and charged with reducing to cash any and all of the Debtor's assets. The Debtor compared the potential liquidation value of the Debtor's assets to the potential value of the Debtor's assets under the Plan. As reflected in more detail in the Liquidation Analysis and in Article V (Summary of the Plan of Reorganization) of the Disclosure Statement, the Debtor believes that the value of the distributions provided to Holders of Allowed Claims under the Plan would be greater than under a hypothetical chapter 7 liquidation, thus the Debtor believes the Plan satisfies the "best interests" test with respect to the Debtor.

The Debtor believes that Holders of Allowed Claims in each Impaired Class will receive at least as much under the Plan as they would if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs, which would be realized if the Debtor was to be liquidated in accordance with chapter 7 of the Bankruptcy Code.

### 2. *Scope, Intent, and Purpose of the Liquidation Analysis*

The determination of the hypothetical proceeds from, and costs of the liquidation of the Debtors' assets, is an uncertain process involving the extensive use of estimates and assumptions that although considered reasonable by the Debtor, are inherently subject to significant business and economic uncertainties and contingencies beyond the control of the Debtor.  Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation.  The Debtor prepared the Liquidation Analysis for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtor's assets were liquidated in accordance with chapter 7 of the Bankruptcy Code upon

---

[1] Unless otherwise specifically set forth in the Liquidation Analysis, all capitalized terms used, but not defined herein, shall have the same meanings ascribed to the them in the Plan and Disclosure Statement.

conversion of the Chapter 11 Case. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. Accordingly, while deemed reasonable based on the facts currently available, neither the Debtor nor its advisors make any representations or warranties that the actual results would or would not approximate the estimates and assumptions represented in the Liquidation Analysis and actual results could vary materially.

In preparing the Liquidation Analysis, the Debtor estimated Allowed Claims based upon a review of its books and records. The Liquidation Analysis includes estimates for Claims which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, Liquidation Costs (as defined herein), trustee fees, and other Allowed Claims. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims. Therefore, the Debtor's estimates of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. Nothing contained in the liquidation analysis is intended to be or constitutes a concession or admission of the Debtor. The actual amount of Allowed Claims in the Chapter 11 Case could materially differ from the estimated amounts set forth in the Liquidation Analysis.

### 3. Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes conversion of the Debtor's Chapter 11 Case to a chapter 7 liquidation case on March 31, 2013 (the "Conversion Date"), which is the presumed Effective Date of the Plan. On the Conversion Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (the "Trustee") to oversee the liquidation of the chapter 7 bankruptcy estate (the "Estate"). The Liquidation Analysis is based on estimates of the Debtor's projected assets and liabilities as of March 31, 2013 (the Debtor is using unaudited October 31, 2012 balances as a proxy unless otherwise footnoted). Such estimates are derived from the Debtor's financial statements or more recent financial information, where available. The Debtor does not believe the use of such estimates will result in a material change to estimated recoveries on the Conversion Date unless otherwise noted.

### 4. Debtors' Assets

The Liquidation Analysis assumes a liquidation of all of the Debtor's assets. As described in more detail below, the Debtor has nine major categories of assets: (a) cash and equivalents; (b) accounts receivable; (c) rental equipment; (d) transportation equipment; (e) parts and merchandise; (f) new equipment; (g) furniture and fixtures; (h) leasehold improvements; and (i) other, primarily consisting of deferred financing costs, prepaid expenses, deposits, and other items.

Holders of the Class 1 Term Loan Claims, Class 2 Second Lien Loan Secured Claims, Class 3 Kubota Claims, and Class 4 Other Secured Claims hold first-and second-priority liens against substantially all of the Debtor's assets (the "Collateral).

5. *Liquidation Process*

The Liquidation Analysis assumes an "orderly" liquidation, under which the liquidation of the Debtor's assets and the wind-down of its Estate would occur over a period of six months starting on the Conversion Date. However, the Trustee may not have sufficient funds to conduct an orderly liquidation and maximize value, and thus may be forced to liquidate substantially all of the Debtor's assets immediately. In such an event, the amount of Liquidation Proceeds realized would be materially lower than those assumed in the Liquidation Analysis.

a.  Factors Considered in Valuing Hypothetical Liquidation Proceeds

The following include some, but not all, of the factors that could negatively impact the recoveries set forth in the Liquidation Analysis: (a) turnover of key personnel; (b) customer setoffs; (c) non-return of equipment by customers; and (d) delays in the liquidation process. These factors may limit the amount of the proceeds generated by the liquidation of the Debtor's assets (the "Liquidation Proceeds") available to the Trustee. For example, it is possible that the liquidation would be delayed while the Trustee becomes familiar with the Debtor's Chapter 11 Case and the Debtor's business operations. This delay could materially reduce the value of the Liquidation Proceeds. There is also a risk that a significant amount of equipment that is on rent on the Conversion Date is not able to be recovered, particularly given that customers are generally not responsible for the Debtor's equipment if not picked up by the Debtor within three days after the end of the rental period. In addition, there is a risk that the Trustee would be unable to maximize the value of the Debtor's Estate in a controlled liquidation because the Bankruptcy Court may only allow the Trustee to operate the Debtor's business for a limited period under section 721 of the Bankruptcy Code. While the Bankruptcy Code does not set forth a specific time period under which a chapter 7 trustee is allowed to operate a debtor's business, the Bankruptcy Court may conclude that the six month period assumed in the Liquidation Analysis exceeds the time contemplated by the Bankruptcy Code. Should the Bankruptcy Court limit the Trustee's operation of the Debtor's business, the Liquidation Proceeds generated from the sale of the Debtor's assets would likely decrease.

b.  Waterfall and Recovery Ranges

The Liquidation Analysis assumes that the proceeds generated from the liquidation of all of the Debtor's assets plus cash estimated to be held by the Debtor on the Conversion Date will be reasonably available to the Trustee. After deducting the costs of liquidation, including the Trustee's fees and expenses and other administrative expenses incurred in the liquidation, the Trustee would allocate net Liquidation Proceeds to Holders of Claims and Interests in accordance with the priority scheme set forth in section 726 of the Bankruptcy Code. The Liquidation Analysis provides for high and low recovery percentages for Claims and Interests upon the Trustee's application of the Liquidation Proceeds. Specifically, these percentages reflect a high and low range of estimated Liquidation Proceeds.

The Debtor used the October 31, 2012 financial statements as a proxy for expected asset and liability values on the Conversion Date (unless otherwise footnoted) and made adjustments to those values to account for any known material changes expected to occur before the Conversion

Date. While the Debtor expects to continue to incur obligations in the ordinary course of business until the Conversion Date (which obligations may not be fully reflected herein), the ultimate inclusion of such additional obligations is not expected to change the results of this Liquidation Analysis in any material form or fashion.

The Debtor's Professionals (a) worked with the Debtor's operational, financial, and accounting personnel, (b) used industry knowledge, and (c) drew upon personal experiences to estimate ranges of recovery by asset class. The Debtor does not provide any assurance of such recoveries but has given its best estimates in this scenario. The table on the following page summarizes the low and high range estimates of the Liquidation Proceeds that would be available to Holders of Allowed Claims and Interests for distribution in a chapter 7 liquidation.

**Ahern Rentals, Inc.**
**Liquidation Analysis**
**Estimated as of March 31, 2013**

**Estimated Recovery and Distribution to Claimants**

($s in thousands)

| | Estimated Balance (1) | Estimated Recovery Rate | | Estimated Liquidation Proceeds | |
| --- | --- | --- | --- | --- | --- |
| | | Low | High | Low | High |
| **Assets Available for Distribution** | | | | | |
| Cash & Cash Equivalents (2) | $2,000 | 100% | 100% | $2,000 | $2,000 |
| Accounts Receivable (2) | 66,368 | 45% | 75% | 29,866 | 49,776 |
| Rental Equipment (3) | 245,080 | 104% | 125% | 255,550 | 306,914 |
| Transportation Equipment (3) | 19,758 | 100% | 102% | 19,700 | 20,076 |
| Parts and Merchandise (3) | 22,910 | 22% | 37% | 5,082 | 8,565 |
| New Equipment (3) | 6,263 | 53% | 69% | 3,338 | 4,316 |
| Furniture and Fixtures | 8,878 | 38% | 51% | 3,393 | 4,485 |
| Leasehold Improvements | 29,937 | 5% | 15% | 1,497 | 4,491 |
| Other | 17,896 | 23% | 36% | 4,040 | 6,468 |
| **Total Assets and Net Proceeds Available for Distribution** | | | | **$324,466** | **$407,091** |
| **Estimated Chapter 7 Wind-Down Administrative Costs** | | | | | |
| Chapter 7 Trustee Fees (4) | | | | $9,734 | $12,213 |
| Chapter 7 Professional Fees and Costs (5) | | | | 1,800 | 1,800 |
| Wind Down Costs (6) | | | | 11,954 | 0 |
| Carve-Out for Chapter 11 Professional Fees (7) | | | | 1,280 | 1,280 |
| Total Chapter 7 Wind-Down Administrative Costs | | | | $24,768 | $15,293 |
| **Net Proceeds after Chapter 7 Wind-Down Administrative Costs** | | | | **$299,698** | **$391,799** |

| **Estimated Creditor Recoveries** | Estimated Claim | | | | |
| --- | --- | --- | --- | --- | --- |
| Super-Priority DIP Loan Claims (8) | $217,759 | 100% | 100% | $217,759 | $217,759 |
| Secured Claims | | | | | |
| Kubota Claims | 144 | 100% | 100% | 144 | 144 |
| Term Loan Claims | 111,543 | 73% | 100% | 81,680 | 111,543 |
| Other Secured Claims | 115 | 100% | 100% | 115 | 115 |
| Second Lien Loan Secured Claims | 18,503 | 0% | 100% | 0 | 18,503 |
| **Estimated Proceeds Available after Payment of Secured Claims** | | | | **$0** | **$43,735** |
| Administrative Claims | | | | | |
| Unpaid Post-Petition Accounts Payable (2) | 14,958 | 0% | 100% | 0 | 14,958 |
| 503(b)(9) Claims | 534 | 0% | 100% | 0 | 534 |
| Rejection of Assumed Leases | 3,777 | 0% | 100% | 0 | 3,777 |
| **Estimated Proceeds Available after Payment of Administrative Claims** | | | | **$0** | **$24,467** |
| Other Priority Claims | $71 | 0% | 100% | 0 | 71 |
| Unsecured Claims (9) | $254,575 | 0% | 10% | 0 | 24,395 |
| **Total Claims Paid** | | | | **$299,698** | **$391,799** |
| **Net Proceeds Available to Equity Interests** | | | | **$0** | **$0** |

(1) All balances are estimated net book values as of March 31, 2013 (using unaudited October 31, 2012 balances as a proxy unless otherwise footnoted).
(2) Estimated as of March 31, 2013 in accordance with the Debtor's business plan.
(3) Equipment and parts and merchandise high values based on Orderly Liquidation Value provided by Rouse Asset Services as part of September 30, 2012 equipment appraisal
   with Net Liquidation Value / Orderly Liquidation Value ratio based upon the Net Liquidation Value report prepared by Rouse Asset Services as of March 31, 2012.
   Equipment and parts and merchandise low values based on Forced Liquidation Value provided by Rouse Asset Services as part of September 30, 2012
   appraisal with an estimated 6% reduction for selling commissions and other related costs.
(4) Chapter 7 trustee fees in accordance with section 326 of the Bankruptcy Code and are estimated at 3% of Total Assets and Net Proceeds Available for Distribution.
(5) Assumes a six month wind down period at $300,000 per month to assist in legal and accounting wind down work.
(6) Estimated wind-down costs factored into Net Liquidation Value ratio for high recovery estimate; low recovery estimates assumes six months of declining operating costs.
(7) Estimated fees earned but not yet paid as of March 31, 2013.
(8) Estimated balance as of March 31, 2013 in accordance with Debtor's business plan.
(9) Includes General Unsecured Claims, Second Lien Loan Deficiency Claims and Personal Injury Claims.

v

## Specific Notes to the Asset and Liability Assumptions
## Contained in the Liquidation Analysis

- Cash and Equivalents.  Cash is based on the estimated cash balance on the Debtor's financial statements as of March 31, 2013 in accordance with the Debtor's business plan and includes restricted and unrestricted Cash in any of the Debtor's bank, operating, and reserve accounts.  The Liquidation Analysis assumes a 100% recovery rate for Cash based on the liquidity of such assets.

- Accounts Receivable.  Accounts receivable include amounts owed to the Debtor by its customers and various other parties.  Using the October 31, 2012 aging of the Debtor's accounts receivable as a proxy, and assuming that current accounts receivable are more likely to be collected in a liquidation than past due accounts, the Liquidation Analysis assumes a blended recovery rate of 45% - 75% on account of accounts receivable.  This recovery is due to the impact of the low return anticipated on accounts receivable in the event of a chapter 7 liquidation.

- Rental Equipment.   Rental Equipment generally consists of a broad variety of construction and industrial equipment, including aerial, earthmoving and general rental equipment.  The Debtor estimates that the Net Book Value (NBV) of this equipment will be approximately $245.1 million as of March 31, 2013. The estimated high and low recovery values assumed in the Liquidation Analysis were developed using the Debtor's September 30, 2012 equipment appraisal conducted by Rouse Asset Services (the "Rouse Appraisal") as a proxy for estimated orderly liquidation values and forced liquidation values as a percentage of the estimated March 31, 2013 NBV.  The high recovery assumes an 11.4% reduction for brokers' fees, facility charges, labor expense, transportation, fees to an auctioneer, and other expenses related to a liquidation of the Debtor's fleet equipment.  The low recovery scenario assumes a 6% reduction for auctioneer and other fees related to a liquidation of the Debtor's fleet equipment, with a number of the costs and expenses associated with the high recovery scenario included in wind-down costs in the low recovery scenario.

- Transportation Equipment.  Transportation equipment generally includes pick-up trucks, trailers, lowboys, and utility vehicles.  The Debtor estimates that the NBV of this equipment will be approximately $19.8 million as of March 31, 2013.  The estimated high and low recovery values assumed in the Liquidation Analysis were developed using the September 30, 2012 Rouse Appraisal as a proxy for estimated orderly liquidation values and forced liquidation values as a percentage of the estimated March 31, 2013 NBV.  The high recovery assumes an 11.4% reduction for brokers' fees, facility charges, labor expense, transportation, fees to an auctioneer, and other expenses related to a liquidation of the Debtor's fleet equipment.  The low recovery scenario assumes a 6% reduction for auctioneer and other fees related to a liquidation of the Debtor's fleet equipment, with a number of the costs and expenses associated with the high recovery scenario included in wind-down costs in the low recovery scenario.

vi

- Parts and Merchandise. The Debtor estimates that the Net Book Value (NBV) of Parts and Merchandise will be approximately $22.9 million as of March 31, 2013. The estimated high and low recovery values assumed in the Liquidation Analysis were developed using the September 30, 2012 Rouse Appraisal as a proxy for estimated orderly liquidation values and forced liquidation values as a percentage of the estimated March 31, 2013 NBV. The high recovery assumes an 11.4% reduction for brokers' fees, facility charges, labor expense, transportation, fees to an auctioneer, and other expenses related to a liquidation of the Debtor's fleet equipment. The low recovery scenario assumes a 6% reduction for auctioneer and other fees related to a liquidation of the Debtor's fleet equipment, with a number of the costs and expenses associated with the high recovery scenario included in wind-down costs in the low recovery scenario.

- New Equipment. The Debtor estimates that the Net Book Value (NBV) of this equipment will be approximately $6.3 million as of March 31, 2013. The estimated high and low recovery values assumed in the Liquidation Analysis were developed using the September 30, 2012 Rouse Appraisal as a proxy for estimated orderly liquidation values and forced liquidation values as a percentage of the estimated March 31, 2013 NBV. The high recovery assumes an 11.4% reduction for brokers' fees, facility charges, labor expense, transportation, fees to an auctioneer, and other expenses related to a liquidation of the Debtor's fleet equipment. The low recovery scenario assumes a 6% reduction for auctioneer and other fees related to a liquidation of the Debtor's fleet equipment, with a number of the costs and expenses associated with the high recovery scenario included in wind-down costs in the low recovery scenario.

- Furniture and Fixtures. Furniture and Fixtures primarily include storage containers, dumpsters, shop equipment, computer equipment, office equipment and furniture and other.

- Leasehold Improvements. Leasehold Improvements primarily include improvements made to locations at which the Debtor is a lessee, including building improvements, paving, landscaping, lighting and other improvements to the Debtor's locations.

- Other Assets. Other assets primarily include deferred financing costs, prepaid expenses, deposits, and other assets.

## Liquidation Costs

To maximize recoveries on the Debtor's assets, minimize the amount of Claims, and generally ensure an orderly chapter 7 liquidation, the Trustee will need to continue to employ a number of the Debtor's employees for a limited amount of time during the chapter 7 liquidation process. These individuals will primarily be responsible for overseeing and maintaining the Debtor's operations, providing operational knowledge and insight to the Trustee regarding the Debtors' business operations, and concluding the administrative liquidation of the Debtor's equipment rental business after the sale of all the Debtor's assets. The Liquidation Analysis

assumes that the Trustee would reduce employee headcount to minimal staff levels from the current staff levels over a six month period.

Liquidation Costs primarily consist of: (a) the regularly occurring general and administrative costs required to operate the Debtor's business during the liquidation process; (b) the costs of any professionals the Trustee employs to assist with the liquidation process, including investment bankers, attorneys, and other advisors; and (c) the Trustee's fees (collectively, the "Liquidation Costs"). In addition, Liquidation Costs include the payment of an estimated $1.3 million on account of Professional Fees in accordance with the DIP Orders (the "Carve-Out"). The Liquidation Analysis assumes in the low recovery scenario that during the first month while the Trustee continues to operate the Debtor's business, the operational and overhead costs will equal approximately 45% of operating costs contained in the Debtor's projections in the first month, with such costs declining over the six month period to approximately 3% of projected costs by the sixth month of the liquidation process, during which the Trustee will wind-down the Debtor's Estate and effect final distributions. In the high recovery scenario, these costs are included in the 11.4% reduction to OLV.

### Claims and Interests

- DIP Loan Claims. The Liquidation Analysis assumes that approximately $217.8 million will be drawn on the DIP Loan as of the Conversion Date. Thus, there will be approximately $217.8 million outstanding on account of DIP Loan Claims as of the Conversion Date, which are projected to be satisfied in full from the Liquidation Proceeds.

- Kubota Claims. On the Conversion Date, the Debtor estimates there will be approximately $144,000 of allowed secured claims held by Kubota. Holders of Kubota Claims are secured by a first priority purchase money security interest in all products and any other tractors, engines, spare parts, attachments, accessories, implements and any and all other items and inventory sold by Kubota to the Debtor and are projected to be satisfied in full from the Liquidation Proceeds.

- Term Loan Claims. On the Conversion Date, the Debtor estimates there will be approximately $111.5 million outstanding on account of Term Loan Claims. Holders of Term Loan Claims are secured by a first priority lien on substantially all of the Debtor's assets pursuant to the Term Loan Credit Agreement. The Term Loan Claims are only secured to the extent that the value of the underlying Collateral equals or exceeds such Term Loan Claims. Accordingly, on the Conversion Date, Holders of Term Loan Claims will likely be entitled to a 73% - 100% recovery on account of such Claims. Additionally, these claimants are assumed to have super-priority claims for any diminution in value in their collateral that occurs before the Conversion Date.

- Other Secured Claims. On the Conversion Date, the Debtor estimates there will be approximately $115,324 in Other Secured Claims, consisting primarily of statutory real and personal property tax liens secured by the subject real or personal property. On the

Conversion Date, Other Secured Claims are projected to be satisfied in full from the Liquidation Proceeds of the subject collateral.

- **Second Lien Loan Secured Claims.** Second Lien Loan Secured Claims consist of the Secured Claims held by the Holders of the Second Lien Note Claims. On the Conversion Date, the Debtor estimates the Allowed Second Lien Loan Secured Claims to be $18.5 million. Holders of Second Lien Loan Secured Claims are secured by a second priority lien on substantially all of the Debtor's assets pursuant to the Second Lien Indenture. Second Lien Loan Note Claims are only Secured to the extent that the value of the underlying Collateral equals or exceeds such Second Lien Loan Note Claims. The value of the Collateral is estimated by the Debtor's to be less than the value of the Second Lien Loan Note Claims as of the Petition Date. As such, Holders of Second Lien Loan Note Claims will not be entitled to any postpetition interest and will have a Secured Claim and a General Unsecured deficiency Claim against the Debtor. Accordingly, as reflected in the Liquidation Analysis, Holders of Secured Second Lien Loan Note Claims will be entitled to an estimated 0% - 100% recovery. Additionally, these claimants are assumed to have super-priority claims for any diminution in value in their collateral that occurs before the Conversion Date.

- **Administrative and Priority Claims.** Administrative and Priority Claims include estimated unpaid postpetition operating expenses of the Debtor's Chapter 11 Case, priority claims, unpaid 503(b)(9) claims and estimated rejection claims of leases assumed during the Debtor's Chapter 11 Case per section 503(b)(7) of the Bankruptcy Code. Administrative Claims are assumed paid on a pro rata basis from the net proceeds, if any, remaining after the payment of Liquidation Costs, DIP Loan Claims (including the Carve-Out) and Secured Claims. Priority Claims are assumed to be paid on a pro rata basis from the net proceeds available, if any, after the payment of Liquidation Costs, DIP Loan Claims (including the Carve-Out), Administrative Claims and Secured Claims. As reflected in the Liquidation Analysis, Holders of Administrative and Priority Claims will be entitled to an estimated 0% - 100% recovery.

- **Unsecured Claims.** Unsecured Claims consist of General Unsecured Claims, Personal Injury Claims and Second Lien Loan Deficiency Claims. On the Conversion Date, the Debtor estimates there will be approximately $3.0 million outstanding on account of General Unsecured Claims, $2.4 million outstanding on account of the Personal Injury Claims and $249.2 million Second Lien Loan Deficiency Claims. It should be noted that the Liquidation Analysis does not attempt to estimate potential additional General Unsecured Claims that would likely arise as a result of the rejection of executory contracts and the failure of the Debtor to perform under existing contracts with its customers. Such additional claims would likely result from a cessation of operations as contemplated herein and may be substantial. General Unsecured Claims are assumed to be paid on a pro rata basis from the net Liquidation Proceeds available, if any, after the payment of all other Claims. As reflected in the Liquidation Analysis, Holders of Unsecured Claims will be entitled to an estimated 0% - 10% recovery.

- Equity Interests.  There are insufficient Liquidation Proceeds for Holders of Equity Interests to obtain any recovery in a chapter 7 liquidation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX D

# VALUATION ANALYSIS

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

## VALUATION ANALYSIS

In connection with certain matters relating to the Plan, the Debtor requested that Oppenheimer & Co. Inc. ("Oppenheimer") prepare a valuation analysis of the Debtor's business on a going-concern basis. The valuation analysis ("Valuation Analysis") was prepared by Oppenheimer based in part on historical results and the projections ("Projections") provided by the Debtor.  The Valuation Analysis is dated as of November 30, 2012 and is based on data and information available as of that date exclusively.   Oppenheimer makes no representation or undertaking to update the Valuation Analysis with respect to changes to such data and information that may have occurred subsequent to November 30, 2012 (the "Valuation Date").

In preparing the Valuation Analysis, Oppenheimer has, among other things:

- Reviewed documents, presentations, analyses and other relevant materials received from the Debtor and other sources, including, but not limited to: (i) the Debtor's historical SEC filings, bankruptcy filings and other publicly available documents as well as Debtor's internal operating results and supporting data; (ii) the Debtor's Plan of Reorganization (the "Plan") and Disclosure Statement (iii) historical financial results for the Debtor and various metrics used by the Debtor and the industry to analyze performance; (iv) the Projections; (v) research on the industry from a limited number of financial brokerage firms and other industry analysts; and (vi) rental industry and construction sector growth forecasts from IHS Global Insight, American Rental Association and Dodge McGraw-Hill.

- Reviewed publicly available data on certain companies that Oppenheimer deemed to be the most comparable to the Debtor's business, reviewing, among other things, both current and historical trading and acquisition multiples, current and historical profitability and various other financial ratios

- Conducted such other analyses as Oppenheimer deemed necessary and/or appropriate under the circumstances

Oppenheimer relied upon and assumed, without independent verification, the accuracy and completeness of the financial and other information available to it from public resources or as provided by other parties (including the Debtor). Oppenheimer has not audited, reviewed or compiled the accompanying information in accordance with generally accepted accounting principles or otherwise. Oppenheimer also assumed that the Projections have been reasonably prepared on a basis reflecting management's best estimates and good faith judgment as to future operating and financial performance. To the extent the Valuation Analysis is dependent upon the management's achievement of the Projections, the Valuation Analysis must be considered speculative. Oppenheimer has not assumed any responsibility for the independent verification of any such information, including, without limitation, the Projections, and has further relied upon the assurances of management of the Debtor that they are unaware of any facts that would make the information and the Projections incomplete or misleading. Oppenheimer does not make any representation or warranty as to the fairness of the terms of the Plan.

In addition to the foregoing, Oppenheimer relied upon the following assumptions in preparing the Valuation Analysis:

- Debtor shall have sufficient availability under its revolving credit facility as of the Assumed Effective Date

- General financial and market conditions as of the Assumed Effective Date will not differ materially from those conditions prevailing as of the date of the Valuation Analysis of November 30, 2012

- Oppenheimer has not considered the impact of a prolonged bankruptcy case and has assumed operations will continue in the ordinary course consistent with the Projections

Oppenheimer has employed certain generally accepted valuation techniques in estimating the total enterprise value of the Debtor. In preparing the Valuation Analysis, Oppenheimer considered each of the following valuation techniques:

1) Comparable Companies Analysis ("Comparable Companies Analysis"): A Comparable Companies Analysis estimates the value of a company based on the valuation metrics of publicly traded companies with relatively similar businesses and financial characteristics to the Debtor. Oppenheimer made certain qualitative judgments concerning differences between the characteristics of the Debtor and companies considered for inclusion as comparable companies. Upon selecting the appropriate peer group, a company's valuation is expressed as total enterprise value as a multiple of earnings before interest, tax, depreciation and amortization ("EBITDA"). Based upon this analysis, a range of these EBITDA multiples is applied to the Debtor's results to arrive at an estimate of total enterprise value.

2) Precedent Transactions Analysis ("Precedent Transactions Analysis"): A Precedent Transactions Analysis estimates the value of a company by examining publicly disclosed information on M&A transactions for comparable companies and analyzing the purchase price as a multiple of an appropriate financial metric. A range of multiples derived from this analysis is then applied to the Debtor's results to arrive at an estimate of total enterprise value. This method also requires qualitative judgments, as each M&A transaction occurs under unique circumstances. Oppenheimer reviewed recent M&A transactions involving equipment rental companies. The majority of the transactions analyzed occurred, however, in different fundamental, credit and other market conditions from those prevailing in the current marketplace.

3) Discounted Cash Flow Analysis ("DCF"): A DCF analysis estimates the value of a business from the present value of its expected future cash flows. This analysis includes the estimated value of unlevered free cash flows over a forecast period, plus an estimated terminal value to account for the value of the business beyond the forecast period, discounted to the present at a rate commensurate with the estimated riskiness of the cash flows. Oppenheimer used the Projections for deriving projected unlevered free cash flows and discounted these annual cash flows and the terminal value at the theoretical weighted average cost of capital determined by, among other things, reference to observed costs of capital for companies with relatively similar business and financial characteristics to the Debtor's business.

After completing the abovementioned valuation analyses, Oppenheimer provided to the Debtor its view that the Debtor's total enterprise value is a range of $680.0 million to $790.0 million. Oppenheimer then deducted the Debtor's total outstanding debt of $610.4 million as of October 31, 2012 from total enterprise value in order to calculate the existing equity value of the Debtor, resulting in an equity valuation range of $69.6 million to $179.6 million.

Debtor's Total Enterprise Value Range

| ($ in millions) | Low Value | High Value |
|---|---|---|
| Total Enterprise Value | $680.0 | $790.0 |
| Less: Total Debt | $(610.4) | $(610.4) |
| Equity Value | $69.6 | $179.6 |

Oppenheimer's total enterprise value estimate is based on economic, market, and financial and other conditions as they exist, and on the information made available to Oppenheimer as of November 30, 2012. It should be understood that, although subsequent developments may affect Oppenheimer's conclusions, Oppenheimer does not have any obligation to update, revise, or reaffirm its estimated valuation.

Oppenheimer expresses no view as to, and the Valuation Analysis does not address, the underlying business decision of the Debtor to proceed with or effect the Plan nor does it address the relative merits of the Plan  compared to any alternative strategies that might exist. Oppenheimer is not a legal, tax, regulatory or accounting advisor to the Debtor and has relied on the assessments made by the Debtor with respect to such issues.  The Valuation Analysis does not address any legal, tax, regulatory or accounting matters.