**THIS NOTEHOLDER DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO, BUT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA AS COMPLYING WITH THE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. INFORMATION CONTAINED IN THIS NOTEHOLDER DISCLOSURE STATEMENT IS SUBJECT TO THE QUALIFICATIONS SET FORTH HEREIN IN ALL RESPECTS.**

Robert M. Charles, Jr., Esq.
(NV Bar No. 6593)
Laury M. Macauley, Esq.
(NV Bar No. 11413)
LEWIS AND ROCA LLP
50 W. Liberty Street, Ste. 410
Reno, Nevada 89501
Telephone: (775) 823-2900
Facsimile: (775) 823-2929
E-mail: rcharles@lrlaw.com
E-mail: lmacauley@lrlaw.com

Paul V. Shalhoub, Esq.*
Joseph G. Minias, Esq.*
Mary K. Warren, Esq.*
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-mail: pshalhoub@willkie.com
E-mail: jminias@willkie.com
E-mail: mwarren@willkie.com

*Admitted Pro Hac Vice*

Counsel for Sphere Capital, LLC - Series B

Laurel E. Davis (NV Bar No. 3005)
FENNEMORE CRAIG JONES VARGAS
300 South Fourth Street, Suite 1400
Las Vegas, Nevada 89101
Telephone: (702) 692-8000
E-mail: ldavis@fclaw.com

Kurt A. Mayr, Esq.*
BRACEWELL & GIULIANI LLP
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (860) 246-3201
Email: kurt.mayr@bgllp.com

Daniel S. Connolly, Esq.*
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas, 49th Fl.
New York, New York 10020
Telephone: (212) 508-6100
Facsimile: (212) 508-6101
Email: daniel.connolly@bgllp.com

*Admitted Pro Hac Vice*

Counsel for the Proponents

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>AHERN RENTALS, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No.: BK-N-11-53860-BTB<br><br>Date of Hearing: March 8, 2013<br>Time of Hearing: 10:00 a.m. |

## DISCLOSURE STATEMENT FOR THE PLAN OF REORGANIZATION FOR AHERN RENTALS, INC. PROPOSED BY CERTAIN HOLDERS OF THE 9¼% SENIOR SECURED SECOND LIEN NOTES DUE 2013

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

    A.    Summary Of The Noteholder Plan ........................................1

    B.    Purpose Of This Noteholder Disclosure Statement .....................2

    C.    Summary Of Classification And Treatment Of Claims And Equity Interests Under The Noteholder Plan..........................................2

    D.    Confirmation Hearing ........................................................5

    E.    Overview Of Chapter 11 Process ...........................................6

ARTICLE I.    GENERAL INFORMATION ABOUT THE DEBTOR ................................6

    A.    The Debtor's Business .......................................................6

        1.    Corporate Structure ...............................................7

        2.    Operations ...........................................................7

        3.    The Debtor's Prepetition Equity And Management Structure ............................................................8

        4.    Affiliated Entities And Transactions .........................9

    B.    The Debtor's Capital Structure ...........................................11

        1.    First Lien Credit Facility.......................................11

        2.    Second Lien Notes ...............................................12

    C.    Events Leading To The Chapter 11 Case ...............................13

        1.    Economic Pressures And The Debtor's Reponses.................13

        2.    Financial Performance ..........................................14

    D.    Attempts To Reorganize Debt Outside Bankruptcy ...........................14

    E.    Commencement Of Chapter 11 Cases ...................................14

    F.    Significant Events During The Chapter 11 Case .................................15

        1.    First Day Motions ...............................................15

        2.    The DIP Loan And Cash Collateral .........................15

        3.    Information Regarding The Proponents......................15

        4.    Other Significant Motions And Postpetition Events................15

ARTICLE II.    TREATMENT OF UNCLASSIFIED CLAIMS................................19

    A.    Administrative Claims .....................................................20

    B.    DIP Loan .....................................................................20

    C.    Professional Fee Claims....................................................20

    D.    Priority Tax Claims .........................................................21

ARTICLE III.    TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS....21

FENNEMORE CRAIG JONES VARGAS

LAS VEGAS

7926115.1/030988.0001

A.    Summary Of Classification................................................21

B.    Acceptance By Impaired Class ........................................22

C.    Cramdown........................................................................22

D.    Treatment Of Claims And Equity Interests ....................22

    1.    Class 1: Other Secured Claims ..............................22

    2.    Class 2: Other Priority Claims ...............................23

    3.    Class 3: First Lien Term Loan Claims....................23

    4.    Class 4: Second Lien Notes Claims ........................23

    5.    Class 5: Insider Claims ...........................................24

    6.    Class 6: Personal Injury Claims..............................24

    7.    Class 7: General Unsecured Claims.........................25

    8.    Class 8: Equity Interests..........................................25

E.    Allowed Claims ...............................................................25

F.    Postpetition Interest ........................................................26

ARTICLE IV.    MEANS FOR IMPLEMENTATION OF THE PLAN................................26

A.    Noteholder Plan Funding.................................................26

B.    Reorganized Ahern ..........................................................26

C.    Additional Reorganized Ahern Provisions ......................26

D.    New Financing .................................................................26

E.    Effective Date Events ......................................................27

F.    Post-Effective Date Officers And Directors Of Reorganized Ahern...27

G.    No Corporate Action Required ........................................27

H.    Effectuation Of Transactions ..........................................28

I.    Filing Of Noteholder Plan And Confirmation Order...........................28

J.    Vesting Of Assets In Reorganized Ahern ........................28

ARTICLE V.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES................................28

A.    Assumption And Rejection Of Executory Contracts And Unexpired Leases................................28

B.    Cure Of Defaults..............................................................29

C.    Objection To Cure Amounts ............................................30

D.    Confirmation Order...........................................................30

E.    Rejection Claims Bar Date................................................30

ARTICLE VI.    PROVISIONS GOVERNING DISTRIBUTIONS .......................................30

| | A. | Distributions | 30 |
|---|---|---|---|
| | B. | Timing And Calculation Of Amounts To Be Distributed | 30 |
| | C. | Rights And Powers Of Disbursing Agent | 31 |
| | D. | Providing For Claims Payments | 32 |
| | E. | Means Of Cash Payments | 32 |
| | F. | Time Bar To Cash Payments | 32 |
| | G. | Application Of Record Date | 33 |
| | H. | Claims Paid By Third Parties | 33 |
| | I. | Insurance Claims | 33 |
| | J. | Applicability Of Insurance Policies | 33 |
| | K. | Allocation Of Noteholder Plan Distributions Between Principal And Interest | 33 |
| | L. | Setoffs | 34 |
| | M. | Fractional Distributions | 34 |
| | N. | Prepayment | 34 |
| | O. | No Distribution In Excess Of Allowed Amounts | 34 |
| | P. | Joint Distributions | 34 |
| | Q. | Statements | 35 |
| | R. | Further Authorization | 35 |
| ARTICLE VII. | | RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS | 35 |
| | A. | Resolution Of Disputed Claims | 35 |
| | B. | No Distribution Pending Allowance | 35 |
| | C. | Resolution Of Objections After Effective Date | 36 |
| | D. | Distributions After Allowance | 36 |
| | E. | Disputed Claims Reserve | 36 |
| | F. | Estimation Of Claims | 36 |
| | G. | Deadline To File Objections To Claims | 37 |
| | H. | Late-Filed Claims | 37 |
| | I. | Reservation Of Right To Object To Allowance Or Asserted Priority Of Claims | 37 |
| ARTICLE VIII. | | CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE | 37 |
| | A. | Conditions Precedent To Confirmation | 37 |

| | B. | Conditions Precedent To The Effective Date | 38 |
|---|---|---|---|
| | C. | Failure Of Conditions Precedent | 39 |
| | D. | Notice Of Effectiveness | 39 |
| | E. | Waiver Of Conditions Precedent | 39 |
| ARTICLE IX. | | TRANSFER OF ASSETS, DISCHARGE, RELEASES, INJUNCTION AND SETTLEMENT | 39 |
| | A. | Vesting And Transfer Of Assets And Assumption Of Liabilities | 39 |
| | B. | Discharge Of Claims | 40 |
| | C. | Claims Enjoined | 40 |
| | D. | Compromise And Settlement | 40 |
| | E. | Releases | 40 |
| | F. | Exculpation | 41 |
| | G. | Supplemental Injunction | 41 |
| ARTICLE X. | | RETENTION OF JURISDICTION | 42 |
| ARTICLE XI. | | MISCELLANEOUS PROVISIONS | 44 |
| | A. | Effectuating Documents; Further Transactions; And Timing | 44 |
| | B. | Cancellation Of Existing Agreements | 44 |
| | C. | Exemption From Transfer Taxes | 44 |
| | D. | Modification Of The Noteholder Plan | 45 |
| | E. | Revocation Of The Noteholder Plan | 45 |
| | F. | Term Of Bankruptcy Injunction Or Stays | 45 |
| | G. | Dissolution Of Committee | 45 |
| | H. | Governing Law | 45 |
| | I. | Plan Supplement | 46 |
| | J. | Expedited Tax Determination | 46 |
| | K. | Post-Confirmation Date Fees And Expenses | 46 |
| | L. | Substantial Consummation | 46 |
| | M. | Exhibits/Schedules | 46 |
| | N. | Closing Of The Chapter 11 Case | 46 |
| | O. | Severability Of Noteholder Plan Provisions | 46 |
| | P. | Withholding And Reporting Requirements | 47 |
| | Q. | Fees And Reporting To The U.S. Trustee | 47 |
| | R. | Binding Effect | 47 |
| ARTICLE XII. | | CONFIRMATION AND CONSUMMATION PROCEDURE | 48 |

A.    Confirmation Hearing ...................................................................48

B.    Plan Confirmation Requirements Under The Bankruptcy Code .........48

C.    "Cramdown" Under Section 1129(B) Of The Bankruptcy Code ........50

    1.    Fair And Equitable Test .....................................................50

    2.    No Unfair Discrimination ...................................................51

D.    Notice To Holders Of Claims And Equity Interests ...........................51

E.    Voting On The Noteholder Plan ......................................................52

    1.    Classes Entitled To Vote....................................................52

    2.    Votes Required For Acceptance Of The Noteholder Plan
       By A Class ........................................................................52

    3.    Tabulation Of Votes...........................................................53

    4.    Voting Instructions.............................................................53

    5.    Inquiries ...........................................................................54

ARTICLE XIII.    ISSUANCE AND DISTRIBUTION OF NEW SECURITIES AND
RELATED MATTERS..................................................................................54

A.    Issuance Of New Equity Interests In Reorganized Ahern ..................54

B.    Issuance Of Rights Offering Equity Interests .....................................54

C.    Issuance Of New Warrants .............................................................55

D.    Management Equity Incentive Program ...........................................55

ARTICLE XIV.    U.S. SECURITIES LAW MATTERS ...........................................................55

ARTICLE XV.    FINANCIAL INFORMATION AND PROJECTIONS ...............................56

A.    Financial Projections.....................................................................56

B.    Reorganization Value.....................................................................57

ARTICLE XVI.    RISK FACTORS .................................................................................57

A.    Certain Bankruptcy Considerations ................................................57

    1.    Risk Of Non-Confirmation Of The Noteholder Plan..............57

    2.    Risk Of Non-Occurrence Or Delayed Occurrence Of
       Effective Date ...................................................................58

    3.    Risk That Claims Will Be Higher Than Estimated..................58

B.    Business Risks ..............................................................................59

    1.    The Debtor's Actual Financial Results May Vary
       Significantly From The Projections......................................59

    2.    Failure To Attract And Maintain Employees May
       Adversely Affect The Debtor's Financial Results...................59

    3.    Change Of Control.............................................................59

        4.      Risk Associated With Potential Loss Of Affiliated Leases ......59

        5.      Risk Of Competition................................................................60

        6.      Environmental Risks................................................................60

        7.      Leverage Risk ........................................................................60

        8.      Litigation Risks......................................................................61

        9.      Adverse Publicity...................................................................61

    C.      Risks To Creditors Who Will Receive New Equity Interests.............61

        1.      The Lack Of An Established Market For The New Equity
              Interests May Adversely Affect Liquidity ..............................62

        2.      Lack Of Dividends May Adversely Affect Liquidity Of The
              New Equity Interests...............................................................62

        3.      Future Sales Or Issuances Of Equity May Depress The
              Price Of The New Equity Interests .........................................62

        4.      Certain Provisions Of The Reorganized Ahern
              Organizational Documents, Including Provisions That
              Restrict Holders' Ability To Transfer Their New Equity
              Interests Could Impact The Attractiveness Of The New
              Equity Interests To Investors And, As A Result, Their
              Market Value .........................................................................62

    D.      Certain U.S. Federal Income Tax Considerations ...............................63

ARTICLE XVII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE NOTEHOLDER PLAN ...................................................................63

    A.      Liquidation Under Chapter 7 Or Chapter 11 ......................................63

    B.      Alternative Plans Of Reorganization .................................................64

ARTICLE XVIII. PREFERENCE AND OTHER AVOIDANCE ACTIONS ...........................64

ARTICLE XIX.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
NOTEHOLDER PLAN ...........................................................................65

    A.      Certain U.S. Federal Income Tax Consequences to the Debtor
        Upon the Adoption of the Noteholder Plan ........................................66

    B.      Certain U.S. Federal Income Tax Considerations With Respect of
        Reorganized Ahern ..........................................................................66

    C.      U.S. Federal Income Tax Consequences to Holders of Second Lien
        Notes that Participate in the Noteholder Plan .....................................67

        1.      Consequences Of The Contribution.........................................67

        2.      Consequences Of The Ownership And Disposition Of The
              New Equity Interests...............................................................68

D.    Certain U.S. Federal Income Tax Consequences of Holders of Equity Interests That Receive New Warrants Pursuant to the Noteholder Plan ..................................................................69

E.    Information Reporting And Withholding ............................................69

ARTICLE XX.    CONCLUSION AND RECOMMENDATION...............................................70

FENNEMORE CRAIG JONES VARGAS

LAS VEGAS

7926115.1/030988.0001

1

## EXHIBITS

2

Exhibit

3

Noteholder Plan ........................................................................................................A

4

Debtor's Liquidation Analysis .....................................................................................B

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7926115.1/030988.0001

# DISCLAIMER

PURSUANT TO SECTION 1128 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE"), A CONFIRMATION HEARING WILL BE HELD WITH RESPECT TO THE PLAN OF REORGANIZATION FOR AHERN RENTALS, INC. (THE "DEBTOR") PROPOSED BY CERTAIN HOLDERS OF THE 9¼% SENIOR SECURED SECOND LIEN NOTES DUE 2013 (THE "NOTEHOLDER PLAN") **ON [_____], 2013**, AT **[_____ _____] (PREVAILING PACIFIC TIME)**, BEFORE THE HONORABLE BRUCE T. BEESLEY, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA (THE "BANKRUPTCY COURT"), 300 BOOTH STREET, RENO, NEVADA 89509 (THE "CONFIRMATION HEARING").   OBJECTIONS, IF ANY, TO CONFIRMATION OF THE NOTEHOLDER PLAN MUST BE FILED AND SERVED ON OR BEFORE [_____], **2013** AT **[_____]** **(PREVAILING PACIFIC TIME)**.   THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME WITHOUT FURTHER NOTICE.

MUCH OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (THE "NOTEHOLDER DISCLOSURE STATEMENT") IS BASED ON THE DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR.   THE PROPONENTS HAVE HAD LIMITED ACCESS TO THE DEBTOR'S MANAGEMENT AND BOOKS AND RECORDS, AND THEREFORE HAVE NOT HAD THE ABILITY TO CONDUCT REASONABLE DILIGENCE OR TO VERIFY THE ACCURACY OF THE INFORMATION IN THE DEBTOR'S DISCLOSURE STATEMENT OR OTHERWISE PROVIDED OR PREPARED BY THE DEBTOR.

THE FINANCIAL PROJECTIONS REFERRED TO IN THIS NOTEHOLDER DISCLOSURE STATEMENT WERE PREPARED BY THE DEBTOR. THE DEBTOR'S FINANCIAL PROJECTIONS HAVE BEEN MODIFIED BY THE PROPONENTS' FINANCIAL ADVISOR TO INCORPORATE CERTAIN MODIFICATIONS AND ADJUSTMENTS. UNLESS OTHERWISE SPECIFIED HEREIN, THE STATEMENTS CONTAINED IN THIS NOTEHOLDER DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS NOTEHOLDER DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE. WHILE THE PROPONENTS HAVE PRESENTED THESE FINANCIAL PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE FINANCIAL PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE PROPONENTS' AND THE DEBTOR'S CONTROL.   THE PROPONENTS CAUTION THAT THEY DO NOT AND CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTOR'S ABILITY TO ACHIEVE THE PROJECTED RESULTS.   SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE OR WILL BE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES.   ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.   THE FINANCIAL PROJECTIONS, THEREFORE,

MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THIS NOTEHOLDER DISCLOSURE STATEMENT IS BEING DISTRIBUTED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE NOTEHOLDER PLAN FROM THE PARTIES ENTITLED TO VOTE ON THE NOTEHOLDER PLAN.  A COPY OF THE NOTEHOLDER PLAN IS ATTACHED AS <u>EXHIBIT A</u> HERETO.  ALL HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR THAT ARE ENTITLED TO VOTE ON THE NOTEHOLDER PLAN ARE ADVISED AND ENCOURAGED TO READ THIS NOTEHOLDER DISCLOSURE STATEMENT AND THE NOTEHOLDER PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE NOTEHOLDER PLAN.  THE PROPONENTS INTEND TO SEEK TO CONFIRM THE NOTEHOLDER PLAN AND TO CAUSE THE EFFECTIVE DATE OF THE NOTEHOLDER PLAN TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE NOTEHOLDER PLAN.  HOWEVER, THERE CAN BE NO ASSURANCE AS TO WHETHER OR WHEN THE CONFIRMATION OR THE EFFECTIVE DATE OF THE NOTEHOLDER PLAN ACTUALLY WILL OCCUR.

THIS NOTEHOLDER DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "<u>BANKRUPTCY RULES</u>") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW.  THIS NOTEHOLDER DISCLOSURE STATEMENT HAS BEEN NEITHER REVIEWED NOR APPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>"), OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY OTHER SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  THE INFORMATION IN THIS NOTEHOLDER DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE NOTEHOLDER PLAN.  NO SOLICITATION OF VOTES TO ACCEPT THE NOTEHOLDER PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED ACTIONS, THIS NOTEHOLDER DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS NOTEHOLDER DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS NOTEHOLDER DISCLOSURE STATEMENT OR CONFIRMATION OF THE NOTEHOLDER PLAN), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE NOTEHOLDER PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.  YOU ARE ADVISED TO OBTAIN INDEPENDENT EXPERT ADVICE ON SUCH SUBJECTS.

THE OFFER OF NEW DEBT INSTRUMENTS OR EQUITY SECURITIES TO HOLDERS OF CERTAIN CLASSES OF CLAIMS OR EQUITY INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "SECURITIES ACT") OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS.  THE OFFERS AND ISSUANCES ARE BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SPECIFIED IN SECTIONS 1125 AND 1145 OF THE BANKRUPTCY CODE, AS APPLICABLE, OR OTHER EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT.  NONE OF THE NEW DEBT INSTRUMENTS OR EQUITY SECURITIES TO BE ISSUED UNDER OR IN CONNECTION WITH THE NOTEHOLDER PLAN, OR UPON EXERCISE OF ANY NEW WARRANTS CONTEMPLATED BY THE NOTEHOLDER PLAN, HAS BEEN APPROVED OR DISAPPROVED BY THE SEC OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS NOTEHOLDER DISCLOSURE STATEMENT OR UPON THE MERITS OF THE NOTEHOLDER PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE PROPONENTS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE PROPONENTS' CONTROL. ACCORDINGLY, THE DEBTOR'S FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS.  SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THIS NOTEHOLDER DISCLOSURE STATEMENT. THE PROPONENTS DO NOT UNDERTAKE TO PUBLICLY UPDATE OR REVISE FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

THIS NOTEHOLDER DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE NOTEHOLDER PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE NOTEHOLDER PLAN THAT ARE ATTACHED HERETO OR HAVE BEEN OR WILL BE SEPARATELY FILED WITH THE BANKRUPTCY COURT. ALTHOUGH THE PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS NOTEHOLDER DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE NOTEHOLDER PLAN OR ANY OTHER SUCH DOCUMENTS, THE NOTEHOLDER PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS NOTEHOLDER DISCLOSURE STATEMENT IS BASED UPON INFORMATION THAT IS PUBLICLY AVAILABLE OR PROVIDED TO THE

PROPONENTS BY THE DEBTOR'S MANAGEMENT AND/OR THE DEBTOR'S ADVISORS. THE PROPONENTS HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION, AND AS SUCH, MAKE NO REPRESENTATION OR WARRANTY THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE NOTEHOLDER PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND THEIR OWN ANALYSES OF THE TERMS OF THE NOTEHOLDER PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE NOTEHOLDER PLAN.  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE NOTEHOLDER PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS SHOULD REVIEW THE NOTEHOLDER PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS NOTEHOLDER DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN ARTICLE XVI HEREIN, AND THE NOTEHOLDER PLAN SUPPLEMENT.

EXCEPT AS OTHERWISE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS NOTEHOLDER DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE PROPONENTS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# INTRODUCTION

Del Mar Master Fund Ltd. ("Del Mar"), Feingold O'Keeffe Capital, LLC ("Feingold"), Nomura Corporate Research & Asset Management Inc. ("Nomura"), Och-Ziff Capital Management Group ("Och-Ziff"), Sphere Capital, LLC - Series B ("Sphere") and Wazee Street Capital Management, LLC ("Wazee" and, together with Del Mar, Feingold, Nomura, Och-Ziff and Sphere, the "Proponents"), Holders of approximately 90% of the 9¼% Senior Secured Notes due 2013, hereby submit this Noteholder Disclosure Statement to Holders of Clams and Equity Interests in the Debtor for (i) the solicitation of votes on the Noteholder Plan, filed by the Proponents with the Bankruptcy Court, and (b) the Confirmation Hearing to consider confirmation of the Noteholder Plan.  Unless otherwise defined herein, all capitalized terms contained in this Noteholder Disclosure Statement shall have the meanings ascribed to them in Article I of the Noteholder Plan.

This Noteholder Disclosure Statement has been prepared to comply with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b), and is hereby transmitted by the Proponents pursuant to section 1126(b) of the Bankruptcy Code for use in the solicitation of acceptances of the Noteholder Plan, a copy of which is attached hereto as Exhibit A.

The primary purpose of the Noteholder Plan is to effectuate the restructuring of the Debtor's capital structure in order to bring it into alignment with the Debtor's present and future operating prospects and to provide the Debtor with greater liquidity.  Presently, the funds expected to be generated by the Debtor from operation of its business based on the current outlook and other sources are insufficient to meet the Debtor's debt service requirements and satisfy its debt obligations unless the Noteholder Plan is consummated.  The Proponents believe that the restructuring contemplated by the Noteholder Plan will reduce uncertainty with respect to the Debtor's future and better position the Debtor to develop and maintain new customers.

### A.    Summary Of The Noteholder Plan

The restructuring will reduce the principal amount of the Debtor's outstanding indebtedness by at least $267.7 million by converting all of the Second Lien Notes into New Equity Interests of Reorganized Ahern.  The New Equity Interests in Reorganized Ahern will be subject to dilution from: (i) the issuance of New Equity Interests in connection with the Backstopped Rights Offering, (ii) the exercise of New Warrants of Reorganized Ahern issued to Holders of existing Equity Interests in the Debtor; and (iii) New Equity Interests issued in connection with a Management Equity Incentive Plan.

Other than the Second Lien Notes Claims, the Noteholder Plan leaves Unimpaired or otherwise pays in full in Cash all of the Debtor's Claim Holders.  Specifically, the Noteholder Plan provides for the cash payment in full of the DIP Loan, Allowed Administrative Claims, Other Priority Claims, Priority Tax Claims, First Lien Term Loan Claims, Personal Injury Claims and General Unsecured Claims.  Holders of certain Other Secured Claims will also be rendered Unimpaired under the Noteholder Plan.  Holders of Insider Claims will be entitled to full recoveries on their Allowed Claims, which will be paid out over time following the conclusion of any litigation related to the Insider Claims that may be brought following the Effective Date.  Finally, Don F. Ahern and John Paul Ahern, Jr., the sole shareholders of the Debtor, will receive New Warrants in satisfaction of their existing Equity Interests.  On balance, the Noteholder Plan provides Holders of

Claims against the Debtor with superior treatment to that which such Holders would receive under the Debtor's Plan, which impairs substantially all of the Debtor's Claim Holders.

To fund Cash Distributions to be made under the Noteholder Plan, Reorganized Ahern will enter into an Exit Financing Facility in the anticipated amount of up to $450 million.  In addition, the Proponents will backstop a rights offering of the New Equity Interests of Reorganized Ahern for an additional infusion of $15 million of equity capital.    The issuance of New Equity Interests in connection with the Backstopped Rights Offering will dilute the New Equity Interests of Reorganized Ahern received under the Noteholder Plan by a pro rata amount based upon the ultimate enterprise value of Reorganized Ahern as determined by the Bankruptcy Court.  The proceeds of the Backstopped Rights Offering will be used to, among other things, fund Distributions required by the Noteholder Plan and provide Reorganized Ahern with additional working capital upon its emergence from bankruptcy.

The Proponents have entered into a Plan Support Agreement pursuant to which they will agree, subject to certain conditions, to support the Noteholder Plan and, after entry of an order approving a disclosure statement for the Noteholder Plan, to vote in favor of the Noteholder Plan. The Plan Support Agreement, if finalized, will be included in the Noteholder Plan Supplement.

**B.     Purpose Of This Noteholder Disclosure Statement**

The purpose of this Noteholder Disclosure Statement is to provide those Holders of Claims against and Equity Interests in the Debtor that are entitled to vote on the Noteholder Plan with adequate information to make an informed decision as to whether to accept or reject the Noteholder Plan.  On [_____], 2013, after notice and a hearing, the Bankruptcy Court issued an order (the "Noteholder Disclosure Statement Order") approving this Noteholder Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor being solicited to make an informed judgment whether to accept or reject the Noteholder Plan.  APPROVAL OF THIS NOTEHOLDER DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT CONSTITUTES A DETERMINATION THAT THE NOTEHOLDER DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION REGARDING THE NOTEHOLDER PLAN, BUT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE NOTEHOLDER PLAN.

**C.     Summary Of Classification And Treatment Of Claims And Equity Interests Under The Noteholder Plan**

As described more fully in this Noteholder Disclosure Statement, the Noteholder Plan provides for significant Distributions on account of certain Allowed Claims in the form of Cash payments, assumption of specified liabilities, and new equity instruments.  The Noteholder Plan Distributions will be in various amounts and will take various forms, depending on the classification and treatment of any particular Claim against or Equity Interest in the Debtor.  The following table summarizes the classification and treatment of Claims and Equity Interests under the Noteholder Plan.  The Claim estimates in the table are based upon the estimates offered in the Debtor's Disclosure Statement dated November 30, 2012, and such estimates are subject to further change and modification, because the Proponents have not had access to the Debtor's Claims register to verify the accuracy of the estimates.  *For a more detailed description of the classification and treatment of Claims and Equity Interests under the Noteholder Plan, please see Article III hereof.*

| Class | Claim | Treatment | Status | Estimated Amount of Claims | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | At the Proponents' option before the Effective Date: (a) Reinstatement or (b) (i) payment in full in Cash, (ii) proceeds from the sale of the Collateral securing the Other Secured Claims, (iii) return of the Collateral securing the Other Secured Claims or (iv) such other Distribution that meets the requirements of section 1129 of the Bankruptcy Code. | Unimpaired | $258,500 | 100% |
| 2 | Other Priority Claims | Payment in full in Cash upon the latest of: (a) the Effective Date or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court; (c) the first Business Day following the fourteenth (14th) day after such Claim is Allowed; and (d) such date as agreed upon by the Holder of such Claim and the Debtor or Reorganized Ahern. | Unimpaired | $71,400 | 100% |
| 3 | First Lien Term Loan Claims | Payment in full in Cash upon the latest of: (a) the Effective Date or as soon thereafter as | Unimpaired | $111.5 million | 100% |

FENNEMORE CRAIG JONES VARGAS

LAS VEGAS

7926115.1/030988.0001

| Class | Claim | Treatment | Status | Estimated Amount of Claims | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| | | practicable; (b) such date as may be fixed by the Bankruptcy Court; and (c) such date as agreed upon by the Holder of such Claim and the Debtor or Reorganized Ahern | | | |
| 4 | Second Lien Notes Claims | Distribution of Pro Rata share of New Equity Interests of Reorganized Ahern, occurring upon the later of: (a) the Effective Date or as soon thereafter as reasonably practicable; and (b) such date as may be fixed by the Bankruptcy Court. | Impaired | $267.7 million | [less than 100]% |
| 5 | Insider Claims | Semi-annual payments over a period of 2 years with interest accruing on such Allowed Claim at rate to be determined by the Bankruptcy Court, upon the later of: (a) the resolution of all litigation relating to, or arising out of Insider Causes (pursuant to one or more Final Orders); (b) resolution of Avoidance Actions against an Insider who is a Holder of an Insider Claim; and (c) | Impaired | $710,574 | 100% |

| Class | Claim | Treatment | Status | Estimated Amount of Claims | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| | | such other date as may be fixed by the Bankruptcy Court. | | | |
| 6 | Personal Injury Claims | Payment in full in Cash upon the Effective Date, or as soon as reasonably practicable thereafter. | Unimpaired | $2,377,000 | 100% |
| 7 | General Unsecured Claims | Payment in full in Cash upon the Effective Date, or as soon as reasonably practicable thereafter. | Unimpaired | $3 million | 100% |
| 8 | Equity Interests | Holders of Existing Equity Interests voting to accept shall receive their pro rata Distribution of New Warrants; Holders voting to reject shall not retain any property or Interest in Reorganized Ahern. | Impaired | N/A | [...]% |

### D.    Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will commence on [_____], 2013, beginning at [_____] (**prevailing Pacific time**), before the Honorable Bruce T. Beesley, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Nevada, 300 Booth Street, Reno, Nevada 89509.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Noteholder Plan be served and filed so that they are received on or before [_____], 2013 at [_____] (**prevailing Pacific time**).  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.  Subsequent to the Confirmation Hearing, the Bankruptcy Court may issue an order confirming the Noteholder Plan (the "Confirmation Order").

E.      **Overview Of Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its equity interest holders.  In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor in property as of the petition date.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the terms for satisfying claims against and equity interests in a debtor.  Upon confirmation of a plan of reorganization, it is binding on a debtor, any issuer of securities under the plan, and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a chapter 11 plan has been filed, holders of certain claims against and equity interests in a debtor are permitted to vote to accept or reject such plan.  Before soliciting acceptances of the proposed plan, however, a debtor is required under section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Proponents are submitting this Noteholder Disclosure Statement to Holders of Claims against and Equity Interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.  This Noteholder Disclosure Statement sets forth specific information regarding the pre-bankruptcy history of the Debtor, the nature and progress of the Chapter 11 Case and the anticipated organizational and capital structure as well as the operations of the Debtor's properties after confirmation of the Noteholder Plan and emergence from chapter 11.  This Noteholder Disclosure Statement also describes the Noteholder Plan, alternatives to the Noteholder Plan, effects of confirmation of the Noteholder Plan, certain risk factors associated with the debt and equity securities that will be issued to Holders of certain Classes of Claims and Equity Interests and the manner in which Distributions will be made under the Noteholder Plan.  In addition, this Noteholder Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims and Equity Interests entitled to vote must follow in order for their votes to be counted.

## ARTICLE I.
## GENERAL INFORMATION ABOUT THE DEBTOR

A.      **The Debtor's Business**

A material portion of the following description of the Debtor's business has been prepared based on disclosures set forth in the Debtor's Disclosure Statement, pleadings and reports filed with the Bankruptcy Court and other public sources of information.  The Proponents have had limited access to the Debtor's management and books and records, and therefore have not had the ability to

conduct reasonable diligence to verify the accuracy of the information in the Debtor's Disclosure Statement.

### 1.    Corporate Structure

The Debtor is a Nevada corporation organized on December 23, 1997 through the merger of Ahern Renters Center, Inc., a Nevada corporation, and Ahern Rentals SW, Inc., a Nevada corporation.  The Debtor's shares are held 97% by Don F. Ahern as Trustee of the DFA Separate Property Trust and 3% by John Paul Ahern, Jr.

### 2.    Operations

The Debtor operates an equipment rental company that additionally sells new and used rental equipment, parts, and supplies related to its rental equipment, and merchandise used by the construction industry.  Further, the Debtor provides maintenance and repair services.  As of September 30, 2012, the Debtor's rental fleet contained 37,750 total rental items, including 20,063 high reach units, including fork lifts, boom lifts, and scissor lifts.  As of that same date, the Debtor's rental fleet also contained 17,687 general rental units, including backhoes, skid steers, skiploaders, trenchers, compressors, generators, light towers, welders, lawn and garden equipment and hand tools.  The Debtor's business operates through 74 rental branches located in 22 states.

The Debtor's level of equipment rental revenue is sensitive to overall macro-economic conditions, particularly the level of activity within the non-residential construction industry, as well as to factors specific to the Debtor, such as the size and condition of the Debtor's equipment rental fleet, the utilization level of this rental fleet, the level of rental rates, the length of time the equipment is on rent, and general weather conditions within the Debtor's geographic markets.

For financial reporting purposes, the Debtor's revenues are divided into three categories: (a) equipment rentals and related, including revenues from renting equipment and related revenues such as fees charged for equipment delivery, damage waivers, repair of rental equipment, and fuel; (b) sales of rental equipment; and (c) sales of new equipment and other.

In order to measure the financial performance of its business, the Debtor reports and monitors its level of "EBITDA" (Earnings Before Interest Expense, Income Taxes, Depreciation and Amortization) generation as an important financial metric.  Adjusted EBITDA represents an adjustment to the company's EBITDA for items considered extraordinary and non-recurring ("Adjusted EBITDA").  EBITDA is a commonly used financial metric utilized by companies within the equipment rental industry.  Between 2005 and 2008, the Debtor's Adjusted EBITDA increased from $80.2 million to $150.1 million as the Debtor benefited from strong growth of non-residential construction activity, particularly in the Las Vegas market.  Subsequent to 2008, the Debtor's financial performance was adversely impacted by the severe economic recession, and resulting significant reduction in non-residential construction spending, as more fully described later in this document in "Events Leading to the Chapter 11 Case."  The Debtor's Adjusted EBITDA declined from $150.1 million in 2008 to $67.5 million in 2009 and to $52.7 million in 2010.  According to the Debtor, its lowest pre-bankruptcy financial results were realized midway through 2010 when the Debtor's Last Twelve Months ("LTM") Adjusted EBITDA through the quarter ended June 30, 2010 was $46.4 million.

According to the Debtor, in response to the economic downturn it attempted to implement initiatives that it believed might address the changed business environment. These initiatives included: (a) significant geographic redeployment of its rental fleet from Las Vegas to other markets; (b) the opening of twenty-four (24) branches in 2009 and 2010 in new markets; (c) cost reductions, (d) reduced capital expenditures; and (e) a focus on customers in segments other than non-residential construction. Since the Debtor's LTM Adjusted EBITDA of $46.4 million in June 2010, the Debtor's LTM Adjusted EBITDA has increased to $101.5 million for the LTM period ending September 30, 2012.

The Debtor's operating results have traditionally been highly dependent on the strength of the economy of Las Vegas, Nevada, accounting for approximately 25% of revenues in 2009, 19% of revenues in 2010, and 12% of revenues in 2011, and the rapid growth of the Las Vegas population and accompanying economic growth contributed significantly to Debtor's growth in revenues over years prior to 2008.

### 3.    The Debtor's Prepetition Equity And Management Structure

Don F. Ahern has been Debtor's President, Chief Executive Officer and a member of the Debtor's board of directors since February 1994. Prior to that, since 1978 Mr. Ahern was the sole proprietor of Los Arcos Equipment, an equipment rental company. Mr. Ahern has over thirty (30) years of experience in the equipment rental industry.

Evan B. Ahern has been the Debtor's Executive Vice President since March 2004 and joined the Debtor's board of directors in April 2004. He served as Chief Information Officer from 1998 to May 2007. Between 1993 and 1998, Mr. Ahern was responsible for managing and implementing the Debtor's technology infrastructure. From 1990 through 1993, Mr. Ahern held various other positions with Debtor. Mr. Ahern has been and continues to be involved in nearly every aspect of the Debtor's operations. He spends much of his current time in business development activities, branch level process reengineering and training, and technology integration into every aspect of the Debtor's business to improve operational efficiencies and effectiveness.

Howard Brown has been the Debtor's Chief Financial Officer since September 1997. He joined the Debtor's board of directors in April 2004. He has over thirty-five (35) years of finance experience. Prior to joining the Debtor, from October 1995 through September 1997, he was Chief Financial Officer of the H&O Foods division of Rykoff-Sexton, Inc. (now known as U.S. Foodservice, Inc.), the largest food service distributor in Las Vegas, Nevada. From September 1992 through October 1995, he was Chief Financial Officer of H&O Foods, Inc.

Mark J. Wattles joined the Debtor's board of directors in April 2004. Mr. Wattles founded Hollywood Entertainment Corporation ("Hollywood"), a chain of video rental and game stores, in June 1988, and until September 1998 he served as Hollywood's Chairman of the Board, President, and Chief Executive Officer. From August 1998 through June 2000, Mr. Wattles left his full-time position at Hollywood and served as Chief Executive Officer of Reel.com, then a wholly-owned subsidiary of Hollywood. In August 2000, Mr. Wattles returned full time to Hollywood to assist with changes in its business strategy. He served as President of Hollywood from January 2001 until January 2004 and as Chief Executive Officer from January 2001 until February 2005. Since January 2005, Mr. Wattles has served as President of Wattles Capital Management, LLC, a capital

management company that invests in public and private companies providing consumer products and services.

P. Enoch Stiff joined Debtor's board of directors in April 2004. Mr. Stiff has been the managing partner of the Executive Management Group, a consulting firm specializing in effective management practices for senior executive teams of midsize businesses, since November 2002. Additionally, since January 2004, Mr. Stiff has been a partner in the Value Management Group, a Chicago-based investment management company that focuses on manufacturing companies. In February 2008, Mr. Stiff became President and Chief Executive Officer of American Sportworks, a company that manufactures various types of utility vehicles. From September 2000 to November 2002, Mr. Stiff provided independent business consulting services to executive management groups. From September 1996 to September 2000, Mr. Stiff was the President, Chief Executive Officer and a member of the board of directors of OmniQuip International, Inc., a North American manufacturer of telescopic material handlers, aerial work platforms and other material handling equipment. From August 1989 to September 1996, Mr. Stiff was the President and Chief Executive Officer of TRAK International, Inc. ("TRAK"), a wholly owned subsidiary of OmniQuip International, Inc. He previously served as the Chief Operating Officer of TRAK from November 1987 to August 1989.

Timothy N. Lotspeich has been the Debtor's Senior Vice President of Risk Management and Transportation since April 2005. From December 1995 until April 2005, he served as the Debtor's Senior Vice President and was responsible for the Debtor's floating fleet, transportation and risk management. Mr. Lotspeich has approximately twenty-three (23) years of experience in the equipment rental industry. From July 1986 through December 1995, Mr. Lotspeich served as the Debtor's California regional manager responsible for supervising operations and sales for all of the Debtor's California branches. From April 1983 through June 1986, Mr. Lotspeich served as manager of Debtor's Bloomington, California branch and was responsible for operations and sales for that branch. Prior to joining the Debtor, from 1972 through June 1982, Mr. Lotspeich was a customer service representative for Grove Manufacturing, a large manufacturer of high reach equipment.

D. Kirk Hartle has been Debtor's Senior Vice President of Finance and Treasurer since March 2009; previously, Mr. Hartle served as Vice President of Finance beginning in September 2007 and prior to that he served as the Debtor's Director of Finance from the time he was hired in February 2004. His responsibilities include oversight of all accounting and financial reporting for Debtor. During his career, Mr. Hartle has held senior management positions with KPMG LLP and Deloitte LLP. Prior to joining Ahern Rentals, Mr. Hartle was chief financial officer for five years with a publicly-held golf retail and sports entertainment company. Mr. Hartle also is a past-president of the University of Nevada, Las Vegas Alumni Association and served on its Board of Directors for thirteen (13) years.

## 4.    Affiliated Entities And Transactions

The Debtor has entered into numerous transactions with affiliated entities and persons. Below is a description of affiliated transactions based upon information provided by the Debtor in the Debtor's Disclosure Statement. Despite requests by the Proponents for information regarding affiliated transactions, the Proponents have received almost no information beyond the disclosure below and, in addition, the Proponents do not know if the affiliated transactions listed below comprise all of the Debtor's affiliated transactions. The Proponents have issued discovery regarding

affiliated transactions and will investigate the propriety of all affiliated transactions and reserve all rights to pursue actions and claims that may exist.  The Noteholder Plan vests Reorganized Ahern with all claims and actions relating to or arising from affiliated transactions, which may be pursued by Reorganized Ahern after the Effective Date if any claims or actions are determined to exist.

(a)     Ahern IT, LLC ("Ahern IT").  Evan B. Ahern owns 100% of Ahern IT. Ahern IT is an information technology (IT) reseller that purchased dark fiber and other equipment for the Debtor, which provided the Debtor improved connectivity to its data center and enhanced its disaster recovery system.  Ahern IT manages the Debtor's bandwidth with respect to its data and communication needs.  Evan B. Ahern is the son of Don F. Ahern.

(b)     American Sportworks ("AS").  AS manufactures utility trucks similar to golf carts that transport tools and other equipment on jobs sites.  The Debtor has alleged that it "buys and sells AS vehicles for a profit."  P. Enoch Stiff, a board director of the Debtor, owned 100% of AS until he sold his interest in AS on or about November 7, 2012.  Neither Mr. Stiff nor the Debtor has provided any information on, among other things, (i) the profits realized by the Debtor for the sale of AS vehicles, (ii) the fairness of the transactions between the Debtor and AS; (iii) whether any interests in AS have been transferred to an Insider of the Debtor; or (iv) any transactions between Mr. Stiff and any Insider of the Debtor on account of or relating to transactions between AS and the Debtor.

(c)     A & K 67, LLC ("A&K").  Don F. Ahern owns 25% of A&K.  A&K owns a 77-foot boat located in the San Diego Bay.  As consideration for the Debtor's sales force having access to the boat to entertain and develop customer relationships, the Debtor pays 25% of A&K's costs.  The Debtor has provided no information regarding the fairness of the contractual arrangement between the Debtor and A&K, or whether the Debtor receives reasonably equivalent value in exchange for the payments it makes to A&K.

(d)     DFA, LLC ("DFA").  Don F. Ahern owns 100% of DFA.  DFA locates and acquires real property, arranges the financing, and leases such property under triple net lease arrangements.  The majority of DFA's real property is leased by the Debtor.  DFA locates and purchases real property based on the Debtor's needs, specifications, and target markets, thus limiting the Debtor's upfront capital investments in new stores and markets.  The Debtor has alleged that all leases for DFA properties are approved by the Debtor's independent board members.  The Debtor has provided no information with regard to the fairness of the lease terms allegedly approved by the independent board members.

(e)     The DFA Family Limited Partnership (the "DFA LP").  Don F. Ahern is a general partner owning 1% of DFA LP, and Evan Ahern and Ryan Ahern are both limited partners each owning 49.5%.  DFA LP owns the real property located at 4241 S.  Arville in Las Vegas, Nevada, which property is a maintenance, paint, and cosmetic machine shop leased to the Debtor. DFA LP also owns life insurance policies insuring Don F. Ahern.  Evan Ahern and Ryan Ahern are sons of Don F. Ahern.

(f)     Diamond A Equipment, LLC ("Diamond A").  Don F. Ahern owns 100% of Diamond A.  Diamond A is a Case tractor dealership located in Oxnard, California.  The Debtor has alleged that Diamond A "also sells the Debtor's equipment at book value plus a reasonable mark-up, resulting in a profit for the Debtor."  The Debtor has further alleged that as "a Case tractor dealer, Diamond A can buy parts and has access to technical services that support the Debtor's rental fleet." The Debtor has provided no information to verify these statements.

(g)     Don and Paul, LLC ("D&P").  Don F. Ahern owns 85.5% of D&P, and John Paul Ahern, Jr. owns 14.5%.  D&P owns various parcels of real property located on West Bonanza in Las Vegas, Nevada, which property is a high reach and general rental store leased to the Debtor. Jon Paul Ahern, Jr. is Don F. Ahern's brother. The Debtor has provided no information on the fairness of the lease terms or other transactions between the Debtor and D&P.

(h)     Equipment Connections, LLC ("EC").  Janis Ahern owns 100% of EC.  EC performs consulting work and special projects for Debtor, and uses its relationships to sell and rent Debtor's equipment.

(i)     Fanterior, LLC ("Fanterior").   Don F. Ahern owns 49% of Fanterior. Fanterior imports promotional items such as plastic cups and other products displaying the Debtor's name(s) and logo(s).

(j)     Hutt Aviation, Inc. ("Hutt").  Don F. Ahern owns 50% of Hutt.  Hutt operates a facility at the Minden-Tahoe airport in Minden, Nevada, where it provides aircraft fuel pumping and other aircraft support.  Approximately 1% of Hutt's sales are to the Debtor.  From time to time, Hutt rents snow removal equipment from Debtor.

(k)     XFS, Inc. d/b/a Xtreme Financial Services ("XFS").  Don F. Ahern owns 100% of XFS.  XFS provides financing for customers who do not qualify under the Debtor's credit specifications.  XFS ordinarily provides financing on transactions of approximately $10,000.

(l)     Xtreme Manufacturing, LLC ("Xtreme").  Don F. Ahern owns 96.74% of Xtreme.  Xtreme is a manufacturer of forklifts, related parts, and heavy duty steel cubes for offices, housing and other uses that require reinforced structure for remote operations.  Xtreme sells forklifts and metal cubes to Debtor.  The Debtor sells forklifts manufactured by Xtreme.

**B.     The Debtor's Capital Structure**

**1.     First Lien Credit Facility**

On January 8, 2010, the Debtor, as "Borrower" (as defined therein), entered into a Second Amended and Restated Loan and Security Agreement (as amended, supplemented or otherwise modified, the "First Lien Credit Agreement"; and, together with all security, pledge and guaranty agreements and all other documentation executed and/or delivered in connection with any of the foregoing, including without limitation, the Intercreditor Agreement, each as amended, supplemented, or otherwise modified, the "First Lien Documents") with Bank of America, as administrative agent (in such capacity, the "First Lien Agent"), Wells Fargo Bank, National Association ("Wells Fargo Bank"), as collateral agent (in such capacity, the "First Lien Collateral Agent") and certain Revolving Lenders (as defined therein) and "last out" Term Lenders (as defined therein, and, collectively with the Revolving Lenders, the "First Lien Lenders").  The First Lien

Credit Agreement made credit facilities available to Debtor consisting of a $350,000,000 revolving credit facility (the "Revolving Credit Facility") and a $95,000,000 term loan (as thereafter amended, the "Term Loan" and, together with the Revolving Credit Facility, as amended, restated, supplemented, or otherwise modified, the "First Lien Credit Facility"). Pursuant to the First Lien Documents, the "Revolving Obligations" under, and as defined in, the First Lien Credit Agreement are payable prior to the "Term Loan Obligations" under, and as defined in, the First Lien Credit Agreement.

Pursuant to the First Lien Credit Agreement, the original maturity date for the Revolving Credit Facility was August 21, 2011 (the "Revolving Maturity Date"), and the original maturity date for the Term Loan was December 15, 2012, at which time all outstanding principal and interest amounts became due and payable.

## 2. Second Lien Notes

The Debtor is also a party to that certain Indenture, dated as of August 18, 2005 (as amended, supplemented or otherwise modified, the "Second Lien Indenture"; the notes issued thereunder; and together with the Second Lien Indenture and all security, pledge and guaranty agreements and all other documentation executed and/or delivered in connection with the foregoing, each as amended, supplemented or otherwise modified, the "Second Lien Documents" and the indebtedness owed pursuant to the Second Lien Documents, plus accrued and unpaid interest thereon and fees and expenses as provided in the Second Lien Documents, collectively, the "Second Lien Obligations") among the Debtor, as borrower, Wells Fargo Bank, as collateral agent and trustee (in such capacity, the "Second Lien Agent"), and the Noteholders (collectively, the "Second Lien Noteholders"; and together with the First Lien Lenders, the "Lenders"). Under the Second Lien Indenture, second priority senior secured notes (the "Second Lien Notes") are due August 15, 2013, bearing interest at 9¼% payable semi-annually on February 15 and August 15. Pursuant to the Second Lien Indenture, the Second Lien Notes were sold in two tranches for an aggregate purchase price of $200,000,000 in the first tranche and $90,000,000 in the second tranche. The Second Lien Notes are secured on a second-priority basis by liens on all of Debtor's assets that secure Debtor's obligations under the First Lien Credit Facility. As of the Petition Date, outstanding liabilities from the Second Liens Notes payable totaled $236,666,667 in actual principal outstanding (not including accrued unpaid interest).

On August 18, 2005, the Debtor, as borrower, entered into an Intercreditor Agreement (as amended, supplemented or otherwise modified, the "Intercreditor Agreement") among Wachovia, as First Lien Collateral Agent and Control Agent for the First Lien Collateral Agent and the Second Lien Collateral Agent (each as defined therein) and Wells Fargo Bank, as Trustee under the Indenture and as Second Lien Collateral Agent (each as defined therein), providing the Revolving Credit Facility in connection with the 2005 Loan Agreement, which Intercreditor Agreement permitted creditor facilities available to the Debtor consisting of a $175,000,000 revolving credit facility.

On December 23, 2009, the Debtor entered into an Amendment No. 1 to Intercreditor Agreement (the "2009 First Intercreditor Amendment") with Wachovia and Wells Fargo Bank, which 2009 First Intercreditor Amendment permitted credit facilities available to the Debtor consisting of a maximum $396,000,000 revolving credit facility.

## C.    Events Leading To The Chapter 11 Case

### 1.    Economic Pressures And The Debtor's Reponses

Through the Debtor's primary business of equipment rental, the Debtor makes capital investments to expand its rental fleet in exchange for the potential rental revenue streams generated from customers including construction and industrial companies, municipalities, manufacturers, utilities and homeowners who prefer to rent equipment as an alternative to buying the equipment. To generate rental revenue streams in excess of the capital invested into the continually depreciating equipment so as to turn a profit, the Debtor is consequently dependent upon its customers' continuing demand for the rental of such equipment over the lifetime of that equipment.  As such, the Debtor's business is highly dependent on the level of equipment utilization, at acceptable rates, in order to generate ongoing rental revenue and operating profitability.  In addition, the Debtor attempts to balance capital expenditures in new equipment to meet increases in demand for new rental opportunities with the risk of reduced demand for such equipment before the value of that equipment has been recouped through rental revenue.

Because of its dependence on rental revenue from the non-residential construction industry, the Debtor was adversely impacted by the downturn in construction activity during the recent economic recession.  Specifically, the Debtor was impacted by a reduction in both new construction projects as well as the often-abrupt cancellation of projects for which construction had already begun, which caused the return to the Debtor of equipment on rent, resulting in a decline in equipment utilization compounded by pressure on rental rates, which in turn resulted in reduced revenues and levels of operating performance.  The Debtor's revenues were necessarily harmed in the wake of economic concerns both nationally and to a greater extent in the Las Vegas market as the Debtor's ability to successfully rent its equipment inventory purchased during periods of growth in the construction industry was adversely impacted during the recession.

To adapt to the construction downturn, the Debtor has attempted a number of strategies since 2009 to both retain and develop new rental streams.  Among these strategies, the Debtor redeployed unutilized rental units to existing branch locations with higher demand and also opened branches in new geographies with high growth potential.  The Debtor opened seventeen (17) new rental branches in 2009, and opened seven (7) new rental branches in 2010.  The Debtor was able to redeploy some of its existing rental units to these new locations from existing branch locations.  This strategy was used in part to relocate rental equipment following the completion of the City Center project in Las Vegas, which was completed in late 2009 and resulted in a surplus of rental units in Las Vegas.

The Debtor has stated that by redeploying existing rental fleet and opening new branches in 2009 and 2010, it was able to reduce capital expenditures for purchases of new rental equipment. Additionally, the Debtor has stated that it was able to limit new capital expenditures by selling excess rental fleet as market conditions warranted.  In 2007 and 2008, the Debtor invested $191.6 million and $178.6 million, respectively.  Capital investments in 2009 were $15.9 million.  Capital investments in 2010 were negative $5.1 million.

The Debtor's equipment rental fleet has a large concentration of aerial equipment.  The average age of the rental fleet has increased, which has led and will continue to lead to increased repair, maintenance and equipment replacement costs.

Additionally, in response to the economic downturn, the Debtor has undertaken cost containment through reductions in personnel and employee benefits, renegotiation of vendor pricing structures, and reduced commissions and bonuses for senior management. To maintain and increase equipment utilization, the Debtor has also expanded its customer base into infrastructure related industries, alternative energy, and other end-user markets to participate in rental demand distinct from the non-residential construction sector.

### 2.    Financial Performance

Revenues for the nine months ended September 30, 2012 have increased to $274.8 million from $241.1 million compared to the nine month period ended September 30, 2011 and from $213 million compared to the nine month period ended September 30, 2010. From Adjusted EBITDA of $46.4 million for the LTM period ended June 30, 2010, the Debtor's Adjusted EBITDA for the LTM period ended September 30, 2012 has increased to $101.5 million.

### D.    Attempts To Reorganize Debt Outside Bankruptcy

On July 1, 2010, Debtor engaged Oppenheimer & Co. Inc. ("Oppenheimer") to assist the Debtor in obtaining a one-year extension of its Revolving Credit Facility. Thereafter, the Debtor and Oppenheimer engaged in negotiations with the Debtor's creditors to obtain the requisite approval of all Lenders for an extension of the Revolving Maturity Date.

On February 14, 2011, the Debtor entered into forbearance agreements with the Lenders, Liberty Harbor Master Fund I, L.P. (as Term Loan Lender) and Platinum (as majority Second Lien Notes Holder). On February 15, 2011, the Debtor failed to make a semi-annual payment on the Second Lien Notes, and no payments have been made on the Second Lien Notes since that time. On March 1, 2011, the Debtor failed to make a monthly interest payment on the Term Loan, and no further payments were made on the Term Loan until the Petition Date, after which the Debtor began making payments on the Term Loan pursuant to the Final DIP Order.

By June 2011, the Debtor had received preliminary approval for the one-year extension from all but three of the Revolving Lenders and from all of the Term Lenders. In order to effectuate the one-year extension, the Debtor needed 100% of the Revolving Lenders to approve it.

On August 21, 2011, the Revolving Credit Facility matured. At this time, Bank of America began to make advances to the Debtor as Agent (the "Agent Advances") to fund the Debtor's continuing operations. The Debtor continued to negotiate with Bank of America, the Term Lenders and, from time to time, some of the Second Lien Lenders for the four months leading up to the Petition Date to effectuate the extension of the Revolving Credit Facility and agreed upon the DIP Loan (defined below) to essentially effectuate the terms of the extension in bankruptcy.

### E.    Commencement Of Chapter 11 Cases

On December 22, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**F.    Significant Events During The Chapter 11 Case**

**1.    First Day Motions**

On or about December 23, 2011, the Bankruptcy Court approved certain "first day" orders on an interim basis that were designed to minimize the disruption of the Debtor's business operations and to facilitate its reorganization.  On January 27, 2012, the Bankruptcy Court held a hearing and approved the Debtor's requested first day relief on a final basis.

**2.    The DIP Loan And Cash Collateral**

Concurrently with the above-mentioned first day motions, the Debtor filed a motion to approve post-petition financing under, inter alia, section 364 of the Bankruptcy Code (the "DIP Financing Motion") [ECF No. 17].  On January 3, 2012, an interim order was entered [ECF No. 95].

Following the filing of the DIP Financing Motion and prior to the hearing on January 27, 2012, the Debtor negotiated with the DIP Lenders (as defined therein) regarding the terms of the final order on the DIP Financing Motion.  The Debtor also extensively negotiated the terms of a stipulation with the Majority Term Lenders (as defined therein) regarding the relief requested in the DIP Financing Motion and the provision of adequate protection to the Term Lenders.  On January 31, 2012, the Bankruptcy Court entered a final order approving the DIP Financing Motion [ECF No. 329] (the "Final DIP Order") and the stipulation with the Majority Term Lenders regarding the Debtor's use of cash collateral and adequate protection.  The Final DIP Order authorized the Debtor to obtain postpetition financing under an asset-based revolving credit facility in an amount up to the aggregate principal amount of $350 million outstanding at any time on a final basis (including a $10 million sub-limit for letters of credit) (the "DIP Loan").  Under the Final DIP Order, the Revolving Credit Facility was repaid in full and replaced by the DIP Loan.

**3.    Information Regarding The Proponents**

For information regarding the Proponents, see that certain Supplemental Verified Statement of the Second Lien Noteholder Group Pursuant to Bankruptcy Rule 2019 [ECF No. 1580].

**4.    Other Significant Motions And Postpetition Events**

a.    Retention and Employment of Professionals

Various applications were filed, and subsequently approved, for employment of Professionals in connection with the Chapter 11 Case.  Such applications included: (i) the Debtor's application to employ Gordon Silver as its general bankruptcy counsel [ECF No. 126]; (ii) the Debtor's application to employ CRG Partners Group, LLC as its financial and restructuring advisor [ECF No. 128]; (iii) the Debtor's application to employ Piercy Bowler Taylor & Kern as its auditor and accountant [ECF No. 96]; (iv) the Debtor's application to employ Stoel Rives LLP as its special counsel [ECF No. 132]; (v) the Debtor's application to employ Oppenheimer & Co., Inc., as its financial advisor and investment banker [ECF No. 162]; (vi) the Debtor's application to employ Sea Port Group Securities, LLC as its financial advisor and investment banker [ECF No. 164]; (vii) the Debtor's application to employ DLA Piper LLP (US) as its bankruptcy co-counsel [ECF No. 429]; and (viii) the Debtor's application to employ and compensate certain Professionals in the ordinary course of business [ECF No. 76] (Professionals covered by this application consist of various outside

Professionals whom the Debtor employed prior to filing the Chapter 11 Case, including law firms and accountants in various non-bankruptcy matters ranging from defending personal injury and workers' compensation suits, to providing advice on various general litigation and corporate related issues).

b.     <u>Schedules and Statements</u>

On January 26, 2012, the Debtor filed its schedules of assets and liabilities and statements of financial affairs, other than Schedule F.  On January 27, 2012, the Debtor filed Schedule F.

c.     <u>Administration of Personal Injury Claims</u>

The Debtor maintains automobile, general liability, and umbrella policies covering personal injury liability.  The Debtor renews its policies or purchases new policies on or about May 10 of each year.  Generally, the Debtor's automobile policies have a coverage limit of $1 million per accident, with no aggregate limits.  Up to and including the 2007-2008 policy year, the Debtor's per-accident deductible under its automobile policies was $10,000.  For the 2008-2009 through 2011-2012 policy years, the Debtor's per-accident deductible under its automobile policies was $50,000.  The present automobile policy does not have a deductible requirement.

The Debtor's general liability policies have $1,000,000 per-occurrence limits with $2,000,000 aggregate limits.  The self-insured retention ("SIR") obligation under the general liability policies is $250,000 per-occurrence.  The 2009-2010 general liability policy limited the Debtor's aggregate SIR obligation to a maximum of $750,000.  For the 2010-2011 through 2011-2012 policy years, the general liability policies limited Debtor's aggregate SIR obligation to a maximum of $650,000.

The 2012-2013 general liability policy currently in effect limits the Debtor's aggregate SIR obligation to a maximum of $750,000.

The Debtor also maintains umbrella insurance, which policies provide coverage for personal injury liability that exceeds the automobile or general liability policy coverage.  Up to and including the 2010-2011 policy year, the umbrella policies had $5,000,000 coverage limits.  The 2011-2012 and present umbrella policies have $10,000,000 coverage limits.  The Debtor has provided no information with regard to coverage limits for the 2012-2013 policy year.

Total claims against each of the Debtor's policies in each of the above policy years range from $10,000 to $13.5 million.  Except with respect to the 2008-2009 policy period, the Debtor has asserted that it faces no real risk of liability in excess of its policy limits even if the plaintiffs' claims were allowed in full.  Moreover, the Debtor has declared that many of the asserted claims, including the claims in the 2008-2009 policy period, are entirely without merit.  The Debtor has not provided any detailed information regarding any personal injury claims or its analysis of potential liabilities relating to such claims.

In order to centralize and streamline the process of liquidating these personal injury claims, the Debtor moved for implementation of alternative dispute resolution procedures pursuant to Bankruptcy Rule 9019(b).  On March 12, 2012, the Debtor filed its Amended Motion for Order, Pursuant to section 105(a) of the Bankruptcy Code and Local Rule 9019, Requiring Each Personal Injury Claimant Attend and Participate in a Settlement Conference as a Condition Precedent to

Relief from the Automatic Stay [ECF No. 721] (the "ADR Motion").  Pursuant to the Final Order approving the ADR Motion, any personal injury claimant was required to file its Claim by April 30, 2012, thereby ensuring the number of claims asserted will not continue to increase.  See ECF No. 782.  Also pursuant to the Final Order, with certain limited exceptions, each personal injury claimant is required to participate in a settlement conference as a condition precedent to relief from the automatic stay to liquidate his or her personal injury claim in a nonbankruptcy forum.  See id.

### d.    Affiliated Leases

The Debtor is a lessee under numerous leases (the "Affiliated Leases") with DFA, LLC and other entities which are Affiliates of the Debtor by virtue of ownership interests held therein by Don F. Ahern.  The locations of the Affiliated Leases include, among other things, branch locations, administrative offices, storage locations, aircrafts hangers and a 250 acre ranch allegedly intended to be used as a training facility.  On July 2, 2012 the Debtor filed its Motion to Assume Certain Affiliated Nonresidential Real Property Leases, [ECF No. 806] (the "Affiliated Leases Motion"), pursuant to which the Debtor sought approval from the Bankruptcy Court to, among other things, assume, and in some cases modify the terms of, certain of the Affiliated Leases.  Among other modifications, the Affiliated Leases Motion sought to shorten the maturities of the Affiliated Leases by one year from October 2014 to October 2013. Subsequent to the filing of the Affiliated Leases Motion, several parties objected to the relief requested therein and the hearing on such motion was adjourned several times.  The hearing on the Affiliated Leases Motion is currently scheduled to be heard in connection with the Confirmation Hearing.

### e.    Mediation

In conjunction with Debtor's request to extend its exclusive right to file a plan, by order entered on August 10, 2012, [ECF No. 959], the Bankruptcy Court ordered Debtor and various parties in interest to participate in a settlement conference pertaining to plan confirmation issues. The settlement conference was conducted on September 6-7, 2012 by Judge William T. Thurman of the United States Bankruptcy Court for the District of Utah and several parties in interest attended including the Debtor, the Majority Term Lenders, the Committee, the Proponents, the Second Lien Indenture Trustee, certain of the DIP Loan Agents and Kubota Tractor.  No consensual resolution was reached concerning plan issues; however, the parties did agree to further mediation with Judge Thurman, which was conducted on September 27, 2012.  Again, the parties were unable to resolve their disagreements regarding plan confirmation issues.

### f.    The Debtor's Plan

On November 30, 2012, the Debtor filed the Debtor's Plan and Debtor's Disclosure Statement.  The Debtor's Plan impairs almost every class of creditors, but allows Don F. Ahern and John Paul Ahern, Jr. the two controlling shareholders of the Debtor, to retain all of their equity ownership of the Debtor without impairment, resulting in a recovery of 100%.  Specifically, the Debtor's Plan proposes to pay the $111.5 million of First Lien Term Loans either: (a) a Cash payment equal to 80% of their Claims conditioned on acceptance of the Debtor's Plan; or (b) a "cram down" in which the First Lien Term Loan Lenders would be forced to take repayment over a four-year period at 4.25% interest per year (as compared to the 16% interest rate of the current First Lien Term Loan).  The Debtor's Plan proposes to pay the $267.7 million of Second Lien Notes either: (a) a Cash payment equal to 50% of their Claims conditioned on acceptance of the Debtor's

Plan; or (b) a "cram down" in which they would be forced to take repayment over a seven-year period with only 2% interest accruing per year but not paying any cash interest until year five, and with all principal payments deferred to year seven (as compared to the 9.25% interest rate on the Second Lien Notes when issued). The Debtor's Plan further proposes to pay Allowed General Unsecured Claims either: (a) a Cash in equal quarterly installments over two (2) years without interest conditioned on acceptance of the Debtor's Plan; or (b) a "cram down" in which they would be forced to take repayment in equal quarterly installments over five (5) years with only 2% interest accruing per year, or such other interest rate determined by the Bankruptcy Court. The Debtor's Plan further proposes to pay Allowed Personal Injury Claim up to $250,000, less defense costs expended on each such insured Allowed Personal Injury Claim, with the balance payable in sixty (60) equal monthly installments, together with interest at the Federal Judgment Rate, commencing on the Effective Date at the latest. The remainder of the creditor classes are discounted or restructured under the Debtor's Plan, resulting in impairment under the Bankruptcy Code and less than full recovery.

g.    The Noteholder Plan

On February 8, 2013, the Proponents filed the Noteholder Plan, which is described more particularly below. The Noteholder Plan will convert all of the Second Lien Notes into New Equity Interests of Reorganized Ahern. Other than the Second Lien Notes Claims, the Noteholder Plan leaves Unimpaired or otherwise pays in full in Cash all of the Debtor's Claim Holders. Holders of Equity Interests will receive New Warrants. The Noteholder Plan provides Holders of Claims against the Debtor with superior treatment to what such Holders would receive under the Debtor's Plan, which impairs substantially all of the Debtor's Claim Holders. As part of the Noteholder Plan, certain of the Noteholders will enter into agreements to acquire additional equity in Reorganized Ahern through a Backstopped Rights Offering in the amount of $15 million. The proceeds of the Backstopped Rights Offering will be used to, among other things, fund Distributions required by the Noteholder Plan and provide Reorganized Ahern with additional working capital upon its emergence from bankruptcy.

h.    Cash Collateral Termination Event and DIP Default

The Debtor's Plan field on November 30, 2012 violated the terms of the Majority Term Lender Cash Collateral Stipulation because it did not provide for payment in full in Cash of the First Lien Term Loan Claims on the Effective Date. That violation gave rise to a "Termination Event" under the terms of the Majority Term Lender Cash Collateral Stipulation, and the Majority Term Lenders delivered notice of that Termination Event to the Debtor on December 4, 2012. Despite the triggering of a Termination Event, the Majority Term Lenders have allowed the Debtor to continue to use the cash collateral, but have reserved the right to terminate the Majority Cash Collateral Stipulation at any time. If the Majority Cash Collateral Stipulation is terminated, the Debtor will not be able to use its cash to fund its operations.

The Termination Event and the expiration of exclusivity also constituted default ("DIP Defaults") under the DIP Facility. Despite the DIP Defaults, the DIP Lenders have continued to make loans to the Debtor and have not accelerated the DIP Facility.

i.    Exclusivity and Related Appeals

Under the Bankruptcy Code, a debtor has the exclusive right to file a plan or plans of reorganization for an initial period of 120 days from the date on which a debtor filed a petition for voluntary relief (which may be extended by a bankruptcy court for a period of up to 18 months from the petition date).  If a debtor files a plan within this exclusive period, then a debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan (which may be extended by a bankruptcy court for a period of up to 20 months from the petition date).  During a debtor's exclusive periods, no other party in interest may file a competing chapter 11 plan; however, a court may terminate a debtor's exclusive periods upon request of a party in interest and "for cause." During the Chapter 11 Case, the Debtor requested, and was granted, extensions of the exclusivity period to file the Debtor's Plan and the Debtor's Disclosure Statement, up to and including December 7, 2012.

On December 7, 2012, after reviewing the Debtor's Plan and the Debtor's Disclosure Statement, and supplemental briefs filed by the Debtor, the Proponents and the Majority Term Lenders, the Bankruptcy Court held a hearing to decide whether to grant the Debtor a further extension of exclusivity.  The Bankruptcy Court conducted a detailed analysis of the nine "cause" factors, which courts have adopted to determine whether extensions of exclusivity are appropriate.  It determined that, among other things, the Debtor had failed to make good faith progress in negotiations with its creditors during the prior twelve months of exclusivity and therefore had not met its burden of demonstrating an entitlement to a further extension of the privilege of exclusivity. At the close of the December 7 hearing, the Debtor orally moved for a stay pending appeal, which the Bankruptcy Court denied.

Two weeks later, on December 20, 2012, the Debtor filed an appeal with the United States District Court for the District of Nevada (the "District Court") of the Bankruptcy Court's termination of exclusivity.  Along with the notice of appeal, the Debtor filed an ex parte "emergency" motion for a stay pending its appeal to the District Court.  The District Court granted the Debtor a stay pending appeal on December 21, 2012, and set a status conference for January 11, 2013.  The Proponents thereafter filed a motion to vacate the stay and dismiss the appeal.  On January 14, 2013, the District Court issued an order granting the Proponents' motion vacating the stay and dismissing the appeal for lack of jurisdiction.  Thereafter, the Debtor further appealed the District Court's order to the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit"), and again filed an "emergency" motion with the District Court for a stay pending its appeal to the Ninth Circuit.  On January 23, 2013, the District Court issued an order denying the Debtor's motion for a stay pending its appeal to the Ninth Circuit.  Two days later, on January 25, 2013, the Debtor again filed an "emergency" motion for a stay pending its appeal to the Ninth Circuit.  The Proponents thereafter filed a motion to strike in part, and an opposition to, the Debtor's motion for stay pending appeal. On January 29, 2013, the Ninth Circuit issued an order denying the Debtor's motion for stay pending appeal.  The Debtor's appeal to the Ninth Circuit remains pending and the Debtor has requested an expedited briefing schedule.

## ARTICLE II.
## TREATMENT OF UNCLASSIFIED CLAIMS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Claims against the Debtor set forth in this Article II are not classified within any Classes.  Holders of such Claims are not entitled

to vote on the Noteholder Plan. The treatment of the Claims set forth below is consistent with the requirements of section 1129(a)(9)(A) of the Bankruptcy Code.

### A.    Administrative Claims

Except with respect to Administrative Claims that are Professional Fee Claims, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Administrative Claim, on the latest of: (i) the Distribution Date; (ii) the date on which its Administrative Claim becomes an Allowed Administrative Claim; (iii) the date on which its Administrative Claim becomes payable under any agreement with the Debtor relating thereto; (iv) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of the Debtor's business, consistent with past practice; and (v) such other date as may be agreed upon between the Holder of such Allowed Administrative Claim and the Debtor or Reorganized Ahern, as the case may be, (a) Cash equal to the unpaid portion of its Allowed Administrative Claim or (b) such other treatment as to which the Holder of such Allowed Administrative Claim may agree.

### B.    DIP Loan

Except to the extent that Reorganized Ahern and the Holder of a DIP Loan Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each DIP Loan Claim, each DIP Loan Claim shall be paid in full in Cash by Reorganized Ahern on the Effective Date.

### C.    Professional Fee Claims

Professionals or other Persons asserting a Professional Fee Claim for services rendered before the Effective Date must file and serve on the Debtor and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other Final Order of the Bankruptcy Court an application for final allowance of such Professional Claim for accrued professional compensation no later than the Administrative Claims Bar Date. Objections to any Claim for accrued professional compensation must be filed and served on Reorganized Ahern and the Office of the U.S. Trustee and the requesting party no later than the Administrative Claims Objection Deadline. The Holder of an Allowed Professional Fee Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Professional Fee Claim Cash equal to the unpaid portion of its Allowed Professional Fee Claim.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Reorganized Ahern may employ and pay any counsel or other advisors for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further Final Order or approval of the Bankruptcy Court.

The Proponents' Fees and the Second Lien Agents' Fees shall be paid in full (or reimbursed if previously paid by the Proponents, as the case may be) in cash on the Effective Date, without the need to obtain further approval of the Bankruptcy Court or to comply with sections 327 through 331 and 1103 of the Bankruptcy Code or any U.S. Trustee guidelines, as applicable.

**D.      Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim, if any, will, in full and final satisfaction of such Claim, be paid in full (or be treated in compliance with section 1129(a)(9)(C) of the Bankruptcy Code) by Reorganized Ahern on the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the fourteenth (14th) day after the date on which an order allowing such Claim becomes a Final Order; and (iv) such date as is agreed to by the Holder of such Claim and the Debtor or Reorganized Ahern, as the case may be.

**ARTICLE III.**
**TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.      Summary Of Classification**

Pursuant to the Noteholder Plan and in accordance with section 1123(a)(1) of the Bankruptcy Code, all Claims of Creditors (except Administrative Claims, Professional Fee Claims and Priority Tax Claims) and Equity Interests are placed in the Classes described below.  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and is classified in such other Classes to the extent that any remainder of the Claim qualifies within the definition of such other Classes.  A Claim is also classified in a particular Class only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.  Notwithstanding the foregoing, any Holder of a Claim in the Classes below described as "entitled to vote" to which no objection to the Claim has been filed on or before the commencement of the Confirmation Hearing or such other date as the Bankruptcy Court determines, shall be entitled to vote to accept or reject the Noteholder Plan.

| Class | Claim | Treatment | Voting Rights |
|-------|-------|-----------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| Class 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| Class 3 | First Lien Term Loan Claims | Unimpaired | Deemed to Accept |
| Class 4 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 5 | Insider Claims | Impaired | Entitled to Vote |
| Class 6 | Personal Injury Claims | Unimpaired | Deemed to Accept |
| Class 7 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| Class 8 | Equity Interests | Impaired | Entitled to Vote |

## B.    Acceptance By Impaired Class

Classes 4, 5 and 8 are Impaired under the Noteholder Plan.  Any one of the Impaired Classes of Claims shall have accepted the Noteholder Plan if (i) Holders of at least two-thirds (2/3) in amount of Allowed Claims actually voting in such Impaired Class have voted to accept the Noteholder Plan and (ii) Holders of more than one-half (1/2) in number of Allowed Claims actually voting in such Class have voted to accept the Noteholder Plan, in each case not counting the vote of any Insider or any Holder whose vote is designated under section 1126(e) of the Bankruptcy Code. The Impaired Class of Equity Interests shall have accepted the Noteholder Plan if Holders of at least two-thirds (2/3) in amount of the Equity Interests actually voting in such Impaired Class have voted to accept the Noteholder Plan, or any Holder whose vote is designated under section 1126(e) of the Bankruptcy Code.

In the event of a controversy as to whether any Class of Claims or Equity Interests is Impaired under the Noteholder Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

## C.    Cramdown

To the extent necessary, the Proponents will request confirmation of the Noteholder Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.   The Proponents reserve the right to modify the Noteholder Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## D.    Treatment Of Claims And Equity Interests

### 1.    Class 1: Other Secured Claims

*Classification*: Class 1 consists of Other Secured Claims against the Debtor.

*Treatment*: Unless the Holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date, or as soon as reasonably practicable, each Holder of an Allowed Other Secured Claim shall (a) have its Allowed Other Secured Claim Reinstated, or (b) receive, in full satisfaction, settlement, release and discharge of and in exchange for, such Allowed Other Secured Claim, either (i) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the Holder's secured interest in such Collateral, (iii) the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (iv) such other Distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code.  The manner and treatment of each Allowed Other Secured Claim shall be determined by the Noteholders and transmitted, in writing, to the Holder of such Other Secured Claim on or prior to the Effective Date.  If the Allowed Other Secured Claim of a Holder exceeds the value of the Collateral that secures it, such Holder will have an Allowed Other Secured Claim equal to the Collateral's value and an Allowed General Unsecured Claim for the deficiency.

*Voting*: Allowed Other Secured Claims are Unimpaired, and Holders of Allowed Other Secured Claims are conclusively deemed to have accepted the Noteholder Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Noteholder Plan.

### 2.    Class 2: Other Priority Claims

*Classification*: Class 2 consists of the Other Priority Claims against the Debtor.

*Treatment*: Unless the Holder of an Allowed Other Priority Claim agrees to a different treatment, each Holder of an Allowed Other Priority Claim, if any, shall, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Other Priority Claims, be paid in full in Cash by Reorganized Ahern upon the latest of: (a) the Effective Date or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court; (c) the first Business Day following the fourteenth (14th) day after such Claim is Allowed; and (d) such date as agreed upon by the Holder of such Claim and the Debtor or Reorganized Ahern.

*Voting*: Allowed Other Priority Claims are Unimpaired, and Holders of Allowed Other Priority Claims are conclusively deemed to have accepted the Noteholder Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Noteholder Plan.

### 3.    Class 3: First Lien Term Loan Claims

*Classification*: Class 3 consists of the First Lien Term Loan Claims against the Debtor.

*Treatment*: The First Lien Term Loan Claims are hereby Allowed Claims, not subject to offset, defense, counterclaim, reduction, or credit of any kind whatsoever. Unless the Holder of an Allowed Frist Lien Term Loan Claim agrees to a different treatment, each Holder of an Allowed Fist Lien Term Loan Claim shall, in full satisfaction, settlement, release and discharge of and in exchange for the Allowed First Lien Term Loan Claim, be paid in full in Cash by Reorganized Ahern upon the latest of: (a) the Effective Date or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court; and (c) such date as agreed upon by the Holder of such Claim and the Debtor or Reorganized Ahern.

*Voting*: Allowed First Lien Term Loan Claims are Unimpaired, and Holders of Allowed First Lien Term Loan Claims are conclusively deemed to have accepted the Noteholder Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed First Lien Term Loan Claims are not entitled to vote to accept or reject the Noteholder Plan.

### 4.    Class 4: Second Lien Notes Claims

*Classification*: Class 4 consists of the Second Lien Notes Claims against the Debtor.

*Treatment*: The Second Lien Notes Claims are hereby Allowed Claims, not subject to offset, defense, counterclaim, reduction, or credit of any kind whatsoever. Unless the Holder of an Allowed Second Lien Notes Claim agrees to a different treatment, each Holder of an Allowed Second Lien Notes Claim shall, in full satisfaction, settlement, release and discharge of and in exchange for the Allowed Second Lien Notes Claim, receive its Pro Rata

share of each of the New Equity Interests of Reorganized Ahern, subject only to dilution from: (a) the issuance of New Equity Interests in connection with the Backstopped Rights Offering, (b) the exercise of New Warrants of Reorganized Ahern issued to Holders of existing Equity Interests in the Debtor; and (c) New Equity Interests issued in connection with a Management Equity Incentive Plan.  Distributions with respect to Allowed Second Lien Notes Claims shall occur upon the later of: (i) the Effective Date or as soon thereafter as practicable; and (ii) such date as may be fixed by the Bankruptcy Court.  All such Distributions shall be made to the Second Lien Indenture Trustee unless the Second Lien Indenture Trustee consents to the direct Distribution to Holders of Second Lien Notes Claims through DTC.

*Voting*: Allowed Second Lien Notes Claims are Impaired, and Holders of Allowed Second Lien Notes Claims are entitled to vote to accept or reject the Noteholder Plan.

### 5.    Class 5: Insider Claims

*Classification*: Class 5 consists of the Insider Claims against the Debtor.

*Treatment*: Unless the Holder of an Allowed Insider Claim agrees to a different treatment, each Holder of an Allowed Insider Claim shall, in full satisfaction, settlement, release, and discharge of, and in exchange for the Allowed Insider Claim, be paid in Cash by Reorganized Ahern in semi-annual payments over a period of 2 years with interest accruing on such Allowed Claim at a rate to be determined by the Bankruptcy Court, upon the later of: (a) the resolution of all litigation relating to, or arising out of Insider Causes of Action (pursuant to one or more Final Orders); (b) resolution of any Avoidance Actions against an Insider who is a Holder of an Insider Claim; and (c) such other date as may be fixed by the Bankruptcy Court.

*Voting*: Allowed Insider Claims are Impaired, and Holders of Allowed Insider Claims are entitled to vote to accept or reject the Noteholder Plan.

### 6.    Class 6: Personal Injury Claims

*Classification*: Class 6 consists of the Personal Injury Claims against the Debtor.

*Treatment*: Unless the Holder of a Personal Injury Claim agrees to a different treatment, each Holder of an Allowed Personal Injury Claim shall, in full satisfaction, settlement, release, and discharge of, and in exchange for the Allowed Personal Injury Claim, be paid in full in Cash upon the Effective Date, or as soon as reasonably practicable thereafter, by Reorganized Ahern; provided that no Distributions shall be made on account of Allowed Personal Injury Claims until the insurance coverage with respect to such Allowed Personal Injury Claims has been exhausted.

*Voting*: Allowed Personal Injury Claims are Unimpaired, and Holders of Allowed Personal Injury Claims are conclusively deemed to have accepted the Noteholder Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Personal Injury Claims are not entitled to vote to accept or reject the Noteholder Plan.

7.    **Class 7: General Unsecured Claims**

*Classification*: Class 7 consists of the General Unsecured Claims against the Debtor.

*Treatment*: Unless the Holder of a General Unsecured Claim agrees to a different treatment, each Holder of an Allowed General Unsecured Claim shall, in full satisfaction, settlement, release, and discharge of, and in exchange for the Allowed General Unsecured Claim, be paid in full in Cash by Reorganized Ahern upon the Effective Date, or as soon as reasonably practicable thereafter.

*Voting*: Allowed General Unsecured Claims are Unimpaired, and Holders of Allowed General Unsecured Claims are conclusively deemed to have accepted the Noteholder Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Noteholder Plan.

8.    **Class 8: Equity Interests**

*Classification*: Class 8 consists of the Equity Interests in the Debtor.

*Treatment*: Upon the Effective Date, Holders of existing Equity Interests who vote in favor of the Noteholder Plan shall receive their Pro Rata Distribution of the New Warrants. Holders of existing Equity Interests who vote in favor of the Noteholder Plan shall be deemed by casting such vote to have agreed not to compete, directly or indirectly with Reorganized Ahern's business or to solicit, directly or indirectly, any employee of the Debtor or Reorganized Ahern for a period of two years after the Effective Date.  Holders of existing Equity Interests who do not vote in favor of the Noteholder Plan shall not receive any distribution and shall not retain any property or Interest in Reorganized Ahern or any of its assets or properties.

Distributions of the New Warrants to Holders of Equity Interests shall be made upon the later of: (a) the resolution of all litigation relating to, or arising out of Insider Causes of Action and Avoidance Actions (pursuant to one or more Final Orders); and (b) such other date as may be fixed by the Bankruptcy Court.

*Voting*: Equity Interests are Impaired, and Holders of existing Equity Interests are entitled to vote to accept or reject the Noteholder Plan.

E.    **Allowed Claims**

Notwithstanding any provision herein to the contrary, the Debtor and/or Reorganized Ahern shall only make Distributions to Holders of Allowed Claims.  No Holder of a Disputed Claim will receive any Distribution on account thereof unless and until and only to the extent that its Disputed Claim becomes an Allowed Claim.  In accordance with section 502(d) of the Bankruptcy Code, no Holder of a Claim will receive any Distribution on account thereof to the extent such Holder is a transferee of a voidable transfer as provided therein.

### F.    Postpetition Interest

In accordance with section 502(b)(2) of the Bankruptcy Code, the amount of all Claims against the Debtor shall be calculated as of the Petition Date.  Except as otherwise explicitly provided herein, in a Final Order of the Bankruptcy Court or in a section of the Bankruptcy Code, no Holder of a Claim shall be entitled to or receive postpetition interest.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Noteholder Plan Funding

Unless otherwise set forth herein, Cash payments under the Noteholder Plan shall be funded from Cash on hand, borrowings under the Exit Financing Facility and the proceeds of the Backstopped Rights Offering.

### B.    Reorganized Ahern

Upon the Effective Date, Reorganized Ahern shall be converted from a Nevada corporation to a Delaware limited liability company.  On or before the Effective Date, the Reorganized Ahern Organizational Documents shall be executed and, to the extent required, the Reorganized Ahern Organizational Documents shall (i) include, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Noteholder Plan and the transactions contemplated herein.  After the Effective Date, Reorganized Ahern shall be responsible for the preparation of all reports, tax returns and other governmental filings required to be filed by the Debtor and Reorganized Ahern and all obligations related thereto.

### C.    Additional Reorganized Ahern Provisions

The Reorganized Ahern Organizational Documents, and resolutions or similar documents related to the formation and governance of Reorganized Ahern under the Noteholder Plan, shall be subject to applicable bankruptcy and/or state law.

### D.    New Financing

On the Effective Date, (a) the Exit Financing Facility, together with new promissory notes and guarantees evidencing the obligations of Reorganized Ahern thereunder, (b) the Backstopped Rights Offering Agreement, and (c) and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, shall become effective.  The obligations incurred by Reorganized Ahern pursuant to the Exit Financing Facility and related documents shall be paid as set forth in the Exit Financing Facility Documents. The obligations incurred by Reorganized Ahern pursuant to the Backstopped Rights Offering shall be paid as set forth in the Backstopped Rights Offering Agreement.

### E.    Effective Date Events

On the Effective Date, or as soon as reasonably practicable thereafter: (i) the DIP Loan Notes, First Lien Term Loans and Second Lien Notes shall be cancelled and extinguished and of no further force or effect except as set forth below; (ii) the Equity Interests of the Debtor shall be cancelled and extinguished and be of no further force or effect; (iii) Reorganized Ahern shall execute and deliver the Exit Financing Facility Documents to the Exit Financing Facility Agents; (iv) Reorganized Ahern or the Distribution Agent shall deliver the New Equity Interests and Rights Offering Interests of Reorganized Ahern in accordance with the provisions of the Noteholder Plan and the Backstopped Rights Offering Agreement; and (iv) the DIP Loan Documents, the First Lien Term Loan Documents and the Second Lien Notes Documents shall be of no further effect except as set forth below.

The DIP Loan Documents, the First Lien Term Loan Documents and the Second Lien Notes Documents will continue in effect solely for the purposes of: (i) allowing the DIP Loan Agent, First Lien Term Loan Agents and Second Lien Indenture Trustee, to receive the Distributions required to be made to them or at their direction pursuant to the Noteholder Plan and/or the DIP Loan Documents, the First Lien Term Loan Documents and the Second Lien Notes Documents, and (ii) allowing and preserving the rights of the Second Lien Agents to (a) make Distributions in satisfaction of Allowed Second Lien Notes Claims, (b) exercise any applicable charging liens against any such Distributions, and (c) seek and obtain compensation and reimbursement for any fees, expenses (including attorney's fees) or indemnity to the extent permitted by the Second Lien Notes Documents. From and after the Effective Date, the Second Lien Agents will have no duties or obligations under the Second Lien Notes Documents other than to make Distributions.

### F.    Post-Effective Date Officers And Directors Of Reorganized Ahern

On the Effective Date, the term of each member of the current board of directors of the Debtor shall automatically expire.   The New Board of Directors of Reorganized Ahern of Reorganized Ahern shall be disclosed in the Noteholder Plan Supplement.   Unless otherwise set forth in the Noteholder Plan Supplement, the current officers and management team of the Debtor shall be entitled to maintain their current positions.

### G.    No Corporate Action Required

As of the Effective Date: (i) the adoption, execution, delivery and implementation or assignment of all contracts, leases, instruments, releases and other agreements related to or contemplated by the Noteholder Plan; and (ii) the other matters provided for under or in furtherance of the Noteholder Plan involving corporate action to be taken by or required of the Debtor, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by Reorganized Ahern's Board of Directors or officers of the Debtor.   In particular, the adoption of the Reorganized Ahern Organizational Documents, the selection of directors and officers of the Debtor or Reorganized Ahern, and all other actions contemplated by or described in the Noteholder Plan with respect thereto, shall be authorized and approved and be binding and in full force and effect in all respects (subject to the provisions of the Noteholder Plan and the Confirmation Order), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule (other than filing such organizational documents with the applicable

governmental unit as required by applicable law) or the vote, consent, authorization, or approval of any Person. Notwithstanding the forgoing, Reorganized Ahern shall take all action required to effectuate the Exit Financing Facility Documents and any other action required to implement the Noteholder Plan.

### H.    Effectuation Of Transactions

On the Effective Date, the appropriate officers of the Debtor and Reorganized Ahern, as applicable, and members of the applicable Board of Directors are authorized to issue, execute, and deliver the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions, and instruments contemplated by or described in the Noteholder Plan in the name of and on behalf of the Debtor and Reorganized Ahern, and to otherwise fully consummate the transactions contemplated by the Noteholder Plan, in each case without further notice to or Final Order of the Bankruptcy Court, act or action under applicable law, regulation, Final Order, or rule or any requirement of further action, vote, or other approval or authorization by any Person.

### I.    Filing Of Noteholder Plan And Confirmation Order

To the extent required by applicable law, on the Effective Date a certified copy of the Noteholder Plan and the Confirmation Order shall be filed. The Debtor, from the Confirmation Date until the Effective Date, is authorized and directed to take any action or carry out any proceeding necessary, if any, to effectuate the Noteholder Plan pursuant to applicable law.

### J.    Vesting Of Assets In Reorganized Ahern

Except as otherwise provided in the Noteholder Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in the Debtor's estate, including all Causes of Action, and any property acquired by the Debtor pursuant to the Noteholder Plan shall vest in Reorganized Ahern free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the repayment of the Exit Financing Facility, and any Liens relating to Secured Claims that are Reinstated ). On and after the Effective Date, Reorganized Ahern may operate its business and may use, acquire, or dispose of property and compromise or settle any Retained Causes of Action or interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption And Rejection Of Executory Contracts And Unexpired Leases

Any Executory Contract or Unexpired Lease that: (i) has not expired by its own terms on or prior to the Effective Date; (ii) has not been assumed or rejected by the Debtor during the pendency of the Chapter 11 Case; (iii) is not listed in the Noteholder Plan Supplement as Executory Contracts or Unexpired Leases to be rejected (which may be modified and amended up to the date the Bankruptcy Court enters the Confirmation Order); and (iv) is not the subject of a pending motion to reject such Executory Contract or Unexpired Lease, shall be deemed assumed by the Debtor as of immediately prior to the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumption pursuant to section 365(a) and 1123 of the Bankruptcy Code. Any Executory Contract or Unexpired Lease listed in the Noteholder Plan

Supplement as an Executory Contract or Unexpired Lease to be rejected by the Debtor shall be deemed rejected by the Debtor as of immediately prior to the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Upon the Effective Date, each counterparty to an assumed Executory Contract or Unexpired Lease listed shall be deemed to have consented to assumption contemplated by section 365(c)(1)(B) of the Bankruptcy Code, to the extent such consent is necessary for such assumption. To the extent applicable, all Executory Contracts or Unexpired Leases of Reorganized Ahern assumed pursuant to this Article V shall be deemed modified such that the transactions contemplated by the Noteholder Plan shall not be a "change of control," however such term may be defined in the relevant Executory Contract or Unexpired Lease and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by entry of the Confirmation Order. Also, to the extent applicable, all Executory Contracts or Unexpired Leases of the Debtor assumed pursuant to this Article V shall be assigned to Reorganized Ahern on the Effective Date, and such assignment shall not be a "change of control," however such term may be defined in the relevant Executory Contract or Unexpired Lease, and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by entry of the Confirmation Order.

Unless otherwise specified on the Noteholder Plan Supplement, each executory contract and unexpired lease listed or to be listed on the Noteholder Plan Supplement shall include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed on the Noteholder Plan Supplement.

Notwithstanding anything contained in the Noteholder Plan to the contrary, unless subject to a motion for approval or rejection that has been filed and served prior to the Confirmation Date, all of the Debtor's insurance policies and any agreements, documents or instruments relating thereto, shall be treated as executory contracts under the Noteholder Plan and shall be assumed pursuant to the Noteholder Plan, effective as of the Effective Date. Nothing contained in this paragraph shall constitute or be deemed a waiver of any Cause of Action that the Debtor may hold against any Entity, including, without limitation, the insurer, under any of the Debtor's insurance policies.

## B.    Cure Of Defaults

The Debtor or Reorganized Ahern shall Cure any defaults respecting each Executory Contract or Unexpired Lease assumed pursuant to this Article V upon the latest of (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court or agreed upon by the Debtor, and after the Effective Date, Reorganized Ahern; and (iii) the first Business Day following the fourteenth (14th) day after the entry of a Final Order resolving any dispute regarding (a) a Cure amount, (b) the ability of the Debtor or Reorganized Ahern to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease assumed pursuant to the Noteholder Plan in accordance with section 365(b)(1) of the Bankruptcy Code, or (c) any other disputed matter pertaining to assumption, assignment or the Cure of a particular Executory Contract or an Unexpired Lease; provided, however, that upon resolution of a dispute over a Cure amount, Reorganized Ahern may reject the Executory Contract or Unexpired Lease notwithstanding a previous listing as assumed. The proposed Cure amounts, if any, that will

be paid as provided by above will be listed in the Noteholder Plan Supplement (which may be supplemented and amended up to and including the commencement of the Confirmation Hearing).

## C.    Objection To Cure Amounts

Any party to an Executory Contract or Unexpired Lease who objects to the Cure amounts listed in the Noteholder Plan Supplement must file and serve an objection on the Debtor's counsel no later than the deadline set by the Bankruptcy Court for filing Noteholder Plan objections. Failure to file and serve a timely objection shall be deemed consent to the Cure amounts listed in the Noteholder Plan Supplement. Any Cure Amounts shall be the responsibility of Reorganized Ahern. If there is a dispute regarding: (i) the amount of any Cure payment; (ii) the ability of Reorganized Ahern to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease to be assumed or assigned; or (iii) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of an order resolving the dispute and approving the assumption.

## D.    Confirmation Order

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in this Article V, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. Notwithstanding the foregoing, if, as of the date the Bankruptcy Court enters the Confirmation Order, there is pending before the Bankruptcy Court a dispute concerning the Cure amount or adequate assurance for any particular Executory Contract or Unexpired Lease (or if the time period for a non-Debtor to object to the Cure has not yet lapsed), the assumption of such Executory Contract or Unexpired Lease shall be effective as of the date the Bankruptcy Court enters an order resolving any such dispute and authorizing assumption by the Debtor.

## E.    Rejection Claims Bar Date

All proofs of Claims with respect to Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be filed on or before the Rejection Claims Bar Date. Any Claim not filed within such time shall be forever barred.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

## A.    Distributions

Except as otherwise explicitly provided for in the Noteholder Plan, the Disbursing Agent shall be responsible for making Distributions described in the Noteholder Plan. Except as otherwise provided in the Noteholder Plan or the Confirmation Order, all Cash necessary for Reorganized Ahern to make payments pursuant to the Noteholder Plan shall be obtained from a combination of: (i) existing Cash balances and the operations of the Debtor and Reorganized Ahern, (ii) Cash from the Exit Financing Facility; and (iii) Cash from the Backstopped Rights Offering.

## B.    Timing And Calculation Of Amounts To Be Distributed

Except as otherwise provided in the Noteholder Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the

date that such a Claim becomes an Allowed Claim, on the next Distribution Date or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the Distributions that the Noteholder Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. All Distributions provided for in the Noteholder Plan shall be made only to the extent permitted by applicable law. In the event that any payment or act under the Noteholder Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### C.    Rights And Powers Of Disbursing Agent

The Disbursing Agent shall be empowered to: (i) affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Noteholder Plan; (ii) make all Distributions contemplated hereby; (iii) employ Professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by an order of the Bankruptcy Court, pursuant to the Noteholder Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof. The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Persons entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in such property. Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date, including, without limitation, reasonable fees and expenses of counsel, shall be paid in Cash by Reorganized Ahern without further order of the Bankruptcy Court within twenty (20) days of receipt of an invoice by Reorganized Ahern. In the event that Reorganized Ahern objects to the payment of such invoice for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court shall retain jurisdiction to make a determination as to the extent to which the invoice shall be paid by Reorganized Ahern.

With respect to a Holder of a Claim whose Distribution is governed by an agent or other agreement which is administered by an indenture trustee, agent or servicer, such Distributions shall be deposited with the appropriate agent or servicer, who shall then deliver such Distributions to Holders of Claims in accordance with the provisions of the Noteholder Plan and the terms of the relevant indenture or other governing agreement; provided, however, that Distributions to the Disbursing Agent (other than the Debtor or Reorganized Ahern) under the Noteholder Plan will be deemed payment in full, regardless of whether such agent (other than the Debtor or Reorganized Ahern) ultimately distributes such Distribution to the appropriate Claim or Equity Interest Holder.

From and after the Effective Date, the Disbursing Agent shall be exculpated by all Persons and Entities, including, without limitation, Holders of Claims and Equity Interests and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Noteholder Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Noteholder Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or

willful misconduct of such Disbursing Agent. No Holder of a Claim or an Equity Interest or other party in interest shall have or pursue any Claim or Cause of Action against the Disbursing Agent for making payments in accordance with the Noteholder Plan or for implementing the provisions of the Noteholder Plan.

### D.    Providing For Claims Payments

Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent: (i) at the addresses set forth on the proofs of Claim filed by such Holders (or at the last known addresses of such Holders if no proof of Claim is filed or if the Debtor has not been notified of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of Claim; or (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address. If the Second Lien Indenture Trustee consents to direct Distributions to Holders of Second Lien Notes Claims, such Distributions shall be made through the facilities of DTC. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then-current address, at which time all returned Distributions shall be made to such Holder without interest. Amounts in respect of undeliverable Distributions made through the Disbursing Agent shall be returned to Reorganized Ahern until such Distributions are claimed. All claims for undeliverable Distributions shall be made on or before the second (2nd) anniversary of the Effective Date. After such date, all unclaimed property shall revert to Reorganized Ahern and the Claim of any Holder or successor to such Holder with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Noteholder Plan shall require Reorganized Ahern or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### E.    Means Of Cash Payments

Payments of Cash made pursuant to the Noteholder Plan shall be in U.S. dollars and shall be made, at the option and in the discretion of the Debtor or the Disbursing Agent, as the case may be, by (i) checks drawn on, or (ii) wire transfer from, a domestic bank selected by the Debtor or the Disbursing Agent, as the case may be. Cash payments to foreign Creditors may be made, at the option of the Debtor or the Disbursing Agent, in such funds and by such means as are necessary or customary in the applicable foreign jurisdiction.

### F.    Time Bar To Cash Payments

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days from and after the date of issuance thereof. Requests for re-issuance of any check shall be made directly to the Disbursing Agent by the Holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (a) the fifth (5th) anniversary of the Effective Date or (b) 180 days after the date of issuance of such check, if such check represents a final Distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and Reorganized Ahern shall retain all monies related thereto.

### G.    Application Of Record Date

At the close of business on the Record Date, the claims registers for all Claims shall be closed, and there shall be no further changes in the record Holders of Claims.  Except as provided herein, the Debtor, Reorganized Ahern, the Disbursing Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims occurring after the Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record Holders stated on the Claims registers as of the close of business on the Distribution Date irrespective of the number of Distributions to be made under the Noteholder Plan to such Persons or the date of such Distributions.

### H.    Claims Paid By Third Parties

The Debtor, or the Disbursing Agent, as applicable, shall reduce in part or in full a Claim to the extent that the Holder of such Claim receives payment in part or in full on account of such Claim from a party that is not the Debtor or the Disbursing Agent.  To the extent a Holder of a Claim receives a Distribution on account of such Claim receives payment from a party that is not the Debtor or the Disbursing Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the Distribution to Reorganized Ahern, to the extent the Holder's total recovery on account of such Claim from the third party and under the Noteholder Plan exceeds the amount of such Claim as of the date of any such Distribution under the Noteholder Plan.

### I.    Insurance Claims

No Distributions under the Noteholder Plan shall be made on account of Allowed Claims covered by the Debtor's Insurance Policies, including but not limited to Allowed Personal Injury Claims, until the insurance coverage with respect to such Allowed Claims has been exhausted.  To the extent that the Debtor's insurers agree to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurer's agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### J.    Applicability Of Insurance Policies

Except as otherwise provided in the Noteholder Plan, Distributions to Holders of Allowed Claims, including but not limited to Allowed Personal Injury Claims, shall be made in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Noteholder Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### K.    Allocation Of Noteholder Plan Distributions Between Principal And Interest

To the extent that any Allowed Claim entitled to a Distribution under the Noteholder Plan is comprised of principal and accrued but unpaid interest thereon, such Distribution shall, for the Debtor's U.S. federal income tax purposes, be allocated on the Debtor's books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

FENNEMORE CRAIG JONES VARGAS

LAS VEGAS

7926115.1/030988.0001

### L.    Setoffs

Except as provided in the Noteholder Plan, the Debtor or Reorganized Ahern may, but shall not be required to, set off or offset against any Claim, and the payments or other Distributions to be made pursuant to the Noteholder Plan in respect of such Claim, Claims of any nature whatsoever that the Debtor may have against the Claim's Holder; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or Reorganized Ahern of any claim that the Debtor may have against such Holder.  Nothing herein shall be deemed to expand rights to setoff under applicable law.  Unless otherwise provided in an order of the Bankruptcy Court, nothing contained in the Noteholder Plan is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 556, 559, 560, or 561 of the Bankruptcy Code or pursuant to the common law right of recoupment.

### M.    Fractional Distributions

Notwithstanding any other provision of the Noteholder Plan to the contrary, no fractional New Equity Interests or New Warrants to purchase fractional amount of New Equity Interests will be made pursuant to the Noteholder Plan.  Whenever any Distribution would otherwise call for Distribution of a fraction of New Equity Interest or a New Warrant to purchase a fraction amount of New Equity Interests, such number of New Equity Interests or New Warrants to be distributed shall be rounded down to the nearest whole number.

### N.    Prepayment

Except as otherwise provided in the Noteholder Plan, any ancillary documents entered into in connection with the Noteholder Plan, or the Confirmation Order, Reorganized Ahern will have the right to prepay, without penalty, all or any portion of an Allowed Claim entitled to payment in Cash at any time following the Effective Date; provided, however, that any such prepayment will not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

### O.    No Distribution In Excess Of Allowed Amounts

Notwithstanding anything to the contrary set forth in the Noteholder Plan, no Holder of an Allowed Claim will receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding payments on account of interest due and payable from and after the Effective Date pursuant to the Noteholder Plan, if any).

### P.    Joint Distributions

The Debtor or the Disbursing Agent may, in their sole discretion, make Distributions jointly to any Holder of a Claim and any other entity who has asserted, or whom the Debtor has determined to have, an interest in such Claim.  Except as otherwise provided in the Noteholder Plan or in the Confirmation Order, and notwithstanding the joint nature of any Distribution, all Distributions made by the Debtor or the Disbursing Agent will be in exchange for and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor and Reorganized Ahern or any of its assets or properties as set forth in Article III hereof.

**Q.      Statements**

The Debtor and the Disbursing Agent shall maintain a record of the names and addresses of all Holders of Allowed General Unsecured Claims as of the Effective Date for purposes of mailing Distributions to them.  The Debtor and the Disbursing Agent may rely on the name and address set forth in the Schedules and/or proofs of Claim as of the Record Date as being true and correct unless and until notified in writing.  The Debtor and Reorganized Ahern shall file all tax returns and other filings with governmental authorities on behalf of the Debtor and Reorganized Ahern and the Assets it holds.

**R.      Further Authorization**

Reorganized Ahern shall be entitled to seek such orders, judgments, injunctions, and rulings as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions of the Noteholder Plan.

## ARTICLE VII.
## RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

**A.      Resolution Of Disputed Claims**

Holders of Claims must file proofs of Claims on or prior to the applicable Bar Date.  No later than the Claims Objection Deadline (unless extended by an order of the Bankruptcy Court), the Debtor or Reorganized Ahern, as the case may be, shall file objections to Claims that were required to be filed by the applicable Bar Date with the Bankruptcy Court and serve such objections upon Holders of such Claims to which objections are made.  Nothing contained herein, however, shall limit Reorganized Ahern's right to object to Claims, if any, filed or amended after the Claims Objection Deadline.

Holders of Administrative Claims must file a request for payment on or prior to the Administrative Claims Bar Date.  No later than the Administrative Claims Objection Deadline (unless extended by an order of the Bankruptcy Court), the Debtor or Reorganized Ahern, as the case may be, shall file objections to the Administrative Claims with the Bankruptcy Court and serve such objection upon Holders of such Administrative Claims to which objections are made.  Nothing contained herein, however, shall limit Reorganized Ahern's right to object to Administrative Claims, if any, filed or amended after the Administrative Claims Objection Deadline.

**B.      No Distribution Pending Allowance**

No payments or Distributions, if any contemplated by the Noteholder Plan, will be made with respect to all or any portion of a Disputed Claim or Equity Interest unless and until all objections to such Disputed Claims or Equity Interests have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim or Allowed Equity Interest.

### C.    Resolution Of Objections After Effective Date

From and after the Effective Date, Reorganized Ahern may propose settlements of, or withdraw objections to, all pending or filed Disputed Claims and may settle or compromise any Disputed Claim without notice and a hearing and without approval of the Bankruptcy Court.

### D.    Distributions After Allowance

From and after the Effective Date, the Disbursing Agent will make Distributions quarterly (i) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (ii) on account of previously Allowed Claims that would have been distributed to Holders of such Claims on the dates Distributions previously were made to Holders of Allowed Claims in such Class had the Disputed Claims that have become Allowed Claims been Allowed on such dates.  Such Distributions will be made pursuant to the applicable provisions of Article VI hereof.

### E.    Disputed Claims Reserve

From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by Final Order, the Disbursing Agent shall reserve and hold in escrow for the benefit of each Holder of a Disputed Claim and any dividends, gains, or income attributable thereto, in an amount equal to Distributions which would have been made to the Holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the amount of the Disputed Claim, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim ultimately may become an Allowed Claim, or (iii) such other amount as may be agreed upon by the Holder of such Disputed Claim and Reorganized Ahern.  Any amount reserved and held for the benefit of a Holder of a Disputed Claim shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in the event the Disputed Claim ultimately becomes an Allowed Claim.  In the event that a Disputed Claim is not Allowed, in whole or in part, Holders of Allowed Claims in the same Class as the Holder of the Claim that is not Allowed shall receive their Pro Rata share of any amount reserved on account of the Claim that is not Allowed.  Such Cash reserved for the benefit of Holders of Disputed Claims shall be either (x) held by the Disbursing Agent in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States Government and guaranteed by the United States Government, and having (in either case) a maturity of not more than thirty (30) days, for the benefit of such Holders pending determination of their entitlement thereto under the terms of the Noteholder Plan.  No payments or Distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

### F.    Estimation Of Claims

The Debtor (before the Effective Date) or Reorganized Ahern (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate

any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Person, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor (before the Effective Date) or Reorganized Ahern (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Noteholder Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### G.    Deadline To File Objections To Claims

The Debtor reserves its right to file objections to Claims, if any, on or before the applicable Claim Objection Deadline.

### H.    Late-Filed Claims

Except with respect to Claims, proof of which is made in compliance with the requirements of sections 502(e) and 509 of the Bankruptcy Code, no Claim filed after the Bar Date or, as applicable, the Administrative Claims Bar Date, shall be allowed, and all such Claims are hereby disallowed in full. After the Bar Date or the Administrative Claim Bar Date, as applicable, no Creditor shall be permitted to amend any claim to increase the claimed amount, unless permitted by the Bankruptcy Court, subject to the Debtor's or Reorganized Ahern's right to object to such increase; and any such amendment shall be disallowed, unless permitted by the Bankruptcy Court, subject to the Debtor's or Reorganized Ahern's right to object to such increase, to the extent of the late-filed increase in the claimed amount.

### I.    Reservation Of Right To Object To Allowance Or Asserted Priority Of Claims

Nothing herein will waive, prejudice or otherwise affect the rights of the Debtor, Reorganized Ahern or Holders of any Claims to object at any time, including after the Effective Date, to the allowance or asserted priority of any Claim, except with respect to any Allowed Claim.

### ARTICLE VIII.
### CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

### A.    Conditions Precedent To Confirmation

The Confirmation of the Noteholder Plan shall be conditioned upon, and shall not occur, unless and until each of the following conditions have been satisfied or waived pursuant to the terms of this Article VIII:

      i.    The Bankruptcy Court shall have entered an order, in form and in substance acceptable to the Proponents, approving the Noteholder Disclosure Statement with respect to the Noteholder Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

ii.     The Noteholder Plan and all schedules, documents, supplements and exhibits relating to the Noteholder Plan, including, but not limited to, any Noteholder Plan Supplement, shall have been filed in form and in substance acceptable to the Proponents; and

iii.    The proposed Confirmation Order shall be in form and substance acceptable to the Proponents.

**B.      Conditions Precedent To The Effective Date**

The Effective Date shall be conditioned upon, and shall not occur, and the Noteholder Plan shall not be consummated unless and until each of the following conditions have been satisfied or waived pursuant to the terms of this Article VIII:

i.      The Confirmation Order, in form and substance acceptable to the Proponents, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

ii.     The Exit Financing Facility shall have been executed and delivered by all of the Persons that are parties thereto, in a form and substance acceptable to the Proponents, and all conditions precedent to the consummation thereof shall have been waived, or satisfied in accordance with the terms thereof, and funding pursuant to the Exit Financing Facility shall have occurred;

iii.    The Backstopped Rights Offering shall have been consummated and funded by the Investors.

iv.     All documents necessary to implement the transactions contemplated by the Noteholder Plan shall be in form and substance acceptable to the Proponents  and approved by the Bankruptcy Court;

v.      All actions documents, certificates, and agreements necessary to implement the Noteholder Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

vi.     The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtor as contemplated herein in form and substance acceptable to the Proponents;

vii.    Sufficient Cash and other Assets shall be set aside, reserved and withheld by the Debtor to make the Distributions required to be paid on the Effective Date or within sixty (60) days thereafter by the Bankruptcy Code and the Noteholder Plan;

viii.   All authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Noteholder Plan and that are required by law, regulation, or order have been received; and

ix.     The New Equity Interests shall have been authorized in the amounts set forth in the Noteholder Plan and on terms reasonably satisfactory to the Proponents.

**C.     Failure Of Conditions Precedent**

In the event that one or more of the conditions specified in Article VIII(B) hereof have not occurred or been waived as permitted by Article VIII(E) hereof on or before March 1, 2014 or such other date agreed to by the Proponents (i) the Confirmation Order shall be vacated, (ii) no Distributions under the Noteholder Plan shall be made, (iii) the Debtor and all Holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iv) the Debtor's obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims or Equity Interests by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.  For the avoidance of doubt, and notwithstanding anything in the Noteholder Disclosure Statement or the Noteholder Plan to the contrary, if the Noteholder Plan is not confirmed or does not become effective, nothing in the Noteholder Plan or the Noteholder Disclosure Statement shall be construed as a waiver of any rights or Claims of the Noteholders.

**D.     Notice Of Effectiveness**

When all of the steps contemplated by Article VIII(B) hereof have been completed, the Debtor shall file with the Bankruptcy Court and serve upon all Creditors and all potential Holders of Administrative Claims known to the Debtor (whether or not disputed), a Notice of Effective Date of Noteholder Plan.  The Notice of Effective Date of Noteholder Plan shall include notice of the Administrative Claims Bar Date.

**E.     Waiver Of Conditions Precedent**

The Proponents and, if applicable, Reorganized Ahern shall have the right to waive any of the conditions precedent set forth in this Article VIII at any time without leave of or notice to the Bankruptcy Court and without any formal action other than proceeding with consummation of the Noteholder Plan.

**ARTICLE IX.**
**TRANSFER OF ASSETS, DISCHARGE, RELEASES, INJUNCTION AND SETTLEMENT**

**A.     Vesting And Transfer Of Assets And Assumption Of Liabilities**

Subject to and as provided for in the Noteholder Plan, the Assets shall be vested and/or transferred to Reorganized Ahern on the Effective Date, free and clear of all Claims, Liens, encumbrances, and other interests, except as provided herein, and Reorganized Ahern shall assume all obligations required under the Noteholder Plan, which obligations shall be performed by Reorganized Ahern.

FENNEMORE CRAIG JONES VARGAS

LAS VEGAS

7926115.1/030988.0001

### B. Discharge Of Claims

Except as provided in the Noteholder Plan or in the Confirmation Order, the rights afforded under the Noteholder Plan and the treatment of Claims under the Noteholder Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims against the Debtor arising on or before the Effective Date, including any interest accrued on Claims from the Petition Date. In accordance with the foregoing, except as provided in the Noteholder Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other Case debts and liabilities against the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

### C. Claims Enjoined

Except as provided in the Noteholder Plan or the Confirmation Order or agreed to by the Proponents or Reorganized Ahern, as of the Effective Date all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged pursuant to the terms of the Noteholder Plan will be permanently enjoined from taking any enforcement actions on account of any such discharged Claim, debt or other liability, including, but not limited to, (i) commencing or continuing in any manner any action or other proceeding, (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (iii) creating, perfecting or enforcing any Lien or encumbrance, (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or Reorganized Ahern, and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the terms of the Noteholder Plan.

### D. Compromise And Settlement

The allowance, classification, and treatment of all Allowed Claims and their respective Distributions under the Noteholder Plan take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(c) of the Bankruptcy Code. As of the Effective Date, any and all such rights described in the preceding sentence will be settled, compromised, and released pursuant to the Noteholder Plan and any and all such Causes of Action related thereto are settled, compromised, and released pursuant hereto.

### E. Releases

As of the Effective Date, to the fullest extent permitted under applicable law, each of the Released Parties shall be, and shall be deemed to be, released from all Causes of Action owned, held, or which could have been, or may be asserted by, any other Released Party whether prior to or subsequent to the Petition Date but in all cases not subsequent to the Effective Date arising from or related to the Debtor, its Assets, businesses, property or Estate, the Chapter 11 Case, the Noteholder Disclosure Statement, the Noteholder Plan or the solicitation of votes on the Noteholder Plan; provided, however, that nothing herein will in any way limit or modify any and all debts or obligations of the Released Parties or the Substantial Consummation obligations of the Released Parties, as required under the Noteholder Plan, all agreements entered into in connection with the

Noteholder Plan, or any Final Order of the Bankruptcy Court. As of the Effective Date, for good and valuable consideration, each Holder of a Claim or Equity Interest shall, and shall be deemed to, release the Released Parties (other than the Proponents) from any and all Causes of Action, whether arising prior to or subsequent to the Petition Date but in all cases not subsequent to the Effective Date arising from or related to the Debtor, its Assets, businesses, property or Estate the Chapter 11 Case, the Noteholder Disclosure Statement, the Noteholder Plan or the solicitation of votes on the Noteholder Plan; provided, however, that these releases will have no effect on the liability of any Released Party arising out of gross negligence or willful misconduct; and provided further that nothing herein will in any way limit or modify any and all debts or obligations owed pursuant to the Noteholder Plan, or any Final Order of the Bankruptcy Court.

**F.      Exculpation**

The Released Parties shall incur no liability to any Holder of a Claim or Equity Interest for any act, event, or omission in connection with, or arising out of, the Chapter 11 Case, the confirmation of the Noteholder Plan, the solicitation in connection with the Noteholder Plan, the consummation of the Noteholder Plan or the administration of the Noteholder Plan or the property to be distributed under the Noteholder Plan, in each case relating to any fact or circumstance existing prior to or as of the Effective Date, except for gross negligence and willful misconduct or the obligations of any Person or Entity with respect to their obligations pursuant to the Noteholder Plan. Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Noteholder Plan.

**G.      Supplemental Injunction**

In order to preserve and promote the settlements contemplated by and provided for in the Noteholder Plan and as described in Article IX of the Noteholder Plan, except as otherwise expressly provided in the Noteholder Plan or the Confirmation Order, all Persons and any Person claiming by or through them, which have held or asserted, which currently hold or assert, or which may hold or assert any Claims or any other Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies, or liabilities of any nature whatsoever, and all Equity Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Equity Interest in the Debtor, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other Causes of Action, obligations, suits, judgments, damages, debts, rights remedies or liability, and all Equity Interests or other rights of a Holder of an equity security or other ownership interest, arising prior to the Effective Date, including, but not limited to (i) commencing or continuing in any manner any action or other proceeding, (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (iii) creating, perfecting or enforcing any Lien or encumbrance, (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Released Party, and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the terms of the Noteholder Plan.

# ARTICLE X.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such exclusive jurisdiction over the Chapter 11 Case after the Effective Date as is legally permissible, including jurisdiction to:

i.     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance, priority or classification of Claims or Equity Interests;

ii.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Noteholder Plan for periods ending on or before the Effective Date;

iii.   Resolve any matters related to the assumption of any executory contract and unexpired lease to which the Debtor is a party or with respect to which the Debtor or Reorganized Ahern may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any disputed cure amount;

iv.    Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Noteholder Plan;

v.     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor or Reorganized Ahern that may be pending on the Effective Date or brought thereafter prior to the closing of the Chapter 11 Case;

vi.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Noteholder Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Noteholder Plan, the Noteholder Disclosure Statement or the Confirmation Order;

vii.   Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of any order, the Noteholder Plan, the Confirmation Order, or obligations of any Persons incurred in connection with such order, the Noteholder Plan, or the Confirmation Order;

FENNEMORE CRAIG JONES VARGAS

LAS VEGAS

7926115.1/030988.0001

viii.   Modify the Noteholder Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Noteholder Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Noteholder Plan, the Disclosure Statement, the Noteholder Plan Supplement, or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Noteholder Plan, the Noteholder Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Noteholder Plan, the Noteholder Disclosure Statement, the Noteholder Plan Supplement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Noteholder Plan;

ix.     Issue injunctions, enforce the injunctions contained in the Noteholder Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Noteholder Plan or the Confirmation Order;

x.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Noteholder Plan are enjoined or stayed;

xi.     Determine any other matters that may arise in connection with or relate to the Noteholder Plan, the Noteholder Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Noteholder Plan, the Noteholder Disclosure Statement or the Confirmation Order;

xii.    Enter an order closing the Chapter 11 Case;

xiii.   Hear and decide any Claim or Cause of Action of the Debtor or Reorganized Ahern pending on the Effective Date;

xiv.    Decide or resolve any matter over which the Bankruptcy Court has jurisdiction pursuant to section 505 of the Bankruptcy Code;

xv.     Resolve any Disputed Claims;

xvi.    Recover all assets of the Debtor and property of the Debtor's Estate, wherever located, including resolving any Avoidance Actions;

xvii.   Determine the scope of any discharge of the Debtor under the Noteholder Plan or the Bankruptcy Code; and

xviii.  Resolve any disputes regarding whether a Cause of Action constitutes a Retained Cause of Action.

1    _provided_, _however_, that the foregoing is not intended to (1) expand the Bankruptcy Court's
2    jurisdiction beyond that allowed by applicable law, (2) impair the rights of an Entity to (i) invoke the
     jurisdiction of a court, commission, or tribunal, including, without limitation, with respect to matters
3    relating to a governmental unit's police and regulatory powers, and (ii) contest the invocation of any
4    such jurisdiction; _provided_, _further_, that the invocation of such jurisdiction, if granted, shall not
     extend to the allowance or priority of Claims or the enforcement of any money judgment against the
5    Debtor or Reorganized Ahern, as the case may be, entered by such court, commission, or tribunal,
     and (3) impair the rights of an Entity to (i) seek the withdrawal of the reference in accordance with
6    28 U.S.C. § 157(d) and (ii) contest any request for the withdrawal of reference in accordance with 28
     U.S.C. § 157(d).

7
                                      **ARTICLE XI.**
8                            **MISCELLANEOUS PROVISIONS**

9         **A.      Effectuating Documents; Further Transactions; And Timing**

10        Each of the officers of the Debtor and Reorganized Ahern are authorized to execute, deliver,
11   file, or record such contracts, instruments, releases, and other agreements or documents and to take
     such actions as may be necessary or appropriate to effectuate and further evidence the terms and
12   conditions of the Noteholder Plan and any obligations issued transferred, or cancelled pursuant to the
13   Noteholder Plan and transactions contemplated by the Noteholder Plan.  All transactions that are
     required to occur on the Effective Date under the terms of the Noteholder Plan shall be deemed to
14   have occurred simultaneously.  The Debtor and Reorganized Ahern are authorized and directed to do
     such acts and execute such documents as are necessary to implement the Noteholder Plan.

15        **B.      Cancellation Of Existing Agreements**

16        On the latest to occur of (i) the Effective Date; (ii) the entry of an order resolving all Claims
17   in the Chapter 11 Case; and (iii) the final Distribution made to Holders of Allowed Claims in
     accordance with the terms of the Noteholder Plan, unless otherwise provided in the Noteholder Plan,
18   any document, agreement, or instrument evidencing any Disputed Claim that is disallowed shall be
19   deemed automatically cancelled and terminated without further act or action under any applicable
     agreement, law, regulation, order, or rule and the obligations of the Debtor under such documents,
20   agreements, or instruments evidencing such Claims shall be discharged.

21        **C.      Exemption From Transfer Taxes**

22        Pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, Distribution, transfer,
23   or exchange of Estate property; (ii) the creation, modification, consolidation, or recording of any
     deed of trust or other interest, or the securing of additional indebtedness by such means or by other
24   means in furtherance of, or in connection with the Noteholder Plan or the Confirmation Order; (iii)
     the making, assignment, modification, or recording of any lease or sublease; or (iv) the making,
25   delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in
     connection with, the Noteholder Plan, Confirmation Order, or any transaction contemplated above,
26   or any transactions arising out of, contemplated by, or in any way related to the foregoing shall not
27   be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax,
     mortgage tax, stamp act or real estate transfer tax, mortgage recording tax, or other similar tax or
28   governmental assessment and the appropriate state or local government officials or agents shall be,

and hereby are, directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

### D.    Modification Of The Noteholder Plan

Prior to Confirmation, the Proponents may alter, amend, or modify the Noteholder Plan under section 1127(a) of the Bankruptcy Code at any time.  After the Confirmation Date and prior to the Effective Date, the Proponents may, under sections 1127(b), (c), and (d) of the Bankruptcy Code, alter, amend, or modify the Noteholder Plan or institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Noteholder Plan or the Confirmation Order, and to make appropriate adjustments and modifications to the Noteholder Plan or the Confirmation Order as may be necessary to carry out the purposes and effects of the Noteholder Plan, so long as such proceedings do not materially adversely affect the treatment of Holders of Claims under the Noteholder Plan.

### E.    Revocation Of The Noteholder Plan

The Proponents reserve the right to revoke or withdraw the Noteholder Plan at any time prior to the Confirmation Date.  If the Noteholder Plan is withdrawn or revoked or if the Bankruptcy Court denies confirmation of the Noteholder Plan, then the Noteholder Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person, nor shall the withdrawal or revocation of the Noteholder Plan prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.  In the event the Noteholder Plan is withdrawn or revoked, nothing set forth herein shall be deemed an admission of any sort and the Noteholder Plan and any transaction contemplated thereby shall be inadmissible into evidence in any proceeding.

### F.    Term Of Bankruptcy Injunction Or Stays

All injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Upon the Effective Date, the injunction provided in Article IX hereof shall apply.

### G.    Dissolution Of Committee

On the Effective Date, the Committee shall cease to exist, except with respect to any application for compensation or reimbursement of costs and expenses in connection with services rendered prior to the Effective Date, any objection to any Professional Fee Claim, or any appeals of the Confirmation Order.  Following the Effective Date, none of the Committee's professionals shall be precluded from representing any Entity created by the Noteholder Plan.

### H.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable or as provided in any contract, instrument, release, or other agreement entered into in connection with the Noteholder Plan or in any document which remains unaltered by the Noteholder Plan, the rights, duties, and obligations of the Debtor and any other Person arising under the Noteholder Plan shall be

governed by, and construed and enforced in accordance with, the internal laws of the State of Nevada without giving effect to Nevada choice of law provisions.

## I.     Plan Supplement

The Noteholder Plan Supplement shall be filed with the Clerk of the Bankruptcy Court at least seven (7) days prior to the Voting Deadline; provided, however, that the Proponents may amend the documents contained in the Noteholder Plan Supplement, subject to Article XI(D) hereof, through and including the Effective Date in a manner consistent with the Noteholder Plan and the Noteholder Disclosure Statement.  Each of the documents contained in the Noteholder Plan Supplement as to form and substance shall be subject to the consent of the Noteholders, which consent shall not be unreasonably withheld.  Upon its filing with the Bankruptcy Court, the Noteholder Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

## J.     Expedited Tax Determination

Reorganized Ahern may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, Reorganized Ahern for all taxable periods through the Effective Date.

## K.     Post-Confirmation Date Fees And Expenses

From and after the Confirmation Date, Reorganized Ahern shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, (i) retain professionals and (ii) pay the reasonable fees and expenses (including reasonable professional fees and expenses) incurred by the Debtor or Reorganized Ahern, as the case may be, related to implementation and consummation of or consistent with the provisions of the Noteholder Plan.

## L.     Substantial Consummation

On the Effective Date, the Noteholder Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## M.     Exhibits/Schedules

All exhibits and schedules to the Noteholder Plan, including the Noteholder Plan Supplement, are incorporated into and are a part of the Noteholder Plan as if set forth in full herein.

## N.     Closing Of The Chapter 11 Case

Reorganized Ahern shall, promptly upon the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court.

## O.     Severability Of Noteholder Plan Provisions

If, prior to Confirmation, any term or provision of the Noteholder Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to

alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Noteholder Plan to the extent that the general intent of the Noteholder Plan can be effectuated will remain in full force and effect and will in no way be affected, Impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Noteholder Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### P.    Withholding And Reporting Requirements

In connection with the Noteholder Plan and all instruments issued in connection therewith and Distributions thereon, Reorganized Ahern shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. Reorganized Ahern shall be authorized to take any and all action that may be necessary to comply with such withholding and recording requirements. Notwithstanding any other provision of the Noteholder Plan, each Holder of an Allowed Claim that has received a Distribution pursuant to the Noteholder Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding, and other tax obligation on account of such Distribution.

### Q.    Fees And Reporting To The U.S. Trustee

Prior to the Effective Date, the Debtor, and after the Effective Date, the Reorganized Ahern, is obligated to pay the U.S. Trustee quarterly fees based upon all disbursements in accordance with the sliding scale set forth in 28 U.S.C. § 1930(a)(6). These fees accrue throughout the pendency of the Chapter 11 Case and until entry of a final decree. U.S. Trustee fees paid prior to confirmation of the Noteholder Plan will be reported in operating reports required by sections 704(8), 1106(a)(1), 1107(a) of the Bankruptcy Code and the United States Trustee Guidelines. All U.S. Trustee quarterly fees accrued prior to confirmation of the Noteholder Plan will be paid on or before the Effective Date pursuant to section 1129(a)(12) of the Bankruptcy Code. All U.S. Trustee fees accruing post-confirmation are due on a calendar quarter basis and reported both on post-confirmation operating reports and in post-confirmation operating reports required by the United States Trustee Guidelines.

### R.    Binding Effect

The Noteholder Plan shall be binding upon and inure to the benefit of the Debtor and the Estate, Reorganized Ahern and all present and former Holders of Claims against and Equity Interests in the Debtor, whether or not such Holders will receive or retain any property or interest in property under the Noteholder Plan, their respective successors and assigns, including, without limitation, all other parties in interest in the Chapter 11 Case.

# ARTICLE XII.
## CONFIRMATION AND CONSUMMATION PROCEDURE

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan.  As of the date of the filing of the Noteholder Plan and Noteholder Disclosure Statement, the Proponents have requested, pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors, equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to section 1128(b) of the Bankruptcy Code, any party in interest may object to confirmation of a plan of reorganization.  Any objection to Confirmation of the Noteholder Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon the Debtor, the U.S. Trustee, all creditors and indenture trustees in accordance with Bankruptcy Rule 2002(b).

### B.    Plan Confirmation Requirements Under The Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Noteholder Plan satisfies the requirements of chapter 11 of the Bankruptcy Code that must be satisfied in order for a plan to be confirmed.  Specifically, in addition to other applicable requirements, the Proponents believe that the Noteholder Plan satisfies or will satisfy the following requirements of section 1129 of the Bankruptcy Code:

(a)    The Proponents, as the proponents of the Noteholder Plan, have complied with the applicable provisions of the Bankruptcy Code.

(b)    The Noteholder Plan has been proposed in good faith and not by any means forbidden by law.

(c)    Any payment made or promised by the Debtor or by a person acquiring property under the Noteholder Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Noteholder Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment: (i) made before the confirmation of the Noteholder Plan is reasonable; or (ii) is subject to the approval of the Bankruptcy Court as reasonable, if such payment is to be fixed after confirmation of the Noteholder Plan.

(d)    The Proponents, as proponents of the Noteholder Plan, will disclose the identity and affiliations of any individual proposed to serve, after confirmation of the Noteholder Plan, as the plan administrator, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy.

(e)      The Proponents will disclose the identity of any Insider that will be employed or retained as or by the plan administrator and the nature of any compensation for such Insider.

(f)      Each Holder of an Impaired Claim or Equity Interest either has accepted the Noteholder Plan or will receive or retain under the Noteholder Plan, on account of such Holder's Claim or Equity Interest, property of a value as of the Effective Date that is not less than the amount such Holder would receive or retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code (the "best interests" test).

- The starting point in determining whether the Noteholder Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the hypothetical liquidation of the Debtor's assets in the context of a chapter 7 liquidation (such amount, the "Liquidation Proceeds"). The Liquidation Proceeds must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Case and allowed under chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses, a chapter 7 trustee's fees and the fees and expenses of professionals retained by the chapter 7 trustee). The potential chapter 7 liquidation distribution in respect of each Class must be reduced further by costs imposed by the delay caused by conversion to chapter 7. In addition, inefficiencies in the claims resolution process in a chapter 7 would negatively impact the recoveries of creditors. The net present value of a hypothetical chapter 7 liquidation distribution in respect of an Impaired Claim is then compared to the recovery provided by the Noteholder Plan for such Impaired Claim.

- To support its opinion that the Noteholder Plan meets the best interest test, the Proponents have reviewed the Debtor's Liquidation Analysis attached as Exhibit B hereto (the "Debtor's Liquidation Analysis"). The Proponents have not had sufficient access to the Debtor's books and records and management to independently verify the Liquidation Analysis and its underlying assumptions. The Proponents' reference to the Debtor's Liquidation Analysis is for purposes of this Disclosure Statement only, and is not and should not be construed as an endorsement thereof or any waiver of any right to challenge the Debtor's Liquidation Analysis or as an acknowledgement or admission as to the accuracy thereof. Notwithstanding the foregoing, based on the Debtor's liquidation analysis the Proponents are of the opinion that the Noteholder Plan meets the best interests test.

(g)      Except to the extent the Noteholder Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests either has accepted the Noteholder Plan or is not an Impaired Class under the Noteholder Plan.

(h)      Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Noteholder Plan provides that Administrative Claims, Priority Tax Claims and Other Priority Claims will be paid in full or otherwise treated in accordance with section 1129(a)(9) of the Bankruptcy Code as required by the Bankruptcy Code.

(i)    At least one Impaired Class has accepted the Noteholder Plan, determined without including any acceptance of the Noteholder Plan by any Insider holding a Claim in such Impaired Class.

(j)    Confirmation of the Noteholder Plan is not likely to be followed by the liquidation or the need for further financial reorganization of any successor to the Debtor under the Noteholder Plan, unless such liquidation or reorganization is proposed in the Noteholder Plan.  In order to determine whether the Noteholder Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code, the Proponents have analyzed the Debtor's ability to meet its obligations under the Noteholder Plan.  As part of this analysis, the Proponents have reviewed the projections set forth in the Debtor's Disclosure Statement (the "Debtor Projections") filed with the Bankruptcy Court on November 30, 2012.  The Proponents have not had sufficient access to the Debtor's books and records and management to independently verify the accuracy of the Debtor Projections.  The Proponents have sought and continue to seek further information from the Debtor to understand, analyze and verify the Debtor Projections and their underlying assumptions.  The Proponents' reference to the Debtor Projections for purposes of this Disclosure Statement is not and should not be construed as an endorsement thereof or any waiver of any right to challenge the Debtor Projections or as any acknowledgement or admission as to the accuracy thereof.

(k)    All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee will be paid as of the Effective Date.

## C.    "Cramdown" Under Section 1129(B) Of The Bankruptcy Code

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a chapter 11 plan of reorganization even if not all impaired classes have accepted the plan, provided that such plan has been accepted by at least one impaired class.  The Proponents will seek to confirm the Noteholder Plan notwithstanding its rejection by any of the Impaired Classes.

In order to obtain such nonconsensual confirmation (or "cramdown") of the Noteholder Plan, the Proponents must demonstrate to the Bankruptcy Court that the Noteholder Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that voted to reject the Noteholder Plan (each such Impaired Class, a "Non-Accepting Class").

### 1.    Fair And Equitable Test

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" and sets different standards for secured creditors, unsecured creditors, and equity holders, as follows:

a.    Secured Creditors

With respect to Non-Accepting Classes of Secured Claims, the "fair and equitable" test requires that either: (A) each impaired secured creditor retains the liens securing its allowed secured claim and receives on account of that claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (B) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (A) or (B) of this paragraph; or (C) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim.

b.    Unsecured Creditors

With respect to Non-Accepting Classes of Unsecured Claims, the "fair and equitable" test requires that (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of any claims (or equity interests) that are junior to the Non-Accepting Class will not receive any property under the Noteholder Plan. (This provision is often referred to as the "absolute priority" rule.)

c.    Equity Interests

With respect to the Equity Interests Class, the "fair and equitable" test requires that (i) the Noteholder provides that each Holder of an Allowed Equity Interest receives or retains on account of such Allowed Equity Interest property of a value, as of the Effective Date of the Noteholder Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such Holder is entitled, any fixed redemption price to which such Holder is entitled, or the value of such Allowed Equity Interest; or (ii) the Holder of any Allowed Equity Interest that is junior to the Allowed Equity Interest of such class will not receive or retain any property under the Noteholder Plan on account of such junior interest.

## 2.    No Unfair Discrimination

A plan does not "discriminate unfairly" with respect to a Non-Accepting Class if the value of the cash and/or securities to be distributed to the class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the Non-Accepting Class.  Exact parity is not required.  The Proponents believe that any discrepancy in treatment or potential Distributions to otherwise Unsecured Creditors is objectively small and justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.

To the extent necessary, the Proponents will establish at the Confirmation Hearing that each of these requirements has been satisfied under the Noteholder Plan.

## D.    Notice To Holders Of Claims And Equity Interests

Approval by the Bankruptcy Court of the Noteholder Disclosure Statement means that the Bankruptcy Court has found that the Noteholder Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims and Equity Interests entitled to vote on the Noteholder Plan to make an informed judgment about whether to accept or reject the Noteholder Plan.   THE BANKRUPTCY COURT'S APPROVAL OF THE NOTEHOLDER DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE NOTEHOLDER PLAN BY THE BANKRUPTCY COURT.

IF THE NOTEHOLDER PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE NOTEHOLDER PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN,

THE DEBTOR, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE NOTEHOLDER PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE NOTEHOLDER PLAN.   THUS ALL HOLDERS OF CLAIMS OR INTERESTS AGAINST THE DEBTOR ENTITLED TO VOTE ARE ENCOURAGED TO READ THE NOTEHOLDER DISCLOSURE STATEMENT AND ITS APPENDICES, SUPPLEMENTS AND/OR EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE NOTEHOLDER PLAN.

THE NOTEHOLDER DISCLOSURE STATEMENT AND THE NOTEHOLDER PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE NOTEHOLDER PLAN.  No solicitation of votes may be made except after distribution of the Noteholder Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor other than the information contained herein or therein.  No such information should be relied upon in making a determination to vote to accept or reject the Noteholder Plan.

### E.    Voting On The Noteholder Plan

The Noteholder Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Noteholder Plan from Holders of Claims against and Equity Interests in the Debtor, which procedures are described below.

### 1.    Classes Entitled To Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of claims or interests that are members of a class that (a) is "impaired" within the meaning of section 1124 of the Bankruptcy Code (each, an "Impaired Class") and (b) is not deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code are entitled to vote to accept or reject a plan of reorganization (each, a "Voting Class").

Under the Noteholder Plan, the Voting Classes are Classes 4, 5, and 8.  Holders of record of Claims or Equity Interests as of [_____], 2013 that are classified in Voting Classes have been sent a copy of this the Noteholder Plan and this Noteholder Disclosure Statement (the "Noteholder Solicitation Package") and an appropriately customized ballot to vote on the Noteholder Plan (a "Ballot").

Classes of claims or interests that are not impaired (the "Non-Voting Classes") under section 1124 of the Bankruptcy Code are conclusively presumed to have accepted the plan and are not entitled to vote to accept or reject the plan.  Holders of record of Claims or Equity Interests will receive a copy of the Noteholder Solicitation Package and a notice of non-voting status.

### 2.    Votes Required For Acceptance Of The Noteholder Plan By A Class

Pursuant to the Bankruptcy Code, (i) a class of claims is considered to have accepted a proposed plan of reorganization if the plan is accepted by more than one-half (1/2) in number of the class members that actually voted on the plan, holding at least two-thirds (2/3) in dollar amount of the claims in that class for which a valid Ballot was submitted; and (ii) a class of interests has accepted a plan if such plan has been accepted by holders of such interests (other than any entity

whose vote has been designated by the Bankruptcy Court) that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests. Thus, for each of Classes 4 and 5 under the Noteholder Plan, the Class will have accepted the Noteholder Plan if, of the total number of Class members that vote, more than one-half (1/2) vote to accept the Noteholder Plan, and such majority of voters holds at least two-thirds (2/3) of the total dollar amount of the Claims in that Class for which a Ballot was properly submitted. For Class 8 under the Noteholder Plan, the Class will have accepted the Noteholder Plan if, of the total number of Class members that vote, more than two-thirds in amount of the Allowed Equity Interests in that Class vote to accept the Noteholder Plan.

### 3.    Tabulation Of Votes

A vote to accept or reject the Noteholder Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not cast in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. A Ballot that does not indicate the acceptance or rejection of the Noteholder Plan or that indicates both acceptance and rejection of the Noteholder Plan will be disregarded. If the Holder of a Claim or Equity Interest does not properly submit its Ballot, or that Holder's vote is disregarded, that Holder and that Holder's Claim or Equity Interest will not be included in deciding whether the requisite number of Class members and amount of Claims or Equity Interests voted to accept or reject the Noteholder Plan.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of the Noteholder Plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. Holders of Claims and Equity Interests should assume that, if one or more of the Classes of Claims or Equity Interests entitled to vote on the Noteholder Plan reject the Noteholder Plan, the Proponents will request confirmation of the Noteholder Plan pursuant to section 1129(b) of the Bankruptcy Code at the currently scheduled Confirmation Hearing. *For a more detailed description of the requirements for confirmation of a plan that has been rejected by one or more classes, please see Article XII hereof.*

### 4.    Voting Instructions

If you are entitled to vote on the Noteholder Plan, a Ballot is enclosed with this Noteholder Disclosure Statement. If you are entitled to vote in more than one Class, you will receive separate Ballots for each Claim or Equity Interest, which must be used for each separate Class when voting on the Noteholder Plan. Please refer to your Ballot and the Noteholder Disclosure Statement Order for more specific instructions on voting on the Noteholder Plan.

**If you are a Holder of record of a Claim:**

Please vote and return your Ballot(s) in accordance with the instructions set forth herein and in the instructions accompanying your Ballot(s), to:

>       Ahern Equipment Rentals Claims Processing
>       c/o Kurtzman Carson Consultants LLC
>       2335 Alaska Avenue
>       El Segundo, CA 90245

**TO BE COUNTED, YOUR EXECUTED BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE NOTEHOLDER PLAN MUST BE RECEIVED AT THE ADDRESS ABOVE NO LATER THAN 4:00 P.M. (PREVAILING PACIFIC TIME) ON [_____], 2013 (THE "VOTING DEADLINE").  ANY BALLOT RECEIVED THAT IS NOT EXECUTED, DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE NOTEHOLDER PLAN, OR INDICATES BOTH ACCEPTANCE AND REJECTION OF THE NOTEHOLDER PLAN WILL BE DISREGARDED.  DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.  FACSIMILE BALLOTS WILL NOT BE ACCEPTED.**

### 5.    Inquiries

If you are a Holder of a Claim or Equity Interest entitled to vote on the Noteholder Plan and either did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have questions about the procedures for voting your Claim or Equity Interest, or about the packet of materials that you received, please contact Kurtzman Carson Consultants LLC (the "Voting Agent"), at 2335 Alaska Avenue, El Segundo, CA 90245, Attention: Ahern Equipment Rentals Claims Processing, or by telephone at (877) 606-7652.

If you wish to obtain additional copies of the Noteholder Plan, this Noteholder Disclosure Statement, the Noteholder Plan Supplement or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact Fennemore Craig Jones Vargas, 300 South Fourth Street, Suite 1400, Las Vegas, Nevada 89101, Attention: Laurel E. Davis, Esq. by telephone at (702) 692-8000 or by electronic mail at ldavis@fclaw.com, or by downloading such documents (excluding the Ballots) from the Debtor's restructuring website at http://www.kccllc.net/Ahern.

### ARTICLE XIII.
### ISSUANCE AND DISTRIBUTION OF NEW SECURITIES AND RELATED MATTERS

### A.    Issuance Of New Equity Interests In Reorganized Ahern

Reorganized Ahern shall be organized as a Delaware limited liability company.  The New Equity Interests will be comprised of the membership interests in Reorganized Ahern issued to satisfy the Second Lien Claims, the participants in the Backstopped Rights Offering and the exercise of any New Warrants.

### B.    Issuance Of Rights Offering Equity Interests

As presently contemplated, pursuant to the Backstopped Rights Offering, eligible Holders of Second Lien Notes will receive a non-transferable right (a "Subscription Right") entitling such Holder to purchase its pro-rata share of up to $15 million of New Equity Interests, based on the ultimate enterprise value of Reorganized Ahern as determined by the Bankruptcy Court.  Additional terms of the Rights Offering will be set forth in a term sheet annexed to the Backstopped Rights Offering Agreement, and shall include any requirements that must be satisfied for the Backstopped Rights Offering to be exempt from the Securities Act pursuant to Section 1145 of the Bankruptcy Code.  The Backstopped Rights Offering Agreement will be filed with the Noteholder Plan Supplement.

### C.    Issuance Of New Warrants

In the event that the Holders of Allowed Equity Interests in Class 8 vote to accept the Plan, Reorganized Ahern shall issue New Warrants, which shall entitle the Holders to acquire up to 3% of the New Equity of Reorganized Ahern, pursuant to the terms of the New Warrant Agreement, which shall be filed with the Noteholder Plan Supplement.

### D.    Management Equity Incentive Program

At the discretion of the New Board of Directors of Reorganized Ahern, after the Effective Date Reorganized Ahern may adopt a Management Equity Incentive Plan for the purpose of granting awards over time to directors, officers and employees of Reorganized Ahern.  Any awards granted pursuant to the Management Equity Incentive Program shall be subject to a vesting schedule and other customary conditions.  Awards granted pursuant to the Management Equity Incentive Program shall not exceed 10% of the New Equity Interests in Reorganized Ahern on a fully diluted basis.

### ARTICLE XIV.
### U.S. SECURITIES LAW MATTERS

Except as set forth below, any and all debt instruments and equity securities to be issued in conjunction with the Noteholder Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code or, if applicable, in reliance on the exemption set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering.  Therefore, the securities issued pursuant to a section 1145 exemption may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states.  However, recipients of securities issued under the Noteholder Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(l) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, or (b) offers to sell securities offered or sold under the Noteholder Plan for the holders of such securities, or (c) offers to buy securities issued under the Noteholder Plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the Noteholder Plan, with the consummation of the Noteholder Plan or with the offer or sale of securities under the Noteholder Plan, or (d) is an issuer, as used in section 2(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in section 2(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer." Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed "underwriters" receive securities under the Noteholder Plan, resales of such securities would not be exempted by the operation of section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law, Holders of such restricted securities may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE ISSUER, THE PROPONENTS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE ANY SECURITIES TO BE DISTRIBUTED PURSUANT TO THE NOTEHOLDER PLAN. ACCORDINGLY, THE PROPONENTS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES UNDER THE NOTEHOLDER PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## ARTICLE XV.
## FINANCIAL INFORMATION AND PROJECTIONS

### A.    Financial Projections

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Noteholder Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Noteholder Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. To support its opinion that the Noteholder Plan is feasible, the Proponents have reviewed the Debtor Projections. The Proponents have not had sufficient access to the Debtor's books and records and management to independently verify the accuracy of the Debtor Projections. The Proponents have sought and continue to seek further information from the Debtor to understand and analyze the Debtor Projections and their underlying assumptions. The Proponents' reference to the Debtor Projections for purposes of this Disclosure Statement is not and should not be construed as an endorsement thereof or any waiver of any right to challenge the Debtor Projections or as any acknowledgement to the accuracy thereof. Without limiting the foregoing, the Debtor Projections indicate that Reorganized Ahern should have sufficient cash flow to pay and service its debt obligations under the Noteholder Plan and to fund its operations, particularly in light of the substantial debt reduction

proposed by the Noteholder Plan. Accordingly, the Proponents believe that the Noteholder Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code.

**B.    Reorganization Value**

Based upon the information in the Debtor's Disclosure Statement and other information provided by the Debtor or available through public resources, the Proponents, with the assistance of their financial advisor, Houlihan Lokey, believe that the Debtor's enterprise value does not exceed the amount of its existing liabilities to secured and unsecured creditors. More specifically, the Proponents intend to prove at the Confirmation Hearing regarding the Noteholder Plan that that the Debtor's enterprise value is less than the aggregate amount of the amounts that it owes with respect to the DIP Loan Agreement, the First Lien Term Loan Claims and the Second Lien Note Claims.

**ARTICLE XVI.**
**RISK FACTORS**

THE IMPLEMENTATION OF THE NOTEHOLDER PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED IN THE RISK FACTORS SET FORTH BELOW.

PRIOR TO VOTING TO ACCEPT OR REJECT THE NOTEHOLDER PLAN, HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS NOTEHOLDER DISCLOSURE STATEMENT, THE DOCUMENTS DELIVERED TOGETHER WITH THIS NOTEHOLDER DISCLOSURE STATEMENT AND THE NOTEHOLDER PLAN SUPPLEMENT. THE RISK FACTORS SET FORTH BELOW SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE NOTEHOLDER PLAN AND ITS IMPLEMENTATION.

The Noteholder Plan sets forth the means for satisfying the Claims against the Debtor. The reorganization of the Debtor's business and operations under the proposed Noteholder Plan avoids the potentially adverse impact of a sale or liquidation on the Debtor's customers, suppliers, employees, communities, and the recoveries that Creditor and Equity Interests are projected to receive under the Noteholder Plan.

**A.    Certain Bankruptcy Considerations**

**1.    Risk Of Non-Confirmation Of The Noteholder Plan**

The Noteholder Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date. In order for the Proponents to implement the Noteholder Plan, the Proponents must obtain approval of the Noteholder Plan from the Debtor's creditors and confirmation of the Noteholder Plan through the Bankruptcy Court, and then successfully implement the Noteholder Plan. The foregoing process requires the Proponents to: (a) meet certain statutory requirements with respect to the adequacy of this Noteholder Disclosure Statement; (b) solicit and obtain creditor acceptances of the Noteholder Plan; and (c) fulfill other statutory conditions with respect to the confirmation of the Noteholder Plan.

FENNEMORE CRAIG JONES VARGAS

LAS VEGAS

7926115.1/030988.0001

The Proponents may or may not receive the requisite acceptances to confirm the Noteholder Plan. If the requisite acceptances of the Noteholder Plan are received, the Proponents will seek confirmation of the Noteholder Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Proponents will nevertheless seek confirmation of the Noteholder Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as long as at least one Impaired Class has accepted the Noteholder Plan (determined without including the acceptance of any "insider" in such Impaired Class).

Even if the requisite acceptances of the Noteholder Plan are received, or the Proponents are able to seek a "cramdown" confirmation, the Bankruptcy Court may not confirm the Noteholder Plan as proposed. A Holder of a Claim in a Non-Accepting Class could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could decline to confirm the Noteholder Plan if it found that any of the statutory requirements for confirmation had not been met. See Article XII hereof for a discussion of these requirements.

The Bankruptcy Court may determine that the Noteholder Plan does not satisfy one or more of these applicable requirements, in which case the Noteholder Plan could not be confirmed by the Bankruptcy Court. If the Noteholder Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor would be able to reorganize its businesses and what, if any, Distributions Holders of Claims and Equity Interests ultimately would receive with respect to their Claims or Equity Interests. In addition, there can be no assurance that the Proponents will be able to successfully develop, prosecute, confirm, and consummate an alternative plan of reorganization with respect to the Chapter 11 Case that is acceptable to the Bankruptcy Court and the Holders of Claims and Equity Interests.

### 2. Risk Of Non-Occurrence Or Delayed Occurrence Of Effective Date

The Noteholder Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Noteholder Disclosure Statement, there can be no assurance that any or all of the conditions in the Noteholder Plan will be satisfied (or waived) at all, or within anticipated timeframes. Although the Proponents anticipate that the Effective Date will occur soon after the Confirmation Date, if any, there can be no assurance as to such timing. If each of the conditions precedent is not satisfied or duly waived, the Confirmation Order will be vacated without further order of the Bankruptcy Court, in which event the Noteholder Plan would be deemed null and void. If the Effective Date is unduly delayed, the Debtor's relationships with its customers, vendors, employees, and partners could be adversely affected, and the cost of the Debtor's Chapter 11 Case could also materially increase.

### 3. Risk That Claims Will Be Higher Than Estimated

There can be no assurance that any estimated Claim amounts set forth in the Noteholder Disclosure Statement are correct. The actual allowed amount of Claims might differ materially in some respects from the estimates as the estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, the actual allowed amount of Claims may vary materially from those estimated herein.

### B.    Business Risks

#### 1.    The Debtor's Actual Financial Results May Vary Significantly From The Projections

The Projections were prepared by the Debtor's management in consultation with its professional advisors.  The Projections have not been examined or compiled by independent accountants.  While the Debtor has presented the Projections with numerical specificity, they have stated that they have necessarily based the Projections on a variety of estimates and assumptions that may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the Debtor's and the Reorganized Debtor's control.  The Proponents do not and cannot make any representations as to the accuracy of the Projections or to the Debtor's or the Reorganized Debtor's ability to achieve the projected results.  Some assumptions inevitably will not materialize.  Furthermore, events and circumstances occurring subsequent to the date on which the Projections were prepared may differ from any assumed facts and circumstances.  Alternatively, any events and circumstances that come to pass may well have been unanticipated, and thus may affect financial results in a materially adverse or materially beneficial manner.  The Projections, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur.  In addition, the value of the New Equity Interests may be adversely affected by the Debtor's failure to achieve operating results that meet or exceed the Projections.

#### 2.    Failure To Attract And Maintain Employees May Adversely Affect The Debtor's Financial Results

The Debtor's experienced and skilled employees have the ability to leave the Debtor and deprive the Debtor of valuable skills and knowledge that contribute substantially to its business operations.   In the event that the Debtor's employees cease employment with Reorganized Ahern, it is not clear that Reorganized Ahern will be able to replace such personnel with comparable personnel.  Because the Debtor's success depends to a significant degree upon the continued contributions of its employees, employee attrition may hinder the Debtor's ability to operate efficiently, which could have a material adverse effect on their results of operations and financial condition.  In addition, upon emergence from the Chapter 11 Cases, the Debtor may need to attract and retain new personnel, including key management, sales, marketing, and other personnel.  Accomplishing this may be difficult due to many factors, including uncertainty created by the Debtor's Chapter 11 Case. The failure to continue to attract and retain such individuals could materially adversely affect Reorganized Ahern's ability to compete.

#### 3.    Change Of Control

Don F. Ahern, the Debtor's president has publicly indicated that if a competing plan is confirmed that does not leave him in control of Reorganized Ahern he will terminate his association with Reorganized Ahern and form a competing equipment rental business.

#### 4.    Risk Associated With Potential Loss Of Affiliated Leases

The Debtor leases numerous properties for its operation from entities controlled by and/or affiliated with Don F. Ahern and his family members.  According to the Debtor, these leased locations are important to the Debtor's business and operations.  According to the Debtor, these

FENNEMORE CRAIG JONES VARGAS

LAS VEGAS

Affiliated Leases expire in October 2014 and they have not yet been assumed by the Debtor in the Chapter 11 Case. If the affiliated lessors terminated the Affiliated Leases or the Affiliated Leases were unable to be assumed or renewed, the loss of these locations could adversely effect the business operations and prospects of the Debtor and Reorganized Ahern. There can be no assurance that Mr. Ahern or his affiliated entities will permit the Debtor or Reorganized Ahern to continue their use of the properties subject to the Affiliated Leases.

**5.      Risk Of Competition**

As did the Debtor, Reorganized Ahern will face intense competition which could adversely affect its operations and harm financial condition. For example, Reorganized Ahern cannot ensure that a new equipment rental or sales company will not commence operations in the same markets in which the Debtor currently operates or that an existing competitor will not increase capacity or lower prices in such markets.

**6.      Environmental Risks**

The Proponents are not aware of any environmental condition at any of the Debtor's properties that the Proponents consider material. However, it is possible that future environmental laws and regulations, or new interpretations of existing environmental laws, will impose material environmental liabilities on the Debtor, or that current environmental conditions of properties that the Debtor owns or operates will be adversely affected by hazardous substances associated with other nearby properties or the actions of unrelated third parties. The cost to defend any future environmental claims, perform any future environmental remediation, satisfy any environmental liabilities, or respond to changed environmental conditions could have a material adverse effect on the Debtor's financial condition and operating results.

**7.      Leverage Risk**

The Noteholder Plan Proponents believe that the Debtor will emerge from Chapter 11 with a reasonable level of debt that can be effectively serviced in accordance with the Noteholder Plan Proponents' business plan, especially with the equitization of the Second Lien Notes Claims and the resulting substantial deleveraging. Circumstances, however, may arise which might cause the Noteholder Plan Proponents to conclude that the Debtor is overleveraged, which could have significant negative consequences, including:

i.      It may become more difficult for Reorganized Ahern to satisfy its obligations with respect to all of its obligations;

ii.     Reorganized Ahern may be vulnerable to a downturn in the markets in which it operates or a downturn in the economy in general;

iii.    Reorganized Ahern may be required to dedicate a substantial portion of its cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements;

iv.     Reorganized Ahern may be limited in its flexibility to plan for, or react to, changes in its business and the industry in which it operates or entry of new competitors into its markets;

FENNEMORE CRAIG JONES VARGAS

LAS VEGAS

7926115.1/030988.0001

v.    Reorganized Ahern may be placed at a competitive disadvantage compared to its competitors that have less debt, including with respect to implementing effective pricing and promotional programs; and

vi.    Reorganized Ahern may be limited in borrowing additional funds.

Additionally, there may be factors beyond the control of Reorganized Ahern that could impact its ability to meet debt service requirements. The ability of Reorganized Ahern to meet debt service requirements will depend on its future performance, which, in turn, will depend on Reorganized Ahern's ability to sustain sales or rental conditions in the markets in which Reorganized Ahern operates, the economy generally, and other factors that are beyond its control. The Proponents can provide no assurance that the business of Reorganized Ahern will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable Reorganized Ahern to pay its indebtedness or to fund its other liquidity needs. Moreover, Reorganized Ahern may need to refinance all or a portion of its indebtedness on or before maturity. The Proponents cannot make assurances that Reorganized Ahern will be able to refinance any of its indebtedness on commercially reasonable terms or at all. If Reorganized Ahern is unable to make scheduled debt payments or comply with the other provisions of its debt instruments, its various lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

### 8.    Litigation Risks

Reorganized Ahern will be subject to various claims and legal actions arising in the ordinary course of its business. The Proponents are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on Reorganized Ahern.

### 9.    Adverse Publicity

Adverse publicity or news coverage relating to Reorganized Ahern, including but not limited to publicity or news coverage in connection with the Chapter 11 Case, may negatively impact Reorganized Ahern's efforts to establish and promote name recognition and a positive image after the Effective Date.

### C.    Risks To Creditors Who Will Receive New Equity Interests

The ultimate recoveries under the Plan to Holders of Claims that receive New Equity Interests pursuant to the Plan will depend on the realizable value of the New Equity Interests. The New Equity Interests will be subject to a number of material risks, including, but not limited to, those specified below. Prior to voting on the Plan, each Holder of Claims that are to be satisfied in whole or part through a distribution of New Equity Interests should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Plan.

1.      **The Lack Of An Established Market For The New Equity Interests May Adversely Affect Liquidity**

No established market exists for the New Equity Interests and there can be no assurance that an active market for the New Equity Interests will develop, nor can any assurance be given as to the prices at which such securities might be traded.  If a trading market for the New Equity Interests does not develop or is not maintained, holders of New Equity Interests may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such market were to exist, such securities could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, Reorganized Ahern's performance and investor expectations thereof.  In addition, some persons who receive New Equity Interests may prefer to liquidate their investment in the near term rather than hold such securities on a long-term basis.  Accordingly, any market for such securities may be volatile, at least for an initial period following the Effective Date, and may be depressed until the market has had time to absorb any such sales and to observe Reorganized Ahern's performance.

2.      **Lack Of Dividends May Adversely Affect Liquidity Of The New Equity Interests**

The Projections do not anticipate that cash dividends or other distributions will be made with respect to the New Equity Interests in the foreseeable future.  In addition, covenants in certain debt instruments to which Reorganized Ahern will be a party may restrict their ability to pay dividends and make certain other payments.  Further, such restrictions on dividends may have an adverse impact on the market demand for the New Equity Interests as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

3.      **Future Sales Or Issuances Of Equity May Depress The Price Of The New Equity Interests**

If holders of New Equity Interests sell substantial amounts of New Equity Interests or Reorganized Ahern issues substantial additional amounts of its equity securities, or there is a belief that such sales or issuances could occur, the market price of the New Equity Interests could decline significantly.  If Holders who receive New Warrants in connection with the implementation of the Plan exercise such warrants and purchase a significant number of shares of New Equity Interests, the market price of the New Equity Interests may be adversely affected.  In addition, any new issuances of equity securities by Reorganized Ahern including as a result of warrant exercises, may be dilutive to existing stockholders of Reorganized Ahern.

4.      **Certain Provisions Of The Reorganized Ahern Organizational Documents, Including Provisions That Restrict Holders' Ability To Transfer Their New Equity Interests Could Impact The Attractiveness Of The New Equity Interests To Investors And, As A Result, Their Market Value**

The Reorganized Ahern Organizational Documents, including the limited liability operating agreement, will contain restrictions on unitholders' ability to transfer New Equity Interests and certificates representing membership interests in Reorganized Ahern may bear a legend restricting

the sale, transfer, assignment, conversion or other disposal of such securities. Such transfer restrictions, together with drag along and tag along and related provisions and certain Holders' ability to nominate their representatives to the Board of Managers of Reorganized Ahern may limit Holders' ability to sell or transfer their New Equity Interests, and will likely prevent or limit the establishment of a liquid trading market for the New Equity Interests.

### D.    Certain U.S. Federal Income Tax Considerations

Some of the material consequences of the Noteholder Plan regarding U.S. federal income taxes are summarized in Article XIX. Some of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, that raise additional uncertainties. The Debtor cannot ensure that the Internal Revenue Service ("IRS") will not take a contrary view and no ruling from the IRS has been or will be sought regarding the tax consequences described in Article XIX. In addition, the Debtor cannot ensure that the IRS will not challenge the various positions the Debtor has taken, or intends to take, with respect to various U.S. federal income tax issues, or that a court would not sustain such a challenge.

**FOR A MORE DETAILED DISCUSSION OF THE CONSEQUENCES AND RISKS RELATING TO THE SPECIFIC POSITIONS THE DEBTOR INTENDS TO TAKE WITH RESPECT TO VARIOUS TAX ISSUES, PLEASE SEE ARTICLE XIX**.

### ARTICLE XVII.
### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE NOTEHOLDER PLAN

If the Noteholder Plan is not confirmed and consummated, the alternatives include: (i) liquidation of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code; and (ii) the preparation and presentation of an alternative plans of reorganization.

### A.    Liquidation Under Chapter 7 Or Chapter 11

The Debtor believes that in liquidation under chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtor's Estate. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtor's assets. More importantly, conversion to chapter 7 liquidation would likely result in the immediate cessation of the Debtor's business, as most chapter 7 trustees are disinclined to continue operations.

The Debtor could also be liquidated pursuant to the provisions of a chapter 11 plan of liquidation. In a liquidation under chapter 11, the Debtor's assets theoretically could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent the Debtor's business incurs operating loss, the Debtor's effort to liquidate its assets over a longer period of time theoretically could result in a lower net distribution to creditors than they would receive through chapter 7 liquidation. Nevertheless, because there would be no need to appoint a chapter 7 trustee and to hire new professionals, chapter 11 liquidation might be less costly than chapter 7 liquidation and thus

provide larger net distributions to creditors than in chapter 7 liquidation. Any recovery in a chapter 11 liquidation, while potentially greater than in a chapter 7 liquidation, would also be highly uncertain. Although preferable to a chapter 7 liquidation, the Proponents believe that any alternative liquidation under chapter 11 is a much less attractive alternative to creditors than the Noteholder Plan because of the greater return anticipated by the Noteholder Plan.

The Liquidation Analysis provided by the Debtor in the Debtor's Disclosure Statement filed on November 30, 2012 is attached hereto as <u>Exhibit B</u>. The Proponents have not had sufficient access to the Debtor's books and records and management to independently verify the accuracy of the Liquidation Analysis and its underlying assumptions. The Proponents' reliance upon the Debtor's Liquidation Analysis for purposes of this Disclosure Statement is not and should not be construed as an endorsement thereof or any waiver of any right to challenge the Debtor's Liquidation Analysis or as an acknowledgement or admission as to the accuracy thereof.

### B.    Alternative Plans Of Reorganization

If the Noteholder Plan is not confirmed, the Bankruptcy Court may confirm the Debtor's Plan, or any other party in interest, may attempt to formulate an alternative chapter 11 plan. Any attempt to formulate an alternative chapter 11 plan would necessarily delay creditors' receipt of distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to Holders of Allowed Claims than are currently provided for under the Noteholder Plan. Accordingly, the Proponents believe that the Noteholder Plan will enable all creditors to realize the greatest possible recovery on their respective Claims or Equity Interests with the least delay.

### ARTICLE XVIII.
### PREFERENCE AND OTHER AVOIDANCE ACTIONS

A bankruptcy trustee (or a debtor as a debtor-in-possession) may avoid as a preference a transfer of property made by a debtor to a creditor on account of an antecedent debt while a debtor was insolvent, where that creditor receives more than it would have received in a liquidation of the entity under chapter 7 had the payment not been made, if (i) the payment was made within ninety (90) days before the date the bankruptcy case was commenced or (ii) the creditor is found to have been an "insider," as defined in the Bankruptcy Code, within one year before the commencement of the bankruptcy case. A debtor is presumed to have been insolvent during the ninety (90) days preceding the commencement of the case.

A bankruptcy trustee (or a debtor as a debtor-in-possession) may avoid as a fraudulent transfer a transfer of property made by a debtor within two years (and under applicable Nevada law, four years) before the date the bankruptcy case was commenced if a debtor (i) received less than reasonably equivalent value in exchange for such transfer and (ii) was insolvent on the date of such transfer or became insolvent as a result of such transfer, such transfer left a debtor with an unreasonably small capital, or a debtor intended to incur debts that would be beyond a debtor's ability to pay as such debts matured.

Although the Proponents have not fully analyzed various potential preferences or other Avoidance Actions, it is possible that some pre-petition transactions may be avoidable. The

Proponents thus hereby expressly reserve their rights to commence any appropriate actions pursuant to Chapter 5 of the Bankruptcy Code.

## ARTICLE XIX.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE NOTEHOLDER PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the Noteholder Plan to certain holders of Claims or Equity Interests that are entitled to vote to accept or reject the Noteholder Plan.  This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. federal income tax consequences described below.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of such holder's particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," "constructive" sale or straddle transaction, traders in securities that elect to use the mark-to-market method of accounting for their securities holdings, persons holding claims through a partnership or other pass through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who acquired or expect to acquire either an equity interest or other security in a Debtor or a Claim in connection with the performance of services).  In addition, this summary does not discuss (i) alternative minimum tax consequences, (ii) any aspects of state, local, or non-U.S. taxation, (iii) U.S. federal taxes other than income taxes (such as federal estate and gift taxes or the 3.8% Medicare tax on certain investment income), and (iv) and does not address the U.S. federal income tax consequences to holders of Claims that are Unimpaired under the Noteholder Plan or holders of Claims that are not entitled to receive or retain any property under the Noteholder Plan.

A substantial amount of time may elapse between the date of the Noteholder Disclosure Statement and the receipt of a final Distribution under the Noteholder Plan.  Events occurring after the date of the Noteholder Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Noteholder Plan and the transactions contemplated thereunder. There can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below.  No ruling will be sought from the IRS with respect to any of the tax aspects of the Noteholder Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect thereto.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS NOTEHOLDER DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH

THE PROMOTION OR MARKETING BY THE PROPONENTS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

As used herein, a "Holder" means a beneficial owner of Claims that is, for U.S. federal income tax purposes:

- a citizen or individual resident of the United States;

- a corporation or other entity treated as a corporation created or organized in or under the laws of the United States, any State thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if (1) a court within the United States is able to exercise primary supervision over the trust's administration and one or more U.S. persons have the authority to control all of its substantial decisions, or (2) a valid election to be treated as a U.S. person is in effect under the relevant Treasury Regulations with respect to such trust.

If a partnership is the holder of a Claim, the tax treatment of a partner in the partnership generally will depend upon the status of the partner and the activities of the partnership. Partners of partnerships holding a Claim should consult their tax advisors regarding the U.S. federal income tax consequences of the transactions discussed below.

**A.      Certain U.S. Federal Income Tax Consequences to the Debtor Upon the Adoption of the Noteholder Plan**

The Debtor is classified as a corporation taxable under subchapter S of the Tax Code for U.S. federal income tax purposes (an "S-corporation").  It is expected that, in connection with the adoption of the Noteholder Plan, the Debtor will be converted into a limited liability company taxable as a partnership for U.S. federal income tax purposes.  For U.S. federal income tax purposes, the conversion of an S-corporation into a partnership is treated as a deemed liquidating distribution of all of the S-corporation's assets and liabilities to its shareholders in exchange for their equity in the S-corporation followed by a deemed contribution by such shareholders of the assets and liabilities to the newly formed partnership.  Thus, upon the adoption of the Noteholder Plan, for U.S. federal income tax purposes, the Debtor will be deemed to liquidate and recognize gain or loss on its assets as if such assets were sold for their fair market values, then distributing such assets and liabilities to the holders of the Equity Interests.  The Debtor's gain, if any, attributable to the exchange of assets for Equity Interests will be included in the taxable income of the holders of the existing Equity Interests.

**B.      Certain U.S. Federal Income Tax Considerations With Respect of Reorganized Ahern**

Under current Treasury Regulations, a domestic entity that has two or more members and that is not organized as a corporation under U.S. federal or state law will generally be classified as a partnership for U.S. federal income tax purposes, unless it elects to be treated as a corporation.

Thus, subject to the discussion of "publicly traded partnerships" below, Reorganized Ahern likely will be treated as a partnership for U.S. federal income tax purposes upon the effective date of the Noteholder Plan.

Under the "publicly traded partnership" provisions of the Tax Code, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation. For example, if there are more than one-hundred (100) members of Reorganized Ahern at any time during a taxable year, as determined under applicable Treasury Regulations, Reorganized Ahern could be treated as a corporation for U.S. federal income tax purposes. Reorganized Ahern may take measures to prevent it from being treated as a corporation for U.S. federal income tax.

This discussion of the U.S. federal income tax consequences of the Noteholder Plan assumes that Reorganized Ahern will be treated as a partnership for U.S. federal income tax purposes.

**C.    U.S. Federal Income Tax Consequences to Holders of Second Lien Notes that Participate in the Noteholder Plan**

**1.    Consequences Of The Contribution**

Holders of Second Lien Notes should be treated as contributing their Second Lien Notes to the capital of Reorganized Ahern in exchange for their New Equity Interests in a nontaxable transaction (the "Contribution").[1]

As a result, the Contribution and the material U.S. federal income tax consequences of the Contribution to the Holders should be as follows:

- Except as discussed below with respect to claims for accrued but unpaid interest, a Holder of Second Lien Notes should not recognize gain or loss on the Contribution.

- The adjusted basis in the New Equity Interests generally should equal the Holder's tax basis in the Second Lien Notes.

- The holding period of the New Equity Interests should include the holding period of the Second Lien Notes.

- If a Holder acquired Second Lien Notes with market discount, such holder should not be required to recognize any accrued but unrecognized market discount upon the Contribution (although such holder may be required to recognize accrued but unpaid market discount as ordinary income upon the subsequent taxable disposition of its New Equity Interests).

Pursuant to the Noteholder Plan, the Debtor will allocate, for U.S. federal income tax purposes, the value of the New Equity Interests issued in respect of any Second Lien Notes first to the principal amount of the Holder's Second Lien Notes, and thereafter to accrued but unpaid interest. Certain legislative history indicates that an allocation of consideration between principal

---

[1] Federal income tax treatment of the subscription rights to be determined.

and interest provided for in a bankruptcy plan of reorganization is binding for U.S. federal income tax purposes. However, no assurances can be provided that the IRS will not challenge such allocation. To the extent a Holder of Second Lien Notes receives New Equity Interests in satisfaction of interest accrued during the holding period of such Second Lien Notes, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income). Conversely, such a Holder generally recognizes a deductible loss to the extent that any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full in connection with the Contribution.

Each Holder of a Second Lien Note is urged to consult its/his/her own tax advisor regarding the allocation of consideration and the deductibility of previously included unpaid interest and OID for tax purposes

### 2.    Consequences Of The Ownership And Disposition Of The New Equity Interests

As a partnership, Reorganized Ahern itself will not be subject to U.S. federal income tax. Instead, Holders of New Equity Interests will receive an allocation of income, gain, loss, deduction, credit and items thereof and will be responsible for any tax liability associated with such allocation. Specifically, each Holder of New Equity Interests will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Reorganized Ahern's income, gain, loss, deduction and credit of Reorganized Ahern. Each item generally will have the same character as if the Holder had realized the item directly. Holders will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized Ahern for such taxable year, and thus may incur income tax liabilities in excess of any distributions from Reorganized Ahern. For purposes of calculating Reorganized Ahern's items of income, gain, loss and deduction, upon the implementation of the Noteholder Plan, Reorganized Ahern should receive a tax basis in the assets of the Debtor equal to their fair market values at the time of the adoption of the plan.

A Holder may deduct its allocable share of Reorganized Ahern losses' (if any) only to the extent of such holder's adjusted tax basis (discussed below) in its New Equity Interests at the end of the taxable year in which the losses occur. In addition, various other limitations in the Tax Code may significantly limit a Holder's ability to deduct its allocable share of deductions and losses of Reorganized Ahern against other income.

A Holder of New Equity Interests generally will not recognize gain or loss on the receipt of a distribution of cash or property from Reorganized Ahern. Such Holder, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from Reorganized Ahern to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such holder's adjusted tax basis in its New Equity Interests.

*Sale, Exchange, or Other Taxable Disposition of the New Equity Interests.* A Holder will recognize gain on the complete liquidation of its New Equity Interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Any gain recognized by a Holder on the receipt of a distribution from Reorganized Ahern generally will be capital gain, but may be taxable as ordinary income, either in whole or in part, under certain circumstances. No loss can be

recognized on a distribution in liquidation of a New Equity Interest, unless the holder receives no property other than money and ordinary income items.

A Holder's adjusted tax basis in its New Equity Interests generally will be equal to such Holder's initial tax basis in its Second Lien Notes (see "U.S. Federal Income Tax Consequences to Holders of Second Lien Notes that Participate in the Noteholder Plan — Consequences of the Contribution" above), increased by the sum of (i) any additional capital contribution such Holder makes to Reorganized Ahern, (ii) the Holder's allocable share of the income of Reorganized Ahern, and (iii) increases in the Holder's allocable share of the indebtedness of Reorganized Ahern, and reduced, but not below zero, by the sum of (iv) the holder's allocable share of the losses of Reorganized Ahern, and (v) the amount of money or the adjusted tax basis of property distributed to such Holder, including constructive distributions of money resulting from reductions in such Holder's allocable share of indebtedness of Reorganized Ahern.

A sale of all or part of a Holder's New Equity Interests will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such holder's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the New Equity Interest has been held for more than one year, except to the extent that the proceeds of the sale are attributable to a Holder's allocable share of certain ordinary income items of Reorganized Ahern and such proceeds exceed the holder's adjusted tax basis attributable to such ordinary income items. A Holder's ability to deduct any loss recognized on the sale of its New Equity Interests will depend on the holder's own circumstances and may be restricted under the Tax Code.

Each Holder of a Second Lien Note Claim is urged to consult its tax advisor regarding the tax consequences of directly or indirectly owning and disposing or causing to dispose of New Equity Interests.

**D.    Certain U.S. Federal Income Tax Consequences of Holders of Equity Interests That Receive New Warrants Pursuant to the Noteholder Plan**

Holders of Equity Interests could be treated as exchanging their share of the Debtor's assets for New Warrants pursuant to a nontaxable contribution under section 721 of the Tax Code. If the exchange of Equity Interests for New Warrants were treated as such a contribution, a Holder of Equity Interests generally would not recognize gain or loss upon the exchange. Holders of Equity Interests are strongly urged to consult their tax advisors concerning the receipt, ownership and disposition of New Warrants.

**E.    Information Reporting And Withholding**

All distributions to Holders of Claims under the Noteholder Plan are subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN

provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Noteholder Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

The U.S. federal income tax consequences to foreign taxpayers are not generally addressed in this summary, but such consequences are complex. Foreign holders of Second Lien Note Claims could be subject to certain unfavorable U.S. federal income tax consequences if they receive New Equity Interests pursuant to the Noteholder Plan. For example, such foreign holders would be required to file U.S. federal income tax returns annually and would be directly liable for U.S. federal income tax on their distributive share of Reorganized Ahern's income (whether distributed or not). Foreign holders of New Equity Interests will be generally subject to U.S. federal income tax upon the disposition of their interests. Foreign holders of Second Lien Note Claims are urged to consult their tax advisors concerning the receipt, ownership and disposition of New Equity Interests.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE NOTEHOLDER PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ASSOCIATED WITH THE NOTEHOLDER PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE NOTEHOLDER PLAN.

### ARTICLE XX.
### CONCLUSION AND RECOMMENDATION

The Proponents believe that confirmation and implementation of the Noteholder Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to Holders of Claims and Equity Interests. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. The Proponents urge Holders of Impaired Claims and Equity Interests entitled to vote on the Noteholder Plan to accept the Noteholder Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than 4:00 p.m., prevailing Pacific time, on [_____] 2013.

/ / /

Dated: February 8, 2013

Respectfully submitted,

By:    /s/ Laurel E. Davis
Laurel E. Davis (NV Bar No. 3005)
FENNEMORE CRAIG JONES VARGAS
300 South Fourth Street, Suite 1400
Las Vegas, Nevada 89101
Telephone: (702) 692-8000
E-mail: ldavis@fclaw.com

and

Kurt A. Mayr, Esq.*
BRACEWELL & GIULIANI LLP
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, Connecticut  06103
Telephone:  (860) 947-9000
Facsimile:   (860) 246-3201
Email: kurt.mayr@bgllp.com

Daniel S. Connolly, Esq.*
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas, 49th Fl.
New York, New York 10020
Telephone:  (212) 508-6100
Facsimile:  (212) 508-6101
Email:  daniel.connolly@bgllp.com

*Admitted Pro Hac Vice

Counsel for the Proponents